**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone:  212-857-8500

**MOTION INFORMATION STATEMENT**

Docket Number(s): No. 22-368
_____ Caption [use short title]

Motion for: Emergency motion for interim stay, stay

pending appeal, and expedited briefing and argument

of appeal from District Court decision.

Set forth below precise, complete statement of relief sought:

Interim stay of District Court decision enforcing SEC

subpoenas, stay of District Court order during the

pendency of this appeal, and expedited briefing

and argument of this appeal.

United States Securities and Exchange Commission
Petitioner - Appellee,

v.

Terraform Labs Pte LTD., Do Kwon

Respondents - Appellants.

MOVING PARTY: Terraform Labs PTE, Ltd. and Do Kwon    OPPOSING PARTY: U.S. Secs. and Exch. Comm.

☐ Plaintiff                    ☐ Defendant
☑ Appellant/Petitioner    ☐ Appellee/Respondent

MOVING ATTORNEY: Douglas W. Henkin    OPPOSING ATTORNEY: Eric Reicher
[name of attorney, with firm, address, phone number and e-mail]

Dentons US LLP

1221 Avenue of the Americas, New York, NY 10020

(212) 768-6832; douglas.henkin@dentons.com

U.S. Securities and Exchange Commission

100 F. Street, NE, Washington, D.C. 20549

(202) 551-7921; reichere@sec.gov

Court-Judge/Agency appealed from: S.D.N.Y. — Hon. J. Paul Oetken

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below? ☑ Yes ☐ No
Has this relief been previously sought in this Court? ☐ Yes ☑ No
Requested return date and explanation of emergency: Interim stay reque

to be issued on or before March 3, 2022.  The District

Court granted a temporary stay but declined to extend

that stay beyond March 3 in a decision issued March

1, 2022.  This motion was submitted the next day.

Is oral argument on motion requested? ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☐ Yes ☑ No  If yes, enter date: _____

Signature of Moving Attorney:
_____ Date: March 2, 2022    Service by: ☑ CM/ECF ☐ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Petitioner - Appellee,<br><br>v.<br><br>TERRAFORM LABS PTE, LTD. and DO KWON,<br><br>Respondents-Appellants. | Case No.: 22-368 |

## RESPONDENTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL AND EXPEDITED CONSIDERATION

Pursuant to Rules 2, 8, 27, and 31(a)(2) of the Federal Rules of Appellate Procedure and Rule 27.1(d) of the Local Rules of the United States Court of Appeals for the Second Circuit, Respondents-Appellants Terraform Labs PTE Ltd. ("TFL") and Do Kwon ("Appellants") respectfully move for a stay of the judgment below pending appeal (including an interim stay while this Court is deciding this motion) and expedited briefing and consideration of this appeal.  For the reasons set forth below, TFL and Mr. Kwon request that this Court order the following briefing schedule.

Appellants' Opening Brief Due: March 15, 2022

Appellee's Opposition Brief Due: March 29, 2022

Appellants' Reply Brief Due: April 5, 2022

TFL and Mr. Kwon also respectfully request that this Court schedule an oral argument to take place at the Court's earliest opportunity after merits briefing is complete.

As required by Local Rule 27.1(d), Appellants state the following: At Appellants' request, the District Court stayed the decision that is the subject of this appeal for 14 days (until March 3, 2022) to allow the parties to brief Appellants' request for a stay pending appeal under Fed. R. App. P. 8. The District Court issued its decision denying a further stay on March 1, 2022. Declaration of Douglas W. Henkin, dated March 2, 2022 ("Henkin Decl.") Ex. M. Appellants therefore request that this Court act, not later than the close of business on March 3, 2022, to maintain the *status quo* by extending the stay pending appeal at least until the Court can decide this motion.

As required by Local Rule 27.1(d), Appellants gave the SEC notice of their intent to file this motion by email at 5:43 p.m. on March 1, 2022; as of the time of filing this motion, the SEC had not provided its positions (promising only to do so some time "today"). *See* Henkin Decl. Ex. Q. Appellants' counsel also gave telephonic (voicemail) notice of this motion to the Clerk of the Court at 7:55 p.m. on March 1, 2022. Henkin Decl. ¶ 18.

**BACKGROUND**

TFL and Mr. Kwon appeal from a District Court order dated and entered February 17, 2022, granting an application by the U.S. Securities and Exchange Commission ("SEC") for an order requiring compliance with investigative subpoenas for documents and testimony in connection with an SEC investigation entitled *In the Matter of Mirror Protocol* (File No. HO-14164). Henkin Decl. Ex. A. The District Court's order addressed an issue of first impression: The interpretation of Rule 150(b) of the SEC's Rules of Practice.

TFL is a technology firm at the forefront of developing blockchain-based, decentralized finance applications such as the Mirror Protocol and the associated MIR governance tokens. Henkin Decl. Ex. B ¶¶ 5-6. Mr. Kwon is TFL's chief executive officer. TFL is incorporated under the laws of Singapore and maintains corporate offices in Singapore and South Korea. *Id.* ¶ 3. Mr. Kwon is a citizen of South Korea and resident of Singapore. *Id.* ¶ 4. In May 2021, the SEC staff began investigating whether mAssets (a type of digital asset created by the Mirror Protocol community using the Mirror Protocol, not by TFL) or MIR tokens should be considered securities under U.S. law and whether they should have been registered with the SEC (there is no "issuer" of mAssets or MIR tokens—they are minted by Mirror Protocol smart contracts pursuant to governance decisions made by the Mirror Protocol community). *Id.* Ex. B ¶¶ 6–7; Ex. C ¶¶ 5, 16.

3

The SEC staff contacted TFL and Mr. Kwon in May 2021 and asked them to cooperate voluntarily with the SEC's investigation. *Id.* Ex. C ¶ 5. Neither Mr. Kwon nor TFL were legally obligated to do so. *Id.* However, Mr. Kwon and TFL engaged Dentons US LLP to represent them in connection with the investigation and agreed to provide voluntary assistance to the SEC. *Id.* ¶ 6. From May to September 2021, after providing the SEC with counsel's names and contact information, Dentons cooperated with the SEC staff—who consistently recognized and identified Dentons as counsel for TFL and Mr. Kwon after Dentons made its representation known. *Id.* ¶¶ 6–17. Dentons and the SEC reached a proffer agreement under which the SEC staff interviewed Mr. Kwon for five hours. *Id.* ¶¶ 8–9. The proffer letter, which was drafted by the SEC in the first instance, recognized Dentons as counsel for Appellants. *Id.* ¶ 8, Ex. 2.

The SEC staff then submitted voluntary document requests to Dentons. *Id.* ¶ 12. Although the requests were overbroad and reflected a lack of understanding of topics discussed during the five-hour interview with Mr. Kwon, Dentons provided what responsive information it could (the vast majority of which was publicly available—a key aspect of open-source decentralized blockchain software programs like the Mirror Protocol) and invited further discussion. *Id.* ¶ 14.

In September, amid negotiations with counsel for Mr. Kwon and TFL, the SEC overreached. From monitoring Mr. Kwon's Twitter feed, the SEC staff

4

learned that he would be attending an industry conference in New York. *Id.* Ex. D

¶ 26. They saw this as a chance to "tag" Mr. Kwon with compulsory process and

create more leverage than voluntary cooperation provided, by trying to serve Mr.

Kwon personally while in the U.S. *Id.* ¶ 28. On September 20, the SEC staff had

a process server hand Mr. Kwon two investigative subpoenas, one directed to Mr.

Kwon and the other to TFL. *Id.* Ex. C ¶ 18. The subpoenas demanded production

of documents by TFL and Mr. Kwon and in-person testimony by Mr. Kwon at the

SEC's headquarters in Washington, D.C. Afterward, the SEC staff emailed copies

of the subpoenas to Dentons and advised Dentons that they had "served" Mr.

Kwon "personally;" the SEC did not purport to serve the subpoenas on TFL or Mr.

Kwon through Dentons or even ask Dentons whether it would accept service. *Id.*

Ex. C ¶¶ 17 & 19, Ex. 4 thereto. The SEC did not obtain an order pursuant to Rule

150(b) before attempting to personally serve Mr. Kwon. *Id.* ¶ 21.

On October 22, 2021, Appellants filed an action in the district court seeking

a declaration that the SEC acted in violation of the APA and its Rules of Practice,

rendering the subpoenas null and void. *Id.* Ex. E. The SEC followed with a

separate application for enforcement of the subpoenas. *Id.* Ex. F. Appellants

opposed the SEC's application, arguing that the SEC lacked authorization to

personally serve Mr. Kwon in the absence of a Rule 150(b) order, that the District

Court lacked personal jurisdiction over TFL and Mr. Kwon to enforce the

subpoenas, and that (separate from the Rule 150(b) issue) service upon Mr. Kwon could not be proper service upon TFL. *Id.* Ex. G at 3–4.

The District Court granted the SEC's application on February 17, 2022. *Id.* Ex. A. The District Court concluded that although TFL and Mr. Kwon were represented by Dentons in connection with the investigation and their voluntary cooperation with it, the SEC's Rules of Practice did not require an order authorizing personal service upon Mr. Kwon. *Id.* Ex. H at 39:24–40:2. The District Court also concluded that it could exercise personal jurisdiction over TFL and Mr. Kwon after finding that both purposely availed themselves of the privilege of doing business in the United States in several respects it deemed causally connected to the subpoenas' basis. *Id.* 40–42. The District Court did not address the argument that even if service on Mr. Kwon of a subpoena directed to him was proper, service on Mr. Kwon of a subpoena directed to TFL was not.

During argument, TFL and Mr. Kwon made an oral motion for a stay pending appeal, which the District Court granted for 14 days (expiring March 3, 2022). Henkin Decl. Ex. A. On February 23, TFL and Mr. Kwon initiated this appeal from the District Court's order and moved for a stay pending appeal in the District Court pursuant to Fed. R. App. P. 8. *Id.* Exs. I, J. The SEC opposed that motion on February 24 (*id.* Ex. K) and TFL and Mr. Kwon filed a brief reply that evening (*id.* Ex. L). The District Court denied the motion on March 1, 2022 in a

brief order that referred to its oral ruling and "substantially" adopted the SEC's arguments regarding irreparable harm. *Id.* Ex. M. TFL and Mr. Kwon now move in this Court for a stay pending appeal and expedited briefing and consideration of this appeal.

## ARGUMENT

### THE DISTRICT COURT'S ORDER SHOULD BE STAYED PENDING APPEAL AND BRIEFING AND ARGUMENT OF THIS APPEAL SHOULD BE EXPEDITED

This Court may "suspend any provision of these rules in a particular case and order proceedings as it directs" in order "to expedite its decision or for other good cause." Fed. R. App. P. 2; *see also* Fed. R. App. P. 31(a)(2) ("A court of appeals that routinely considers cases on the merits promptly after the briefs are filed may shorten the time to serve and file briefs, either by local rule or by order in a particular case."). Expedited briefing and consideration of this appeal are warranted for the same reasons a stay of the decision is appropriate. Expedited briefing will also minimize any burdens that might be associated with the stay.

On a motion for a stay pending appeal, this Court must "balance the likelihood of success on the merits, irreparable injury if a stay is denied, substantial injury to the party opposing a stay if one is issued, and the public interest." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (citation omitted). "The probability of success that must be demonstrated is inversely proportional to the amount of

7

irreparable injury [Appellants] will suffer absent the stay.  Simply stated, more of

one excuses less of the other."  *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir.

2002) (internal quotation marks omitted).  All four factors favor staying the

District Court's order.

*First*, this Court is likely to reverse the District Court's order.  Judicial

enforcement of administrative subpoenas requires that an agency comply with "the

administrative steps required" to properly issue and serve them.  *RNR Enters., Inc.*

*v. SEC*, 122 F.3d 93, 96 (2d Cir.1997).  The applicable rules here are:

- Rule 8 of the SEC's Rules Relating to Investigations requires that
  "[s]ervice of subpoenas issued in formal investigative proceedings
  shall be effected in the manner prescribed by Rule 232(c) of the
  Commission's Rules of Practice."  17 C.F.R. § 203.8.

- Rule 232(c) confirms that "[t]he provisions of this paragraph (c) shall
  apply to the issuance of subpoenas for purposes of investigations,"
  and requires that such "[s]ervice shall be made pursuant to the
  provisions of § 201.150(b) through (d)."  *Id.* § 201.232(c).[1]

- Rule 150(b) requires that "[w]henever service is required to be made
  upon a person represented by counsel who has filed a notice of
  appearance pursuant to § 201.102, service shall be made pursuant to
  paragraph (c) of this section upon counsel, *unless service upon the
  person represented is ordered by the Commission … ."  Id.* § 201.150
  (emphasis added).

---

[1]  Rule 150(a) does not apply here.  Nevertheless, the transcript of the
February 17, 2022 argument refers to Rule 150(a), (b), and (c) instead of
Rule 150(b), (c), and (d).  Henkin Decl. Ex. H at 39:15–40:11.  For example,
the transcript references Rule 150(a) but quotes Rule 150(b) (*id.* 39:17–19)
and references Rule 150(b) but quotes Rule 150(c) (*id.* 39:20–22).

The District Court's interpretation of Rule 150 was wrong for several reasons. Although Mr. Kwon was unquestionably represented by counsel when the SEC attempted service, the District Court held that absent a formal "notice of appearance," Rule 150(b) did not apply. Henkin Decl. Ex. H at 39:19–40:1. But in the context of investigations, there is no docket in which to even file a formal appearance, which is exacerbated when the target of a subpoena is represented by counsel while cooperating voluntarily. The District Court's interpretation renders Rule 150(b) a nullity for formal investigations, to which Rule 232(c) expressly says it applies, even though (as demonstrated above) there is no question that Dentons provided all information that is in a "notice of appearance" and the SEC acknowledged Dentons as Appellants' "counsel."

The SEC itself argued for the interpretation it now rejects in a prior subpoena enforcement proceeding, stating that "[i]t would elevate form over substance to require, in the context of an SEC investigation, that a formal 'notice of appearance' be entered in order for Rule 150(b) to be given effect" and that such a reading "would frustrate and render ineffective Rule 232(c)'s express reference to Rule 150(b), a result that any reasonable construction of the SEC's rules should avoid." Henkin Decl. Ex. N at 15 n.9. The District Court held that prior SEC filing not binding on the District Court (*id.* Ex. H at 40:5), but the interpretation asserted therein is of great significance to whether the SEC's current position

9

should be relied on or otherwise accorded deference.  If "inconsistent litigating positions" by an agency are "undeniably relevant" to the proper construction of the agency's governing statute, *Lever Bros. Co. v. United States*, 981 F.2d 1330, 1337 (D.C. Cir. 1993), they are even more relevant to the construction of rules the agency itself promulgates.

The District Court also held that filing a "notice of appearance" sufficient for Rule 150(b) necessarily means "agreeing to *the jurisdiction*."  Henkin Decl. Ex. H at 8:23 (emphasis added).  That presents significant constitutional concerns in addition to interpretive problems.  *See generally Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 328 (2d Cir. 2016) (personal jurisdiction represents the constitutional "right to be subject only to lawful power"); *O'Connor v. Pierson*, 426 F.3d 187, 201 (2d Cir. 2005) ("[T]he government may not, as a general rule, grant even a gratuitous benefit on condition that the beneficiary relinquish a constitutional right.").  It cannot be that the right to be "accompanied, represented and advised by counsel"—expressly codified in the "rights of witnesses" section of the SEC's Rules Related to Investigations, 17 CFR § 203.7—can only be enjoyed by one who submits to personal jurisdiction by voluntarily cooperating when compulsory process is unavailable.  Were this true, voluntary cooperation would be a rare occurrence.

Also misplaced was the District Court's conclusion that the SEC complied with subsection (d) of Rule 150, which provides that if service is to be made of an investigative subpoena, then an additional method of service is upon "the person required to be served." Henkin Decl. Ex. H at 40:5-6 (citing 17 C.F.R. § 201.150(d)). Read in context, an individual represented by counsel is not the "person required to be served" absent an order from the Commission.[2] The SEC insists "[t]here can be no serious dispute" that the subpoenas were properly served according to Rule 150(d), but again, this assertion is premised on an interpretation that ignores the structure of the rule and the SEC's own prior interpretation of it. Ordinary rules of construction mean that once someone has begun interacting with the SEC on a voluntary basis through counsel, Rule 150(b) governs, not Rule 150(d), especially when what the SEC later seeks to serve is compulsory process. Any other interpretation would mean that compulsory or initiatory process could be served on counsel as a matter of course, which is not the law. *See Santos v. State Farm Fire and Cas. Co.*, 902 F.2d 1092, 1094 (2d Cir. 1990) ("service of

---

[2]     The District Court concluded that Appellants' reading would "read out Rule 150([d])." *Id.* 40:7-8. But that does not follow. Rule 150(d) provides for an additional *method* of service on whomever is the "person required to be served." Appellants' reading merely recognizes that this "person"—absent an order from the Commission—is counsel. But service on counsel requires consent, which the SEC never even requested.

11

process on an attorney not authorized to accept service for his client is ineffective").

The District Court also failed to address an entirely separate service issue: Even if service could have been deemed proper as to Mr. Kwon (it could not), handing Mr. Kwon a subpoena for TFL was not effective because "tag" jurisdiction cannot be established over a corporation by serving a transiting officer. *See Estate of Ungar v. Palestinian Authority*, 400 F. Supp. 2d 541, 553 (S.D.N.Y. 2005). Failure of service on TFL eliminates the need to consider whether there could be personal jurisdiction over TFL.

The District Court also erred in holding that TFL and Mr. Kwon were subject to specific personal jurisdiction. None of the contacts in the record is sufficiently related to the SEC investigation to count as purposeful availment. The SEC applied to enforce subpoenas demanding information about whether mAssets or MIR tokens might be considered securities that TFL might have sold or marketed to US investors. Henkin Decl. Ex. F ¶ 4; Ex. C ¶ 19–20, Ex. 4 thereto. The contacts the District Court relied upon do not relate to the marketing or sale of mAssets or MIR tokens by TFL or Mr. Kwon to U.S. persons. For instance, the District Court pointed to correspondence between Mr. Kwon and a digital asset trading platform regarding the listing of MIR tokens. *Id.* Ex. H at 40:23-41:2. But none of the 27 categories of documents demanded by the subpoenas relate to this

contract. *Id.* Ex. C ¶ 19–20, Ex. 4. Further, it is not disputed that TFL paid the platform nothing, earned nothing, and the platform listed the tokens for transactions by *third parties around the world*—not limited to the U.S. *Id.* Ex. B ¶ 9. That is not *forum-directed* targeting. *Cf. Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 350 (S.D.N.Y. 2019) (exercising specific personal jurisdiction over co-founders who "*targeted the U.S. market* in an effort to promote the sale of ATB coins"). Similarly, the District Court found it significant that mAssets can (but need not) mimic U.S. stocks and are being offered to U.S. customers. Henkin Decl. Ex. H at 41:11–12. But *TFL* does not "offer" anyone mAssets—this is activity by outside third parties that is not purposeful availment *by TFL or Mr. Kwon. See Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("[T]he relationship must arise out of contacts that the defendant *himself* creates with the forum … .") (internal quotations omitted) (emphasis in original). Moreover, during argument the SEC raised an entirely new supposed contact orally; the District Court appears to have done its own research about that *during* argument and then relied on that research as part of its holding. Henkin Decl. Ex. H at 41:13–20. That was inappropriate, as will be explained in more detail in merits briefing.

*Second*, TFL and Mr. Kwon face irreparable injury. Absent a stay pending appeal, TFL and Mr. Kwon would be forced to begin producing documents and sit for an interview (Mr. Kwon has already voluntarily spoken with the SEC for five

hours).  The Supreme Court has explained that it is only a "partial remedy" that a

court might later order the return of documents and other materials.  *Church of*

*Scientology of California v. United States*, 506 U.S. 9, 13 (1992).  Thus, as many

courts have recognized in granting stays in similar circumstances, requiring TFL

and Mr. Kwon to comply with the subpoenas while this appeal is pending would

risk making the appeal academic.  *See, e.g.*, *Maxcrest Ltd. v. United States*, No. 15-

MC-80270-JST, 2016 WL 6599463, at *4 (N.D. Cal. Nov. 7, 2016); *Consumer*

*Fin. Prot. Bureau v. Great Plains Lending, LLC*, No. CV142090MWFPLAX, 2014

WL 12685941, at *19 (C.D. Cal. May 27, 2014); *E.E.O.C. v. Quad/Graphics, Inc.*,

875 F. Supp. 558, 560 (E.D. Wis. 1995).  As Judge Furman explained, this

"proverbial bell cannot be unrung" once Appellants "disclose[] the information at

issue." *In re Accent Delight Int'l Ltd.*, No. 16-MC-125 (JMF), 2018 WL 7473109,

at *1 (S.D.N.Y. June 27, 2018).[3]

---

[3]    In opposing Appellants' motion for a stay, the SEC cited cases holding that
"the provision of information pursuant to an administrative subpoena or a
summons does not constitute irreparable harm for purposes of a stay pending
appeal."  Henkin Decl. Ex. K at 3-4.  None of those cases were binding on
the District Court and none bind this Court.  And *Faiveley Transp. Malmo
AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) has nothing to do with
Appellants' request for a stay pending appeal.  In that case, this Court found
that a showing of irreparable harm in the context of a preliminary injunction
was defeated by the clear availability of money damages, *id.* at 118—a
remedy the SEC does not suggest is available to TFL and Mr. Kwon.

Notably, even though it has emphasized the "summary" and "expeditious" nature of subpoena enforcement proceedings (Henkin Decl. Ex. K at 5; Ex. O at 2.), the SEC indicated it does "not presently intend to join" in this motion, even the part that seeks expedited treatment (*id.* Ex. J at ECF 31-1 at 2). The SEC thus demands immediate compliance with, yet resists immediate review of, the decision below. But maintaining the *status quo* pending expeditious resolution by this Court will clarify the parties' obligations and provide crucial guidance for other entities that might become subject to requests for voluntary cooperation from the SEC.

*Third*, a stay will not substantially injure the SEC. The SEC did not seek expedited handling of its application in the District Court, and even sought an extension of its time to file reply papers. *Id.* Ex. P. All it has asserted is that it wants more information faster; notably it has not asserted any significant *risks* to anyone from an orderly examination of whether it acted according to law. If TFL and Mr. Kwon are unsuccessful on appeal, "the only harm incurred will be a delay in the [SEC's] receipt of the information that it has requested. A delay will not result in substantial harm to other parties interested in this litigation." *Quad/Graphics*, 875 F. Supp. at 560. The SEC's interest in obtaining information "must be balanced against [Appellants'] right to contest enforcement in federal court." *Maxcrest*, 2016 WL 6599463, at *5. Expedited review in this Court

(which the SEC would not even consent to when asked in connection with the District Court stay process) would serve the SEC's legitimate interests here. Indeed, the SEC was unable to point to a single case finding substantial prejudice to the subpoena-issuing party and has not asserted that the requested information is essential to the progress of its investigation. *Compare* Henkin Decl. Ex. K at 4, *with S.E.C. v. Finazzo*, No. M18-304 (KMW), 2008 WL 1721517, at *5 (S.D.N.Y. Apr. 11, 2008) ("mere delay in receiving the information requested does not constitute substantial prejudice"). This is especially important when the appeal involves a threshold issue about the interpretation and operation of SEC rules relating to the propriety of service of compulsory process. Any concern about prejudice to the SEC's investigation would be ameliorated by the expedited treatment Appellants seek.

*Fourth*, a stay is in the public interest. At stake are fundamental questions about how voluntary interactions with an executive agency relate to the operation of that agency's regulations; parties faced with requests to voluntarily cooperate with the SEC in the future will look to the outcome of this case in deciding how to respond to such requests. The construction of Rule 150(b)–(d) presents an issue of first impression in this Circuit and beyond. The District Court did not purport to ground its decision on any precedent, because none exists: No court has ever construed Rule 150(b). The SEC argues the "unambiguous language" of its Rules

16

of Practice dictate the result below (Henkin Decl. Ex. K at 2), but this assertion flies in the face of its own diametrically opposed litigation position from 2013 (*id.* Ex. N at 13–16). The personal jurisdiction analysis is also nuanced and novel. As the District Court observed, the third-party control over the Mirror Protocol by its community—rather than by Appellants—represents the "brave new world of the blockchain that … makes this *unlike prior cases*." *Id.* Ex. H at 26:18-19 (emphasis added). Immediate guidance from this Court is necessary not only for TFL and Mr. Kwon, but also for similar entities. Many, like TFL and Mr. Kwon, are based abroad and would be assisted by guidance regarding the issues raised here, which will assist them in determining how to respond if approached by the SEC. The requested stay, coupled with expedited treatment, would not "have an adverse impact on the public interest." *Quad/Graphics*, 875 F. Supp. at 560. In fact, it would enhance the public interest.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court immediately extend the stay granted by the District Court pending resolution of this motion, grant their motion for a stay pending appeal, and order expedited briefing according to the following schedule:

Appellants' Opening Brief Due: March 15, 2022

Appellee's Opposition Brief Due: March 29, 2022

Appellants' Reply Brief Due: April 5, 2022

Appellants further respectfully request that this Court schedule oral argument at its earliest convenience once merits briefing is completed.

Dated: March 2, 2022

Respectfully submitted,

*/s/ Douglas W. Henkin*
Douglas W. Henkin
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6832
Facsimile: (212) 768-6800

Nicholas W. Petts (*pro hac vice*
forthcoming)
1900 K Street NW
Washington, D.C. 20006
Telephone: (202) 496-7356
Facsimile: (202) 496-7756

*Counsel for Appellants Do Kwon
and Terraform Labs PTE, Ltd.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This motion complies with the word limit of Fed. R. App. P. 27(d)(2)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4193 words.

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6).  The motion has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

March 2, 2022

_/s/ Douglas W. Henkin_
Douglas W. Henkin

_Counsel for Appellants Do Kwon_
_and Terraform Labs PTE, Ltd._

## CERTIFICATE OF SERVICE

I, Douglas Henkin, an attorney, hereby certify that on March 2, 2022, I electronically filed the foregoing **NOTICE OF APPEAL** by using the CM/ECF system, which will send notification of such filing to all counsel of record.

_s/ Douglas W. Henkin_
Douglas W. Henkin

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>                  Petitioner - Appellee,<br><br>v.<br><br>TERRAFORM LABS PTE, LTD. and DO KWON,<br><br>                  Respondents-Appellants. | Case No.: 22-368 |

## DECLARATION OF DOUGLAS W. HENKIN IN SUPPORT OF RESPONDENTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL AND EXPEDITED CONSIDERATION

Douglas W. Henkin declares, pursuant to 28 U.S.C. § 1746:

1.     Attached hereto as Exhibit A is a true and correct copy of the District Court's order dated and entered February 17, 2022, which granted an application by the U.S. Securities and Exchange Commission ("SEC") for an order requiring compliance with investigative subpoenas for documents and testimony and which was filed as ECF No. 28 in *U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y.).

2.     Attached hereto as Exhibit B is a true and correct copy of the Declaration of Han Chang Joon, which was filed as ECF No. 19 in *U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y).

1

3.      Attached hereto as Exhibit C is a true and correct copy of the Declaration of Stephen J. Senderowitz (including only those exhibits cited in this motion), which was filed as ECF No. 20 in *U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y).

4.      Attached hereto as Exhibit D is a true and correct copy of the Declaration of Roger J. Landsman, which was filed as ECF No. 4 in *U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y.).

5.      Attached hereto as Exhibit E is a true and correct copy of the complaint filed by Respondents-Appellants Terraform Labs Pte, Ltd. and Do Kwon ("Appellants") as ECF No. 1 in *Terraform Labs Pte Ltd. et al v. United States Securities and Exchange Commission*, Case No. 21-cv-08701-JPO (S.D.N.Y.).

6.      Attached hereto as Exhibit F is a true and correct copy of the SEC's Application for an order to show cause and for an order requiring compliance with subpoenas, which was filed as ECF No. 1 in *U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y.).

2

7.     Attached hereto as Exhibit G is a true and correct copy of Appellants' opposition to the SEC's application, which was filed as ECF No. 18 in *U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y).

8.     Attached hereto as Exhibit H is a true and correct copy of the transcript of the February 17, 2022 hearing in *U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y).

9.     Attached hereto as Exhibit I is a true and correct copy of the Notice of Appeal, filed as ECF No. 30 in *U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y).

10.     Attached hereto as Exhibit J is a true and correct copy of Appellants' Letter Motion For a Stay Pending Appeal, filed as ECF No. 31 in *U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y.).

11.     Attached hereto as Exhibit K is a true and correct copy of the SEC's Response to Appellants' Letter Motion For a Stay, filed as ECF No. 33 in *U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y.).

12.     Attached hereto as Exhibit L is a true and correct copy of Appellants'
Reply in Support of Letter Motion For a Stay Pending Appeal, filed as ECF No. 34
in *U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do
Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y.).

13.     Attached hereto as Exhibit M is a true and correct copy of the Order
denying Appellants' Motion For a Stay Pending Appeal, filed as ECF No. 37 in
*U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do
Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y.).

14.     Attached hereto as Exhibit N is a true and correct copy of the SEC's
Reply Memorandum in Support of its Renewed Application for Order Requiring
Compliance with Subpoena, filed as ECF No. 66 in *U.S. Securities & Exchange
Commission v. Deloitte Touche Tohmatsu, CPA LTD*, Case No. 11 Misc. 512
GK/DAR (D.D.C. May 30, 2013).

15.     Attached hereto as Exhibit O is a true and correct copy of the SEC's
Letter Response to Appellants motion to consolidate proceedings, filed as ECF No.
10 in *U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. and
Do Kwon*, Case No. 21-mc-00810-JPO (S.D.N.Y.).

16.     Attached hereto as Exhibit P is a true and correct copy of the SEC's
Motion for Extension of Time to File a Reply, filed as ECF No. 21 in *U.S.*

4

*Securities and Exchange Commission v. Terraform Labs Pte Ltd. and Do Kwon*,
Case No. 21-mc-00810-JPO (S.D.N.Y.).

17.    Attached hereto as Exhibit Q is a true and correct copy of the email I
sent to the SEC's counsel notifying the SEC of this motion and requesting its
views on the relief sought herein, and the SEC's response thereto (which did not
provide substantive responses).

18.    At 7:55 p.m. on March 1, 2022, I left a voicemail for the Clerk of the
Court to notify the Court that Appellants would be filing this motion today.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 2, 2022

/s/ *Douglas W. Henkin*
Douglas W. Henkin

5

# **<u>EXHIBIT A</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Applicant,<br><br>                    -v-<br><br>TERRAFORM LABS PTE Ltd. and DO KWON,<br><br>                              Respondents. | 21-MC-810 (JPO)<br><br>ORDER |

J. PAUL OETKEN, District Judge:

The U.S. Securities and Exchange Commission ("SEC") filed this application for an

order requiring compliance with investigative subpoenas for documents and testimony served on

Terraform Labs PTE, Ltd. ("Terraform") and its co-founder and chief executive officer, Do

Kwon, in September 2021 in connection with the SEC's investigation entitled *In the Matter of*

*Mirror Protocol* (File No. HO-14164). The Court has reviewed all the parties' filings and held

oral argument on February 17, 2022, by telephone conference.

For the reasons stated on the record at the February 17, 2022 conference, the SEC's

application is GRANTED, and Terraform and Kwon are hereby ordered to comply with the

above-referenced subpoenas.

This order is STAYED for 14 days to permit further briefing regarding a potential stay

pending any appeal of this order.

SO ORDERED.

Dated: February 17, 2022
       New York, New York

_____
             J. PAUL OETKEN
             United States District Judge

# **EXHIBIT B**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                    Applicant,

v.

TERRAFORM LABS PTE LTD. and DO
KWON

                 Respondents.

Civil Action No. 1:21-mc-00810_____

Hon. J. Paul Oetken

Hon. Barbara C. Moses

**DECLARATION OF HAN CHANG JOON IN OPPOSITION TO THE U.S. SECURITIES
AND EXCHANGE COMMISSION'S APPLICATION FOR AN ORDER
REQUIRING COMPLIANCE WITH SUBPOENAS**

I, Han Chang Joon, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1.     I am Chief Financial Officer of Terraform Labs PTE Ltd.

2.     I submit this declaration in support of Respondents Terraform Labs PTE, Ltd.

("TFL") and Do Kwon's opposition to the Application by the United States Securities and

Exchange Commission ("SEC" or "Commission") for an Order Requiring Compliance with

Subpoenas. The SEC's application seeks an order directing Mr. Kwon and TFL to comply with

investigative subpoenas served personally upon Mr. Kwon for both himself and TFL in

connection with the SEC's investigation entitled *In the Matter of Mirror Protocol,* File No. HO-

14164 (the "Mirror Protocol Investigation"). This Declaration is based upon my personal

involvement with and knowledge of TFL's business, including the technical underpinnings of the

Mirror Protocol.

1

## I.     General Information about TFL

3.      TFL is a private company located at 22 Cross Street #02-103 Singapore 048421, engaged in open source software and blockchain platform development and related activities.

4.      Do Kwon, a citizen of South Korea, is now a resident of Singapore.

5.      TFL is the developer of Terra, a decentralized and open-source public blockchain network, and the Mirror Protocol, a decentralized finance protocol built on Terra that is governed by its stakeholder community.  Through the Mirror Protocol, users can choose to create (or "mint") Mirrored Assets ("mAssets") that "mirror" real-world assets of the users' and the community's choice.  Through the operation of the autonomous smart contracts that create and enable them, these tokens mimic the price behavior of the assets upon which they are based.

6.      To mint (or create) an mAsset, users deposit collateral to the Mirror Protocol. The protocol accepts TerraUSD and other decentralized algorithmic stablecoins pegged to fiat currencies and other mAssets as collateral.  Which mAssets are minted is determined by governance proposals submitted to and voted on by the Mirror Protocol community, participation in which is based on holding MIR tokens, the governance tokens for the Mirror Protocol.

7.      In addition, the Mirror Protocol allows users to obtain MIR tokens granted from the community pool for services to the community (this entire process is also governed by autonomous smart contracts not controlled by TFL).  Neither TFL nor Mr. Kwon control the Terra network or the Mirror Protocol.  Various user interfaces (some web-based, some app-based) facilitate access to the Mirror Protocol; only one such interface was created by TFL, and TFL no longer hosts that interface.  The trading of assets through the Mirror Protocol generates no revenue for TFL.

2

8.     TFL maintained a web application that some users utilized to interact with the Mirror Protocol until November 14, 2021.  That user interface has since been open sourced and is not hosted by TFL.

9.     In April 2021, TFL entered into a "listing agreement" for MIR tokens (not mAssets) with a global digital asset trading platform incorporated in Delaware.  TFL earns no money from that agreement, which facilitates trading of MIR tokens by third parties around the world.

10.    TFL does not pay to advertise mAssets or MIR tokens in the U.S. or otherwise market them specifically to U.S. persons.

11.    On September 20, 2021, Mr. Kwon attended "Mainnet 2021," a cryptocurrency summit. At the summit, Mr. Kwon participated in a panel titled "The Multi-Chain Future Is Here" about interoperability among the leading blockchains.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

December 17, 2021

_____

Han Chang Joon

US_Active\120018365\V-1

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 1:21-mc-00810_____ |
| Applicant, | |
| v. | |
| | Hon. J. Paul Oetken |
| TERRAFORM LABS PTE LTD. and DO KWON | Hon. Barbara C. Moses |
| Respondents. | |

## DECLARATION OF STEPHEN J. SENDEROWITZ IN SUPPORT OF RESPONDENTS' OPPOSITION TO THE U.S. SECURITIES AND EXCHANGE COMMISSION'S APPLICATION FOR AN ORDER REQUIRING COMPLIANCE WITH SUBPOENAS

I, Stephen J. Senderowitz, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1.      I am a partner with the law firm of Dentons US LLP.

2.      I submit this declaration in support of the opposition by Respondents Terraform

Labs PTE, Ltd. ("TFL") and Do Kwon to the Application by the United States Securities and

Exchange Commission ("SEC" or "Commission") for an Order Requiring Compliance with

Subpoenas.  The SEC's application seeks an order from this Court directing Mr. Kwon and TFL

to comply with investigative subpoenas attempted to be served personally upon Mr. Kwon for

both himself and TFL in connection with the Commission's non-public investigation entitled *In

the Matter of Mirror Protocol* (Internal File No. HO-14164) (the "Mirror Protocol

Investigation").  This Declaration is based upon my direct participation in the Mirror Protocol

Investigation as one of Respondents' counsel, and sets forth both (1) the nature of Mr. Kwon's

and TFL's cooperation with the SEC's investigation and (2) communications with the SEC

regarding this matter.

1

3.      For over 45 years, I have focused my practice on securities and commodities litigation, first as an assistant US attorney for the Northern District of Illinois, where as deputy chief of the Special Prosecutions Division, and prior thereto as deputy chief of the Criminal Division, I supervised criminal commodities and securities prosecutions.  Since 1983, in private practice, I have represented exchanges, hedge funds, broker-dealers, traders, and other financial market participants in defense of regulatory, criminal, class-action, and other civil matters implicating U.S. securities and commodities laws and regulations.  I am licensed in Illinois and have defended financial market litigations in Illinois, New York, and 22 other states and the District of Columbia.

4.      I have on multiple occasions represented parties before the SEC, including by appearing on their behalf in investigatory proceedings.  In such proceedings the SEC has recognized my appearance and representation of clients when I have advised the SEC that I represent a party and provided the required contact information, as I did in the instant matter for both myself and Douglas Henkin, also a Dentons partner.

5.      On May 20 and May 23, 2021, Roger Landsman and Kathleen Hitchens, attorneys from the SEC's Division of Enforcement, emailed Mr. Kwon requesting his voluntary cooperation in connection with a formal order of investigation styled *In the Matter of Mirror Protocol*, HO-14164 (the "Formal Order").[1]

6.      TFL and Mr. Kwon retained Dentons US LLP, specifically Mr. Henkin and myself, to represent them in connection with the SEC's request for voluntary cooperation.  On May 27, 2021, on behalf of TFL and Mr. Kwon, I left a voicemail for Mr. Landsman, who returned my call, at which time I advised him that Mr. Henkin and I represented the

---

[1]      *See* Landsman Decl. ¶ 13, ECF No. 4.

Respondents. We arranged to have a call later that afternoon with Mr. Landsman, his colleague Kathleen Hitchins, Mr. Henkin, and me attending. On my call with Mr. Landsman I also advised him that as soon as our call ended I would send him by email contact information for both myself and Mr. Henkin, which I did. A copy of my May 27 email is attached as **Exhibit 1**.

7.      Later on May 27, during the phone call with Landsman and Hitchins, they expressed their desire to learn more about the Mirror Protocol, mAssets, and MIR tokens. They indicated their interest in speaking with a representative of TFL and envisioned a discussion lasting between two to three hours. Among other points of discussion, Mr. Henkin and I emphasized that any cooperation could not contribute to establishing jurisdiction over TFL or Mr. Kwon with respect to any proceedings.

8.      Mr. Henkin and I, as counsel for Mr. Kwon and TFL, thereafter engaged in multiple conversations with Landsman and Hitchins. We made clear that although our clients were beyond the SEC's territorial jurisdiction, we understood the SEC could through various protocols seek investigative assistance from regulators in foreign countries and that our client Mr. Kwon was willing to participate, pursuant to a proffer agreement, in a voluntary interview with Landsman and Hitchins as an act of good faith and with the belief that none of TFL's activities contravened US securities laws. We negotiated a proffer agreement, whereby Mr. Kwon agreed to be interviewed for approximately three hours, and the SEC agreed that Mr. Kwon's statements could not directly be used against him or TFL in any subsequent enforcement action, except for limited purposes. The proffer agreement—drafted by the SEC with input from Dentons—explicitly identified Dentons (specifically myself) as representing, and appearing for, Mr. Kwon and TFL in the Mirror Protocol Investigation; in other words, the SEC drafted and signed a document expressly recognizing Dentons as counsel for TFL and Mr. Kwon in

connection with the Mirror Protocol Investigation.  A copy of the proffer agreement is attached as **Exhibit 2**.

9.     On July 8, 2021, the SEC staff interviewed Mr. Kwon for approximately *five* hours.  The interview was conducted via WebEx because Mr. Kwon then resided in South Korea (he now lives in Singapore).  Mr. Kwon was represented by Dentons during the interview.  Mr. Landsman began the interview by stating that he would be trying to understand the Mirror Protocol from a business, economic, and technical perspective.  Consistent with that statement and the length of the interview, the topics covered included, but were not limited to the Mirror Protocol's creation, implementation, functionality, and operations; whether TFL receives income from the minting of or transactions in mAssets; Mr. Kwon's ownership of mAssets or MIR tokens;[2] and where mAssets trade.

10.     The SEC also posed several questions about TFL as an entity—including about its corporate structure, and its relationship to investors in the protocol—despite our belief that such inquiry was beyond the scope of the interview.  Mr. Henkin and I asked the SEC to move on to other questions and directed Mr. Kwon not to respond to the inquiry, as this was not a subject related to the operation of the Mirror Protocol.  For the same reason, we limited any questions about the TFL corporate structure and identification of its executives and their duties, as those queries were more akin to an attempt to create an investigative witness list.  When we made these two requests, the SEC moved on to other topics.  Mr. Kwon was transparent and forthcoming throughout the interview.

---

[2]     Mr. Kwon voluntarily showed his digital wallet to the SEC staff during the interview; it contained — in total — $155.46 of four mAssets and $10,000 worth of MIR tokens (at the time the value of all outstanding MIR tokens was $283 million).

11.     At no time during the interview did the SEC staff express frustration or displeasure with Mr. Kwon's responses to questions.  To the contrary, when the extended (by 2 hours) interview concluded, Landsman and Hitchins effusively thanked Mr. Kwon for his cooperation, for extending the interview without objection, and for providing useful information in response to their questions.

12.     Subsequent to the interview, on July 22, the SEC requested, again through Dentons, that Mr. Kwon and TFL voluntarily produce documents.  The nineteen requests were onerous, ill-defined, overbroad, and akin to a subpoena.  The request (1) in part sought records that were unavailable and (2) was otherwise so broad and/or defective that to the extent responsive documents might exist, the requests had to be narrowed and clarified.

13.     Communications ensued, by phone and email, between the SEC and Dentons lawyers, with the shared goal of reaching common ground for the voluntary production of information responsive to the SEC's requests, including a phone call on July 28, 2021 with the SEC lawyers, at which we discussed some problems we saw with the request.  The SEC requested that we put in writing our positions as to each request, which we did on August 17, 2021.

14.     On August 17, 2021, Dentons provided responses to the SEC's voluntary document requests, in which we reiterated the various respects in which the requests were unclear, overbroad, or otherwise sought information not relevant to the Commission's inquiry, sought production of publicly available data, or sought information TFL did not possess.  The response also pointed the SEC to publicly available sources (such as Github and other public Internet sites) from which the information sought could be obtained.  Further, the response reiterated the request that that the SEC advise as to its intentions related to TFL's status in the

investigation, as well as its goal(s) with respect to the operation of the Mirror Protocol, so that TFL could evaluate whether assistance might be feasible. A copy of this response is attached as **Exhibit 3**.

15. On August 25, 2021, Mr. Landsman called Mr. Henkin and me, and indicated that the SEC staff believed that MIR tokens and mAssets might be securities and requested that our clients consider what they might do to address the SEC's views.

16. In a conversation on September 15, 2021, Landsman, Hitchins and Reed Muoio advised that in the SEC's view, an enforcement action would be warranted to resolve the issues set forth in paragraph 15 even if there could be a negotiated resolution. They also indicated that any cooperation—specifically the implementation of remedial actions related to Mirror Protocol—would result in a reduced financial sanction included in any consent agreement. However, they were unwilling (or simply unable) to specify either the amount of any contemplated financial sanction or the extent of the desired remedial actions and cooperation. The lawyers further failed to mention that they had recently learned Mr. Kwon was slated to appear at a conference in New York City in less than a week.

17. Even absent assurance there would not be an enforcement action, TFL and Mr. Kwon continued to cooperate with the SEC's investigation. That Friday afternoon, September 17, I reached out by phone to Mr. Landsman and requested, in connection with any remedial cooperation, that we arrange a call at which the SEC would specifically advise us as to the "remedial" steps it thought TFL might take in connection with the Mirror Protocol. I reiterated our view that an enforcement action was not appropriate, and suggested the Commission decline to bring such an action in exchange for our clients' cooperation. I also stressed that in any event, we needed to understand what the SEC believed could be done by way of remediation, in order

to determine if TFL was even capable of implementing the SEC's remediation goals. I suggested that our discussions should focus on this issue. Mr. Landsman advised me he would discuss the matter with his colleagues. Mr. Landsman did not mention that earlier that morning he had issued and signed subpoenas directed to TFL and Mr. Kwon. At no time during this call did Mr. Landsman mention the subpoenas, much less inquire whether Dentons was willing to accept service of them on behalf of TFL or Mr. Kwon. Indeed, despite his steady engagement with Mr. Henkin and me over the course of many weeks, Mr. Landsman never indicated any intention to issue subpoenas.

18.     On September 20, 2021, while in New York City attending "Mainnet 2021," a cryptocurrency summit, Mr. Kwon was approached by an SEC-hired private process service company—"Cavalier Courier & Process Service"—and handed an envelope containing the aforementioned subpoenas, seeking production of documents by TFL and Mr. Kwon, and in-person testimony by Mr. Kwon in Washington, D.C. in connection with the SEC's investigation. The subpoenas were handed to Mr. Kwon in public: Mr. Kwon was approached by the process server as he exited an escalator at the Mainnet summit while on his way to participate in a panel discussion just minutes later.

19.     The SEC subsequently sent copies of the subpoenas to Dentons as counsel for Mr. Kwon and TFL, stating that they had been "served this morning personally" on Mr. Kwon, but not suggesting that the SEC was attempting to effect service by sending copies to Dentons. A copy of the email transmitting these copies, along with the copies themselves, is attached as **Exhibit 4**.

20.     The subpoenas include 27 document requests—eight more than in the voluntary request to produce information (¶ 12, *supra*).

21.     I emailed Mr. Landsman on September 26, requesting copies of two documents: (1) the order issued by the Commission authorizing personal service upon Mr. Kwon, pursuant to Rule 150(b) of the SEC's Rules of Practice (which governs service of papers upon persons represented by counsel) and (2) the Formal Order.  Mr. Landsman responded on September 28, advising us of the process for obtaining a copy of the Formal Order.  SEC staff did not produce the requested 150(b) order.  Mr. Landsman in his email stated that the subpoenas were served "pursuant to Rule 150(d)(1)" (which sets forth the process for delivering papers to persons required to be served).  A copy of this email exchange is attached as **Exhibit 5**.

22.     Mr. Henkin and I spoke with SEC attorneys by phone on September 28, 2021.  In addition to discussing our respective positions as to the subpoenas, Mr. Landsman described the SEC's ideas that they were considering, including, among other things, that TFL delist MIR tokens from US platforms, or, in the alternative, register MIR tokens and mAssets as securities. Mr. Landsman also made clear a public consent order would be required for any resolution.

23.     Mr. Henkin followed up with the SEC by email on October 1, a copy of which is attached as **Exhibit 6**.

24.     Despite our belief that the SEC failed to follow the steps necessary to effect service of the subpoenas personally on Mr. Kwon, Mr. Henkin and I continued to engage with Landsman and Hitchins for the purpose of resolving the SEC's concerns related to Mirror Protocol.  In particular, during a phone call on October 7, we sought the SEC's view as to how our clients might effectuate the agency's goals, such as how the SEC believed registration of mAssets could be accomplished given the prior discussions.  We were advised that implementation would be up to our clients to determine and achieve, that the SEC would not provide any advice, and that any steps would need to be taken "in short order."  We were also

advised that a financial sanction was likely in any event, regardless of the success of any voluntary remediation efforts.

25.     During this call, Mr. Henkin and I reiterated our view that the SEC's service of the subpoenas directly upon Mr. Kwon was improper, and that delivery of the subpoenas to counsel, even were such delivery intended to comprise service, would be ineffective in establishing a basis for personal jurisdiction over TFL and Mr. Kwon.

26.     On October 22, TFL and Mr. Kwon filed a lawsuit asserting claims under the APA and the Fifth Amendment's Due Process clause, seeking a declaration that the subpoenas were invalid and should be quashed because Mr. Landsman issued them without adhering to Rule 150(b)'s requirement that he obtain an order of authorization from the Commission permitting service upon a person represented by counsel. *Terraform Labs PTE Ltd. and Do Kwon v. United States Securities and Exchange Commission*, No. 21-cv-8701 (S.D.N.Y.), ECF No. 1.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

December 17, 2021

Stephen J. Senderowitz

# <u>EXHIBIT 2</u>



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

**DIVISION OF ENFORCEMENT**

July 6, 2021

<u>VIA EMAIL</u>
Do Kwon
c/o Stephen J. Senderowitz, Esq.
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606-6361
stephen.senderowitz@dentons.com

      Re:    Proffer Agreement
              <u>In the Matter of Mirror Protocol, File No. HO-14164</u>

Dear Mr. Kwon:

      This Agreement contains the terms of the July 8, 2021 meeting at 8pm Eastern Time between you and the staff of the Division of Enforcement of the United States Securities and Exchange Commission in the above-referenced matter ("Meeting"). These terms are as follows:

(1)    This Meeting is voluntary, and you agree to provide complete and truthful statements during the Meeting.

(2)    This Agreement only covers statements provided by you during the Meeting. It does not cover statements provided, including statements made, at any other time, regardless of format (e.g., oral, written, or recorded).

(3)    "Company" shall mean the entity doing business under the name "Terraform Labs" or "Terra."

(4)    The Commission's staff will not use against you or the Company any statements provided by you during the Meeting, except for the following purposes:

      (a)    To obtain other evidence, which may be used against you, the Company and others;

      (b)    In any action or proceeding brought or instituted by the Commission against you or the Company, to rebut your testimony, evidence offered, or arguments or assertions made by you, the Company, or on your behalf, or on the Company's behalf (including in response to questions raised by a judge or jury);

      (c)      If you are a witness in any other action or proceeding brought or instituted by the Commission, to rebut your testimony; and

      (d)      In any referral to a criminal law enforcement agency or entity as evidence of false statements, perjury, or obstruction of justice, or as the basis for a criminal sentence adjustment for obstructing or impeding the administration of justice.

(5)      You and the Company agree that any statements provided by you during the Meeting, or evidence obtained as a result, does not constitute a compromise offer, compromise negotiations, plea discussions, or any related statements for purposes of Federal Rules of Evidence 408 or 410, and you and the Company agree not to assert that such rules apply to any statements provided by you during the Meeting, or evidence obtained as a result.

(6)      You, the Company, and your counsel agree that you have fully discussed and understand all terms of this Agreement and their consequences.

(7)      You and the Company agree that there are no other promises or understandings applicable to the Meeting, and that none will be entered into unless in writing and signed by the parties to this Agreement.

(8)      This Agreement does not bind anyone other than the Commission's staff. Except as provided in paragraph (4) or unless compelled by law, the Commission's staff will not disclose statements provided by you during the Meeting to any other regulator or law enforcement agency or entity not present at the Meeting without an agreement to abide by terms comparable to the terms of this Agreement as applicable to such other regulator or law enforcement agency or entity. Nothing in this Agreement limits the Commission staff's right to share within the Commission any statements provided by you during the Meeting.

(9)     This Agreement is not limited or affected by any agreement between you or the Company and any other regulator or law enforcement agency or entity, and vice versa.

Sincerely,

*Reid A. Muoio*

Reid Muoio
Assistant Director

I agree to the foregoing, and further attest that I am duly authorized to enter this agreement on behalf of the Company.

_____          7.8.21
Do Kwon                                                          Date

_____
Stephen J. Senderowitz
Counsel to Do Kwon

_____
Stephen J. Senderowitz
Counsel to Terraform Lab

# EXHIBIT 4

| **From:** | Landsman, Roger J |
| **Sent:** | Monday, September 20, 2021 11:15 AM |
| **To:** | 'Senderowitz, Stephen J.' |
| **Cc:** | Hitchins, Kathleen M; Henkin, Douglas W. |
| **Subject:** | Mirror Protocol HO-14164 |
| **Attachments:** | Do Kwon Subpoena 2021-09-17.pdf; Terraform Labs PTE Ltd Subpoena 2021-09-17.pdf |

Stephen,

Please see the attached subpoenas for Do Kwon and Terraform Labs PTE Ltd that were served this morning personally on Do Kwon.  If you would like to discuss further, please email me some proposed times to speak.

Regards,

Roger Landsman
Attorney
Division of Enforcement
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549
Tel: (202) 551-7501



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

**DIVISION OF ENFORCEMENT**

September 17, 2021

IN PERSON
Do Kwon
Via Cavalier Courier & Process Service

Re: In the Matter of Mirror Protocol, HO-14164

Dear Mr. Kwon:

The staff of the United States Securities and Exchange Commission is conducting an investigation in the matter identified above. The enclosed subpoena has been issued to you as part of this investigation. The subpoena requires you to provide us with documents and give sworn testimony.

Please read the subpoena and this letter carefully. This letter answers some questions you may have about the subpoena. You should also read the enclosed SEC Form 1662. If you do not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this subpoena. Failure to comply with a court order enforcing this subpoena may result in the court imposing a fine, imprisonment or both.

**Producing Documents**

*What materials do I have to produce?*

The subpoena requires you to provide us the documents described in the attachment to the subpoena. You must provide these documents by October 4, 2021. The attachment to the subpoena defines some terms (such as "document") before listing what you must provide.

You should produce each and every document in your possession, custody, or control, including any documents that are not in your immediate possession but that you have the ability to obtain. All responsive documents shall be produced as they are kept in the usual course of business, and shall be organized and labeled to correspond with the numbered paragraphs in the subpoena attachment. In that regard, documents should be produced in a unitized manner, *i.e.*, delineated with staples or paper clips to identify the document boundaries.

Documents responsive to this subpoena may be in electronic or paper form. Electronic documents such as email should be produced in accordance with the attached document entitled

SEC Data Delivery Standards (the "Standards"). If you have any questions concerning the production of documents in an electronic format, please contact me as soon as possible but in any event before producing documents. **All electronic documents responsive to the document subpoena, including all metadata, must also be secured and retained in their native software format and stored in a safe place.** The staff may later request or require that you produce the native format.

For documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy documents and produce them in an electronic format consistent with the Standards. Alternatively, you may send us photocopies of the documents in paper format. **If you choose to send copies, you <u>must</u> secure and retain the originals and store them in a safe place.** The staff may later request or require that you produce the originals.

Whether you scan or photocopy documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a document differ in any way, they are considered separate documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

If you <u>do</u> send us scanned or photocopied documents, please put an identifying notation on each page of each document to indicate that you produced it, and number the pages of all the documents submitted. (For example, if Jane Doe sends documents to the staff, she may number the pages JD-1, JD-2, JD-3, etc., in a blank corner of the documents.) Please make sure the notation and number do not conceal any writing or marking on the document. If you send us originals, please do not add any identifying notations.

In producing a photocopy of an original document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original document, photocopies of the original document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

*Do I need to send anything else?*

You should enclose a list briefly describing each item you send. The list should state to which numbered paragraph(s) in the subpoena attachment each item responds. A copy of the subpoena should be included with the documents that are produced.

Passwords for documents, files, compressed archives, and encrypted media should be provided separately either via email addressed to <u>ENF-CPU@sec.gov</u>, or in a separate cover letter mailed separately from the data. Password correspondence should reference case number, case name and requesting SEC staff member.

Please include a cover letter stating whether you believe you have met your obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us. Correspondence should reference case number, case name and requesting SEC staff member.

*What if I do not send everything described in the attachment to the subpoena?*

The subpoena requires you to send <u>all</u> the materials described in it. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the subpoena, you should submit a list of what you are not producing. The list should describe each item separately, noting:

- its author(s);
- its date;
- its subject matter;
- the name of the person who has the item now, or the last person known to have it;
- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
- the reason you did not produce the item; and
- the specific request in the subpoena to which the document relates.

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, you should identify the attorney and client involved. If you withhold anything on the basis of the work product doctrine, you should also identify the litigation in anticipation of which the document was prepared.

If documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such documents and give the date on which they were lost, discarded or destroyed.

*Where should I send the materials?*

Please send the materials to:

> ENF-CPU
> U.S. Securities and Exchange Commission
> 14420 Albemarle Point Place, Suite 102
> Chantilly, VA 20151-1750

For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address: ENF-CPU@sec.gov.

Please also provide a duplicate copy of any document production cover letters to Roger Landsman at LandsmanR@sec.gov. Additionally, please include the SEC matter number and the name of the requesting attorney when responding.

3

**Testifying**

*Where and when do I testify?*

The subpoena requires you to come to the Commission's offices at, 100 F. Street, NE, Washington, DC 20549 at 9:30 a.m. Eastern Time on October 27, 2021 to testify under oath in the matter identified on the subpoena.

**Other Important Information**

*May I have a lawyer help me respond to the subpoena?*

Yes. You have the right to consult with and be represented by your own lawyer in this matter. If you are represented by a lawyer when you testify, your lawyer may advise and accompany you when you testify. We cannot give you legal advice.

*What will the Commission do with the materials I send and/or the testimony I provide?*

The enclosed SEC Form 1662 explains how we may use the information you provide to the Commission. This form also has other important information for you. Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation does not mean that we have concluded that anyone has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*Important Policy Concerning Settlements*

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions. What should I do?*

If you have any other questions, you may call me at (202) 551-7501. If you are represented by a lawyer, you should have your lawyer contact me.

Sincerely,

*Roger Landsman*

Roger Landsman
Staff Attorney
Division of Enforcement

Enclosures:      Subpoena and Attachment
                SEC Data Delivery Standards
                SEC Form 1662



# SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### In the Matter of Mirror Protocol, HO-14164

**To:**   Do Kwon
Via Cavalier Courier & Process Service

---

☒   **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

ENF-CPU, U.S. Securities and Exchange Commission, 14420 Albemarle Point Place, Suite 102 Chantilly, VA 20151-1750, no later than October 4, 2021 at 5:00 p.m. Eastern Time.

---

☒   **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

Securities and Exchange Commission, 100 F. Street, NE, Washington, DC 20549
October 27, 2021 at 9:30 a.m. Eastern Time.

---

### FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.
If you do not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this subpoena.
Failure to comply with a court order enforcing this subpoena may result in the court imposing a fine, imprisonment, or both.


By:   _____          Date:   September 17, 2021
Roger Landsman, Staff Attorney
U.S. Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933, Section 21(a) of the Securities Exchange Act of 1934, and Section 42(a) of the Investment Company Act of 1940.

NOTICE TO WITNESS: If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

**SUBPOENA ATTACHMENT FOR DO KWON**
<u>In the Matter of Mirror Protocol, HO-14164</u>

September 17, 2021

**<u>Definitions</u>**

As used in this subpoena, the words and phrases listed below shall have the following meanings:

1.  "Terraform Labs PTE Ltd." means the entity doing business under the name "Terraform Labs PTE Ltd." or "Terraform Labs" ("Terra"), including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

2.  "Mirror" means the entity doing business under the name "Mirror," "Mirror team," "Mirror Finance" or "Mirror Protocol" and is associated with the website "Mirror.Finance," including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees , agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing (including but not limited to, Terra, Do Kwon, Daniel Shin, CJ Changjoon Han, SJ Park, Chee Lee, and Nicholas Platias, Rahul Abrol, Stanford Liu, William Chen, Sihyeok Yu, Evan Kereiakes, and Marco Di Maggio).

3.  "Mirror Assets" means all digital assets that can be created by or native to the Mirror Protocol or traded on terra.mirror.finance, including but not limited to Mirror tokens (ticker: MIR), all mAssets and LP Tokens.

4.  "Mirror Protocol" means the blockchain-based protocol or network operating under the same name or "Mirror."

5.  "Terra Assets" means all digital assets associated with the Terra blockchain and Terra ecosystem, including but not limited to Luna and UST.

6.  "UST" means the TerraUSD token.

7.  "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

8.  A "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

9.  "Document" shall include, but is not limited to, all records and other tangible forms of expression in Your possession, custody, or subject to your control (*e.g.*, personal

accounts, services, and devices used to conduct Terra's business), Electronically Stored Information, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, telegrams, facsimiles, messages of any type, telephone messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

10. "Electronically Stored Information" or "ESI" includes electronically stored information of any kind, however created, in Your possession, custody or control, or subject to your control (*e.g.*, personal accounts, services, and devices used to conduct Terra's business), including, but not limited to, text, metadata, word processing files and spreadsheets (including all drafts, versions, revisions, and markups); digital communications (*e.g.*, emails, instant messaging, text messages, voicemails, direct messages, chat messages, tweets, Telegram channel messages, portals, dashboards, platforms, messages on cell phones, Slack, WhatsApp, WeChat, and Discord); database files (including data dictionaries, schemas, logs, reports, and unstructured data containing plain text); documents created, modified, stored, or maintained by drawing, computer-aided design software, document management software, or project management software, including, but not limited to drawings, graphs, and charts; accounting application documents; presentation software documents including, but not limited to slide shows or presentation "decks" and any embedded or related audio, video, notes, or outlines; documents created, modified, stored, or maintained by calendaring, task management, collaboration, group management, and personal information software (*e.g.*, Microsoft Outlook, Lotus Notes, Novell GroupWise); photograph, image, sound, video, and animation files; audiovisual recordings; facsimile files; data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated; network and server activity data including, but not limited to logging files, electronic mail logs, routing software logs, and access and IP address logs; and data created, modified, stored, or maintained in connection with development, rapid development, and prototyping software. For the purpose of this document request, Electronically Stored Information shall be considered to be in Your possession, custody or control if it is accessible to You, whether stored or maintained in a known physical location, on physical media, in the cloud, on Handheld devices, on backup or archival systems or in archival software (*e.g.*, .gho, .zip), or by any third party or service at Your direction or on Your behalf.

11. The term "Handheld" device consists of portable or mobile hardware devices to include wireless handheld devices, smartphones, personal digital assistants (PDA), tablets, Bluetooth, and other devices that provide computing, communications, electronic mail, telephone/fax, texting, instant messaging, paging, networking, or storage functionality.

This includes, but is not limited to, devices used as a calendar, organizer, and computer or for electronic data storage, iPhones, Android phones, and Blackberry devices.

12. "Communication" means any correspondence, contact, discussion, e-mail, instant message, direct message, chat message, dashboard message, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

13. "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting on, relating to, regarding, discussing, showing, describing, analyzing or reflecting.

14. An "Agreement" means any actual or contemplated (i) written or oral Agreement; (ii) term or provision of such Agreement; or (iii) amendment of any nature or termination of such Agreement. A request for any Agreement among or between specified parties includes a request for all Documents Concerning (i) any actual or contemplated Agreement among or between such parties, whether or not such Agreement included any other Person; (ii) the drafting or negotiation of any such Agreement; (iii) any actual or contemplated demand, request or application for any such Agreement, and any response thereto; and (iv) any actual or contemplated objection or refusal to enter into any such Agreement, and any response thereto.

15. The term "Reviewed" means examined, assessed, considered, analyzed or evaluated.

16. The term "you" and "your" means the Person to whom or entity to which this subpoena was issued.

17. To the extent necessary to bring within the scope of this this subpoena any information or Documents that might otherwise be construed to be outside its scope:
    a.   the word "or" means "and/or";
    b.   the word "and" means "and/or";
    c.   the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;
    d.   the masculine gender includes the female gender and the female gender includes the masculine gender; and
    e.   the singular includes the plural and the plural includes the singular.

## Instructions

1. Unless otherwise specified, this subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All

responsive electronic Documents, including all metadata, should also be produced in their native software format.

2.  For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you <u>must</u> secure and retain the originals and store them in a safe place. The staff may later request or require that you produce the originals.

3.  Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

4.  In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

5.  Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, i.e., delineated with staples or paper clips to identify the Document boundaries.

6.  Documents should be labeled with sequential numbering (bates-stamped).

7.  You must produce all Documents created during, or Concerning, the period from January 1, 2020 to the date of this subpoena, unless otherwise specified.

8.  The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

9.  You are not required to produce exact duplicates of any Documents that have been previously produced to the Securities and Exchange Commission staff in connection with this matter. If you are not producing Documents based upon a prior production, please identify the responsive Documents that were previously produced.

10. This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below. If, for any reason – including a claim of attorney-client privilege

– you do not produce something called for by the request, you should submit a list of what you are not producing. The list should describe each item separately, noting:

a.     its author(s);

b.     its date;

c.     its subject matter;

d.     the name of the Person who has the item now, or the last Person known to have it;

e.     the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;

f.     the basis upon which you are not producing the responsive Document;

g.     the specific request in the subpoena to which the Document relates;

h.     the attorney(s) and the client(s) involved; and

i.     in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

11.     If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

## **Documents to be Produced**

1.     Documents sufficient to identify all investors, token holders, owners or beneficial interest holders in MIR tokens, including but not limited to:

     a.  Date of investment or acquisition;

     b.  Amount of investment or consideration (by US dollar equivalent, and digital asset amount, if applicable);

2.     All presentations by Terra to investors, potential investors, token holders, or potential token holders in MIR tokens, including but not limited to, all Persons who entered into simple agreements for farmed tokens.

3.     All Communications with investors, potential investors, token holders, or potential token holders in MIR tokens Concerning Mirror or the Mirror Protocol.

4.     All Agreements between Terra and third parties regarding the sale or transfer of Mirror Assets, including, but not limited to, any agreement for farmed MIR tokens.

5.     Documents sufficient to show each unique marketing, promotional, or informational Document Concerning Mirror, the Mirror Protocol, or Mirror Assets, including but not limited to press releases, blog posts, web pages, videos and advertisements, including but not limited to relevant website addresses.

6.     Documents sufficient to identify LUNA tokens held by you or Terra.

7.      Documents sufficient to identify all public keys holding LUNA tokens responsive to Request. No. 6.

8.      Documents sufficient to identify the operators or owners of all Terra blockchain nodes or validators for MIR tokens or mAssets, including, but not limited to names and all contact information (phone number, address, email, etc.).

9.      All Agreements with ATQ Capital or Kysen Technologies.

10.     Documents sufficient to identify any payments or transfer of assets between Terra and ATQ Capital or Kysen Technologies.

11.     Any user or operating manuals, brochures or electronic text, coding journals, code change logs for any version or modification to the Mirror Protocol code that occurred or was contemplated. The request includes, but is not limited to, any code or memorialization for:

        a.   All smart contracts;

        b.   All automated market makers;

        c.   All minting of tokens;

        d.   All staking of LP or MIR tokens; and

        e.   Any oracle.

12.     All audits of the Mirror Protocol code, including but not limited to, internal audits or audits conducted by any third-parties.

13.     Descriptions, charts, diagrams or Documents sufficient to identify the software and technology-related services and products that Mirror or Terra uses to develop, operate, and maintain Mirror and the Mirror Protocol, including programming software, smart contract programming, testing, and deployment, digital asset wallets.

14.     All current or previous governance proposals proposed, voted for, or endorsed by Terra or Mirror.

15.     Documents sufficient to identify all current or future projects, initiatives or upgrades for the Mirror Protocol.

16.     Documents sufficient to show the mechanism by which rewards or MIR tokens are allocated and communicated to staking users.

17.     Documents sufficient to identify, or a list of, all mAssets currently or previously minted by the Mirror Protocol.

18.     Documents sufficient to identify all fees received by Mirror from the Mirror Protocol.

19.    Documents sufficient to identify all fees received by Terra from Mirror or the Mirror Protocol.

20.    Documents sufficient to identify the distribution of any revenue or income generated through the Mirror Protocol, including, but not limited to, staking rewards and Liquidity Provider ("LP") commissions.

21.    All Documents Concerning the arbitrage of mAssets, including any analysis or description of how arbitrage theoretically works to maintain pricing.

22.    Documents sufficient to identify whether Mirror or the Mirror Protocol uses any services related to investment income or revenue or rewards to third parties for any kind of token.

23.    All organizational charts for personnel and corporate structure for Mirror and Terra.

24.    Organizational charts sufficient to identify all Terra employees who performed any work Concerning the Mirror Protocol.

25.    All articles of incorporation or by-laws for Terra.

26.    All Documents and Communications Concerning Mirror or the Mirror Protocol's use of Band Protocol's oracles or other services, including but not limited to, (i) any Agreements between Terra and Band Protocol, (ii) Documents and Communications concerning the design and modification to Mirror Protocol in connection with oracles, (iii) Documents and Communications Concerning the design and modification of oracles, (iv)  Documents and Communications Concerning the use of data providers, (v) any Agreements with data providers, (vi) Documents Concerning payments to data providers, and (vii) Documents Concerning any remuneration that Band Protocol receives for its oracles.

27.    All non-public Communications Concerning Mirror on Discord, Telegram and Github.



**U.S. Securities and Exchange Commission**

**Data Delivery Standards**

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC). ***Any questions or proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.***

General Instructions..................................................................................................................................1

Delivery Formats.....................................................................................................................................2

    I.  Imaged Productions.........................................................................................................................3

        1.  Images...................................................................................................................................3

        2.  Image Cross-Reference File...............................................................................................3

        3.  Data File.............................................................................................................................3

        4.  Text.....................................................................................................................................3

        5.  Linked Native Files............................................................................................................3

    II.  Native File Productions without Load Files.................................................................................4

    III.  Adobe PDF File Productions.......................................................................................................4

    IV.  Audio Files...................................................................................................................................4

    V.  Video Files....................................................................................................................................4

    VI.  Electronic Trade and Bank Records............................................................................................4

    VII.  Electronic Phone Records............................................................................................................4

    VIII.  Audit Workpapers........................................................................................................................5

    IX.  Mobile Device Data ....................................................................................................................5

**General Instructions**

Due to COVID-19 restrictions the current, temporary mailing address for all physical productions sent to the SEC is:
**ENF-CPU (U.S. Securities & Exchange Commission), 14420 Albemarle Point Place, Suite 102, Chantilly, VA 20151-1750**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business. For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. *(Note: An Adobe PDF file is **not** considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF). If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name and file location and, 2) make that unique metadata part of your production to the SEC.

General requirements for **ALL** document productions are:

1. A cover letter must be included with each production and should include the following information:
   a. Case number, case name and requesting SEC staff member name
   b. A list of each piece of media included in the production with its unique production volume number
   c. A list of custodians, identifying the Bates range for each custodian
   d. The time zone in which the emails were standardized during conversion
   e. Whether the production contains native files produced from Mac operating system environments
2. Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
   a. Case number
   b. Production date
   c. Producing party
   d. Bates range (if applicable)
3. All submissions must be organized by **custodian** unless otherwise instructed.
4. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5. All load-ready collections should include only one data load file and one image pointer file.
6. All load-ready text must be produced as separate document-level text files.
7. All load-ready collections should account for custodians in the custodian field.
8. All load-ready collections must provide the extracted contents of any container files to ensure all relevant files are produced as separate records.
9. Audio files should be separated from data files if both are included in the production.
10. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
11. All electronic productions submitted on media must be produced using industry standard self-extracting encryption software.
12. The SEC uses 7zip to access compressed files. Note that the SEC **cannot** accept files that use AES-256 Jpeg or pkAES-256-Cert Deflate compression methods, even if the files are created with 7zip. If you have any questions or need additional information, please reach out to the requesting SEC staff member.
13. Electronic productions of 20 GB or less are strongly encouraged to be submitted via Secure File Transfer. All Secure File Transfers should be sent to the SEC Centralized Production Unit (ENF-CPU@sec.gov) with a CC to the requesting SEC staff member. If you do not have your own Secure File Transfer application, you may reach out to the requesting SEC staff member for a link to the SEC system in order to upload your production. If using the SEC Secure File Transfer system, you will NOT be able to CC individuals outside the SEC on your upload transmission. Note that the SEC **cannot** accept productions made using file sharing sites such as Google Drive, Microsoft Office 365 or Dropbox.
14. Productions containing BSA or SAR material must be delivered on encrypted physical media. The SEC **cannot** accept electronic transmission of BSA or SAR material. Any BSA or SAR material produced should be segregated and appropriately marked as BSA or SAR material, or should be produced separately from other case related material.
15. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a cover letter apart from the media.
16. All electronic productions should be produced free of computer viruses.
17. Before producing forensically collected images, parties should reach out to the requesting SEC staff member in order to discuss appropriate handling.
18. Before producing unique data sets (large sets of relational data, website reconstruction, chat room data, etc.), parties should reach out to the requesting SEC staff member in order to discuss an appropriate production format.
19. Additional technical descriptions can be found in the addendum to this document.

   **\*Please note that productions sent to the SEC via United States Postal Service are subject to Mail Irradiation, and as a result electronic productions may be damaged.\***

2

U.S. Securities and Exchange Commission
Data Delivery Standards

**Delivery Formats**

I. **Imaged Productions**
The SEC prefers that all scanned paper and electronic file collections be produced in a structured format including industry standard load files, Bates numbered image files, native files and searchable document-level text files.

 1. **Images**
    a. Black and white images must be 300 DPI Group IV single-page TIFF files
    b. Color images must be produced in JPEG format
    c. File names cannot contain embedded spaces or special characters (including the comma)
    d. Folder names cannot contain embedded spaces or special characters (including the comma)
    e. All image files must have a unique file name, i.e. Bates number
    f. Images must be endorsed with sequential Bates numbers in the lower right corner of each image
    g. The number of image files per folder should not exceed 2,000 files
    h. Excel spreadsheets should have a placeholder image named by the Bates number of the file
    i. AUTOCAD/photograph files should be produced as a single page JPEG file

 2. **Image Cross-Reference File**
    The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

    *ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

 3. **Data File**
    The data file (.DAT) contains all of the fielded information that will be loaded into the database.

    a. The first line of the .DAT file must be a header row identifying the field names
    b. The .DAT file must use the following *Concordance®* default delimiters:
       Comma ¶ ASCII character (020)
       Quote þ ASCII character (254)
    c. If the .DAT file is produced in Unicode format it must contain the byte order marker
    d. Date fields should be provided in the format: mm/dd/yyyy
    e. Date and time fields must be two separate fields
    f. The time zone must be included in all time fields
    g. If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments
    h. An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the FIRSTBATES. Do not include the text in the .DAT file.
    i. For productions with native files, a LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the FIRSTBATES.
    j. BEGATTACH and ENDATTACH fields must be two separate fields
    k. A complete list of metadata fields is available in **Addendum A** to this document

 4. **Text**
    Text must be produced as separate document-level text files, not as fields within the .DAT file. The text files must be named per the FIRSTBATES/Image Key and the full path to the text file (OCRPATH) should be included in the .DAT file. Text files may be in either ANSI or Unicode format, however, ALL text files must be in the same format within the same production. Note that productions containing text with foreign characters must produce text files in Unicode format to preserve the foreign characters. Text files must be in a separate folder, and the number of text files per folder should not exceed 2,000 files. There should be no special characters (including commas) in the folder names. For redacted documents, provide the full text for the redacted version.

 5. **Linked Native Files**
    Copies of original email and native file documents/attachments must be included for all electronic productions.
    a. Native file documents must be named per the FIRSTBATES number
    b. The full path of the native file must be provided in the .DAT file for the LINK field
    c. The number of native files per folder should not exceed 2,000 files

## II.  Native File Production without Load Files

With prior approval, native files may be produced without load files. The native files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, native email files (.PST or .MBOX) may be produced. A separate folder should be provided for each custodian.

## III.  Adobe PDF File Production

With prior approval, Adobe PDF files may be produced in native file format.

1. All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
2. PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
3. All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4. If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

## IV.  Audio Files

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

| | | |
|---|---|---|
| 1) | Caller Name: | Caller's name or account/identification number |
| 2) | Originating Number: | Caller's phone number |
| 3) | Called Party Name: | Called party's name |
| 4) | Terminating Number: | Called party's phone number |
| 5) | Date: | Date of call |
| 6) | Time: | Time of call |
| 7) | Filename: | Filename of audio file |

## V.  Video Files

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

## VI.  Electronic Trade and Bank Records

When producing electronic trade records, bank records, or financial statements, provide the files in one of the following formats:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2. Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

## VII.  Electronic Phone Records

When producing electronic phone records, provide the files in the following format:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.  Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).
   a. The metadata that must be included is outlined in **Addendum B** of this document. Each field of data must be loaded into a separate column.  For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information.  Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

**VIII. Audit Workpapers**

The SEC prefers for workpapers to be produced in two formats: (1) With Bates numbers in accordance with the SEC Data Delivery Standards; and (2) in native format or if proprietary software was used, on a standalone laptop with the appropriate software loaded so that the workpapers may be reviewed as they would have been maintained in the ordinary course of business. The laptop must have printing capability, and when possible, the laptop should be configured to enable a Virtual Machine (VM) environment.

**IX. Mobile Device Data**

Before producing mobile device data (including but not limited to text messages) parties should reach out to the requesting SEC staff member in order to discuss the appropriate production format

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email<br>**The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email<br>**This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments<br>**The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided<br>Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender<br>Native: Author(s) of document<br>**semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s)<br>**semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email<br>Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field |

Rev 8/2021

| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone<br>Native: (empty) |
|---|---|---|
| LINK | D:\001\ EDC0000001.msg | Hyperlink to the email or native file document<br>**The linked file must be named per the FIRSTBATES number |
| MIME_TYPE | application/msword | The content type of an email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the email or native file document; will vary depending on the format |
| AUTHOR | John Smith | Email: (empty)<br>Native: Author of the document |
| LAST_AUTHOR | Jane Doe | Email: (empty)<br>Native: Last Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty)<br>Native: Date the document was created |
| TIME_CREATED/TIME_ZONE | 10:25 AM GMT | Email: (empty)<br>Native: Time the document was created including time zone<br>**This data must be a separate field and cannot be |
| DATE_MOD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last modified |
| TIME_MOD/TIME_ZONE | 07:00 PM GMT | Email: (empty)<br>Native: Time the document was last modified including the time zone<br>**This data must be a separate field and cannot be |
| DATE_ACCESSD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last accessed |
| TIME_ACCESSD/TIME_ZONE | 07:00 PM GMT | Email: (empty)<br>Native: Time the document was last accessed including the time zone<br>**This data must be a separate field and cannot be |
| PRINTED_DATE | 10/12/2010 | Email: (empty)<br>Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty)<br>Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name.<br>Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb8306d1@MSN> | Email: Unique Message ID<br>Native: (empty) |

| HEADER | Return-Path: <example_from@dc.edu> X-SpamCatcher-Score:1[X] Received:from[136.167.40.119] (HELO dc.edu) by fe3.dc.edu (CommuniGate Pro SMTP4.1.8) with ESMTP-TLS id 61258719 for example_to@mail.dc.edu; Mon, 23 Aug 2004 11:40:10 -0400 Message-ID: <4129F3CA.2020509@dc.edu> Date: Mon, 23 Aug 2005 11:40:36 -400 From: Taylor Evans <example_from@dc.edu> User-Agent:Mozilla/5.0 (Windows;U; Windows NT 5.1; en-US;rv:1.0.1) Gecko/20020823 Netscape/7.0 X-Accept-Language:en-us,en MIME-Version:1.0 To: Jon Smith <example_to@mail.dc.edu> Subject:Business Development Meeting Content-Type: text/plain;charset=us-ascii; format=flowed Content-Transfer-Encoding:7bit | Email: The email header information Native: (empty) |
|--------|--------|--------|
| MD5HASH | d131dd02c5e6eec4693d9a069 8aff95c 2fcab58712467eab4004583eb 8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Cross-Reference File:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000004.TIF,Y,,,
IMG0000005,,E:\001\IMG0000005.TIF,Y,,,
IMG0000006,,E:\001\IMG0000006.TIF,,,,
```

## **ADDENDUM B**

For Electronic Phone Records, include the following fields in separate columns:

For Calls:
1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable


For Text messages:
1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable

For Mobile Data Usage:
1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

Section 1519 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . ., or in relation to or contemplation of any such matter.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1. *Record*. Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2. *Counsel*. You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3. *Transcript Availability*. Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however*, That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4. *Perjury*. Section 1621 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever--
>
> (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare,

SEC 1662 (09-21)

depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true.

5.  *Fifth Amendment and Voluntary Testimony*. Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6.  *Formal Order Availability*. If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

## C. Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

> Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

> In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## D. Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

### E. Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena*. The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily*. One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

### F. Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena*. If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, Section 21(c) of the Securities Exchange Act of 1934, Section 42(c) of the Investment Company Act of 1940, and Section 209(c) of the Investment Advisers Act of 1940 provide that fines and terms of imprisonment may be imposed upon any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

### G. Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

### H. Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1. To appropriate agencies, entities, and persons when (1) the SEC suspects or has confirmed that there has been a breach of the system of records, (2) the SEC has determined that as a result of the suspected or confirmed breach there is a risk of harm to individuals, the SEC (including its information systems, programs, and operations), the Federal Government, or national security; and (3) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm.

2. To other Federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3. To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the Federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4. By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the Federal securities laws.

5. In any proceeding where the Federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6. In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7. To a bar association, state accountancy board, or other Federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8. To a Federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9. To a Federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10. To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11. To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the Federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 through 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100 through 1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the Federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12. To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13. To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14. In reports published by the Commission pursuant to authority granted in the Federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15. To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16. To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 through 200.735-18, and who assists in the investigation by the Commission of possible violations of the Federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the Federal securities laws.

17. To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18. To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19. To prepare and publish information relating to violations of the Federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20. To respond to subpoenas in any litigation or other proceeding.

21. To a trustee in bankruptcy.

22. To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection,

including collection by administrative offset, Federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

23. To another Federal agency or Federal entity, when the SEC determines that information from this system of records is reasonably necessary to assist the recipient agency or entity in (1) responding to a suspected or confirmed breach or (2) preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal Government, or national security, resulting from a suspected or confirmed breach.

\* \* \* \* \*

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

**DIVISION OF ENFORCEMENT**

September 17, 2021

IN PERSON
Terraform Labs PTE Ltd.
c/o Do Kwon, Co-founder and Director
Via Cavalier Courier & Process Service

Re: In the Matter of Mirror Protocol, HO-14164

Dear Mr. Kwon:

The enclosed subpoena has been issued pursuant to a formal order entered by the United States Securities and Exchange Commission. Pursuant to Rule 8 of the United States Securities and Exchange Commission's Rules Relating to Investigations, 17 C.F.R. § 203.8, I have enclosed a subpoena for documents issued to Terraform Labs PTE Ltd. ("Terra"), in connection with the above-referenced investigation.

The enclosed subpoena requires Terra to produce documents to the SEC by October 4, 2021. Please deliver the materials by October 4, 2021 at 5:00 p.m. Eastern Time to:

ENF-CPU
U.S. Securities and Exchange Commission
14420 Albemarle Point Place, Suite 102
Chantilly, VA 20151-1750

For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address: ENF-CPU@sec.gov.

Please also provide a duplicate copy of any document production cover letters to me at LandsmanR@sec.gov. Additionally, please include the SEC matter number and the name of the requesting attorney when responding.

Please carefully read the subpoena attachment, which contains, among other things, important instructions related to the manner of producing documents. In particular, if Terra prefers to send us copies of original documents, **the staff requests that you scan and produce hard copy documents, as well as electronic documents, in an electronic format consistent with the SEC Data Delivery Standards attached hereto. All electronic documents responsive to the subpoena, including all metadata, should also be produced in their native**

**software format**. If you have any questions concerning the production of documents in an electronic format, please contact me as soon as possible and in any event before producing documents. For security reasons, we strongly encourage the encryption of sensitive documents before production.

When producing the records, please consecutively number and mark each document produced with a symbol that identifies it as being produced by Terra.

In your cover letter(s) accompanying the production of responsive documents, please enclose a list briefly describing each item you send. The list should identify the paragraph(s) in the subpoena attachment to which each item responds. Please also state in the cover letter(s) whether you believe Terra has met the obligations of the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us.

A copy of the subpoena should be included with the documents that are produced. Correspondence should reference case number, case name and requesting SEC staff member.

Passwords for documents, files, compressed archives, and encrypted media should be provided separately either via email addressed to ENF-CPU@sec.gov, or in a separate cover letter mailed separately from the data. Password correspondence should reference case number, case name and requesting SEC staff member.

In addition, for any documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please have the appropriate representative(s) of Terra complete a business records certification (a sample of which is enclosed) and return it with the document production. Execution of this certification may allow the Commission to introduce the documents provided by Terra in any subsequent judicial proceeding, without requiring the testimony of a records custodian.

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

Enclosed is a copy of the Commission's Form 1662, entitled "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena." This form explains how we may use the information that Terra provides to the Commission and has other important information.

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation does not mean that we have concluded that anyone has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity, or security.

2

If you have any questions or would like to discuss this matter, you may contact me at (202) 551-7501.  If Terra is represented by a lawyer, you should have Terra's lawyer contact me.

Sincerely,

Roger Landsman
Staff Attorney
Division of Enforcement

Enclosures:  Subpoena and Attachment
      SEC Data Delivery Standards
      SEC Form 1662
      Business Records Certification



# SUBPOENA

# UNITED STATES OF AMERICA
# SECURITIES AND EXCHANGE COMMISSION

### In the Matter of Mirror Protocol, HO-14164

**To:** Terraform Labs PTE Ltd.
c/o Do Kwon, Co-founder and Director
Via Cavalier Courier & Process Service

---

☒ **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

ENF-CPU, U.S. Securities and Exchange Commission, 14420 Albemarle Point Place, Suite 102 Chantilly, VA 20151-1750, no later than October 4, 2021 at 5:00 p.m. Eastern Time.

---

☐ **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

---

### FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.
If you do not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this subpoena.
Failure to comply with a court order enforcing this subpoena may result in the court imposing a fine, imprisonment, or both.

By: _____      Date:      September 17, 2021
Roger Landsman, Staff Attorney
U.S. Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549

---

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933, Section 21(a) of the Securities Exchange Act of 1934, and Section 42(a) of the Investment Company Act of 1940.

---

NOTICE TO WITNESS: If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

**SUBPOENA ATTACHMENT FOR TERRAFORM LABS PTE LTD.**
In the Matter of Mirror Protocol, HO-14164

September 17, 2021

**Definitions**

As used in this subpoena, the words and phrases listed below shall have the following meanings:

1.    "Terraform Labs PTE Ltd." means the entity doing business under the name "Terraform Labs PTE Ltd." or "Terraform Labs" ("Terra"), including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

2.    "Mirror" means the entity doing business under the name "Mirror," "Mirror team," "Mirror Finance" or "Mirror Protocol" and is associated with the website "Mirror.Finance," including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees , agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing (including but not limited to, Terra, Do Kwon, Daniel Shin, CJ Changjoon Han, SJ Park, Chee Lee, and Nicholas Platias, Rahul Abrol, Stanford Liu, William Chen, Sihyeok Yu, Evan Kereiakes, and Marco Di Maggio).

3.    "Mirror Assets" means all digital assets that can be created by or native to the Mirror Protocol or traded on terra.mirror.finance, including but not limited to Mirror tokens (ticker: MIR), all mAssets and LP Tokens.

4.    "Mirror Protocol" means the blockchain-based protocol or network operating under the same name or "Mirror."

5.    "Terra Assets" means all digital assets associated with the Terra blockchain and Terra ecosystem, including but not limited to Luna and UST.

6.    "UST" means the TerraUSD token.

7.    "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

8.    A "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

9.     "Document" shall include, but is not limited to, all records and other tangible forms of expression in Your possession, custody, or subject to your control (*e.g.*,  personal

accounts, services, and devices used to conduct Terra's business), Electronically Stored Information, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, telegrams, facsimiles, messages of any type, telephone messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

10.     "Electronically Stored Information" or "ESI" includes electronically stored information of any kind, however created, in Your possession, custody or control, or subject to your control (*e.g.*, personal accounts, services, and devices used to conduct Terra's business), including, but not limited to, text, metadata, word processing files and spreadsheets (including all drafts, versions, revisions, and markups); digital communications (*e.g.*, emails, instant messaging, text messages, voicemails, direct messages, chat messages, tweets, Telegram channel messages, portals, dashboards, platforms, messages on cell phones, Slack, WhatsApp, WeChat, and Discord); database files (including data dictionaries, schemas, logs, reports, and unstructured data containing plain text); documents created, modified, stored, or maintained by drawing, computer-aided design software, document management software, or project management software, including, but not limited to drawings, graphs, and charts; accounting application documents; presentation software documents including, but not limited to slide shows or presentation "decks" and any embedded or related audio, video, notes, or outlines; documents created, modified, stored, or maintained by calendaring, task management, collaboration, group management, and personal information software (*e.g.*, Microsoft Outlook, Lotus Notes, Novell GroupWise); photograph, image, sound, video, and animation files; audiovisual recordings; facsimile files; data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated; network and server activity data including, but not limited to logging files, electronic mail logs, routing software logs, and access and IP address logs; and data created, modified, stored, or maintained in connection with development, rapid development, and prototyping software. For the purpose of this document request, Electronically Stored Information shall be considered to be in Your possession, custody or control if it is accessible to You, whether stored or maintained in a known physical location, on physical media, in the cloud, on Handheld devices, on backup or archival systems or in archival software (*e.g.*, .gho, .zip), or by any third party or service at Your direction or on Your behalf.

11.     The term "Handheld" device consists of portable or mobile hardware devices to include wireless handheld devices, smartphones, personal digital assistants (PDA), tablets, Bluetooth, and other devices that provide computing, communications, electronic mail, telephone/fax, texting, instant messaging, paging, networking, or storage functionality.

This includes, but is not limited to, devices used as a calendar, organizer, and computer or for electronic data storage, iPhones, Android phones, and Blackberry devices.

12.    "Communication" means any correspondence, contact, discussion, e-mail, instant message, direct message, chat message, dashboard message, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

13.    "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting on, relating to, regarding, discussing, showing, describing, analyzing or reflecting.

14.    An "Agreement" means any actual or contemplated (i) written or oral Agreement; (ii) term or provision of such Agreement; or (iii) amendment of any nature or termination of such Agreement. A request for any Agreement among or between specified parties includes a request for all Documents Concerning (i) any actual or contemplated Agreement among or between such parties, whether or not such Agreement included any other Person; (ii) the drafting or negotiation of any such Agreement; (iii) any actual or contemplated demand, request or application for any such Agreement, and any response thereto; and (iv) any actual or contemplated objection or refusal to enter into any such Agreement, and any response thereto.

15.    The term "Reviewed" means examined, assessed, considered, analyzed or evaluated.

16.    The term "you" and "your" means the Person to whom or entity to which this subpoena was issued.

17.    To the extent necessary to bring within the scope of this this subpoena any information or Documents that might otherwise be construed to be outside its scope:
    a.    the word "or" means "and/or";
    b.    the word "and" means "and/or";
    c.    the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;
    d.    the masculine gender includes the female gender and the female gender includes the masculine gender; and
    e.    the singular includes the plural and the plural includes the singular.

## Instructions

1.    Unless otherwise specified, this subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All

responsive electronic Documents, including all metadata, should also be produced in their native software format.

2.    For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you <u>must</u> secure and retain the originals and store them in a safe place. The staff may later request or require that you produce the originals.

3.    Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

4.    In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

5.    Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, i.e., delineated with staples or paper clips to identify the Document boundaries.

6.    Documents should be labeled with sequential numbering (bates-stamped).

7.    You must produce all Documents created during, or Concerning, the period from January 1, 2020 to the date of this subpoena, unless otherwise specified.

8.    The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

9.    You are not required to produce exact duplicates of any Documents that have been previously produced to the Securities and Exchange Commission staff in connection with this matter. If you are not producing Documents based upon a prior production, please identify the responsive Documents that were previously produced.

10.   For any Documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please complete a business records certification (a sample of which is enclosed) and return it with the Document production.

11.    This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what you are not producing. The list should describe each item separately, noting:

a.    its author(s);
b.    its date;
c.    its subject matter;
d.    the name of the Person who has the item now, or the last Person known to have it;
e.    the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
f.    the basis upon which you are not producing the responsive Document;
g.    the specific request in the subpoena to which the Document relates;
h.    the attorney(s) and the client(s) involved; and
i.    in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

12.    If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

## **Documents to be Produced**

1.    Documents sufficient to identify all investors, token holders, owners or beneficial interest holders in MIR tokens, including but not limited to:

a.    Date of investment or acquisition;

b.    Amount of investment or consideration (by US dollar equivalent, and digital asset amount, if applicable);

2.    All presentations by Terra to investors, potential investors, token holders, or potential token holders in MIR tokens, including but not limited to, all Persons who entered into simple agreements for farmed tokens.

3.    All Communications with investors, potential investors, token holders, or potential token holders in MIR tokens Concerning Mirror or the Mirror Protocol.

4.    All Agreements between Terra and third parties regarding the sale or transfer of Mirror Assets, including, but not limited to, any agreement for farmed MIR tokens.

5.    Documents sufficient to show each unique marketing, promotional, or informational Document Concerning Mirror, the Mirror Protocol, or Mirror Assets, including but not limited to press releases, blog posts, web pages, videos and advertisements, including but not limited to relevant website addresses.

6.   Documents sufficient to identify LUNA tokens held by you or Terra.

7.   Documents sufficient to identify all public keys holding LUNA tokens responsive to Request. No. 6.

8.   Documents sufficient to identify the operators or owners of all Terra blockchain nodes or validators for MIR tokens or mAssets, including, but not limited to names and all contact information (phone number, address, email, etc.).

9.   All Agreements with ATQ Capital or Kysen Technologies.

10.  Documents sufficient to identify any payments or transfer of assets between Terra and ATQ Capital or Kysen Technologies.

11.  Any user or operating manuals, brochures or electronic text, coding journals, code change logs for any version or modification to the Mirror Protocol code that occurred or was contemplated.  The request includes, but is not limited to, any code or memorialization for:

    a.  All smart contracts;

    b.  All automated market makers;

    c.  All minting of tokens;

    d.  All staking of LP or MIR tokens; and

    e.  Any oracle.

12.  All audits of the Mirror Protocol code, including but not limited to, internal audits or audits conducted by any third-parties.

13.  Descriptions, charts, diagrams or Documents sufficient to identify the software and technology-related services and products that Mirror or Terra uses to develop, operate, and maintain Mirror and the Mirror Protocol, including programming software, smart contract programming, testing, and deployment, digital asset wallets.

14.  All current or previous governance proposals proposed, voted for, or endorsed by Terra or Mirror.

15.  Documents sufficient to identify all current or future projects, initiatives or upgrades for the Mirror Protocol.

16.  Documents sufficient to show the mechanism by which rewards or MIR tokens are allocated and communicated to staking users.

17.  Documents sufficient to identify, or a list of, all mAssets currently or previously minted by the Mirror Protocol.

18. Documents sufficient to identify all fees received by Mirror from the Mirror Protocol.

19. Documents sufficient to identify all fees received by Terra from Mirror or the Mirror Protocol.

20. Documents sufficient to identify the distribution of any revenue or income generated through the Mirror Protocol, including, but not limited to, staking rewards and Liquidity Provider ("LP") commissions.

21. All Documents Concerning the arbitrage of mAssets, including any analysis or description of how arbitrage theoretically works to maintain pricing.

22. Documents sufficient to identify whether Mirror or the Mirror Protocol uses any services related to investment income or revenue or rewards to third parties for any kind of token.

23. All organizational charts for personnel and corporate structure for Mirror and Terra.

24. Organizational charts sufficient to identify all Terra employees who performed any work Concerning the Mirror Protocol.

25. All articles of incorporation or by-laws for Terra.

26. All Documents and Communications Concerning Mirror or the Mirror Protocol's use of Band Protocol's oracles or other services, including but not limited to, (i) any Agreements between Terra and Band Protocol, (ii) Documents and Communications concerning the design and modification to Mirror Protocol in connection with oracles, (iii) Documents and Communications Concerning the design and modification of oracles, (iv) Documents and Communications Concerning the use of data providers, (v) any Agreements with data providers, (vi) Documents Concerning payments to data providers, and (vii) Documents Concerning any remuneration that Band Protocol receives for its oracles.

27. All non-public Communications Concerning Mirror on Discord, Telegram and Github.



# U.S. Securities and Exchange Commission

## Data Delivery Standards

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC).  **_Any questions or proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.**_

General Instructions ........................................................................................................................................ 1

Delivery Formats .......................................................................................................................................... 2

    I.  Imaged Productions ..................................................................................................................................... 3

           1.  Images ................................................................................................................................................. 3

           2.  Image Cross-Reference File ............................................................................................................ 3

           3.  Data File ............................................................................................................................................ 3

           4.  Text ..................................................................................................................................................... 3

           5.  Linked Native Files .......................................................................................................................... 3

    II.  Native File Productions without Load Files ......................................................................................... 4

    III.  Adobe PDF File Productions ................................................................................................................ 4

    IV.  Audio Files .............................................................................................................................................. 4

    V.  Video Files ............................................................................................................................................... 4

    VI.  Electronic Trade and Bank Records .................................................................................................... 4

    VII.  Electronic Phone Records .................................................................................................................... 4

    VIII.  Audit Workpapers ............................................................................................................................... 5

    IX.  Mobile Device Data ............................................................................................................................. 5

**General Instructions**

Due to COVID-19 restrictions the current, temporary mailing address for all <u>physical productions</u> sent to the SEC is:
**ENF-CPU (U.S. Securities & Exchange Commission), 14420 Albemarle Point Place, Suite 102, Chantilly, VA 20151-1750**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business.  For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet.  *(Note:  An Adobe PDF file is <u>not</u> considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF).  If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with

the duplicate files, for example, custodian name and file location and, 2) make that unique metadata part of your production to the SEC.

General requirements for **ALL** document productions are:

1. A cover letter must be included with each production and should include the following information:
   a. Case number, case name and requesting SEC staff member name
   b. A list of each piece of media included in the production with its unique production volume number
   c. A list of custodians, identifying the Bates range for each custodian
   d. The time zone in which the emails were standardized during conversion
   e. Whether the production contains native files produced from Mac operating system environments
2. Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
   a. Case number
   b. Production date
   c. Producing party
   d. Bates range (if applicable)
3. All submissions must be organized by **custodian** unless otherwise instructed.
4. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5. All load-ready collections should include only one data load file and one image pointer file.
6. All load-ready text must be produced as separate document-level text files.
7. All load-ready collections should account for custodians in the custodian field.
8. All load-ready collections must provide the extracted contents of any container files to ensure all relevant files are produced as separate records.
9. Audio files should be separated from data files if both are included in the production.
10. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
11. All electronic productions submitted on media must be produced using industry standard self-extracting encryption software.
12. The SEC uses 7zip to access compressed files. Note that the SEC **cannot** accept files that use AES-256 Jpeg or pkAES-256-Cert Deflate compression methods, even if the files are created with 7zip. If you have any questions or need additional information, please reach out to the requesting SEC staff member.
13. Electronic productions of 20 GB or less are strongly encouraged to be submitted via Secure File Transfer. All Secure File Transfers should be sent to the SEC Centralized Production Unit (ENF-CPU@sec.gov) with a CC to the requesting SEC staff member. If you do not have your own Secure File Transfer application, you may reach out to the requesting SEC staff member for a link to the SEC system in order to upload your production. If using the SEC Secure File Transfer system, you will NOT be able to CC individuals outside the SEC on your upload transmission. Note that the SEC **cannot** accept productions made using file sharing sites such as Google Drive, Microsoft Office 365 or Dropbox.
14. Productions containing BSA or SAR material must be delivered on encrypted physical media. The SEC **cannot** accept electronic transmission of BSA or SAR material. Any BSA or SAR material produced should be segregated and appropriately marked as BSA or SAR material, or should be produced separately from other case related material.
15. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a cover letter apart from the media.
16. All electronic productions should be produced free of computer viruses.
17. Before producing forensically collected images, parties should reach out to the requesting SEC staff member in order to discuss appropriate handling.
18. Before producing unique data sets (large sets of relational data, website reconstruction, chat room data, etc.), parties should reach out to the requesting SEC staff member in order to discuss an appropriate production format.
19. Additional technical descriptions can be found in the addendum to this document.

**\*Please note that productions sent to the SEC via United States Postal Service are subject to Mail Irradiation, and as a**

Rev 8/2021

**result electronic productions may be damaged.***

**Delivery Formats**

**I.    Imaged Productions**
The SEC prefers that all scanned paper and electronic file collections be produced in a structured format including industry standard load files, Bates numbered image files, native files and searchable document-level text files.

**1.    Images**
- a.    Black and white images must be 300 DPI Group IV single-page TIFF files
- b.    Color images must be produced in JPEG format
- c.    File names cannot contain embedded spaces or special characters (including the comma)
- d.    Folder names cannot contain embedded spaces or special characters (including the comma)
- e.    All image files must have a unique file name, i.e. Bates number
- f.    Images must be endorsed with sequential Bates numbers in the lower right corner of each image
- g.    The number of image files per folder should not exceed 2,000 files
- h.    Excel spreadsheets should have a placeholder image named by the Bates number of the file
- i.    AUTOCAD/photograph files should be produced as a single page JPEG file

**2.    Image Cross-Reference File**
The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

*ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

**3.    Data File**
The data file (.DAT) contains all of the fielded information that will be loaded into the database.

- a.    The first line of the .DAT file must be a header row identifying the field names
- b.    The .DAT file must use the following *Concordance®* default delimiters:
    - Comma ¶ ASCII character (020)
    - Quote þ ASCII character (254)
- c.    If the .DAT file is produced in Unicode format it must contain the byte order marker
- d.    Date fields should be provided in the format: mm/dd/yyyy
- e.    Date and time fields must be two separate fields
- f.    The time zone must be included in all time fields
- g.    If the production includes imaged emails and attachments, the attachment fields be included to preserve the parent/child relationship between an email and its attachments
- h.    An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media.  The text file must be named after the FIRSTBATES.  Do not include the text in the .DAT file.
- i.    For productions with native files, a LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the FIRSTBATES.
- j.    BEGATTACH and ENDATTACH fields must be two separate fields
- k.    A complete list of metadata fields is available in **Addendum A** to this document

**4.    Text**
Text must be produced as separate document-level text files, not as fields within the .DAT file. The text files must be named per the FIRSTBATES/Image Key and the full path to the text file (OCRPATH) included in the .DAT file. Text files may be in either ANSI or Unicode format, however, ALL text files must be in the same format within the same production. Note that productions containing text with foreign characters must produce text files in Unicode format to preserve the foreign characters. Text files must be in a separate folder, and the number of text files per folder should not exceed 2,000 files. There should be no special characters (including commas) in the folder names. For redacted documents, provide the full text for the redacted version.

**5.    Linked Native Files**
Copies of original email and native file documents/attachments must be included for all electronic productions.
- a.    Native file documents must be named per the FIRSTBATES number
- b.    The full path of the native file must be provided in the .DAT file for the LINK field

c.   The number of native files per folder should not exceed 2,000 files

## II. Native File Production without Load Files

With prior approval, native files may be produced without load files. The native files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, native email files (.PST or .MBOX) may be produced. A separate folder should be provided for each custodian.

## III. Adobe PDF File Production

With prior approval, Adobe PDF files may be produced in native file format.

1. All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
2. PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
3. All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4. If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

## IV. Audio Files

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

| | | |
|---|---|---|
| 1) | Caller Name: | Caller's name or account/identification number |
| 2) | Originating Number: | Caller's phone number |
| 3) | Called Party Name: | Called party's name |
| 4) | Terminating Number: | Called party's phone number |
| 5) | Date: | Date of call |
| 6) | Time: | Time of call |
| 7) | Filename: | Filename of audio file |

## V. Video Files

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

## VI. Electronic Trade and Bank Records

When producing electronic trade records, bank records, or financial statements, provide the files in one of the following formats:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2. Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

## VII. Electronic Phone Records

When producing electronic phone records, provide the files in the following format:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details. Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).
   a. The metadata that must be included is outlined in **Addendum B** of this document. Each field of data must be loaded into a separate column. For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information. Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

**VIII. Audit Workpapers**

The SEC prefers for workpapers to be produced in two formats: (1) With Bates numbers in accordance with the SEC Data Delivery Standards; and (2) in native format or if proprietary software was used, on a standalone laptop with the appropriate software loaded so that the workpapers may be reviewed as they would have been maintained in the ordinary course of business. The laptop must have printing capability, and when possible, the laptop should be configured to enable a Virtual Machine (VM) environment.

**IX. Mobile Device Data**

Before producing mobile device data (including but not limited to text messages) parties should reach out to the requesting SEC staff member in order to discuss the appropriate production format

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email<br>**The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email<br>**This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments<br>**The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided<br>Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender<br>Native: Author(s) of document<br>**semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s)<br>**semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email<br>Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field |

| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone<br>Native: (empty) |
|---|---|---|
| LINK | D:\001\ EDC0000001.msg | Hyperlink to the email or native file document<br>**The linked file must be named per the FIRSTBATES number |
| MIME_TYPE | application/msword | The content type of an email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the email or native file document; will vary depending on the format |
| AUTHOR | John Smith | Email: (empty)<br>Native: Author of the document |
| LAST_AUTHOR | Jane Doe | Email: (empty)<br>Native: Last Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty)<br>Native: Date the document was created |
| TIME_CREATED/TIME_ZONE | 10:25 AM GMT | Email: (empty)<br>Native: Time the document was created including time zone<br>**This data must be a separate field and cannot be |
| DATE_MOD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last modified |
| TIME_MOD/TIME_ZONE | 07:00 PM GMT | Email: (empty)<br>Native: Time the document was last modified including the time zone<br>**This data must be a separate field and cannot be |
| DATE_ACCESSD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last accessed |
| TIME_ACCESSD/TIME_ZONE | 07:00 PM GMT | Email: (empty)<br>Native: Time the document was last accessed including the time zone<br>**This data must be a separate field and cannot be |
| PRINTED_DATE | 10/12/2010 | Email: (empty)<br>Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty)<br>Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name.<br>Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb8306d1@MSN> | Email: Unique Message ID<br>Native: (empty) |

| HEADER | Return-Path: <example_from@dc.edu> X-SpamCatcher-Score:1[X] Received:from[136.167.40.119] (HELO dc.edu) by fe3.dc.edu (CommuniGate Pro SMTP4.1.8) with ESMTP-TLS id 61258719 for example_to@mail.dc.edu; Mon, 23 Aug 2004 11:40:10 -0400 Message-ID: <4129F3CA.2020509@dc.edu> Date: Mon, 23 Aug 2005 11:40:36 -400 From: Taylor Evans <example_from@dc.edu> User-Agent:Mozilla/5.0 (Windows;U; Windows NT 5.1; en-US;rv:1.0.1) Gecko/20020823 Netscape/7.0 X-Accept-Language:en-us,en MIME-Version:1.0 To: Jon Smith <example_to@mail.dc.edu> Subject:Business Development Meeting Content-Type: text/plain;charset=us-ascii; format=flowed Content-Transfer-Encoding:7bit | Email: The email header information Native: (empty) |
|---|---|---|
| MD5HASH | d131dd02c5e6eec4693d9a069 8aff95c 2fcab58712467eab4004583eb 8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Cross-Reference File:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000004.TIF,Y,,,
IMG0000005,,E:\001\IMG0000005.TIF,Y,,,
IMG0000006,,E:\001\IMG0000006.TIF,,,,
```

## **ADDENDUM B**

For Electronic Phone Records, include the following fields in separate columns:
For Calls:
1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable


For Text messages:
1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable

For Mobile Data Usage:
1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

Section 1519 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . ., or in relation to or contemplation of any such matter.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1. *Record*. Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2. *Counsel*. You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3. *Transcript Availability*. Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however*, That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4. *Perjury*. Section 1621 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever--

> (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare,

depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true.

5. *Fifth Amendment and Voluntary Testimony*. Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6. *Formal Order Availability*. If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

## C. Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

> Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

> In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## D. Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

**E. Authority for Solicitation of Information**

*Persons Directed to Supply Information Pursuant to Subpoena.* The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.* One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

**F. Effect of Not Supplying Information**

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, Section 21(c) of the Securities Exchange Act of 1934, Section 42(c) of the Investment Company Act of 1940, and Section 209(c) of the Investment Advisers Act of 1940 provide that fines and terms of imprisonment may be imposed upon any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

**G. Principal Uses of Information**

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

**H. Routine Uses of Information**

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1. To appropriate agencies, entities, and persons when (1) the SEC suspects or has confirmed that there has been a breach of the system of records, (2) the SEC has determined that as a result of the suspected or confirmed breach there is a risk of harm to individuals, the SEC (including its information systems, programs, and operations), the Federal Government, or national security; and (3) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm.

2. To other Federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3. To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the Federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4. By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the Federal securities laws.

5. In any proceeding where the Federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6. In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7. To a bar association, state accountancy board, or other Federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8. To a Federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9. To a Federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10. To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11. To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the Federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 through 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100 through 1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the Federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12. To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13. To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14. In reports published by the Commission pursuant to authority granted in the Federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15. To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16. To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 through 200.735-18, and who assists in the investigation by the Commission of possible violations of the Federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the Federal securities laws.

17. To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18. To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19. To prepare and publish information relating to violations of the Federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20. To respond to subpoenas in any litigation or other proceeding.

21. To a trustee in bankruptcy.

22. To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection,

including collection by administrative offset, Federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

23. To another Federal agency or Federal entity, when the SEC determines that information from this system of records is reasonably necessary to assist the recipient agency or entity in (1) responding to a suspected or confirmed breach or (2) preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal Government, or national security, resulting from a suspected or confirmed breach.

* * * * *

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

**DECLARATION OF [*Insert Name*] CERTIFYING RECORDS
OF REGULARLY CONDUCTED BUSINESS ACTIVITY**

I, the undersigned, [*insert name*], pursuant to 28 U.S.C. § 1746, declare that:

1.  I am employed by Terraform Labs PTE Ltd. as [*insert position*] and by reason of my position am authorized and qualified to make this declaration. [*if possible supply additional information as to how person is qualified to make declaration, e.g., I am custodian of records, I am familiar with the company's recordkeeping practices or systems, etc.*]

2.  I further certify that the documents [*attached hereto or submitted herewith*] and stamped [*insert bates range*] are true copies of records that were:

    (a) made at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;

    (b) kept in the course of regularly conducted business activity; and

    (c) made by the regularly conducted business activity as a regular practice.

I declare under penalty of perjury that the foregoing is true and correct. Executed on [*date*].

_____
[*Name*]

# <u>EXHIBIT D</u>

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, |
|                         Applicant, |
|         v. |
| TERRAFORM LABS PTE, Ltd. and DO KWON, |
|                      Respondents. |

No. 21-mc-      (      )

**DECLARATION OF ROGER J. LANDSMAN  IN SUPPORT OF U.S. SECURITIES AND EXCHANGE COMMISSION'S APPLICATION FOR AN ORDER TO SHOW CAUSE AND FOR AN ORDER REQUIRING COMPLIANCE WITH SUBPOENAS**

I, Roger J. Landsman, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1.	I am employed by the United States Securities and Exchange Commission ("SEC" or "Commission") as an attorney in the Division of Enforcement at the SEC's headquarters in Washington, DC.  I am admitted to the Bars of New York and the District of Columbia.

2.	I submit this Declaration in support of the Commission's Application for an Order to Show Cause and for an Order Requiring Compliance with Subpoenas directing Respondents Do Kwon and Terraform Labs PTE Ltd. ("Terraform") to comply with investigative subpoenas served upon Mr. Kwon and Terraform in connection with the Commission's non-public investigation entitled *In the Matter of Mirror Protocol* (Internal File No. HO-14164) (the "Mirror Protocol Investigation").  This Declaration is based upon my direct participation in the Mirror Protocol Investigation and sets forth both (1) the nature of the investigation; and (2) the Commission's unsuccessful efforts to secure Mr. Kwon's and

1

Terraform's compliance with investigative subpoenas seeking documents from Mr. Kwon and Terraform and testimony from Mr. Kwon.

## I.  Nature of the SEC's Mirror Protocol Investigation

3.      The Commission's Mirror Protocol Investigation concerns, among other things, whether persons or entities have engaged in acts constituting violations of various provisions of the federal securities laws, including, but not limited to, Section 5 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e], prohibiting the unregistered offer or sale of securities; Section 6(l) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78f(l)], prohibiting any person from effecting transactions in a security-based swap with or for a person that is not an eligible contract participant unless such transaction is effected on a national security exchange; Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], prohibiting acting as an unregistered broker or dealer; and Section 7(a) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a–7], prohibiting securities transactions by unregistered investment companies, in connection with Terraform's involvement with the Mirror Protocol, including Terraform's participation in the creation, promotion, and offer to sell mAssets and MIR tokens to U.S. investors.

4.      Terraform is a Singapore-incorporated computer programming and digital asset[1] company that regularly transacts business in the United States, including by contracting with

---

[1]      On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, which advised on the "applicability" of the federal securities laws to "virtual organizations or capital raising entities that use distributed ledger or blockchain technology to facilitate capital raising and/or investment" and finding that the offering of digital assets at issue in that report were securities.  The term "digital asset" or "digital token" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," digital "coins," and digital "tokens."

U.S.-based companies, such as a prominent digital asset-trading platform incorporated in Delaware. Several employees of Terraform appear to reside in the United States, including Terraform's General Counsel (located in Pennsylvania), its Business Development lead (located in Texas), its Head of Research (located in California), and its Director of Special Products (located in New York).

5.  Do Kwon is the co-founder and Chief Executive Officer ("CEO") of Terraform and a resident of the Republic of Korea. Mr. Kwon graduated with a Bachelor of Science degree in computer science from Stanford University in California and travels to the United States to conduct business on behalf of Terraform, including to a digital asset and blockchain conference held in New York City in September 2021.

6.  To the best of my understanding, Terraform launched the Mirror Protocol in December 2020. The Mirror Protocol is a series of computer codes written on a blockchain[2] through which users create digital assets,[3] called Mirrored Assets, or "mAssets." The mAssets "mirror" equity or other types of securities traded in the United States, including those traded on U.S. national securities exchanges, such as shares of Apple, Inc. or Tesla, Inc., in that they are designed so that their value rises and falls with the value of those securities. The mAssets corresponding to those equities have been named as "mAAPL" or "mTSLA." *See* Terraform website, https://terra.mirror.finance and https://docs.mirror.finance (last visited November 10,

---

[2]  A blockchain is a type of distributed ledger or peer-to-peer database that is spread across a computer network and records all transactions in the network in theoretically unchangeable, digitally recorded data packages called "blocks." Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain. The system relies on cryptographic techniques for securely recording transactions. A blockchain can be shared and accessed by anyone with appropriate permissions.

[3]  The term "digital asset" or "digital token" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," digital "coins," and digital "tokens."

2021) ("mAssets mimic the price behavior of real-world assets and give traders anywhere in the world open access to price exposure without the burdens of owning or transacting real assets."). Users access the Mirror Protocol through a variety of means, including through Terra's website and web application.  *See* Terraform website, https://docs.mirror.finance/user-guide/getting-started (last visited November 5, 2021).

7.      mAssets are created or "minted" when sufficient collateral is deposited in a so-called "smart contract," a computer program designed to execute the terms of a contract when certain triggering conditions are met.  After mAssets have been minted, they may be traded by investors, including investors located in the United States, through Terraform's web application. According to Terraform's web application, the total value of mAssets outstanding under the Mirror Protocol is more than $437 million, as of November 8, 2021.  *See* Terraform website, https://terra.mirror.finance.

8.      The Mirror Protocol also provides users with the ability to obtain Mirror Tokens or "MIR tokens," a digital asset that Terraform describes as the "governance token" for the Mirror Protocol.  *See* Terraform website, https://docs.mirror.finance/protocol/governance.  As of November 8, 2021, there are approximately 120 million MIR tokens in circulation, with a market capitalization of approximately $407 million.  https://terra.mirror.finance.  MIR tokens receive value based upon, among other things, fees generated under the Mirror Protocol.  MIR tokens have been or may be purchased through several means, including through entry into a contract with Terraform and through purchasing tokens in the secondary trading market via various digital asset trading platforms.

9.      Both mAssets and MIR tokens are offered and available for purchase by U.S. investors through Terraform's web application.  MIR tokens can also be purchased on digital

4

asset trading platforms.  Upon information and belief, U.S. investors have purchased both mAssets and MIR tokens.  Terraform and Mr. Kwon promote the Mirror Protocol, mAssets, and the MIR token through, among other means, Terraform's website, web application, social media accounts, podcast interviews, and through U.S. media.  *See, e.g. Our mission is to bring decentralized monies to as many blockchains as possible: Terraform Labs CEO* (July 12, 2021) Yahoo! News (https://news.yahoo.com/mission-bring-decentralized-monies-many-171201969.html); and *Fake Tesla, Apple Stocks Have Started Trading on Blockchains* (July 6, 2021) Bloomberg News (https://www.bloomberg.com/news/articles/2021-07-06/fake-tesla-apple-stocks-have-started-trading-on-blockchains).  In addition, Terraform appears to be actively conducting business in the U.S. by, among other things, (1) entering into a contract with a U.S. digital asset trading platform concerning the listing of MIR tokens; (2) Mr. Kwon corresponding with a U.S. digital asset trading platform and discussing listing of MIR tokens; and (3) Terraform completing an extensive questionnaire to the U.S. digital asset trading platform in furtherance of the digital asset trading platform's decision to custody MIR tokens, and the questionnaire was potentially used for the platform making a listing determination as well.

10.     It appears that Terraform also continues to play an active role in maintaining and updating the technological architecture for the Mirror Protocol.

11.     Terraform, the mAssets and the MIR tokens are not registered with the SEC in any capacity.  For example, Terraform has not registered any offering of securities pursuant to the Securities Act, nor has it registered the mAssets or MIR tokens as a class of securities under the Exchange Act.  Terraform has also not registered with the SEC as a broker or dealer under Section 15(a) of the Exchange Act, or as an investment company under Section 7(a) of the Investment Company Act.

12.     On May 7, 2021, pursuant to Section 20(a) of the Securities Act [15 U.S.C.

§ 77t(a)], Section 21(a) of the Exchange Act [15 U.S.C. § 78u(a)], and Section 42(a) of the

Investment Company Act [15 U.S.C. § 80a-41], the Commission issued an Order Directing

Private Investigation and Designating Officers to Take Testimony in the Mirror Protocol

Investigation (the "Formal Order").[4]  Among other things, the Formal Order:

> a.  directed, pursuant to Section 20(a) of the Securities Act, Section 21(a) of
>     the Exchange Act, and Section 42(a) of the Investment Company Act that
>     the Commission staff conduct a private investigation to determine whether
>     any persons or entities have engaged in acts or practices in violation of
>     various provisions of the federal securities laws; and
>
> b.  designated, pursuant to Section 19(c) of the Securities Act, Section 21(b) of
>     the Exchange Act, and Section 42(b) of the Investment Company Act,
>     certain individuals, including myself, as officers of the Commission
>     empowered to administer oaths and affirmations, subpoena witnesses,
>     compel their attendance, take evidence, and require the production of any
>     books, papers, correspondence, memoranda, or other records deemed
>     relevant or material to the investigation.

## II.   The Commission's Unsuccessful Efforts to Secure Documents from Terraform and Mr. Kwon and Testimony from Mr. Kwon

13.     On May 20, 2021, I sent an email to Mr. Kwon and Terraform's Chief Financial

Officer to request a voluntary meeting with a representative of Terraform regarding the Mirror

Protocol.  A copy of my May 20, 2021 email is attached as **Exhibit 1**.  After receiving a

notification that the email had not been opened, I resent the email to Mr. Kwon and Terraform's

CFO on May 23, 2021.  A copy of my May 23, 2021 email is **Exhibit 2**.

14.     Several days later, on May 27, 2021, my co-counsel, Kathleen Hitchins, and I,

spoke on a call with Douglas W. Henkin and Stephen J. Senderowitz of the law firm Dentons US

---

[4]     Commission formal orders are not public. The Commission has not included a copy of
the Formal Order with this Application and respectfully requests that the Court conduct an *in
camera* review if the Court wishes to examine it.  Counsel for Respondents Terraform and Mr.
Kwon requested a copy of the formal order, which was provided to counsel on October 5, 2021.

LLP ("Dentons") after they contacted me.  Mr. Henkin indicated that he and Mr. Senderowitz represented Terraform regarding the SEC's Mirror Protocol Investigation and asked what interest the Commission had in Terraform and Mr. Kwon, who Mr. Senderowitz described as a foreign company and foreign witnesses.  I told Mr. Henkin and Mr. Senderowitz that the SEC was interested in an interview with Mr. Kwon or another representative of Terraform to better understand the Mirror Protocol.  In response, during subsequent conversations, Dentons offered that Mr. Kwon would agree to an interview if the SEC would enter into a proffer agreement with Mr. Kwon, under which statements made by Mr. Kwon could not be used against him or Terraform in subsequent proceedings, except that the Commission may use statements made during the proffer session as a source of leads to discover additional evidence and for impeachment or rebuttal purposes if Mr. Kwon or Terraform testifies or argues inconsistently in a subsequent proceeding. *See SEC Enforcement Manual* §§ 3.3.3, 3.3.7 (Nov. 28, 2017) (available at https://www.sec.gov/divisions/enforce/enforcementmanual.pdf).

15.    Following further negotiations, the SEC entered into a proffer agreement with Mr. Kwon and Terraform.  The SEC staff, including myself, then interviewed Mr. Kwon by videoconference for approximately four and a half hours on July 8, 2021.  Mr. Senderowitz and Mr. Henkin represented Mr. Kwon and Terraform during the interview.  Among other things, Mr. Kwon was unable to provide specific information or failed to answer several questions on a variety of topic areas, including Terraform's relationship with a U.S.-based digital asset trading platform, its contacts with third parties regarding the sale of MIR tokens, the corporate structure of Terraform, whether Terraform owned any MIR tokens, and Terraform raising capital in connection with the Mirror Protocol.

16.     Two weeks later, on July 22, 2021, I, along with Ms. Hitchins, initiated a call with Mr. Henkin and Mr. Senderowitz, to discuss follow-up requests to Mr. Kwon's proffer interview. Among other things, I explained that the SEC proposed sending voluntary document requests to Terraform, and I inquired whether Terraform would agree to produce documents related to the Mirror Protocol.  In response, Mr. Senderowitz stated that Terraform could not commit whether it would voluntarily produce documents until the SEC provided the document requests.  Later that same day, I emailed the SEC's document requests to Mr. Henkin and Mr. Senderowitz.  A copy of my July 22, 2021 email transmitting the document requests, along with the document requests, is attached as **Exhibit 3**.  The document request included requests for documents regarding topics that Mr. Kwon did not provide specific information during the proffer session, such as the corporate structure of Terraform and its contacts with third parties regarding the sale of MIR tokens.  The document request also asked for information concerning topics that Mr. Kwon did discuss during the proffer interview.

17.     On July 27, 2021, Ms. Hitchins and I had a telephone call with Mr. Henkin and Mr. Senderowitz regarding the SEC's document requests, including offering to modify the document requests based upon counsel's concerns.  Mr. Senderowitz indicated that Terraform could produce certain documents, but had concerns regarding the proprietary nature of several of the document requests by the SEC.

18.     On July 28, 2021, Ms. Hitchins and I had a follow-up call with Mr. Henkin and Mr. Senderowitz to discuss the SEC's document requests.  Mr. Henkin and Mr. Senderowitz stated that Terraform took issue with certain of the requests for various reasons, including how the requests were phrased and that several of the documents were allegedly available in the public domain.  Ms. Hitchins and I responded to many of Mr. Henkin and Mr. Senderowitz's

8

comments, explaining what the document requests were seeking. In addition, we requested that Mr. Henkin and Mr. Senderowitz provide links to the documents Mr. Henkin and Mr. Senderowitz said were in the public domain, but they never did so. In an effort to allow the parties to work cooperatively to resolve any disputes, on the same day, I emailed Mr. Henkin and Mr. Senderowitz to request that they state their objections to the document requests in writing. A copy of my July 28, 2021 email to Mr. Henkin and Mr. Senderowitz is attached as **Exhibit 4**. Mr. Senderowitz responded the following day that Terraform hoped to provide its written objections within the following one or two days. A copy of Mr. Senderowitz's July 29, 2021 email is attached as **Exhibit 5**.

19.     The following week, the SEC staff and Dentons continued to have communications regarding the timing of Terraform providing a written description of Terraform's objections to the document requests, but did not receive those objections. On Monday August 16, 2021, I emailed Mr. Henkin and Mr. Senderowitz to inquire about the status of the responses to the voluntary document requests, because we had not received the objections. A copy of my August 16, 2021 email is attached as **Exhibit 6**.

20.     The following day, on August 17, 2021, Mr. Senderowitz provided Terraform's responses to our voluntary document requests, which included objections that certain document requests were allegedly "unclear, overbroad, sought information not relevant to the Commission's inquiry, sought production of publicly available data, or sought information Terraform does not possess." A copy Mr. Senderowitz's letter containing Terraform's response to the SEC's voluntary document requests is attached as **Exhibit 7**. Nonetheless, Mr. Senderowitz concluded by stating that "Terraform desires to cooperate with the Commission on a voluntary basis, to provide information reasonably related to the Commission's inquiry that

Terraform has in its possession and identify public sources to which it can direct the Commission's attention."

21.    In Mr. Senderowitz's August 17, 2021 letter, he also wrote "we indicated [on the July 28, 2021 call] that it is important for the Commission to advise us of (1) its intentions related to Terraform's status in the investigation, (2) its intentions relating to the Mirror Protocol, and whether (3) the Commission is seeking a specific goal with respect to the operation of the Mirror Protocol (so that Terraform can evaluate whether it might be able to assist the Commission in a cost-efficient and satisfactory resolution of the matter)."

22.    In response to Mr. Senderowitz's letter, a week later, on August 25, 2021, Ms. Hitchins and I initiated a telephone call with Mr. Henkin and Mr. Senderowitz to discuss Terraform's response to the SEC's document requests, including its request for information on the Commission's intentions.  Among other things, I explained that the SEC staff was investigating whether MIR tokens and mAssets were securities and had concerns these potential securities were being offered and sold in the United States in violation of the federal securities laws, and further pointed out Terraform's contacts with the United States.  For example, I explained that Terraform employees continued to promote the Mirror Protocol and its associated assets (the MIR tokens and mAssets) to investors located in the United States.  We offered Terraform the opportunity to respond to and address our concerns.

23.    On September 3, 2021, Ms. Hitchins and I had another telephone call with Mr. Henkin and Mr. Senderowitz.  During the call, Mr. Henkin explained that Terraform wished to cooperate with the SEC's investigation and that it could take limited steps to restrict the future sale of mAssets and MIR tokens in the United States if the SEC would agree not to bring an enforcement action against Terraform.  At the conclusion of the September 3, 2021 call, I again

inquired about the status of Terraform's production of documents, noting again that Terraform had still not produced any documents in response to the SEC's document request.

24.    On September 15, 2021, Ms. Hitchins, my supervisor and I, had a follow-up telephone call with Mr. Henkin and Mr. Senderowitz.  We informed counsel that our investigation was still ongoing, as we had done on prior occasions.  We further discussed Terraform's response to the SEC's document requests.

25.    On September 17, 2021, Mr. Henkin and Mr. Senderowitz called me and stated that Terraform wished to discuss how it could resolve the Mirror Protocol Investigation.

## III.    The SEC's Service of Subpoenas upon Terraform and Mr. Kwon

26.    On September 13, 2021, I learned that Mr. Kwon was scheduled to speak at the Mainnet conference, a digital asset conference held in New York, NY.  I learned this information through Mr. Kwon's publicly available Twitter account.  Do Kwon (@stablekwon), Twitter (September 9, 2021, 12:34 p.m.) ("I almost never go to crypto conferences, but when I do I speak @messaricrypto Mainnet.  Come say hi.").

27.    The conference was marketed on Mainnet's public website as a "gather[ing] [of] crypto leaders, operators, builders, and investors[.]"  https://mainnet.events/ (last visited November 1, 2021).  The conference's public website announced Mr. Kwon as a speaker in his capacity as the co-founder and CEO of Terraform and noted when and where he would speak.

28.     My co-counsel, supervisor and I concluded that it was necessary and appropriate to serve subpoenas upon Terraform and Mr. Kwon while he was located in the United States conducting business on behalf of Terraform.  To the best of my knowledge, after inquiry, Mr. Henkin and Mr. Senderowitz had not filed a notice of appearance pursuant to Rule 102.

29.     On September 17, 2021, pursuant to the Formal Order, I prepared subpoenas requesting documents from Terraform and testimony and documents from Mr. Kwon related to the Mirror Protocol, MIR tokens, and mAssets.  The September 17, 2021 investigative subpoena to Terraform seeking documents is attached as **Exhibit 8** and required that Terraform produce documents by October 4, 2021.  The September 17, 2021 investigative subpoena to Mr. Kwon seeking documents and testimony is attached as **Exhibit 9**.  The subpoena addressed to Mr. Kwon required him to produce documents by October 4, 2021 and to testify on October 27, 2021.  I also requested that the SEC's contracted process server, Cavalier Courier & Process Service, serve Mr. Kwon with both subpoenas.

30.     The subpoenas seek documents necessary for the Commission's investigation relating to the Mirror Protocol, including, among other things, documents concerning investors who purchased MIR tokens from Terraform; Terraform's presentations to investors in MIR tokens; Terraform's marketing and promotion of the Mirror Protocol, MIR tokens, and mAssets, including Terraform's and Kwon's communications with investors; Terraform's ability to control, effect or change the Mirror Protocol; Terraform's agreements with third parties regarding the sale or transfer of mAssets and MIR tokens, the corporate structure of Terraform, whether Terraform owns any MIR tokens, and whether Terraform has raised capital in connection with the Mirror Protocol.  The documents sought through the subpoenas included documents that the SEC Staff had deemed necessary and initially sought through the July 22 voluntary document request for which Terraform produced no documents.  In addition, the subpoenas sought documents on new areas of inquiry developed since our initial document requests to Terraform, and the subpoenas modified and clarified certain language that counsel for Mr. Kwon and Terraform took issue with previously.  No other source could cover all the

documents requested in the subpoenas.  Without the requested documents, the Commission lacks important information about the Mirror Protocol, mAssets, and the MIR tokens, the subject matters of the SEC's investigation, including whether mAssets and MIR tokens qualify as securities or security-based swaps under the federal securities law.

31.     The subpoena calling for Kwon's testimony was issued because the Commission staff determined that it was necessary to seek the sworn testimony of Respondent Kwon regarding, among other topics, Terraform's marketing and promotion of the Mirror Protocol, MIR tokens, and mAssets, including Terraform's and Kwon's communications with investors; Terraform's presentations to investors in MIR tokens; Terraform's relationship with a U.S.-based digital asset trading platform, its contacts with third parties regarding the sale of MIR tokens, the corporate structure of Terraform, whether Terraform owns any MIR tokens, and whether Terraform has raised capital in connection with the Mirror Protocol.  In deciding to issue a subpoena for Kwon to testify, Commission staff determined that it was necessary to obtain his testimony of these subjects as Kwon was the CEO of Terraform.

32.     On September 20, 2021, Mr. Kwon was personally served with the September 17, 2021 subpoenas.  A copy of the proofs of service is attached as **Exhibit 10 and 11**.  I then emailed a copy of the September 17, 2021 subpoenas to Mr. Henkin and Mr. Senderowitz, explaining that both subpoenas were served earlier that day upon Mr. Kwon.  A copy of my September 20, 2021 email to Mr. Henkin and Mr. Senderowitz is attached as **Exhibit 12.**

IV.     **Mr. Kwon's and Terraform's Refusal to Comply with the Subpoenas**

33.     On September 24, 2021, I followed up with Mr. Henkin and Mr. Senderowitz regarding the status of the subpoenas served upon Mr. Kwon.  In response, Mr. Senderowitz requested a "copy of the order entered pursuant to Rule 150(b) of the Rules of Practice by the

Commission authorizing personal service of the subpoenas upon Mr. Kwon." A copy of the email exchange is attached as **Exhibit 13**.

34.     I emailed Mr. Senderowitz on September 28, 2021, and later that day over the phone, explained to Mr. Senderowitz that the subpoenas were properly served pursuant to Rule 150(d).  During the September 28 conversation, Mr. Senderowitz stated that he believed there was an issue with service of the subpoenas and stated that they would provide more information within a week regarding whether Terraform and Mr. Kwon would comply with the subpoenas. A copy of the email exchange is also attached as **Exhibit 13**.

35.      On October 1, 2021, Mr. Henkin sent an email to Ms. Hitchins and me regarding the September 17, 2021 subpoenas.  Mr. Henkin stated he had "not made a determination regarding our views of whether service [of the subpoenas] was valid."  Nonetheless, Mr. Henkin requested that the return dates for the subpoenas be "temporarily suspend[ed]" so the parties could focus on a resolution of the SEC's investigation.  A copy of Mr. Henkin's October 1, 2021 email is attached as **Exhibit 14**.

36.     On October 7, 2021, Ms. Hitchins and I spoke again by telephone to Mr. Henkin and Mr. Senderowitz.  During the call, as part of discussions regarding a potential settlement that would be submitted to the Commission for approval, I offered to extend the return dates of the September 17, 2021 subpoenas, which required that Terraform and Mr. Kwon produce responsive documents by October 4, 2021 and that Mr. Kwon testify on October 27, 2021. Specifically, I offered to extend the date for the start of the production of documents responsive to the subpoenas from October 4, 2021 to October 29, 2021 and the end of document production to be completed by November 30, 2021.  I also offered to delay Mr. Kwon's testimony from October 27, 2021 to December 15, 2021.  Mr. Senderowitz did not accept our offer to extend the

dates and instead stated that he did not believe that service of the subpoenas was proper.  I reiterated that service was proper upon Mr. Kwon and that, even if they contended it was not, the SEC also sent the subpoenas to Mr. Henkin and Mr. Senderowitz.  Mr. Senderowitz responded that even if I served counsel properly, that could not effect jurisdiction over Mr. Kwon and Terraform.  I responded that we were amenable to allowing Terraform to focus on the settlement discussions, requesting that Terraform and Mr. Kwon state whether they were willing to continue to negotiate settlement by October 22, 2021.  Mr. Henkin indicated that they could respond by or before October 22.  I then emailed Mr. Henkin and Mr. Senderowitz to confirm the SEC was willing to extend the return dates of the subpoenas as discussed by telephone earlier in the day. A copy of my October 7, 2021 email is attached as **Exhibit 15.**

37.     On October 19, 2021, I followed up with Mr. Henkin and Mr. Senderowitz by email in regards to the settlement negotiations, but received no reply.  A copy of my October 19, 2021 email is attached as **Exhibit 16.**

38.     On the evening of October 22, 2021, I received an email from Mr. Senderowitz attaching a complaint against the SEC in relation to the subpoenas served on Mr. Kwon and Terraform.  A copy of Mr. Senderowitz's email is attached as **Exhibit 17.**

39.     On November 1, 2021, I emailed Mr. Henkin and Mr. Senderowitz to inquire whether Terraform and Mr. Kwon intended to comply with the September 17, 2021 subpoenas.  I pointed out that Terraform and Mr. Kwon had failed to produce any documents to the SEC by October 29, 2021, the extended return date offered by the SEC for documents responsive to the subpoenas.  I requested that Mr. Henkin and Mr. Senderowitz indicate whether Terraform and Mr. Kwon intended to comply with the documents subpoenas and whether Mr. Kwon accepted our offer to reschedule his testimony for December 15, 2021.  I further stated that the

Commission may seek appropriate remedies if Terraform and Mr. Kwon continued to not comply with the subpoenas.  Mr. Henkin responded to my inquiry on November 4, 2021, stating by email that the subpoenas were not "validly issued."  A copy of the email exchange is attached as **Exhibit 18**.

40.     Neither Terraform nor Mr. Kwon have produced a single document responsive to the September 17, 2021 subpoenas nor the July 22, 2021 document request and Mr. Kwon has not provided testimony pursuant to the subpoena.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

November 12, 2021

Roger J. Landsman

16

# EXHIBIT E

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

TERRAFORM LABS PTE LTD. and DO KWON,

*Plaintiffs,*

v.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

*Defendant.*

Case No. _____

## COMPLAINT

Plaintiffs Terraform Labs PTE Ltd. ("TFL") and Do Kwon, through their undersigned attorneys, for their Complaint against Defendant United States Securities and Exchange Commission ("SEC") allege as follows:

## SUMMARY OF ACTION

1.      This is a lawsuit under the Due Process Clause of the Fourteenth Amendment, the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. (the "'34 Act"), the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA"), and the SEC's Rules of Practice (the "SEC's Rules") challenging two subpoenas improperly issued and served by the SEC and the SEC's failure to keep confidential an investigation into the "Mirror Protocol," all in violation of the Due Process Clause, the SEC's Rules, and the APA.

## PARTIES

2.      TFL is a private company located at 80 Raffles Place, #32-01, UOB Plaza, Singapore 048624, and is engaged in software development, computer programming, and related

activities.  TFL designs, develops, and builds infrastructure for the next generation of decentralized financial applications.

3.     Mr. Kwon is a citizen and resident of the Republic of Korea and is domiciled in the Republic of Korea.[1]  Mr. Kwon is the co-founder and Chief Executive Officer of TFL.  Before co-founding TFL, Mr. Kwon received a Computer Science degree from Stanford University, was a software engineer at two of the world's largest technology companies, and founded Anyfi, a wireless mesh network startup that built one of the most sophisticated decentralized applications in real-world use.  Mr. Kwon was one of Forbes Magazine's "30 Under 30" (Asia - Finance and Venture Capital) in 2019.

4.     Defendant SEC is (and was at all relevant times) an agency of the U.S. government subject to the Administrative Procedure Act.  *See* 5 U.S.C. § 551(1).  It was created by the '34 Act.  *See* 15 U.S.C. § 78d.

## JURISDICTION AND VENUE

5.     This action arises under the Due Process Clause, the APA, and the '34 Act.  Jurisdiction therefore lies in this Court under 28 U.S.C. § 1331.  *See also* 5 U.S.C. § 704.

6.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against an agency of the United States that resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

---

[1]     By bringing this complaint to contest improper actions by the SEC, neither TFL nor Mr. Kwon are submitting to the jurisdiction of the SEC or to jurisdiction of United States courts for any purpose other than the adjudication of this case.

## BACKGROUND

7.      TFL is the developer of Terra, a decentralized and open-source public blockchain network, and the Mirror Protocol, a decentralized finance protocol built on Terra that is governed by its stakeholder community, not by TFL or Mr. Kwon.

8.      On May 24, 2021, two attorneys from the SEC's Division of Enforcement emailed Mr. Kwon seeking his voluntary cooperation in connection with a formal order of investigation styled *In the Matter of Mirror Protocol*, HO-14164 (the "Formal Order"). The SEC requested Mr. Kwon's voluntary cooperation because it knew that it could not serve subpoenas upon Mr. Kwon or TFL, as it could not secure personal jurisdiction over Mr. Kwon or TFL consistent with the Due Process Clause.

9.      TFL and Mr. Kwon retained Dentons US LLP to represent them in connection with the SEC's request. On May 27, 2021, on behalf of TFL and Mr. Kwon, Dentons notified the SEC attorneys who had contacted Mr. Kwon that it represented TFL and Mr. Kwon and provided contact information by email for the Dentons attorneys.

10.     Dentons thereafter had multiple conversations with the SEC attorneys regarding the SEC's request, eventually leading to a negotiated agreement whereby Mr. Kwon would be interviewed by the SEC and the SEC agreed that Mr. Kwon's statements during the interview could not directly be used against him or TFL in a subsequent case. The agreement specifically identified Dentons as counsel for Mr. Kwon and TFL.

11.     The interview took place by Webex on Thursday, July 8, 2021, and lasted approximately 5 hours. Mr. Kwon and two Dentons partners attended the call, and the two SEC attorneys who had contacted Mr. Kwon (and their supervisor) attended for the SEC.

12.     Subsequent to the interview of Mr. Kwon, the SEC requested that Mr. Kwon and TFL voluntarily produce documents. The request (1) in part sought records that were not available

3

and (2) was otherwise so broad and/or defective that, to the extent responsive documents might exist, the requests had to be narrowed and clarified; among other things, the requests evidenced the SEC's misunderstanding of the nature of the Mirror Protocol itself, despite Mr. Kwon's five-hour voluntary interview.  Communications between the SEC and Dentons lawyers ensued for the purpose of reaching common ground for the voluntary production of information responsive to the SEC's requests.

13.    During the course of these discussions, the Dentons lawyers also requested that the SEC advise how the SEC viewed TFL and Mr. Kwon in connection with its investigation.  In a conversation on September 15, 2021, the SEC attorneys advised that they believed that some sort of enforcement action was warranted against TFL and that any cooperation, and implementation of remedial actions as to the Mirror Protocol, would result in a reduced financial sanction as part of any consent agreement.  The SEC lawyers were unwilling to specify anything about what they expected regarding the amount of any financial sanction or any potential remedial actions or other cooperation.

14.    On the afternoon of September 17, Dentons contacted one of the SEC attorneys ("Attorney 1") and requested that the SEC specifically advise what it believed TFL could do to satisfy the SEC's concerns in connection with the Mirror Protocol.  Dentons suggested that the nature of any disposition (whether or not it might involve enforcement proceedings) be put to the side to allow evaluation of what the SEC might be seeking as remediation for its concerns and to determine if TFL was even capable of implementing or otherwise effectuating the type of remediation that the SEC might be seeking, due to the decentralized nature of the Mirror Protocol.

15.     Attorney 1 advised Dentons that he would discuss the matter with his colleagues and get back to Dentons.  Unbeknownst to Dentons, TFL, or Mr. Kwon, Attorney 1 had earlier that morning signed subpoenas for TFL and Mr. Kwon, who was visiting the United States.

16.     On September 20, 2021, while in New York City attending "Mainnet 2021," a cryptocurrency summit, Mr. Kwon was personally served by an SEC-hired private process service company — appropriately named "Cavalier Courier & Process Service" — with the aforementioned subpoenas, seeking production of documents by TFL and Mr. Kwon and in-person testimony by Mr. Kwon in Washington, D.C. in connection with the SEC's investigation.  The SEC subsequently sent copies of the subpoenas to Dentons as counsel for Mr. Kwon and TFL, stating that they had been "served this morning personally" on Mr. Kwon but not suggesting that the SEC was attempting to serve anyone by sending copies to Dentons.

17.     The subpoenas were served on Mr. Kwon in public:  Mr. Kwon was approached by the process server as he exited an escalator at the Mainnet summit while on his way to make a scheduled presentation that was not about the Mirror Protocol:



18.     The SEC's service of the subpoenas was, indeed, "Cavalier," as it violated the SEC's own rules, the APA, and the Due Process Clause, and was intended to impermissibly secure personal jurisdiction over Mr. Kwon and TFL in a way that was not legally available to the SEC.

19.     SEC Rule of Practice 150(b) provides that "whenever service is required to be made upon a person represented by counsel who has filed a notice of appearance … service shall be made … upon counsel, unless service upon the person represented is ordered by the Commission

or the hearing officer."[2]  The SEC is, of course, "required to follow its own regulations."  *Cherokee Nation of Oklahoma v. Babbitt,* 117 F.3d 1489, 1499 (D.C. Cir. 1997).

20.     After the SEC served plaintiffs, Dentons asked the SEC multiple times to provide proof that the subpoenas were served in accordance with Rule of Practice 150(b), *i.e.*, that the Commission had issued an order permitting service upon Mr. Kwon, as required by its rules applicable to persons represented by counsel.  The SEC has provided no such proof.

21.     Upon information and belief, the purpose of the SEC serving a subpoena upon Mr. Kwon personally was, in violation of Rule 150(b), an unauthorized attempt to get personal jurisdiction over him.  In so doing, the SEC enforcement lawyers failed to follow their own rules of practice and therefore the service upon Mr. Kwon is void *ab initio*.  The mere fact that counsel has been retained does not make counsel an agent for service of process on its client.  *See generally Weston Funding, LLC v. Consorcio G Grupo Dina, S.A. de C.V.*, 451 F. Supp. 2d 585, 589 n.1 (S.D.N.Y. 2006).

22.     Indeed, if the SEC lawyers thought otherwise they would have tried to serve subpoenas through Dentons months ago.  The SEC attorneys were well aware that TFL and Mr. Kwon's lawyers had consistently maintained that the SEC lacked jurisdiction over TFL and Mr. Kwon, and at no time asked Dentons lawyers whether it was authorized to accept service of subpoenas.  The unsolicited receipt of copies of subpoenas the SEC asserted it had served "personally on Do Kwon" by Dentons did not and could not create personal jurisdiction over TFL and Mr. Kwon in connection with the SEC proceeding.  *Cf. Santos v. State Farm Fire and Cas.*

---

[2]      As noted above, the SEC itself acknowledged, in a letter it wrote, that Dentons is counsel for TFL and Mr. Kwon.

*Co.*, 902 F.2d 1092, 1094 (2d Cir. 1990) ("Santos has shown no basis for an inference that State Farm had authorized its attorneys to accept service of process on its behalf.").

23.     Section 555(c) of the APA provides that "[p]rocess … or other investigative act or demand may not be issued, made, or enforced except as authorized by law."  As demonstrated above, the subpoenas here were not issued and served as authorized by law, and they are thus invalid.  Section 555(d) of the APA provides that "[o]n contest, the court shall sustain the subpoena or similar process or demand <u>to the extent that it is found to be in accordance with law</u>." (emphasis added).  Thus, on this challenge, the Court cannot find the subpoenas valid because they were not issued and served "in accordance with the law."

24.     The subpoenas are also invalid as a means of securing jurisdiction over TFL.  Indeed, the SEC's attempt at "tag jurisdiction" flies directly in the face of decisions holding that jurisdiction over a corporation cannot be secured by serving a transiting officer or director.  *See, e.g., Daimler AG v. Baumann*, 571 U.S. 117 (2014); *Martinez v. Aero Caribbean,* 764 F.3d 1062 (9th Cir. 2014).

25.     In addition to violating its rules regarding service, the SEC's conduct here violated its rules requiring it to keep formal orders of investigation confidential.  Rule 203.5 of the SEC's Rules Relating to Investigations states that "[u]nless otherwise ordered by the Commission, all formal investigative proceedings shall be non-public."  Indeed, the copy of the Formal Order provided to counsel for TFL and Mr. Kwon is specifically stamped "Non-Public."  Hiring a "Cavalier" process server to approach Mr. Kwon in public, and announce the purpose of his approach, at a summit attended by more than 2,000 people was, at worst, an intentionally brazen display meant to publicly intimidate and embarrass, and at best reckless, creating social media and press speculation about the incident within minutes of the attempted service of process.

## COUNT I

**(Arbitrary and Capricious Agency Action in Disregarding and Violating the APA and the SEC's Rules Regarding Service of Subpoenas)**

26.　TFL and Mr. Kwon repeat and reallege the allegations in paragraphs 1 through 25 as if fully set forth herein.

27.　Rule 203.8 of the Commission's Rules Relating to Investigations states that "service of subpoenas issued in formal investigative proceedings shall be effected in the manner prescribed by Rule 232(c)." 17 C.F.R. §203.8.

28.　Rule 232(c) of the Commission's Rules of Practice, which confirms that "the provisions of this paragraph (c) shall apply to the issuance of subpoenas for purposes of investigations," instructs that "[s]ervice shall be made pursuant to the provisions of § 201.150(b) through (d)." 17 C.F.R.§ 201.232(c).

29.　Rule 150(b) provides that "[w]henever service is required to be made upon a person represented by counsel who has filed a notice of appearance pursuant to § 201.102, service shall be made pursuant to paragraph (c) of this section upon counsel, unless service upon the person represented is ordered by the Commission or the hearing officer." 17 C.F.R. § 201.150.

30.　As the SEC has acknowledged, Dentons lawyers provided them the information required by Rule 102, and despite the fact that "service upon the person represented" was *not* ordered by the Commission, SEC attorneys proceeded, in disregard of SEC rules, to serve the subpoenas upon Mr. Kwon personally. TFL and Mr. Kwon have been, and will continue to be, adversely affected and aggrieved by the SEC conduct set forth herein.

31.　The SEC's conduct was in direct violation of the APA and the SEC's own rules regarding service of process, and was therefore "arbitrary and capricious," as well as "not in accordance with law."

32.     TFL and Mr. Kwon are therefore entitled to relief under 5 U.S.C. §§ 702 and 706(2)(A) & (C).

## COUNT II

**(Arbitrary and Capricious Agency Action in Disregarding and Violating the SEC's Rules Regarding the Confidentiality of Formal Orders of Investigation)**

33.     TFL and Mr. Kwon repeat and reallege the allegations in paragraphs 1 through 25 as if fully set forth herein.

34.     TFL and Mr. Kwon have been, and will continue to be, adversely affected and aggrieved by the SEC conduct set forth herein.

35.     The SEC's conduct was in direct violation of the APA and the SEC's own rules regarding protecting the confidentiality of formal orders of investigation.

36.     TFL and Mr. Kwon are therefore entitled to relief under 5 U.S.C. §§ 702 and 706(2)(A) & (C).

## COUNT III

**(Violation of the Due Process Clause of the Fourteenth Amendment)**

37.     TFL and Mr. Kwon repeat and reallege the allegations in paragraphs 1 through 25 as if fully set forth herein.

38.     Due Process requires that an agency follow its own regulations and procedures, particularly when those regulations themselves delineate a specific process for exceptions—"unless otherwise ordered by the Commission."  In flouting these procedural safeguards, including the specifically prescribed process for setting those safeguards aside, the SEC deprived TFL and Mr. Kwon of the protection those regulations were promulgated to provide.

39.     TFL and Mr. Kwon have been, and will continue to be, adversely affected and aggrieved by the SEC conduct set forth herein.

40.     The SEC's conduct was in violation of the Due Process Clause of the Fourteenth Amendment.

41.     TFL and Mr. Kwon are therefore entitled to relief under 5 U.S.C. §§ 702 and 706(2)(B).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for an order and judgment:

   a)     Declaring that the Subpoenas were issued and served in violation of the APA and the SEC's Rules of Practice and are null, void, and with no force or effect, and in particular were not effective in securing jurisdiction over TFL or Mr. Kwon;

   b)     Declaring that the SEC acted arbitrarily and capriciously within the meaning of 5 U.S.C. § 706(2)(A) in issuing and serving the Subpoenas;

   c)     Quashing the Subpoenas;

   d)     Declaring that the SEC acted arbitrarily and capriciously within the meaning of 5 U.S.C. § 706(2)(A) in failing to maintain the confidentiality of the Formal Order;

   e)     Issuing all orders necessary and appropriate to adjourn the compliance dates of the Subpoenas in their entirety and to maintain the status quo pending the conclusion of this case; and

   f)     Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action;

   g)     Awarding Plaintiffs such other and further relief as this Court deems just and appropriate.

Dated: October 22, 2021
New York, New York

Respectfully Submitted,

By: /s/ Douglas W. Henkin

Douglas W. Henkin
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020-1089
Tel: (212) 768-6700
Fax: (212) 768-6800
douglas.henkin@dentons.com

Stephen J. Senderowitz
DENTONS US LLP
233 S. Wacker Drive
Chicago, Illinois 60606
Tel: (312) 876-8141
Fax: (312) 876-7934
stephen.senderowitz@dentons.com

*Attorneys for Plaintiffs Terraform Labs PTE Ltd.*
*and Do Kwon*

# **<u>EXHIBIT F</u>**

James P. Connor (*pending pro hac vice*)
**U.S. SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, NE**
**Washington, DC 20549**
**Telephone: (202) 551-8394 (Connor)**
**Email: Connorja@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

               Applicant,

      v.                    No. 21-mc- ( )

TERRAFORM LABS PTE, LTD. and
DO KWON,

               Respondents.

**U.S. SECURITIES AND EXCHANGE COMMISSION'S**
**APPLICATION FOR AN ORDER TO SHOW CAUSE AND**
**FOR AN ORDER REQUIRING COMPLIANCE WITH SUBPOENAS**

The U.S. Securities and Exchange Commission ("Commission") respectfully submits this

Application for an Order to Show Cause and for an Order Requiring Compliance with Subpoenas

("Application"), together with the supporting memorandum of law and Declaration of Roger J.

Landsman ("Landsman Declaration") and exhibits thereto, based on the following:

1.      Respondents Terraform Labs PTE, Ltd. ("Terraform") and its co-founder and

Chief Executive Officer, Do Kwon, have refused to comply with lawful Commission

investigative subpoenas for documents and testimony served upon Terraform and Mr. Kwon in

September 2021 in connection with the Commission's investigation entitled *In the Matter of*

*Mirror Protocol* (Internal File No. HO-14164) (the "Mirror Protocol Investigation"). As set forth in the Landsman Declaration, Respondents Terraform and Mr. Kwon have refused to comply with the subpoenas because they contend that the subpoenas were not properly served, even though both subpoenas were personally served upon Respondents in New York, NY, in accordance with the governing regulation. *See* 17 C.F.R. § 201.150(d) ("service [ ] of an [SEC] investigative subpoena . . . may be made by . . . handing a copy to the person required to be served[.]")

2.     On November 1, 2021, counsel for the Commission informed counsel for Terraform and Mr. Kwon that the Commission may seek relief if Terraform and Mr. Kwon did not comply with the subpoenas. In response, counsel for Terraform and Mr. Kwon again stated that in their view the subpoenas were not "validly issued" and refused to comply with the subpoenas.[1]

3.     The nature of the Mirror Protocol Investigation is set forth in more detail in the Declaration of Roger J. Landsman ("Landsman Declaration"), which is incorporated by reference, and establishes that the subpoenas to Respondents Terraform and Mr. Kwon were lawfully issued. On May 7, 2021, pursuant to Section 20(a) of the Securities Act [15 U.S.C. § 77t(a)], Section 21(a) of the Exchange Act [15 U.S.C. § 78u(a)], and Section 42(a) of the Investment Company Act [15 U.S.C. § 80a-41], the Commission issued an Order Directing

---

[1]  Respondents Terraform and Kwon also filed a civil complaint in late October 2021 to "quash[ ] the subpoenas" because the Commission's personal service of the subpoenas upon Terraform and Kwon allegedly violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq. See* Complaint, ECF No. 1, at 11, *Terraform Labs PTE, Ltd., et al. v. SEC*, No. 1:21-cv-08701-JPO (S.D.N.Y. October 22, 2021); *but see Sprecher v. Graber*, 716 F.2d 968, 974 (2d Cir. 1983) (holding that a subpoena enforcement action under Section 21(c) of the Securities Exchange Act of 1934 [15 U.S.C. § 78u(c)] "is the exclusive method by which the validity of SEC investigations and subpoenas may be tested in the federal courts.").

Private Investigation and Designating Officers to Take Testimony in the Mirror Protocol

Investigation (the "Formal Order").

4.     Pursuant to the Formal Order, the Commission is investigating whether any

person or entity has violated certain provisions of the federal securities laws, including Section 5

of the Securities Act [15 U.S.C. § 77e], prohibiting the unregistered offer or sale of securities;

Section 6(l) of the Exchange Act ("Exchange Act") [15 U.S.C. § 78f(l)], prohibiting any person

from effecting transactions in a security-based swap with or for a person that is not an eligible

contract participant unless such transaction is effected on a national securities exchange; Section

15(a) of the Exchange Act [15 U.S.C. § 78o(a)], prohibiting acting as an unregistered broker or

dealer; and Section 7(a) of the Investment Company Act of 1940 [15 U.S.C. § 80a–7],

prohibiting securities transactions by unregistered investment companies, in connection with

Terraform's involvement with the Mirror Protocol and its participation in the creation,

promotion, and offer to sell mAssets and MIR tokens to U.S. investors.

5.      The Formal Order designates certain individuals as officers of the Commission

empowered to subpoena witnesses, to take evidence, and to require the production of any records

deemed relevant or material to the investigation, pursuant to Section 19(c) of the Securities Act

[15 U.S.C. § 77s(c)] and Section 21(b) of the Exchange Act [15 U.S.C. § 78u(b)].

6.     On September 17, 2021, one of the designated Commission officers issued two

subpoenas and caused each to be properly served on Respondents Terraform and Kwon on

September 20, 2021.  The subpoenas required Respondents Terraform and Kwon to produce

responsive documents by October 4, 2021 and for Respondent Kwon to testify on October 27,

2021.  Both Respondents refused to produce documents and Respondent Kwon refused to appear

to testify.  The Commission offered to extend the dates for Respondents Terraform and Kwon to

produce documents and for Respondent Kwon to testify, but counsel for Respondents Terraform and Kwon refused to accept the extended dates and have reiterated their position that the subpoenas are unenforceable.

7.      The Commission therefore applies to this Court for entry of an Order to Show Cause, in the form attached, requiring Respondent Terraform and Respondent Kwon to show cause why they should not be ordered to produce documents responsive to the subpoenas within 10 days at the Commission's Headquarters, 100 F Street, NE, Washington, DC 20549; and requiring Respondent Kwon to show cause why he should not be ordered to appear for testimony within 10 days at the Commission's Headquarters, 100 F Street, NE, Washington, DC 20549.[2]

8.      Jurisdiction is conferred upon this Court, and venue properly lies in this District, pursuant to Section 21(c) of the Exchange Act [15 U.S.C. § 78u(c)].

9.      The Commission has not made any other application for similar relief with respect to Respondents Terraform and Kwon, or with the Mirror Protocol Investigation.

10.      Prior to filing this application, the undersigned counsel emailed copies of this application and all accompanying papers to counsel for Respondents Terraform and Kwon.

WHEREFORE, the Commission respectfully requests:

**I.**

That the Court enter an Order to Show Cause, directing Respondents Terraform and Kwon to show cause why this Court should not enter an Order requiring Terraform and Kwon to produce documents in response to the subpoenas, and for Respondent Kwon to testify before the Commission.

---

[2] The Commission is amenable to alternative procedures other than in-person testimony due to the COVID-19 pandemic.

**II.**

That the Court enter an Order requiring Respondents Terraform and Kwon to comply

fully with the subpoenas within ten (10) days.

**III.**

That the Court order such other and further relief as may be necessary and appropriate to

achieve compliance with the subpoenas within the time period set forth in the proposed Order to

Show Cause.

Respectfully submitted,


/s/ James P. Connor
JAMES P. CONNOR*
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
Tel:  (202) 551-8394
Email:  connorja@sec.gov

November 12, 2021                    *Pending admission pro hac vice

# EXHIBIT G

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 1:21-mc-00810 (JPO) |
| Applicant, | |
| v. | Hon. J. Paul Oetken |
| TERRAFORM LABS PTE, LTD. and DO KWON, | Hon. Barbara C. Moses |
| Respondents. | |

## RESPONDENTS' OPPOSITION TO U.S. SECURITIES AND EXCHANGE COMMISSION'S APPLICATION FOR AN ORDER TO SHOW CAUSE AND FOR AN ORDER REQUIRING COMPLIANCE WITH SUBPOENAS

### ORAL ARGUMENT REQUESTED

Douglas W. Henkin
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6832
Facsimile: (212) 768-6800

Nicholas W. Petts (*pro hac vice* forthcoming)
1900 K Street NW
Washington, D.C. 20006
Telephone: (202) 496-7356
Facsimile: (202) 496-7756

*Counsel for Respondents Do Kwon
and Terraform Labs PTE, Ltd.*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTS ...................................................................................................................... 4

ARGUMENT ............................................................................................................. 9

I.     THE COURT SHOULD DENY ENFORCEMENT OF THE SUBPOENA
DIRECTED TO MR. KWON ............................................................................ 9

     A.     The SEC Failed to Comply with the Required Administrative Steps
Because it Served Mr. Kwon Personally Despite Knowing He Was
Represented by Counsel .................................................................... 9

     B.     To the Extent the SEC Claims to Have Served Counsel for Mr. Kwon, The
Court Lacks Jurisdiction over Mr. Kwon Because He Is Not a United
States Resident and Has No Case-Related Contacts with the U.S. ...... 15

II.    THE COURT SHOULD DENY ENFORCEMENT OF THE SUBPOENA
DIRECTED TO TFL ....................................................................................... 17

     A.     TFL is Not Subject to General Jurisdiction ...................................... 17

     B.     TFL is Not Subject to Specific Jurisdiction ..................................... 18

CONCLUSION ....................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alibaba Group Holding Limited v. Alibabacoin Foundation*,
No. 18-CV-2897 (JPO), 2018 WL 2022626 (S.D.N.Y. April 30, 2018) .................................20

*Balestra v. ATBCOIN LLC*,
380 F.Supp.3d 340 (S.D.N.Y. 2019) .........................................................................................21

*Baxter v. United States*,
2016 WL 468034 (N.D.Cal. 2016) ..............................................................................................9

*Blockchange Ventures I GP, LLC. v. Blockchange, Inc.*,
No. 20-CV-6866 (AKH), 2021 WL 308277 (S.D.N.Y. Jan. 29, 2021) ..................................18

*Capitol Records, LLC v. VideoEgg, Inc.*,
611 F.Supp.2d 349 (S.D.N.Y. 2009) ........................................................................................20

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ....................................................................................................................17

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ....................................................................................................................17

*Gucci America, Inc. v. Weixing Li*,
135 F.Supp.3d 87 (S.D.N.Y. 2015) ...........................................................................................18

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945)....................................................................................................................16

*Martinez v. Aero Caribbean*,
764 F.3d 1062 (9th Cir. 2014) ..................................................................................................17

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015)......................................................................................................................12

*RNR Enters., Inc. v. SEC*,
122 F.3d 93 (2d Cir.1997)............................................................................................................9

*Royalty Network v. Dishant.com*,
638 F. Supp. 2d 410 (S.D.N.Y. 2009).......................................................................................20

*Saint Tropez Inc. v. Ningbo Maywood Industry and Trade Co., Ltd.*,
No. 13 CIV. 5230 NRB, 2014 WL 3512807 (S.D.N.Y. July 16, 2014) ................................17

*Santos v. State Farm Fire and Cas. Co.*,
  902 F.2d 1092 (2d Cir. 1990) ................................................................................ 15

*SEC v. Sharef*,
  924 F.Supp.2d 539 (S.D.N.Y. 2013) ...................................................................... 16

*SPV OSUS Ltd. v. UBS AG*,
  114 F.Supp.3d 161 (S.D.N.Y. 2015) ................................................................. 18, 21

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001) ................................................................................................ 13

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
  916 F.3d 143 (2d Cir. 2019) .................................................................................. 16

*U.S. Securities & Exchange Commission v. Deloitte Touche Tohmatsu, CPA LTD*
  No. 11 Misc. 512 GK/DAR (D.D.C. May 30, 2013) .......................................... 12, 14

*U.S. v. Powell*,
  379 U.S. 48 (1964) ............................................................................................. 9, 15

*Estate of Ungar v. Palestinian Authority*,
  400 F.Supp.2d 541 (S.D.N.Y. 2005) ...................................................................... 17

*Velesaca v. Decker*,
  458 F.Supp.3d 224 (S.D.N.Y. 2020) ...................................................................... 14

*Zherka v. Ryan*,
  52 F. Supp. 3d 571 (S.D.N.Y. 2014) ...................................................................... 15

**Statutes**

15 United States Code
  § 77s(c) ..................................................................................................................... 5
  § 78aa ..................................................................................................................... 15

28 United States Code § 530(B)(a) ...................................................................... 14

**Rules and Regulations**

17 Code of Federal Regulations
    § 201.100(b)(1) ........................................................................................................9
    § 201.101(a)(9)(i) ..................................................................................................12
    § 201.102 ...............................................................................................................10
    § 201.150 ...........................................................................................................9, 12
    § 201.150(b) ..................................................................................................*passim*
    § 201.150(c) ......................................................................................................12, 13
    § 201.150(d) .....................................................................................................12, 13
    § 201.232(c) .................................................................................................9, 11, 12
    § 203.8 ....................................................................................................................9

**Other Authorities**

Rules of Practice, 60 Fed. Reg. 32738, 32751 (June 23, 1995) ......................................10

Amendments to the Commission's Rules of Practice, 85 Fed. Reg. 86464, 86473
    (Dec. 30, 2020) ........................................................................................................12

American Bar Association Model Rule of Professional Conduct Rule 4.2(a) ..............................14

Individual Rules and Practices in Civil Cases, United States District Court,
    Southern District of New York § 4(B) .................................................................................20

International Organization of Securities Commissions, Enhanced Multilateral
    Memorandum of Understanding Concerning Consultation and Cooperation
    and the Exchange of Information, Article 3(2)(b)-(c) ......................................................2

United States Securities and Exchange Commission Enforcement Manual, 2015
    WL 10459618 (June 4, 2015) ..................................................................................12

United States Securities and Exchange Commission Enforcement Manual §
    3.3.5.3.3 .............................................................................................................14

Respondents Terraform Labs PTE, Ltd. ("TFL") and Do Kwon respectfully submit this memorandum of law in opposition to the United States Securities and Exchange Commission ("SEC")'s Application For An Order To Show Cause And For An Order Requiring Compliance With Subpoenas. For the reasons set forth below, and in the accompanying Declarations of Han Chang Joon ("Joon Decl.") and Stephen J. Senderowitz ("Senderowitz Decl.") and the exhibits thereto, Respondents respectfully request that the Court deny the SEC's application to enforce its administrative subpoenas in its entirety.

## INTRODUCTION

The core issue in this proceeding is that the SEC violated its Rules of Practice, the Administrative Procedure Act, and basic legal ethics in issuing and attempting to serve subpoenas on entities over which it lacks jurisdiction and which it knew are represented by counsel.

TFL is a technology firm at the forefront of developing decentralized finance applications such as the Mirror Protocol and the associated MIR governance tokens. Mr. Kwon is TFL's chief executive officer. In May 2021, the SEC staff began investigating whether mAssets (a type of asset created by the Mirror Protocol community using the Mirror Protocol, not by TFL) or MIR tokens are securities[1] and whether to recommend an enforcement action for not registering them with the SEC (there is no "issuer" of these assets—they are minted by Mirror Protocol smart contracts pursuant to governance decisions made by the Mirror Protocol community).

The SEC lacks jurisdiction over TFL and Mr. Kwon. TFL is incorporated under the laws of Singapore and maintains corporate offices in Singapore and South Korea. Mr. Kwon is a citizen of South Korea and resident of Singapore. By statute, the SEC cannot serve

---

[1]     They are not, but that is not an issue the Court needs to address at this time.

administrative subpoenas outside the United States.  The SEC is, however, permitted to obtain

information through accepted international protocols, such as the International Organization of

Securities Commissions' (IOSCO) Enhanced Multilateral Memorandum of Understanding.[2]  The

securities regulators of the United States, Singapore, and Korea are IOSCO signatories.

The SEC staff contacted Mr. Kwon and TFL in May 2021 and asked them to cooperate

voluntarily with the SEC's investigation.  Neither Mr. Kwon nor TFL were legally obligated to

do so.  However, while maintaining that the SEC lacked jurisdiction over them, Mr. Kwon and

TFL agreed to provide voluntary assistance to the SEC.  From May to September, counsel for

Mr. Kwon and TFL cooperated with the SEC staff in its investigation.  Counsel and the SEC

reached a proffer agreement under which the SEC staff interviewed Mr. Kwon for five hours.

The SEC staff then submitted voluntary document requests to counsel.  Although the requests

were overbroad and reflected a lack of understanding of topics discussed during the five-hour

interview with Mr. Kwon, counsel provided what responsive information it could (the vast

majority of which was publicly available, one of the key aspects of open-source decentralized

blockchain software programs like the Mirror Protocol that the SEC staff did not seem to

understand) and invited further discussion.

In September, amid negotiations with counsel for Mr. Kwon and TFL, the SEC

overreached.  From monitoring Mr. Kwon's Twitter feed, the SEC staff learned that he would be

---

[2]      Under IOSCO, signatory nations have pledged to offer one another the "Fullest
Assistance Permissible," including "obtaining and providing Information from any
Persons regarding the matters set forth in the request" and "compelling a Person's
physical attendance to take or, where permissible, compel that Person's statement or
testimony under oath."  EMMoU, Art. 3(2)(b)-(c).  Not surprisingly, what is
"permissible" depends on the local law of each signatory.  An overview of the SEC's
cooperative arrangements with foreign regulators, including IOSCO and bilateral
compacts with individual nations, can be found on the Commission's website, at
https://www.sec.gov/about/offices/oia/oia_coopfactsheet.htm.

traveling to the United States to attend an industry conference in New York.  They saw this as a chance to "tag" Mr. Kwon in an attempt to secure jurisdiction over him in a way that provided more leverage than voluntary cooperation requests, by trying to serve him personally while in the country.  On September 20, the SEC staff had a process server hand Mr. Kwon two investigative subpoenas, one directed to Mr. Kwon and the other to TFL.  Afterward, the SEC staff emailed copies of the subpoenas to counsel and advised counsel that they had "served" Mr. Kwon "personally."

The Court should deny enforcement of the subpoenas because the SEC unequivocally violated its rules governing the issuance and service of administrative subpoenas.  Rule 150(b) of the SEC's Rules of Practice prohibits the SEC staff from serving investigative subpoenas on an individual who is represented by counsel without having secured special permission from the Commission to do so, which was not done.  In such circumstances, service could only be made by asking counsel to accept service, and, in this instance, counsel would not have been required to accept service on behalf of Mr. Kwon and TFL (among other reasons because the SEC lacks jurisdiction over them).

Rule 150(b) reflects the basic principle of legal ethics that a lawyer in a case should never directly contact a party-opponent he knows to be represented by counsel, unless authorized by law.  The principle reflected in Rule 150(b) is so important that exceptions can be granted only by the Commission itself, which must issue an order authorizing service directly on a person represented by counsel.  The SEC staff never obtained such an order here.

The SEC essentially claims the equivalent of harmless error on the theory that it "served" TFL and Mr. Kwon's counsel with courtesy copies after the fact.  This ignores the function of securing jurisdiction, which the SEC had not previously done, that lawful service addresses.

Sending counsel courtesy copies is only relevant if the personal service itself was effective—it does not secure personal jurisdiction.

The Court should also deny enforcement of the subpoena directed to TFL. TFL is not subject to general jurisdiction in the U.S. and lacks the case-related contacts with the U.S. needed for specific jurisdiction. It is black-letter law that trying to serve TFL by handing a subpoena to Mr. Kwon was not effective service.

The SEC's application should be denied in its entirety.

## FACTS

TFL is a private company developing digital infrastructure for the next generation of decentralized financial applications. Joon Decl. ¶¶ 3, 5. It is incorporated under the laws of the Republic of Singapore and has its principal place of business at 22 Cross Street #02-103 Singapore 048421. Joon Decl. ¶ 3. TFL's CEO, Mr. Kwon, is a citizen of South Korea and a resident of Singapore. Joon Decl. ¶ 4.

The Mirror Protocol, which TFL developed, is a decentralized finance protocol built on Terra, a decentralized and open-source public blockchain network which TFL also developed. Joon Decl. ¶ 5. Because both the Mirror Protocol and the Terra blockchain it runs on are decentralized protocols, neither TFL nor Mr. Kwon control them. Joon Decl. ¶ 7. The Mirror Protocol allows users to create or "mint" synthetic asset tokens that mirror the value of other intangible or tangible assets. Joon Decl. ¶ 5. To mint a mirrored asset or "mAsset," a user submits to the protocol a form of digital collateral (either a stablecoin or a different mAsset) in an amount set by the smart contracts that underlie the protocol. Joon Decl. ¶ 6. Minting can be done through a user interface created by TFL or through multiple other user interfaces created by third parties. Joon Decl. ¶ 7.

4

The Mirror Protocol also supports native governance tokens called MIR tokens. *Id.* They allow holders to vote on governance proposals, including the kinds of mAssets that can be minted. Joon Decl. ¶ 6. MIR tokens are granted from the Mirror Protocol community pool for developing valuable Mirror projects and participating in the protocol's governance. Joon Decl. ¶ 7.

Neither mAssets nor MIR tokens can be purchased from TFL. Once minted, mAssets and MIR tokens can be traded on blockchains such as the Terra blockchain (but not only on the Terra blockchain). *Id.*

On May 24, 2021, attorneys from the SEC's Division of Enforcement contacted Mr. Kwon by email. Senderowitz Decl. ¶ 5. Staff attorneys Roger Landsman and Kathleen Hitchens stated that they were investigating the Mirror Protocol. *Id.* Lacking a subpoena, which the SEC can only serve in the United States,[3] they asked Mr. Kwon for his voluntary cooperation. *Id.*

Mr. Kwon obliged. He and TFL retained Dentons US LLP to represent them in connection with the SEC's investigation and facilitate cooperation with the SEC staff. Senderowitz Decl. ¶ 6. On May 27, 2021, Dentons attorney Stephen Senderowitz called Mr. Landsman and informed him that he and Douglas Henkin, also a Dentons partner, represented TFL and Mr. Kwon. *Id.* Mr. Landsman expressed his desire to learn more about the business and technical aspects of the Mirror Protocol and related tokens. Senderowitz Decl. ¶ 7. During several conversations, Mr. Senderowitz and Mr. Henkin made clear that TFL and Mr. Kwon were beyond the SEC's jurisdiction but conveyed their willingness to cooperate on a voluntary basis. Senderowitz Decl. ¶¶ 7–8.

---

[3]     *See* 15 U.S.C. § 77s(c) (authorizing officers of the Commission to "subpoena witnesses, take evidence, and require the production of … documents … *from any place in the United States or any Territory*") (emphasis added).

After multiple conversations between the SEC staff and Messrs. Senderowitz and Henkin, the parties reached a negotiated proffer agreement.  *Id.*  Mr. Kwon agreed to be interviewed by the SEC for approximately three hours, and the SEC agreed that Mr. Kwon's statements could not directly be used against him or TFL in any subsequent enforcement action, except for limited purposes.  *Id.*  The SEC drafted the proffer agreement, which identified Dentons as "counsel" for Mr. Kwon and TFL.  *Id.*

On July 8, 2021, the SEC staff interviewed Mr. Kwon for approximately *five* hours.  Senderowitz Decl. ¶ 9.  The interview was conducted via WebEx, because Mr. Kwon resided in South Korea (he now lives in Singapore).  *Id.*  Mr. Kwon was represented by Mr. Senderowitz and Mr. Henkin during the interview.  *Id.*  Questioning focused on the Mirror Protocol's creation, implementation, functionality, and operations, and TFL's past and current involvement with the Mirror Protocol.  *Id.*  The topics covered included, but were not limited to, the Mirror Protocol's creation, implementation, functionality, and operations; whether TFL receives income from the minting of or transactions in mAssets; Mr. Kwon's ownership of mAssets or MIR tokens;[4] and where mAssets trade.  *Id.*

The interview lasted five hours, two hours longer than what was agreed.  Mr. Kwon fully cooperated and answered all of the SEC's questions to the best of his ability except for those few questions that went beyond the scope of what Dentons understood the interview was to cover.  Senderowitz Decl. ¶ 10.  When the interview concluded, Ms. Hitchins and Mr. Landsman thanked Mr. Kwon for his cooperation, for extending the interview without objection, and for providing useful information in response to their questions.  Senderowitz Decl. ¶ 11.

---

[4]     Mr. Kwon voluntarily showed his digital wallet to the SEC staff during the interview; it contained — in total — $155.46 of four mAssets and $10,000 worth of MIR tokens (at the time the value of all outstanding MIR tokens was $283 million).

On July 22, 2021, the SEC staff contacted Dentons to ask that Mr. Kwon and TFL agree to produce certain documents.  Senderowitz Decl. ¶ 12.  The SEC's voluntary document requests sought records that were unavailable and were otherwise so broad and/or defective that to the extent responsive documents might exist, the requests had to be narrowed and clarified.  *Id.*  On July 28, Dentons and the SEC staff discussed the issues with the requests and the SEC staff requested that Dentons sets forth their position as to each request in writing.  On August 17, Dentons produced written responses to the SEC's voluntary document requests and invited further discussion.  Senderowitz Decl. ¶ 14.  Importantly,  certain of the requested documents were publicly available (for example on Github), a fact explained to the SEC staff.  *Id.*

On September 15, 2021, the SEC staff advised Dentons that, despite the SEC not having concluded that any violations of U.S. securities law had occurred, any potential resolution of the formal order of investigation would have to be accomplished by means of an enforcement action. Senderowitz Decl. ¶ 16.  Mr. Senderowitz disagreed that an enforcement action was necessary, and suggested the SEC should decline to bring such an action in exchange for cooperation by TFL and Mr. Kwon.  Senderowitz Decl. ¶ 17.

On September 17, 2021, Mr. Senderowitz called Mr. Landsman.  *Id*.  Mr. Senderowitz suggested the parties table for now the issue of whether an enforcement action was necessary or appropriate but continue to explore what remedial actions the SEC wanted TFL to perform and determine if such actions were feasible.  *Id.*[5]

During the September 17 call, Mr. Landsman made no mention to Mr. Senderowitz of the subpoenas Mr. Landsman had signed earlier that morning for TFL and Mr. Kwon.  Senderowitz

---

[5]     During discussions on September 28, the SEC staff generally suggested that one remedial act could be the registration of mAssets with the Commission.  However, as Dentons explained, mAssets are not "issued" by TFL or Mr. Kwon.  Senderowitz Decl. ¶¶ 22–23.

Decl. ¶ 17.  Indeed, despite his steady engagement with Dentons over the course of many weeks,
Mr. Landsman never indicated any intention to issue subpoenas.  *Id.*

On September 20, 2021, Mr. Kwon was in New York to attend "Mainnet 2021," a
cryptocurrency summit held at the Marriott Marquis hotel.  Senderowitz Decl. ¶ 18.  As he exited
an escalator on his way to participate in a panel discussion that was starting minutes later,[6] Mr.
Kwon was approached by a process server and handed an envelope containing two investigative
subpoenas.  Senderowitz Decl. ¶ 18.  The SEC demanded production of documents by TFL and
Mr. Kwon and in-person testimony by Mr. Kwon at its headquarters in Washington, D.C. in
connection with the Mirror Protocol investigation.  Senderowitz Decl. ¶ 19, Ex. 4.  Later that
day, Mr. Landsman emailed copies of the subpoenas to Mr. Senderowitz and Mr. Henkin with a
message that they had been "served this morning personally" on Mr. Kwon.  *Id.*  Notably, that
email did not purport to have effected service by being sent to Dentons.  *Id.*

On September 26, 2021, Dentons emailed the SEC staff to request a copy of the order
pursuant to Rule 150(b) that the staff was required to obtain from the SEC before attempting to
personally serve an individual represented by counsel.  Senderowitz Decl. ¶ 21.  The SEC staff
never produced such an order.

---

[6]     The discussion panel was entitled "The Multi-chain Future is Here" and was about
interoperability between leading blockchains and various developments in cross-chain
technology.

# ARGUMENT

## I. THE COURT SHOULD DENY ENFORCEMENT OF THE SUBPOENA DIRECTED TO MR. KWON

### A. The SEC Failed to Comply with the Required Administrative Steps Because it Tried to Serve Mr. Kwon Personally Despite Knowing He Was Represented by Counsel

Judicial enforcement of an administrative subpoena demands that the agency have complied with "the administrative steps required" to properly issue and serve it. *RNR Enters., Inc. v. SEC*, 122 F.3d 93, 96 (2d Cir.1997) (citing *U.S. v. Powell*, 379 U.S. 48, 57-58 (1964)); *Baxter v. United States*, 2016 WL 468034, at *3 (N.D.Cal. 2016) ("The government having failed to show compliance with the administrative steps provided in the IRC, the Summons for 2011 cannot be enforced."). Issuance and service of SEC subpoenas are governed by the SEC's Rules Relating to Investigations and Rules of Practice.[7] The SEC plainly violated Rule of Practice 150(b) by attempting to serve the subpoenas on Mr. Kwon personally, rendering the subpoenas unenforceable.

The applicable rules are not complicated:

- Rule 8 of the Rules Relating to Investigations requires that "[s]ervice of subpoenas issued in formal investigative proceedings shall be effected in the manner prescribed by Rule 232(c) of the Commission's Rules of Practice." 17 C.F.R. § 203.8;

- Rule 232(c) confirms that "[t]he provisions of this paragraph (c) **shall apply to the issuance of subpoenas for purposes of investigations,**" and requires that such "[s]ervice shall be made pursuant to the provisions of § 201.150(b) through (d)." *Id.* § 201.232(c) (emphasis added);

- And Rule 150(b) requires that "[w]henever service is required to be made upon a person represented by counsel who has filed a notice of appearance pursuant to § 201.102, service shall be made pursuant to paragraph (c) of this section upon

---

[7] 17 C.F.R. § 201.100(b)(1) (The Rules of Practice "do not apply to … Investigations *except where made specifically applicable by the Rules Relating to Investigations*.").

9

counsel, *unless service upon the person represented is ordered by the Commission … .*" *Id.* § 201.150 (emphasis added).[8]

There is no question that Mr. Kwon was represented by counsel in connection with the SEC's investigation when the SEC attempted to serve him on September 20, 2021. Beginning in May 2021, when Dentons informed the SEC staff that it represented Mr. Kwon and TFL, Dentons cooperated with the SEC staff ***for four months*** in an effort to provide information for the SEC's investigation.[9] Dentons attorneys negotiated a proffer agreement with the SEC—an agreement drafted by the SEC in which the SEC itself identified Dentons as TFL and Mr. Kwon's counsel. Dentons attorneys were present at the SEC's interview of Mr. Kwon in July 2021. The SEC staff sent their voluntary document requests for Mr. Kwon to Dentons, and Dentons prepared and sent back the written responses. Rule 150(b) was therefore triggered and prohibited the SEC staff from attempting to serve Mr. Kwon personally without an order from the SEC. And yet that is precisely what the SEC staff did.

The SEC does not dispute that Mr. Kwon was represented by counsel when it attempted to serve him directly. The SEC does not dispute that it failed to obtain the requisite order authorizing service directly on Mr. Kwon. Rather, it tries to argue that Rule 150(b) does not

---

[8]     The SEC's adopting release for Rule 150—the rule's legislative history—supports its plain meaning. *See* Rules of Practice 60 Fed. Reg. 32738, 32751 (June 23, 1995) ("One commenter objected to the provision in the proposed rule that would have allowed service directly upon a party where the party was represented by counsel. In response, Rule 150(b) has been amended to clarify that service upon counsel by another party is required unless service upon the person represented is specifically ordered by the Commission or the hearing officer.").

[9]     When the SEC did not know that TFL and Mr. Kwon were represented by counsel, they communicated directly with Mr. Kwon. As soon as the SEC learned that TFL and Mr. Kwon were represented by counsel, the SEC began communicating exclusively with counsel. The SEC's conduct leaves no doubt that it recognized that counsel had appeared for TFL and Mr. Kwon.

apply to investigations. The three arguments the SEC offers against the clear and plain reading of its rules are meritless.

*First*, the SEC argues that it was not required to comply with Rule 150(b) because Dentons "did not even file the notice of appearance" mentioned in the rule. Application 14.[10] But Dentons *did* appear in the Mirror Protocol investigation. On May 27, 2021, Mr. Senderowitz contacted Mr. Landsman, informed him that Dentons represented Mr. Kwon and TFL, and provided his contact information. No special form is needed under Rule 102 to make an appearance in an investigation and trigger Rule 150(b)'s protections. All Rule 102 requires is that when a person appears in a representative capacity before the Commission, that person shall file a written notice stating the name of the proceeding; the representative's name, business address and telephone number; and the name and address of the person or persons represented. The SEC lawyers received this information.[11] Further, as the SEC itself explained in a prior subpoena enforcement proceeding where it rejected the interpretation of Rule 150(b) it now tries to rely on:

> It would elevate form over substance to require, in the context of an SEC *investigation*, that a formal 'notice of appearance' be entered in order for Rule 150(b) to be given effect. As noted, an investigation often precedes and is distinct from an administrative proceeding. Thus, in almost all cases requiring entry of a 'notice of appearance' would frustrate and render ineffective Rule 232(c)'s

---

[10] Citations to "Application" are to the U.S. Securities And Exchange Commission's Memorandum in Support of Application for an Order to Show Cause and For an Order Requiring Compliance with Subpoenas (ECF No. 2). Citations to "Landsman Decl." are to the Declaration of Roger J. Landsman in Support of U.S. Securities And Exchange's Application for an Order To Show Cause and For An Order Requiring Compliance with Subpoenas (ECF No. 4).

[11] There was no docket in the Mirror Protocol investigative proceeding where such a notice could be physically filed. The information concerning counsel representation was conveyed to the SEC lawyers by Dentons telephonically and in written email communications.

express reference to Rule 150(b), a result that any reasonable construction of the SEC's rules should avoid.[12]

Notwithstanding that it previously (correctly) stated that a formal "notice of appearance" is not required under Rule 150(b), the SEC's newly-proposed interpretation of Rule 150(b) would deny its protections to all individuals under investigation. That cannot be right because Rule 232(c) makes clear that 150(b) applies to investigations. And it also cannot be right because the SEC cannot use a litigation interpretation to amend a rule that has been adopted pursuant to notice and comment rulemaking. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) ("[A]gencies [must] use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."). Again, the SEC was right the first time. *See SEC v. Deloitte*, at 15 n.9 ("Rule 150(b) is reasonably construed to permit legal counsel to accept service after they appear in an investigative matter, *which Mr. Cox clearly did by informing SEC Staff that he represented DTTC regarding Longtop.*") (emphasis added).

*Second*, the SEC attempts to argue that Rule 150(b)'s use of "notice of appearance" *implies* that the rule does not apply to investigations, because "notices of appearances are filed in 'proceedings'" and "investigations … are not proceedings." Application 14. That argument fails for two reasons. The conclusion contradicts Rule 232(c), which expressly provides that *investigative subpoenas* be served in accordance with 150(b). And the premise is false—this investigation is indeed a proceeding. Rule of Practice 101 defines "proceeding" broadly to include "any agency process initiated … [b]y an order instituting proceedings." 17 C.F.R. §

---

[12] Securities & Exchange Commission's Reply Memorandum in Support of its Renewed Application for Order Requiring Compliance with Subpoena at 15 n.9., *U.S. Securities & Exchange Commission v. Deloitte Touche Tohmatsu, CPA LTD*, No. 11 Misc. 512 GK/DAR (D.D.C. May 30, 2013) ("*SEC v. Deloitte*"), ECF No. 66.

201.101(a)(9)(i).  This investigation was initiated by the Order of Investigation issued on May 7, 2021.

*Third*, the SEC makes the facile argument that subsection (d) of Rule 150 says that if service is to be made of an investigative subpoena, then one possible method of service is service on "the person required to be served," and that is what the SEC staff did here.  Application 15.  But that is *not* what happened here.  When an individual is represented by counsel, subsection (b) defines the "person required to be served" in subsection (d) as his *counsel*.[13]  Rule 232(c) says that Rule "150*(b)*-(d)" applies to investigative subpoenas, and it would render subsection (b) meaningless if subsection (d) were read to allow service of an investigative subpoena on an individual when he is represented by counsel.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (a rule should be so construed that, if it can be prevented, "no clause, sentence, or word shall be superfluous, void, or insignificant").  Subsection (b) only has meaning if it limits the "[a]dditional methods of service" otherwise available under subsection (d) and thus prohibits

---

[13]    Prior versions of Rule 150 confirm this relationship between the subsections.  Prior to its amendment in January of 2021, Rule 150 read as follows:

(b) Whenever service is required to be made upon a person represented by counsel who has filed a notice of appearance pursuant to § 201.102, service shall be made pursuant to paragraph (c) of this section upon counsel, unless service upon the person represented is ordered by the Commission or the hearing officer.

(c) How made. Service shall be made by delivering a copy of the filing. Delivery means:

(1) Personal service--handing a copy to the person required to be served....

*See, e.g.*, 2015 SEC ENF'T MANUAL, 2015 WL 10459618, at *34 (June 4, 2015) (quoting the then-current Rule 150(b)–(c)).  Service was thus to be made either upon the party, or upon counsel if the party was represented, by the then-exclusive method: "Delivery."  In 2015, the Commission "proposed to amend Rule 150(c) to require parties to serve each other electronically."  Amendments to the Commission's Rules of Practice, 85 Fed. Reg. 86464, 86473 (Dec. 30, 2020).  The current subsection (d) is simply a redesignation of prior subsection (c).  Subsections (c) and (d) do not identify "the person required to be served," subsection (b) does that.

personal service of an investigative subpoena in cases where an individual is represented by counsel, absent a specific order issued by the SEC.[14]

The SEC had it right in the *Deloitte* case when it stated: "Rule 150(b) does apply … in formal investigations." *SEC v. Deloitte* at 14. And Rule 150(b) is not a mere suggestion the SEC can disregard when it is expedient, it is a *rule* promulgated pursuant to notice-and-comment rulemaking that the SEC must follow unless it modifies the rule pursuant to the same administrative requirements: "[G]overnment agencies are generally required to follow their own regulations." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 236 (S.D.N.Y. 2020) (quoting *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020)). When agencies fail to follow their rules, the Administrative Procedure Act empowers aggrieved parties to enforce compliance. *Id.* Hence, weeks before the SEC initiated this proceeding, TFL and Mr. Kwon filed suit in this Court against the SEC asserting claims asserting claims under the APA and the Fifth Amendment's Due Process clause and seeking a declaration that the subpoenas were invalid.[15]

It is particularly important to enforce Rule 150(b) because, among other things, it codifies the bedrock principle of legal ethics that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." Model Rule of Prof'l Conduct r. 4.2

---

[14]     Although Mr. Landsman was designated in the formal order issued by the SEC on May 7, 2021 as an SEC employee *generally* empowered to issue subpoenas, the formal order did not provide him with specific authority to serve a subpoena upon Mr. Kwon if he was represented by counsel. For that, Mr. Landsman needed a specific order issued by the Commission, which he did not obtain.

[15]     *Terraform Labs PTE Ltd. and Do Kwon v. United States Securities and Exchange Commission*, No. 21-cv-8701 (S.D.N.Y.), ECF No. 1.

(Am. Bar Ass'n 2020).[16]  This principle is so basic and categorical that it is not remotely surprising that, as the regulatory history shows, any exception requires an order from the SEC itself.

The Court should not permit the SEC's overreach.  Because the SEC violated Rule 150(b), it has not complied with the administrative steps necessary for enforcement under *Powell*.  The prejudice to Mr. Kwon and TFL is undeniable—only by violating Rule 150(b) could the SEC try to obtain what it could not otherwise obtain: personal jurisdiction, a matter of Constitutional concern and protection.  On this basis alone, the subpoenas directed to Mr. Kwon and TFL should not be enforced.

### B. To the Extent the SEC Claims to Have Served Counsel for Mr. Kwon, The Court Lacks Jurisdiction over Mr. Kwon Because He Is Not a United States Resident and Has No Case-Related Contacts with the U.S.

The SEC argues that any violation of Rule 150(b) in attempting to personally serve Mr. Kwon was harmless because the SEC served Mr. Kwon's counsel.  Application 14.  But sending courtesy copies to Dentons is not "service" at all, and cannot in any event be used to secure personal jurisdiction over a lawyer's client.  Even if "service" was made on Dentons (the record is clear that it was not), the subpoena would be unenforceable for lack of personal jurisdiction over Mr. Kwon; the SEC cannot evade its inability to secure personal jurisdiction over Mr. Kwon by simply emailing U.S. outside counsel.

As an initial matter, the SEC did not purport to serve counsel when it emailed Dentons courtesy copies of the subpoenas it tried to serve on Mr. Kwon, as the email itself makes clear. Senderowitz Decl. ⁋ 19, Ex. 4.  In any event, "[s]ervice of process on an attorney not authorized to accept service for his client is ineffective."  *Zherka v. Ryan*, 52 F. Supp. 3d 571, 577

---

[16]    Rule 4.2 applies to SEC attorneys.  *See* 28 U.S.C. 530(B)(a); Securities And Exchange Commission Division of Enforcement, Enforcement Manual at 3.3.5.3.3.

(S.D.N.Y. 2014). Throughout their voluntary cooperation with the SEC, Dentons was adamant that the SEC lacked personal jurisdiction over Mr. Kwon and that any exercise of jurisdiction would be improper. The SEC therefore "has shown no basis for an inference that [Mr. Kwon] had authorized [his] attorneys to accept service of process on [his] behalf." *Santos v. State Farm Fire and Cas. Co.*, 902 F.2d 1092, 1094 (2d Cir. 1990).

Moreover, if service had been effected on counsel instead of Mr. Kwon (which the facts simply do not support), the SEC would lose the only possible basis for asserting personal jurisdiction over Mr. Kwon, who resides outside the United States—tag jurisdiction. *See* Application 13 n.4 ("The Court has personal jurisdiction over Respondent Kwon because *he was personally served* with process and thus 'found' in this judicial district.") (emphasis added). The SEC cannot have it both ways: If counsel was served, then Mr. Kwon was not personally served.

"Section 27 [of the Exchange Act] permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *SEC v. Sharef*, 924 F.Supp.2d 539, 544 (S.D.N.Y. 2013) (citing 15 U.S.C. § 78aa). The Due Process Clause requires "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The SEC must therefore show that (1) Mr. Kwon has "purposefully availed" himself of doing business in the forum state and that (2) the case "arises out of or relates to" *those contacts with the forum*. *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019).

The only U.S. contact the SEC alleges in support of jurisdiction over Mr. Kwon is that he visited New York to attend the conference at which the SEC attempted to serve him. Landsman Decl. ¶ 5. That does not suffice to show purposeful availment, especially because the SEC has

not even alleged that the substance of the subpoenas arises out of or relates to Mr. Kwon's appearance at Mainnet 2021, which was not about the Mirror Protocol. Indeed, the SEC's overall conduct confirms that jurisdiction is lacking; it is precisely because Mr. Kwon lacks minimum contacts with the U.S. that the SEC initially sought his voluntary cooperation and only later resorted to unlawful tactics to try to obtain jurisdiction over him.

## II.    THE COURT SHOULD DENY ENFORCEMENT OF THE SUBPOENA DIRECTED TO TFL

The subpoena directed to TFL is unenforceable for the same reason the subpoena directed to Mr. Kwon is unenforceable—the SEC violated Rule 150(b) in attempting to personally serve TFL through Mr. Kwon. The subpoena directed to TFL is also unenforceable for the additional reason that TFL is not subject to general or specific jurisdiction in the U.S.

### A.    TFL is Not Subject to General Jurisdiction

The SEC's assertion that the TFL is subject to general jurisdiction because "it was served with process through its CEO" (Application 13 n.4) while Mr. Kwon was passing through New York is wrong as a matter of law. General jurisdiction requires contacts so continuous and systematic as to render the defendant "essentially at home" in the forum state. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). As the Supreme Court held in *Daimler AG v. Bauman*, a corporation is at home and subject to general jurisdiction where it is incorporated and has its principal place of business. 571 U.S. 117, 119 (2014). Incorporated and headquartered in Singapore, TFL is not subject to general jurisdiction anywhere in the U.S.

The SEC's attempt to serve a subpoena directed to TFL upon Mr. Kwon was ineffective, as it could not confer jurisdiction over TFL. It is black letter law that jurisdiction over a foreign corporation cannot be secured by serving a transiting officer or director. *Estate of Ungar v. Palestinian Authority*, 400 F.Supp.2d 541, 553 (S.D.N.Y. 2005); *accord Martinez v. Aero*

*Caribbean*, 764 F.3d 1062, 1068 (9th Cir. 2014) ("service of process on a corporation's officer within the forum state" does not "create general personal jurisdiction over the corporation" because "[a]n officer of a corporation is not the corporation, even when the officer acts on the corporation's behalf").

The SEC's reliance on *Saint Tropez Inc. v. Ningbo Maywood Industry and Trade Co., Ltd.,* 2014 WL 3512807, *1 (S.D.N.Y. July 16, 2014), is unavailing. *Saint Tropez* held that service on a foreign corporation's transiting officer constitutes effective *service* on the corporation, not that it confers *personal jurisdiction* over it. *Id.* at *4. To the contrary, *Saint Tropez* separately analyzed the foreign corporation's contacts to find that it was subject to personal jurisdiction and did not rely on the service to establish jurisdiction. *Id.* at *4-8. When the Court performs that analysis here, the only reasonable conclusion is that there is no general jurisdiction over TFL.

### B. TFL is Not Subject to Specific Jurisdiction

To support specific jurisdiction, a defendant's U.S. contacts must show "purposeful availment" of the privilege of doing business in the forum, and the controversy must arise out of or relate to those contacts. "Relatedness … is a sliding-scale test." *Gucci America, Inc. v. Weixing Li*, 135 F.Supp.3d 87, 98 (S.D.N.Y. 2015). In *Gucci America*, where the Bank of China had "substantial" banking contacts with the forum state, the court required that the contacts "only be a 'but for' cause of Gucci's 2010 and 2011 Subpoenas" for bank records. *Id.* But where—as here— TFL acted "entirely abroad and with only sporadic or indirect contacts with the United States" the relatedness inquiry is more demanding and the SEC must establish that the controversy "was *proximately caused* by those contacts." *SPV OSUS Ltd. v. UBS AG*, 114 F.Supp.3d 161, 170 (S.D.N.Y. 2015). None of the few contacts the SEC has alleged (Application 13 n.4) meets that standard.

TFL's one-shot contract with a global digital asset trading platform which happens to be incorporated in Delaware (*id.*) shows neither purposeful availment nor relatedness. TFL paid that platform nothing, TFL earned nothing, and the platform listed MIR tokens to allow **third parties** around the world—not limited to the U.S.—to trade them. Joon Decl. ¶ 9. This does not evidence purposeful availment. Furthermore, that contract was not the proximate cause of the SEC's subpoena to TFL. The subpoena demands production of twenty-seven (27) categories of documents, none of which relate to this contract. Senderowitz Decl, ¶¶ 19, 20, Ex. 4; *see also Blockchange Ventures I GP, LLC. v. Blockchange, Inc.*, No. 20-CV-6866 (AKH), 2021 WL 308277, at *2 (S.D.N.Y. 2021) ("even if such a partnership existed" between a foreign defendant and an in-state business, "Plaintiff has not shown that its causes of action arise out of the partnership" so as to support specific jurisdiction).

The few contacts alleged between TFL employees and the U.S. (Application 13 n.4) are also inadequate to support jurisdiction over TFL because the contacts are also unrelated to this controversy. Mr. Kwon's "appearing at U.S.-based digital asset conference" Mainnet 2021 does not count—the SEC does not even allege that this appearance pertained to the Mirror Protocol. And the SEC has not shown how the three employees it identifies as working remotely for TFL could possibly be the *proximate cause* of the SEC's subpoenas. The document requests are focused on whether mAssets or MIR tokens might be securities that TFL might have sold or marketed to U.S. investors (they are not, and TFL did not).[17] Joon Decl. ¶ 10.

---

[17] *See* Senderowitz Decl. Ex. 4 (demanding, *inter alia*, "Documents sufficient to identify all investors, token holders, owners or beneficial interest holders in MIR tokens…"; "All presentations by Terra to investors, potential investors, token holders, or potential token holders in MIR tokens…"; "All Communications with investors, potential investors, token holders, or potential token holders in MIR tokens Concerning Mirror or the Mirror Protocol"; "All Agreements between Terra and third parties regarding the sale or transfer of Mirror Assets…"; "Documents sufficient to show each unique marketing, promotional, or informational Document Concerning Mirror, the Mirror Protocol, or Mirror Assets…";

The SEC's allegation that "mAssets and MIR tokens are offered and available for purchase by U.S. investors through TFL's web application" (Landsman Decl. ¶ 9) also fails to show purposeful availment. *First*, it is wrong: U.S. residents cannot purchase mAssets or MIR tokens *from* TFL's website because TFL does not sell them—users mint or claim them from the protocol, and TFL earns *no* revenue from the users' activity; moreover, the website to which Mr. Landsman refers has been open-sourced and is no longer *even hosted* by TFL. Joon Decl. ¶¶ 7–8. In any event, this front-end user interface merely allows access to the underlying decentralized protocol, *which TFL does not control*. Joon Decl. ¶ 7. *Second*, the mere possibility that some U.S. resident might have visited the website fails to show "'purposeful availment' because it is neither volitional nor distinguishable from its interaction with users located in any other jurisdiction." *Capitol Records, LLC v. VideoEgg, Inc.*, 611 F.Supp.2d 349, 359 (S.D.N.Y. 2009). As this Court has held, "operating a website, however commercial in nature, that is capable of reaching customers" in the forum cannot support personal jurisdiction without evidence of acts *directed at those particular customers*. *Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, No. 18-CV-2897 (JPO), 2018 WL 2022626, at *4 (S.D.N.Y. April 30, 2018); *see also Royalty Network v. Dishant.com*, 638 F. Supp. 2d 410, 418 (S.D.N.Y. 2009) ("Because websites are ... equally accessible everywhere, the mere availability of the site to users in New York, standing alone, does not amount to transacting business in the state."). The SEC offers no evidence that TFL targeted U.S. users.

The SEC's further allegation that "[u]pon information and belief, U.S. investors have purchased both mAssets and MIR tokens" (Landsman Decl. ¶ 9) fares no better. Any purported purchases of mAssets or MIR tokens by U.S. investors could only have been from third parties,

---

"Documents sufficient to identify all fees received by Terra from Mirror or the Mirror Protocol").

not TFL, because TFL does not sell mAssets or MIR tokens.  These "information and belief" allegations cannot support imputing minimum contacts to TFL.  And, even if the SEC had evidence not based on information and belief that U.S. users had minted mAssets or were granted MIR tokens through TFL's web application, "they would nonetheless be insufficient to support the further, necessary finding that [TFL] purposefully and knowingly entered into those transactions with [U.S.] residents or otherwise targeted [the U.S.] for business."  *Id.* at 420.  TFL "neither advertises its website in [the U.S.] nor charges … its users," or earns any revenue at all from them. *Capitol Records*, 611 F.Supp.2d at 359.  This is not a situation akin to an initial coin offering in which a defendant marketed and sold digital assets specifically to U.S. investors.  *Cf. Balestra v. ATBCOIN LLC*, 380 F.Supp.3d 340, 350–51 (S.D.N.Y. 2019).

"In sum, given the scant contacts between [TFL] and the forum, combined with the utter lack of nexus between [TFL's] alleged conduct and [the SEC's application] … haling [TFL] into court would 'offend traditional notions of fair play and substantial justice.'"  *SPV OSUS*, 114 F.Supp.3d at 171 (quoting *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998)).

***

TFL and Mr. Kwon believe the foregoing arguments are dispositive and require that the SEC's application for enforcement of the subpoenas must be denied.[18]  For the same reason, these arguments entitle TFL and Mr. Kwon to summary judgment in their earlier-filed action.  *See* ECF No. 1, 21-cv-8701.

---

[18]     If the Court disagrees, Respondents believe that it should direct the parties to meet and confer regarding the scope of the subpoenas.  The record makes clear that there are significant issues as to what exactly the subpoenas purport to call for and whether responsive documents exist.  A meet and confer would help narrow those issues and obviate the need for this Court to evaluate objections to each of the twenty-seven document requests in the subpoenas.

## CONCLUSION

For these reasons, Respondents respectfully request that the Court deny the SEC's application to enforce its administrative subpoenas in its entirety.

Dated: December 17, 2021                              Respectfully submitted,

                                                                        */s/ Douglas W. Henkin*
                                                                        Douglas W. Henkin
                                                                        DENTONS US LLP
                                                                        1221 Avenue of the Americas
                                                                        New York, NY 10020
                                                                        Telephone: (212) 768-6832
                                                                        Facsimile: (212) 768-6800

                                                                        Nicholas W. Petts (*pro hac vice* forthcoming)
                                                                        1900 K Street NW
                                                                        Washington, D.C. 20006
                                                                        Telephone: (202) 496-7356
                                                                        Facsimile: (202) 496-7756

                                                                        *Counsel for Respondents Do Kwon*
                                                                        *and Terraform Labs PTE, Ltd.*

**CERTIFICATE OF SERVICE**

I, Douglas Henkin, an attorney, hereby certify that on December 17, 2021, I electronically filed the foregoing **RESPONDENTS' OPPOSITION TO U.S. SECURITIES AND EXCHANGE COMMISSION'S APPLICATION FOR AN ORDER TO SHOW CAUSE AND FOR AN ORDER REQUIRING COMPLIANCE WITH SUBPOENAS** by using the CM/ECF system, which will send notification of such filing to all counsel of record.


_s/ Douglas W. Henkin_
Douglas W. Henkin

# EXHIBIT H

M2H8USSC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    U.S. SECURITIES AND EXCHANGE
     COMMISSION,
4                       Petitioner,

5              v.                            21 MC 0810 (JPO)

6    TERRAFORM LABS PTE, LTD. and
     DO KWON,
7
                      Respondents.          Remote Conference
8    ------------------------------x
9
                                            February 17, 2022
10                                          11:00 a.m.

11   Before:

12                      HON. J. PAUL OETKEN,

13                                          District Judge

14                         APPEARANCES

15   U.S. SECURITIES AND EXCHANGE COMMISSION
     BY:  JAMES P. CONNOR
16
     DENTONS US LLP
17        Attorneys for Defendants
     BY:  DOUGLAS W. HENKIN
18

19

20

21

22

23

24

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

M2H8USSC

1          (The Court and all parties appearing telephonically)

2          (Case called)

3          THE DEPUTY CLERK:  Starting with the petitioner,

4     counsel, please state your name for the record.

5          MR. CONNOR:  Good morning.  This is James Connor for

6     the SEC.

7          THE COURT:  Good morning.

8          MR. HENKIN:  Good morning, your Honor.  This is

9     Douglas Henkin for Mr. Kwon and Terraform Labs.

10          THE COURT:  Good morning.

11          All right.  Thanks for joining.  I would appreciate it

12     if you would all state your names before speaking so the

13     transcript is clear as to who is speaking.

14          I scheduled this call in response to the briefing, as

15     we discussed at the last conference, which was back on December

16     3rd, and this matter is an application by the SEC to enforce an

17     administrative subpoena.  The respondents are Terraform Labs

18     and Mr. Do Kwon.

19          I have read the briefing and the subsequent letters,

20     and I will start with the SEC.  And I guess -- well, maybe I

21     won't start with the SEC actually.  Maybe I will start with Mr.

22     Henkin.  You're the one that really wanted oral argument.  So

23     here it is.

24          MR. HENKIN:  Thank you, your Honor.

25          Look, I will not go over everything that was said in

M2H8USSC

1    the papers, but the case here is that the SEC wants this Court

2    to condone what is a very crystal-clear violation of one of

3    their own rules that they wrote and they are now unhappy with

4    because of the way it applies in this case.  If they don't like

5    the way the rule works, there is a way to try to change it, but

6    this proceeding isn't that way.

7              The SEC has known that Mr. Kwon and TFL are

8    represented by Dentons since just days after the SEC sent Mr.

9    Kwon a request for voluntary cooperation, months before it

10   tried to serve the subpoenas that are at issue.  The SEC's

11   regulations prohibit the SEC staff from serving subpoenas on

12   people who are represented by counsel.

13             THE COURT:  Wrong.

14             What the rule says is, whenever service is required to

15   be made upon a person represented by counsel who has filed a

16   notice of appearance.

17             Have you filed a notice of appearance -- had you, at

18   the time it was served before the SEC?

19             MR. HENKIN:  Before that, your Honor, we had provided

20   the SEC -- and you can see this in the exhibits to Mr.

21   Senderowitz's declaration -- we had provided them with all the

22   contact information that was required by a notice of

23   appearance.  And in the *Deloitte* case, the SEC took the

24   position that that is sufficient to become a notice of

25   appearance.

M2H8USSC

1                  And with respect to --

2             THE COURT:  I don't care what the SEC said in that

3       case.  It's not binding on me.  Plus, in that case, it was

4       completely different, because in that case, the party had

5       agreed to accept service and then was reneging.

6             I don't know how you can get around this language.  It

7       says, whenever service is required to be made upon a person

8       represented by counsel who has filed a notice of appearance.

9       Then it goes on and says, other methods of service, i.e., in

10      situations where no one has filed a notice of appearance,

11      service may be made by delivering a copy, handing a copy to the

12      person required to be served.  That's what happened.

13            MR. HENKIN:  That's the difference between this case

14      and the ordinary circumstances in which that rule applies.  The

15      service on counsel idea applies only in circumstances in which

16      the SEC has gotten jurisdiction over someone.  Remember that in

17      this instance, this started with the SEC sending requests for

18      voluntary cooperation to Mr. Kwon and TFL.  Mr. Kwon and TFL

19      then immediately retained counsel to represent them in

20      connection with the underlying proceeding and responding to

21      those requests.

22            THE COURT:  If we are not in the world where the SEC

23      has acquired jurisdiction and notices of appearances are being

24      filed, then why doesn't (c) of 150 apply allowing personal

25      service?  Because it was just really annoying and bad?

M2H8USSC

1          MR. HENKIN:  No.  It doesn't apply because when you

2     read through the full rule, starting with 203.8, it directs you

3     to (b).  And that's how you get there.  The way you get there

4     is that 203.8 of the SEC's rules relating to investigations

5     say, service of subpoenas issued in formal investigations,

6     investigative proceedings, shall be effected in the manner

7     prescribed by Rule 232(c).

8          Then you jump to 232(c) of the Rules of Practice,

9     which say the provisions of this paragraph (c) shall apply to

10     the issuance of subpoenas for purposes of investigations, and

11     instructs that service shall be made pursuant to the provisions

12     of Rule 150(b) through (d).  So it expressly includes 150(b).

13          And then 150(b) says, upon a person represented by

14     counsel, whenever service is required to be made upon a person

15     represented by counsel, who has filed a notice of appearance

16     pursuant to Rule 201.102, service shall be made pursuant to,

17     and then it continues as your Honor was discussing.

18          There was no place to file a formal appearance form

19     here because of the way that this had begun.

20          THE COURT:  What is the first thing you cited, 203

21     point what?

22          MR. HENKIN:  203.8 of the SEC's rules relating to

23     investigations, which are separate from the Rules of Practice,

24     your Honor.

25          THE COURT:  Right.  Service of subpoenas issued in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2H8USSC

1    formal investigative proceedings shall be effected in the

2    manner prescribed by 232(c).

3            MR. HENKIN:  Of the Rules of Practice, your Honor.

4            THE COURT:  Right.  So what does that then say?

5            MR. HENKIN:  Then that says, the provisions of this

6    paragraph (c), so 232(c), shall apply to the issuance of

7    subpoenas for purposes of investigations.  And it goes on to

8    say that service shall be made pursuant to the provisions of

9    201.150(b) through (d), which is Rule 150(b) through (d) that

10   we have been talking about.

11           THE COURT:  So that includes (c).

12           MR. HENKIN:  It includes (c), but it starts with (b).

13   And so the question is --

14           THE COURT:  That's because (b) comes before (c) in the

15   alphabet.

16           MR. HENKIN:  In the way the rule is structured.

17           What you have here, though, is you have a situation in

18   which the genesis of this dispute started with the SEC seeking

19   voluntary cooperation, and counsel appearing and being

20   recognized in the proffer letter, by the way, which was drafted

21   by the SEC.

22           THE COURT:  So your view is that when someone

23   cooperates and can have counsel for a limited purpose, that

24   they then shield themselves from being subject to service by

25   the SEC?

M2H8USSC

1        MR. HENKIN:  Well, I wouldn't say for a limited

2    purpose.  The retention was for -- we knew that there was a

3    formal order of investigation, and so Dentons was retained for

4    that purpose.  And if you look at the SEC's proffer letter,

5    which is an exhibit to Mr. Senderowitz's declaration -- by the

6    way, which was written by the SEC, recognizing Dentons as

7    counsel for both Mr. Kwon and TFL in connection with the

8    investigation and the responses to the voluntary request.

9        What you have here is a circumstance in which the SEC

10   would like to get to a place where it doesn't have to abide by

11   Rule 150(b) when it starts out this way.  And there is a

12   reason, by the way, your Honor, that it started out with

13   requests for voluntary cooperation.  If it really believed that

14   there is personal jurisdiction over Mr. Kwon and TFL, then why

15   at the very beginning -- and this is going back to May of

16   2021 -- didn't it try to serve subpoenas on Mr. Kwon and TFL?

17   Why did it continue with additional voluntary requests for

18   information sent to Dentons as counsel for Mr. Kwon and TFL?

19       There was a very clear recognition by the SEC that we

20   were acting as counsel for TFL and Mr. Kwon in connection with

21   this entire inquiry.  And then, in the midst of it, because the

22   SEC got unhappy with the way things were going, and you know

23   this from reading Mr. Landsman's declaration, he was monitoring

24   Mr. Kwon's Twitter feed, took this upon himself and took a

25   shortcut.

M2H8USSC

1          And there is a reason, by the way, an ethical reason,

2     which we point out in our brief, why Rule 150(b) should be

3     interpreted this way.  A lawyer in a case should never directly

4     contact a party opponent he knows to be represented by counsel

5     unless authorized by law.  And that comes from Rule of

6     Professional Conduct 4.2(a), which directly applies to the SEC

7     staff, as we noted in our brief.  And that, by the way,

8     explains precisely why, as soon as we identified ourselves to

9     the SEC staff, all the communications after that were between

10     the staff and counsel.

11          THE COURT:  You have segued a bit into personal

12     jurisdiction, which I think is the real issue here.  And all

13     your argument about how to interpret Rule 150 is, once you know

14     somebody has counsel, you have to serve them through counsel,

15     but then we can also reject service.  And that's just not a

16     reasonable reading of the rule.  You're saying that the rule

17     creates this gap between being able to serve someone.

18          Now, you might believe that 150(c) is not operative

19     when there is no personal jurisdiction.  Obviously, that's the

20     argument.  But I just don't think your reading of the rule is

21     tenable at all.  Because you're arguing that we should rely on

22     this section (a) that says, when you file a notice of

23     appearance, service is through them.  But when you file a

24     notice of appearance, you are agreeing to the jurisdiction.

25     You can't reject service then.  So you're saying there is this

M2H8USSC

1   gap in the rule that is not there.

2          MR. HENKIN:  Well, no, actually, I am not saying that

3   there is a gap.  I am actually saying the opposite, your Honor.

4          The problem here is that there is an assumption in

5   connection with the idea that we declined to accept service.

6          First of all, the question was never asked.  One of

7   the things that we pointed out in our submission is that the

8   SEC never asked us to accept service of anything.  In fact,

9   they never notified us about the subpoenas until the e-mail

10   that was sent, which you also have in the record, by the way,

11   that's Exhibit 4 to Mr. Senderowitz's declaration, that

12   notified us that they believed that they had served Mr. Kwon.

13          So there was never a request.  So the idea that we

14   were asked to accept service and declined is false.  That never

15   happened.  The SEC doesn't know what would have happened if

16   they had asked us to accept it.  And your Honor knows from

17   private practice what happens when there are requests, but that

18   didn't happen here.  And you have a situation where there is

19   counsel representing parties in the context of what has been

20   identified as a formal order of investigation.  Everything that

21   your Honor has seen in the record talks about the fact that

22   there is a formal order of investigation.  And when there is

23   counsel under those circumstances, it's our view that the only

24   reading that makes sense is the reading that they are required

25   to either ask counsel, which didn't happen, so we put that one

M2H8USSC

1    off to the side because they just never asked, or get an order

2    from the Commission, which they didn't do.  So neither of the

3    things that 150(b) says, and it's either/or, neither of those

4    things happened.

5          THE COURT:  So 150(b) does say service shall be made

6    electronically in the form and manner to be specified by the

7    office of the secretary on the Commission's website.  Why

8    doesn't the courtesy copy, which was electronically made to you

9    after the personal service, why doesn't that satisfy (b)?

10   Because it didn't come with the magic words "we hereby serve

11   you"?

12         MR. HENKIN:  No.  It's not a question of magic words,

13   your Honor.  It's a question of reading that e-mail.  It says,

14   "Please see the attached subpoenas for Do Kwon and Terraform

15   Labs Pte Ltd. that were served this morning personally on Do

16   Kwon.  If you would like to discuss further, please e-mail me

17   some proposed times to speak."

18         That's the entirety of that e-mail.  It didn't say,

19   and this qualifies as service on you.  It didn't ask the

20   question.  It didn't do anything other than assert that they

21   had been properly served on Mr. Kwon that morning.  And so if

22   that service was in fact not proper, because it didn't comply

23   with 150(b), that's the end of the inquiry.  That's the

24   argument that we are making with respect to 150(b).

25         The e-mail just doesn't say what the SEC would like it

M2H8USSC

1    to say.  And there was never a follow-up saying, well, will you

2    accept them nunc pro tunc, or can we try again, or any of the

3    other various things that they could have done.  That's the sum

4    total of the e-mail.

5          THE COURT:  Let me give Mr. Connor a chance to respond

6    to any of those points briefly.  I want to leave personal

7    jurisdiction to the side for now.

8          Mr. Connor.

9          MR. CONNOR:  Thank you, your Honor.  This is James

10   Connor for the SEC.

11         Your Honor, whether the question is under 150(b),

12   150(c), or 150(d), the SEC unquestionably effected proper

13   service on Mr. Kwon.

14         Rule 150(d) -- and this is the only portion of the

15   rule that specifically references investigative

16   investigations -- says, service of an investigative subpoena

17   may be made by delivering a copy of the filing.  And then it

18   defines delivery as personal service handing a copy of the

19   person required to be served.

20         That's exactly what the SEC did here.  The SEC hired a

21   process server -- did not communicate with Mr. Kwon, as

22   respondents' counsel incorrectly stated, but actually hired a

23   process server to effect service of the subpoena.  That alone

24   under 150(d) should end the inquiry.

25         But if the Court looks at 150(b), every part of that

M2H8USSC

1    rule supports the SEC's position.  As your Honor pointed out,

2    it says, Whenever service is required to be made upon a person

3    represented by counsel who has filed a notice of appearance.

4    There is no dispute now that respondents' counsel did not file

5    a notice of appearance.  But even if a formal filing of a

6    notice of appearance is not required, Rule 150(b) references 17

7    C.F.R. 201.102 when it references a notice of appearance.  And

8    that section, the title of that section, subpart (d), says

9    designation of address for service.  The entire point of Rule

10   150(b) is to allow for service through counsel.  Counsel's

11   supposed partial representation does not allow them to not

12   accept service if they claim that they entered an appearance in

13   the case.

14          Again, whereas here, counsel does not agree to accept

15   service, they have not entered an appearance in the

16   investigation for purposes of Rule 150(b).  So, therefore, it

17   was fully proper for the SEC to serve Mr. Kwon personally.

18          They claim they provided the business address and

19   e-mail address, but again, they wouldn't accept service through

20   those addresses.  So the SEC was not required to get an order

21   from the Commission.

22          Counsel for respondents I think attempts to be a

23   little coy in whether they would or would not accept service,

24   but their filings are very clear on the issue.  On page 15 of

25   their opposition brief, they quote a case that says service of

M2H8USSC

1    process on an attorney not authorized to accept service for his

2    client is ineffective.  And then, in paragraph 8 and 21 of the

3    complaint that they filed, they state the SEC knew it could not

4    serve subpoenas on Mr. Kwon or TFL.

5            So, essentially, what respondents' counsel has stated

6    is that they were not authorized to accept service.  And since

7    they are not authorized to accept service, it was fully

8    appropriate for the SEC to serve Mr. Kwon personally.

9            Now, even if respondents' counsel is correct about

10   everything they said, regarding a notice of appearance,

11   regarding Rule 150(b), the dispute here is academic because the

12   SEC served counsel through electronic means, which is

13   specifically allowed for in Rule 150(c).

14           Now, counsel makes the argument that the SEC didn't

15   provide the, quote, magic words necessary to effect service.

16   But the rules answer this question.  Rule 150(e) specifically

17   states that electronic service is complete upon transmission.

18   So the SEC does not have to say, attached is a copy for

19   service.  All the SEC is required to do is actually send the

20   subpoenas electronically to respondents' counsel, and that is

21   exactly what the SEC did here.

22           So because the SEC has followed the administrative

23   steps in serving the subpoenas, the Court should enforce the

24   subpoenas.

25           The only other point I will raise about the *Deloitte*

M2H8USSC

1    case that counsel relies very heavily in their briefing was in

2    a completely different circumstance in which the attorney in

3    that case had actually agreed to accept service.  So because

4    counsel agreed to accept service, that's why the SEC served

5    upon counsel, and then they tried to renege that years after

6    the fact.  So the *Deloitte* case and this case bear no

7    resemblance.  The SEC followed Rule 150, and so, therefore, the

8    Court should enforce the subpoenas.

9              Thank you.

10             MR. HENKIN:  Your Honor, can I jump back to just a few

11   quick things about that?

12             THE COURT:  Sure.

13             MR. HENKIN:  I am actually glad that Mr. Connor

14   focused on our citation of the *Zherka* case because what that

15   really shines a light on is the fact that there was never a

16   request for acceptance of service.  Because, as your Honor

17   knows from being in private practice, when counsel for an

18   opposing party makes a request, will you accept service of A,

19   B, C or D, on behalf of your client, you then go to your

20   client, talk about it with your client, and decide how to

21   respond.  That request was never made here.  And that request

22   is particularly important here because the idea of electronic

23   service being effected as soon as something is sent means one

24   thing, when jurisdiction has been gotten over a party, and it

25   means something entirely different when the document that you

M2H8USSC

1    are attempting to serve is the document -- when it is in itself

2    a compulsory process document.

3            That's what they attempted to serve here, and that's

4    why we cited the *Zherka* case and specifically service of

5    process on an attorney not authorized.  Essentially, the

6    argument that Mr. Connor made would turn any lawyer, who

7    appears on behalf of an entity that is asked to provide

8    voluntary cooperation with the SEC, into an authorized agent

9    for service of process for anything that the SEC then wants to

10   serve on them.  And that's not the way any of this works.  That

11   would mean, if you took it to its logical conclusion, that the

12   SEC could decide to commence an enforcement proceeding and just

13   e-mail a copy of it to Dentons, and according to the SEC's

14   reasoning, that would count as service on Mr. Kwon or TFL, for

15   example.  That cannot be and isn't the way the law works.

16           The last two things I will say is Rule 150(b), if you

17   read it, specifically relates to investigative subpoenas.

18   That's something that I noted before.  And the notice of

19   appearance in an investigative proceeding is exactly what we

20   provided because when all that is going on is voluntary

21   cooperation, that's all there is, and then you get to where we

22   are now.

23           THE COURT:  OK.  Thank you for those arguments.  I

24   would like to move on to the personal jurisdiction issue, if we

25   could.

M2H8USSC

1          I think again I will start with Mr. Henkin, if you

2     don't mind, because you had addressed the issue of potentially

3     filing a reply brief and really wanted to be heard after what

4     you suggested were some new points made in the reply.  What we

5     are really talking about is any of the bases for purposeful

6     availment of United States by Kwon and Terraform such that

7     personal jurisdiction for purposes of the subpoena would be

8     appropriate.

9          So, Mr. Henkin.

10          MR. HENKIN:  Sure.  Thank you, your Honor.

11          So let me address that in two steps.

12          The first step, and we alluded to this in the letter,

13     but I just want to highlight it, there are a number of things

14     that are stated in Mr. Landsman's reply declaration where he

15     talks about, for example, in paragraphs 3, 4 and 5, evidence

16     that is not before the Court that the SEC wants the Court to

17     rely on with respect to the personal jurisdiction arguments

18     that it makes in the reply brief.  And they all start with

19     actually the same phrase:  the staff has obtained evidence of

20     an agreement or a document, and so on.  But those documents are

21     not in the record, and the only things that are in the record

22     are Mr. Landsman's characterizations about those documents.  We

23     don't think that the Court should be relying on any of that for

24     a number of reasons.  One, it's hearsay, possibly multiple

25     levels depending upon which document we are talking about; and

M2H8USSC

1    also, Mr. Landsman isn't competent to testify about those

2    documents.  None of them are SEC documents, for example.

3         So that's the overall point that I wanted to make with

4    respect to that.  And that applies to all of the assertions

5    that are in Mr. Landsman's reply declaration.

6         With respect to jurisdiction itself, I was surprised,

7    frankly, that the SEC argued in the reply brief that there is

8    general jurisdiction over Mr. Kwon, because as your Honor

9    knows, it's not at all clear that general jurisdiction can

10   apply to individuals.  In the *Burnham v. Superior Court* case

11   from 1990, the Supreme Court said it may be that general

12   jurisdiction only applies to corporations.  And in the *Hoechst*

13   *Celanese* case, from the Middle District of Florida, from 1995,

14   the court said it's not clear that general jurisdiction can

15   ever be held over a private nonresident defendant.  And your

16   Honor in the *Reich v. Lopez* case, from 2014, this was applying

17   New York law and citing the Second Circuit's decision in the

18   *Roman Catholic Diocese* case, you noted that for an individual,

19   the paradigm forum for the exercise of general jurisdiction is

20   the individual's domicile.  And for Mr. Kwon, that was Korea

21   and is now Singapore.  So the idea that there is general

22   jurisdiction over Mr. Kwon just doesn't fly here.

23         I guess I should pause there and ask if your Honor has

24   any questions.

25         THE COURT:  I guess I am wondering about what that

M2H8USSC

means in terms of the *Kidder, Peabody* case that the SEC cites,

which says that Exchange Act, Section 27 confers personal

jurisdiction over a defendant who is served anywhere within the

United States, that is, that service alone covers personal

jurisdiction.

MR. HENKIN:  I think that flips the issue on its head,

your Honor, because essentially that's making general

jurisdiction over an individual apply on -- essentially tag

jurisdiction or happening to travel through the United States.

Whereas I think the ordinary course definition, going all the

way back to *Burnham*, is that for general jurisdiction -- and

this is also true under pretty much every state law that I am

aware of -- is that in order for general jurisdiction to exist

as opposed to specific jurisdiction, that is limited to the

domicile.  And to allow the SEC to just assert general

jurisdiction over somebody by the happenstance of them

happening to be in some sort of the U.S., continental U.S., at

some point, when their domicile is outside the United States, I

think that would raise some fairly significant due process

issues.

THE COURT:  OK.

MR. HENKIN:  I think the best way to read that statute

is it is a territorial limitation on what the SEC can do, not

as something that creates general jurisdiction in circumstances

where it otherwise wouldn't exist.

M2H8USSC

1          THE COURT:  OK.

2          So let's get into specific personal jurisdiction.  I

3    don't know that there is a lot of daylight between how that

4    would apply with respect to Mr. Kwon and with respect to

5    Terraform Labs, because he is the cofounder and CEO and what he

6    is alleged to have done, in terms of United States-focused

7    activities, was really all coextensive with Terraform Labs, or

8    doing it for Terraform Labs.

9          So how do you respond to the various ways in which the

10   SEC contends Kwon and Terraform were availing themselves of

11   U.S. markets and activity?

12         MR. HENKIN:  So two points about that.  One general

13   and then I will get into the actual assertions of the contacts

14   themselves.

15         The first part -- and we fully briefed this and there

16   essentially was not a response to it -- there is a little bit

17   of daylight between Mr. Kwon and TFL, in the sense that even if

18   jurisdiction could be had, even if service was proper of the

19   subpoena directed to Mr. Kwon, handing him a subpoena when he

20   is transiting the United States for TFL is not effective

21   service.  And the SEC didn't really have a response to that.

22   We cited multiple cases saying that just handing a subpoena to

23   an officer of a company, when he or she happened to be

24   transiting through the United States, is not sufficient to get

25   jurisdiction over the entity as opposed to the individual.

M2H8USSC

1      Now just getting into the specific issues, I think

2  what you have to do is you have to look at the subpoenas and

3  the underlying investigation.  The subpoenas, like the

4  investigation, are focused on whether mAssets or MIR tokens

5  might be securities that TFL might have sold or marketed to

6  U.S. investors.  And nothing that the SEC has focused on shows

7  either Mr. Kwon or TFL marketing or selling those things to

8  U.S. persons.  So they don't count for the purpose of

9  establishing specific jurisdiction.

10      What they point to, for example, on page 6 of the

11  reply, is that Mr. Kwon spoke at a New York event as the

12  cofounder and CEO of Terraform.  That's the way they phrase it.

13  That's not purposeful availment.  He was speaking on a panel

14  about emerging blockchain technology, not conducting business.

15  It's not even related to the Mirror Protocol.  The SEC, by the

16  way, did not challenge this in its reply papers.  The panel

17  that he spoke on was called "The Multichain Future is Here,"

18  and it was about how leading blockchains inter-operate with

19  each other and various developments in cross-blockchain

20  technology.  That's not purposeful availment with respect to

21  the Mirror Protocol or MIR tokens.

22      They argue also that Mr. Kwon promotes the Mirror

23  Protocol through TFL's website, web app, social media, podcast

24  interviews and U.S. media.  But they don't identify anything he

25  said on any of those platforms to promote the Mirror Protocol

M2H8USSC

1    to U.S. investors as opposed to just around the world, which,

2    as your Honor is aware, is not sufficient.  The SEC only

3    identifies two items even in the U.S. media about Mr. Kwon, and

4    neither of them involves marketing to U.S. investors.

5            Then they say that Mr. Kwon talked to Coinbase, which

6    led to a contract to list MIR tokens on Coinbase.  A couple of

7    things about that.

8            First of all, Mr. Kwon wasn't a party to the agreement

9    between Coinbase and Terra.  He didn't sign it.  Two, his

10   communications with Coinbase didn't cause the SEC to issue the

11   subpoenas.  The subpoenas don't even ask about those

12   communications.

13           Then they also point to a contract whereby a U.S.

14   digital -- and this is actually in paragraph 3 of

15   Mr. Landsman's reply declaration -- a U.S. digital asset

16   trading platform paid a Terra subsidiary $200,000 for MIR

17   tokens.  But, first of all, as I pointed out, in general, there

18   is no competent evidence about this in the record.  All of this

19   is from statements by Mr. Landsman about a document he claims

20   to have reviewed.  So that's hearsay.  And he is not competent

21   to testify about it.  It's also irrelevant because the most

22   that this shows is that some U.S. entity purchased MIR tokens

23   from a subsidiary of TFL, and that doesn't establish

24   jurisdiction over TFL or Mr. Kwon.

25           And I would refer your Honor back to your own opinion

M2H8USSC

1    in *Alibaba v. Alibabacoin*, which held that contracting with a

2    company in the forum doesn't support jurisdiction unless the

3    case relates to that contract.  And specifically what your

4    Honor said in that case was that Alibaba had contracted with

5    Digital Ocean LLC, which was headquartered in New York City, to

6    host the website.  But even if Alibaba's websites were hosted

7    in New York, that alone is insufficient to establish personal

8    jurisdiction.  That covers everything that the SEC has argued

9    here and means that it is not sufficient to support the

10   exercise of specific jurisdiction.

11        There is also, by the way, a line of cases going back

12   130 years that hold that listing -- let me take a step back

13   here and say, I am going to talk about equity securities

14   because that's what the cases that I am about to describe cite.

15   I am not acknowledging or admitting or agreeing that anything

16   that we are talking about in this proceeding is an equity

17   security or is a security at all.  But these cases are

18   interesting because for 130 years people have been trying to

19   argue that merely choosing to list an equity security on a U.S.

20   equity exchange, such as NYSE or AMEX or NASDAQ, is sufficient

21   to create jurisdiction in some U.S. forum.

22        Literally, going back to 1890, and this is discussed

23   in the *Wiwa v. Royal Dutch Petroleum* case in the Second

24   Circuit, and in a whole series of other cases that I can give

25   you, but even doing that, even listing your securities on a

M2H8USSC

```
1    U.S. market is not sufficient to establish specific
2    jurisdiction.  And that's been the rule quite literally since
3    1890.  You can look at a case called Law Debenture v. Maverick
4    Tube, which is 2008 WL 4615896, and several other cases which I
5    could read to you, but if you would like, I can provide them in
6    a supplemental letter.  The point is that that sort of
7    activity, and that's the most that you could say that the SEC
8    has asserted here, is not sufficient for specific jurisdiction.
9    So the idea of there is a listing agreement.  It's not enough.
10            Also, and this further distinguishes this case from
11   all of those cases that went before, in all of those cases
12   there were payments to the listing exchange, listing fees, for
13   example.  Here, TFL paid the platform nothing and TFL earned
14   nothing from the listing agreement.  So it's even less of a
15   support.
16            THE COURT:  What is the entity that it's listed by?
17            MR. HENKIN:  The one that they referred to is
18   Coinbase.
19            THE COURT:  OK.
20            MR. HENKIN:  So that can't be sufficient.  If listing
21   on an equities exchange can't be sufficient for personal
22   jurisdiction, then MIR tokens, when it's not even a paid
23   listing, couldn't possibly be sufficient.
24            THE COURT:  But why wouldn't it be sufficient, when
25   you list on Coinbase, that entity pays $200,000 for MIR tokens,
```

M2H8USSC

1    and you have several employees in the United States, including

2    the general counsel.  Why else would it have a general counsel

3    in the United States?

4              MR. HENKIN:  It's interesting, your Honor, and that's

5    one of the other reasons that I wanted to bring up these cases

6    because they also go to exactly those questions.  Among the

7    things that are alleged in some of them, not all of them, are

8    things like paying someone, having employees in the area, and

9    things like that, as opposed to purposeful availment with

10   respect to the specific issues that are in dispute.  And in all

11   of the cases in which those are addressed, and I will give you

12   an example, some of the cases, for example, had situations

13   where underwriters were hired in the same jurisdiction, or

14   where investor relations companies were hired in the same

15   jurisdiction, or where there were small numbers of employees in

16   the same jurisdiction, and again, your Honor, if you want, I

17   can give you a quite long string cite with these cases, but

18   what they uniformly hold is that those things even put together

19   aren't enough.

20             The reason for that is, if you think about it from a

21   policy perspective, that would discourage companies from coming

22   into the United States, or from even -- essentially, it would

23   make companies do everything they possibly could to avoid

24   contact with the United States, to avoid those things giving

25   rise to personal jurisdiction.

M2H8USSC

1      THE COURT:  There is also a 2019 custodial services

2  agreement.  Is that also with Coinbase or is that with somebody

3  else?

4      MR. HENKIN:  That I believe is with somebody else,

5  although I don't remember off the top of my head because I

6  haven't seen the specific document that's being referred to.

7  But again, that is the equivalent of the cases in which

8  plaintiffs have alleged having a bank account and appointing a

9  transfer agent or a registrar is not sufficient.  So, for

10  example, in a case called *Gilson v. Pittsburgh Forgings*, the

11  allegations were, Oh, there is an NYSE listing and there is the

12  appointment of a New York-based transfer agent and registrar,

13  and the court said, no, that's not enough.

14      THE COURT:  You're pointing to four different areas

15  where it's not enough, but here we have all of those things.

16      MR. HENKIN:  No.  Actually, in that case, it was the

17  combination was not sufficient.

18      THE COURT:  The second declaration by the SEC, which I

19  realize you have problems with, I think it says 15 percent or

20  some percent of customers are in the United States.  Do you

21  have a response to that?

22      MR. HENKIN:  I am trying to find where that is.

23  Notice that it doesn't say customers.  What it says -- and this

24  is one of the problems with it.  What that paragraph says is,

25  The staff obtained evidence of an e-mail from a Terraform

M2H8USSC

1    employee to the U.S.-based digital asset trading platform and

2    U.S.-based outside representatives of the trading platform

3    indicating that about 15 percent of users of the Mirror

4    Protocol come from the U.S.

5         Now, that's a very, very vague statement because users

6    of the Mirror Protocol doesn't necessarily mean that they were

7    buying or selling mAssets.  It also doesn't mean that they were

8    using the Mirror Protocol through a TFL interface.  One of the

9    important parts about the Mirror Protocol is that it's just a

10   protocol that operates on the internet.  It's essentially been

11   released into the wild, one way of thinking about it, by TFL.

12   TFL doesn't control it.  TFL doesn't control what mAssets are

13   minted or how they trade.  That is controlled by the Mirror

14   Protocol community.  So nothing in that statement says anything

15   about what those users are doing.  Another way of thinking

16   about it is those users are not customers of TFL.  They are

17   simply using the protocol in ways that TFL has no control over.

18        THE COURT:  Right.  That's kind of the brave new world

19   of the blockchain that is what makes this unlike prior cases,

20   right?

21        MR. HENKIN:  It's one of the things, yes.

22        THE COURT:  I want to give a chance to Mr. Connor to

23   address personal jurisdiction as well.  Did you cover

24   everything you wanted to, Mr. Henkin?

25        MR. HENKIN:  The only other thing that I would throw

M2H8USSC

1    in, your Honor, is that we think that the 2021 case *Blockchange*

2    *Ventures v. Blockchange, Inc.* is another case that supports our

3    argument that there is no jurisdiction.  In that case, the

4    defendant provided digital asset investment services and the

5    plaintiff had pointed to a partnership between the defendant

6    and a New York company for the New York company to share

7    customer information with the defendant, but the court found

8    that there was no jurisdiction because the plaintiff hadn't

9    shown that its case arose out of that partnership.  And I think

10   that the cases that the SEC cites do not show the existence of

11   personal jurisdiction here.

12            THE COURT:  All right.  Thank you.

13            Mr. Connor.

14            MR. CONNOR:  Yes, your Honor.  Thank you.

15            I would like to start with personal jurisdiction over

16   Mr. Kwon.

17            We don't think this is a close question.  The court

18   has personal jurisdiction over Kwon because he was served with

19   the subpoena while he was found in the United States.  And that

20   "found" language comes from Exchange Act, Section 27, 15 U.S.C.

21   78aa.  And we included the reference to the *Kidder* case, which

22   squarely addresses this question and held that when a person is

23   found in the United States, that it's proper for a court to

24   exercise jurisdiction over that person.

25            We also cited the *Edelman* case, 295 F.3d 171, that

M2H8USSC

1      says, when a potential witness comes to the United States, it

2      is neither unfair nor inappropriate under the statute to

3      undertake his discovery here.

4                  THE COURT:  What was that cite of *Edelman*?

5                  MR. CONNOR:  295 F.3d 171.

6                  I think there might be a misunderstanding on the

7      *Burnham* case.  Because in *Burnham*, which was a plurality

8      opinion, the court held jurisdiction, based on physical

9      presence alone, constitutes due process.  I am just reading

10     from the case.  And it reaffirmed a century of judicial

11     practice that serving a person while they are found in the

12     location comports with due process.

13                 I think the confusion is that that doctrine doesn't

14     always apply to corporations, and that's something that the

15     Supreme Court found in *Daimler*.  And to be clear, we are not

16     saying that the Court has general jurisdiction over the

17     corporation.  We are just saying it has it over Kwon because he

18     was found in the location.

19                 So our position there is supported Supreme Court case

20     law, Second Circuit case law, and the statute itself.

21                 Just turning to specific personal jurisdiction over

22     Mr. Kwon and Terraform, there's numerous minimum contacts that

23     establish purposeful availment of the forum.  And I will just

24     tick through a few of these because I think it's important.

25                 First, Mr. Kwon travelled to the United States to

M2H8USSC

1    speak at a digital asset conference where he was identified as

2    the founder and CEO of Terraform.  He signed an agreement with

3    what we termed as a U.S. digital asset trading platform, but

4    which counsel has identified now as Coinbase, under which the

5    digital asset platform paid a Terraform subsidiary at least

6    $200,000 for MIR mirrors.  Again, that was an agreement that

7    was signed by Mr. Kwon personally.

8              THE COURT:  I thought he said he didn't sign it.

9    Maybe I'm wrong.

10             MR. CONNOR:  Yes.  Mr. Kwon signed the agreement.  I

11   think the caveat there was that the agreement was with a

12   wholly-owned Terraform subsidiary.

13             MR. HENKIN:  Just to be clear, your Honor, the

14   agreement he didn't sign was the listing agreement.

15             THE COURT:  Got it.

16             So the agreement that you're talking about, the

17   listing of MIR tokens, when was that?

18             MR. CONNOR:  The agreement that I am referring to is

19   not for the listing.  It's called a SAFT, which is a simple

20   agreement for future token, and that was signed in 2021.  And

21   that was where the U.S. digital asset platform agreed to pay

22   $200,000 for the MIR tokens.

23             THE COURT:  For the tokens.

24             MR. CONNOR:  Yes.  Just to be clear, that's separate

25   and apart from the custody agreement and the listing agreement.

M2H8USSC

1    This is a third agreement.

2              THE COURT:  So they were buying the tokens from the

3    Terraform subsidiary?

4              MR. CONNOR:  Yes.

5              THE COURT:  All right.

6              And Coinbase is a U.S.-based entity?

7              MR. CONNOR:  It is.

8              THE COURT:  But this wasn't a listing agreement.  They

9    weren't reselling the tokens.

10             MR. CONNOR:  No.  But there was also a listing

11   agreement between Terraform and Coinbase as well.

12             THE COURT:  And tell me about that.

13             MR. CONNOR:  That is an agreement, Terraform

14   contracted with Coinbase under which -- and this just addressed

15   the MIR tokens, not the mAssets.  But the MIR tokens were,

16   through this listing agreement, made available for trading in

17   the U.S.  To be clear, when they enter into the agreement, it's

18   Coinbase that's actually -- once that agreement is made, it's

19   Coinbase that is making them available for sale.

20             THE COURT:  So if I go on, I can purchase MIR tokens

21   through a Coinbase platform now?

22             MR. CONNOR:  Yes.

23             THE COURT:  But what about the argument that there is

24   no ongoing role of Terraform in that situation?

25             MR. CONNOR:  Well, Terraform is -- they call MIR token

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2H8USSC

1    the, quote, governance token of the Mirror Protocol, which,

2    again, Terraform developed and continues to maintain.  So there

3    still is a relationship between Terraform and the governance

4    token for the Mirror Protocol.

5         And that's putting aside the fact that, again,

6    Terraform created the Mirror Protocol, which also allowed for

7    the creation of these mAssets.  And these mAssets, they mimic

8    the price of U.S.-based equity securities.  So, for example,

9    they talk about something called mApple and mTesla.  So these

10    are things that Terraform created the infrastructure, and

11    created the Mirror Protocol through which these mimicked assets

12    are developed.

13         Also, with respect to the custody agreement, Terraform

14    signed a contract, and I think we have identified it as

15    Coinbase, for -- actually, this agreement is with a trust

16    associated with Coinbase.  So the custody agreement is not with

17    Coinbase, but with the trust.  And that's for the trust to

18    custody and store digital assets on Terraform's behalf.  So,

19    again, that's a contract between Terraform and the U.S.-based

20    entity, in which the U.S.-based entity is storing and

21    custodying digital assets on Terraform's behalf.  That's

22    continuing, ongoing conduct that's memorialized in an

23    agreement, and that is sufficient for purposes of availment.

24         That's not even to mention, again, at least four

25    individuals, it's growing, Terraform just hired an additional

M2H8USSC

1   general counsel, but there's at least four individuals residing

2   in the United States that are employed by Terraform and press

3   reports -- I will just throw this out there.  There's also

4   press reports that Mr. Kwon and Terra-related entities have a

5   new sponsorship agreement with the Washington Nationals.  There

6   is section behind home plate called The Terra Club.

7           So there is significant minimum contacts between

8   Terraform, Mr. Kwon, and the United States that are more than

9   sufficient for the Court to exercise jurisdiction.

10          I will also point out, Terraform in its briefing tries

11  to minimize the fact that its website and web application

12  allowed U.S. investors to purchase MIR tokens and mAssets.  And

13  the way they do this is sort of retroactively.  If you look at

14  the declaration of the Terraform employee, it states that the

15  website has been open-sourced and is no longer even hosted by

16  Terraform.  But that only changed on November 14, 2021, two

17  days after we filed the subpoena enforcement action.  So up

18  until that time, a U.S. investor could go to Terraform's

19  website and purchase these MIR tokens and these mAssets on a

20  website hosted by Terraform.  Terraform's belated attempt to

21  kind of eliminate this contact does not change the fact that it

22  hosted the website.  And this is just in addition to all the

23  other contacts that I also discussed.

24          I will also point out, the last point is that Mr. Kwon

25  also promotes the mAssets and MIR tokens in U.S. media.  We

M2H8USSC

1  included a cite to a Yahoo! News article and Mr. Kwon is quoted

2  as saying, So we have things like Mirror Protocol, which

3  creates synthetic assets that track the price of real-world

4  assets.  So this would be, for example, MIR Tesla or MIR Apple,

5  referring to the equity securities of U.S.-based companies

6  Apple, Inc. and Tesla, Inc.

7       In the end, the question on jurisdiction over Mr. Kwon

8  and Terraform boils down to this.  Should the Court exercise

9  personal jurisdiction over a digital asset company, when that

10  company has multiple contracts with a U.S.-based trading

11  platform, markets of digital assets, which mimic U.S.

12  securities to U.S. investors, through U.S. media, employs at

13  least four individuals residing in the U.S. in key positions,

14  and has a CEO who travels to the U.S. on behalf of Terraform to

15  speak at digital asset conferences?  We believe the answer is

16  clear and the Court should exercise specific personal

17  jurisdiction over both Kwon and Terraform.

18       THE COURT:  Let me just ask you if you would like to

19  respond to Mr. Henkin's objections to the hearsay and personal

20  knowledge points, particularly with respect to the second SEC

21  declaration.

22       MR. CONNOR:  Sure.  With respect to the agreement, as

23  a practical matter, I think counsel has essentially confirmed

24  what we said in the declaration that these agreements exist.

25  He said that they do have agreements with Coinbase.  And so

M2H8USSC

1   that's the point that we were laying out in the second

2   declaration.  We didn't attach the actual agreements to the

3   declaration.  We are happy to do that.  We have them.  We did

4   provide the Bates numbers so that the Court can have some

5   confidence that they do exist, and we will certainly provide

6   them if need be.

7           As far as of sort of the timing of it, when we

8   initially filed the petition for enforcement of the subpoenas,

9   we did not believe that jurisdiction was going to be a large

10  issue because of all of these contacts with the U.S.  So that's

11  why in our initial papers we focused on the Rule 150 issue,

12  which is the issue that respondents filed the complaint on, and

13  so that's what we focused on.  We did include some of the

14  contracts.  But given that in their response brief respondents

15  described their contacts with Coinbase as a one-shot contract,

16  that's what they said, that was just inaccurate.  So we needed

17  to correct that inaccuracy, that there were more than one

18  contract; there were multiple contracts.  And again, counsel

19  has confirmed what we have said here about these contracts with

20  Coinbase.  There is no dispute about the facts here.  And so I

21  think we have provided more than enough indicia of liability

22  for these agreements, and it's more than enough for the Court

23  to exercise jurisdiction over Kwon and Terraform.

24          MR. HENKIN:  Your Honor, can I respond?

25          THE COURT:  Sure.

M2H8USSC

1          MR. HENKIN:  A few things.

2          First of all, we didn't confirm the content or what

3     the SEC would like the Court to infer from these contracts.  I

4     would like to mention that Terraform is a fairly large company

5     that does a lot of things besides having created the Mirror

6     Protocol, part of which is the MIR token.  It has a lot of very

7     much more substantial products and projects that it works on

8     that have nothing to do, for example, with the Mirror Protocol.

9     So it's the SEC's burden to demonstrate that what it is

10    investigating here, which is only mAssets and the MIR tokens,

11    are related to the things that it has identified as contacts

12    with the U.S.  And it hasn't done that.  That's one of the

13    reasons why I focused on the listing cases and investor

14    relations and other contacts-type cases because those sorts of

15    things in a generic context are not the same.

16          So, for example -- and, of course, this is not in the

17    record, but because Mr. Connor brought it up I will also bring

18    it up -- he referred to discussions with the Washington

19    Nationals.  Two things about that.  One, that started months

20    after the service of the subpoenas was attempted.  But, two,

21    it's got nothing to do with the Mirror Protocol or MIR tokens.

22    It has to do with a completely separate -- and I apologize for

23    the fire engines in the background.  It has nothing to do with

24    mAssets or MIR tokens.  It has to do with a separate

25    cryptocurrency digital asset that TFL had created.

M2H8USSC

1          THE COURT:  It's a DSL thing called cryptocurrency

2     Terra USD.  So it stands for Terra USD.

3          MR. HENKIN:  It's a stable coin.  It's not the MIR

4     token and it's not mAssets.

5          THE COURT:  It's based on the Mirror Protocol as well.

6          MR. HENKIN:  No.  It can interact with the Mirror

7     Protocol, but Terra USD is separate from the Mirror Protocol.

8     And I don't think that's subject to dispute here.

9          The second thing is, neither TFL nor Mr. Kwon creates

10    mAssets.  Those are created and they are traded by people who

11    use the Mirror Protocol.  So it's not up to Mr. Kwon whether

12    mApple or M any other U.S. equity is created.  Those are

13    proposed by and voted on by the community.  TFL doesn't have

14    control over whether one mAsset gets created; if it does get

15    created, who trades it; if it gets destroyed, or anything like

16    that.  In a sense, the Mirror Protocol, one thing that you

17    might analogize it to is a 3D printer, and what somebody who

18    buys a 3D printer makes with it is up to them, not to the

19    company that sells it.  At the end of the day, none of this has

20    been linked to the investigation.  They are just throwing out

21    contacts.  And that's why I think it's very important to focus

22    on, have they demonstrated that any of these contacts are

23    actually related to the things that they are investigating?

24    Because that's what is relevant for specific jurisdiction.

25          Of course, all of this assumes that service was proper

M2H8USSC

1    in the first place.  And I just want to say one brief thing

2    about that.  We provided all the information, and I don't think

3    it's disputed, that is required by the SEC's Rule 102(b).

4    There is no docket, in the context of a situation like this, in

5    which to file a notice of appearance or any other kind of a

6    form.  You provide it to the SEC staff the way we did provide

7    it.  They recognized that we were counsel for TFL and Mr. Kwon.

8    And you can't knock out Rule 150(b) by disagreeing with that.

9    It would essentially write the rule out of existence.

10             That's all I have to say, unless your Honor has

11    further questions.

12             THE COURT:  Thank you.

13             Let me ask Mr. Connor one more thing, and that is,

14    this Nationals deal, do you agree that because it involves a

15    different product, I guess, cryptocurrency Terra USD is not

16    within what would be a basis for specific jurisdiction because

17    it's not within what the SEC is investigating here?

18             MR. CONNOR:  Your Honor, I think, from our

19    perspective, we don't have those agreements.  We can only read

20    what is in the press.

21             What I will say is, with respect to specific

22    jurisdiction and the contacts between Mr. Kwon in the United

23    States, Mr. Kwon is quoted very heavily in these press releases

24    announcing a deal between his company and a major sports

25    franchise here in Washington, D.C.  So I think that does

M2H8USSC

1    support our position.  We think the Court has general

2    jurisdiction over Mr. Kwon, but also specific jurisdiction over

3    Mr. Kwon.  And I think, as Mr. Henkin said, the Terra-related

4    entities that he claims were sort of party to the sponsorship

5    agreement, there is some interaction between those entities and

6    the Mirror Protocol.  We can't speak with any more specificity

7    on that because we don't have those agreements yet.  But I was

8    just sort of pointing that out as an example of the fact of the

9    contacts between at least Mr. Kwon and Terra-related entities

10    with the United States that continue to be ongoing, in addition

11    to the litany of contacts that we described earlier.

12             THE COURT:  What is the scope of the SEC's

13    investigation?

14             MR. CONNOR:  The SEC's investigation is named *In re*

15    *Mirror Protocol* and is investigating whether there were

16    potential violations of the securities laws regarding Mirror

17    Protocol; and as we lay out in our papers, under the Mirror

18    Protocol, MIR tokens are created, and mAssets, which mimic

19    U.S.-based securities, are also created.

20             So I think that's in our papers, and I think that's

21    all that -- yes.  To be clear, that is what our subpoena

22    relates to that's at issue here.

23             So, again, the subpoena relates to the Mirror Protocol

24    through which the MIR tokens and mAssets are created.

25             MR. HENKIN:  Just to get back to the general

M2H8USSC

1    jurisdiction point, because Mr. Connor focused on it so much, I

2    would again refer back to *Burnham*, *Hoechst*, and the *Reich*

3    cases, which make clear, although Mr. Connor is correct that

4    *Burnham* was a plurality case, was a plurality decision, the

5    Supreme Court stated it may be that general jurisdiction

6    applies only to corporations.  And then the *Hoechst* case said

7    that it wasn't clear that general jurisdiction could ever be

8    held over a private nonresident defendant, i.e., an individual.

9    So there is significant doubt, at least at the federal level

10   and also at the state level, whether general jurisdiction can

11   ever be asserted over a two-legged entity as opposed to a

12   corporate entity.

13        THE COURT:  All right.  Thank you for your arguments.

14   I am going to rule.

15        There are two issues before me.  One is whether there

16   was proper service.  And on this, I rule that there was proper

17   service.  I think Rule 150(a) applies, specifically by its

18   terms, when service is required to be made upon a person

19   represented by counsel who has filed a notice of appearance,

20   and (c) provides for and allows service by handing a copy of

21   the person required to be served, and I think that does require

22   proper service.

23        Mr. Henkin is a very smart lawyer and has made clever

24   arguments about how, because the respondents were represented

25   by counsel, service had to be made kind of as service through

M2H8USSC

1    counsel, but I just don't think Rule 150(a) applies by its

2    terms.  And there really is no authority for respondents'

3    position, other than a reply brief by the SEC which is not

4    authority.  In any event, I think that that is distinguishable.

5    It's not binding on me.  In any event, I think the plain

6    language of Rule 150 permits the service that was made here.

7    And I think the reading proposed by respondents would read out

8    Rule 150(c).  This purported gap that respondents' position

9    would create between being personally served and being served

10   through counsel that has "appeared" is illusory and reflects a

11   misreading of SEC rules.

12          With respect to personal jurisdiction, I don't need to

13   decide the general jurisdiction question because I find that

14   there is specific personal jurisdiction with respect to both

15   Kwon and Terraform Labs because they purposely availed

16   themselves of the privilege of doing business in the United

17   States in several respects that are directly causally connected

18   to the basis for the subpoena at issue here in the sense of

19   but-for causation.

20          They promoted the Mirror Protocol and MIR tokens

21   through Terraform's website, web application, social media

22   accounts, interviews, and U.S. media.

23          Second, Kwon corresponded with U.S. digital asset

24   trading platform Coinbase regarding a listing of MIR tokens,

25   which is the governance token of the Mirror Protocol, leading

M2H8USSC

1      to a contract between Terraform and the U.S.-based trading

2      platform on the listing of MIR tokens.

3              Third, Kwon and a Terraform subsidiary entered into an

4      agreement with the U.S.-based digital trading platform under

5      which the U.S. entity paid at least $200,000 for MIR tokens.

6              Fourth, there was a custody agreement entered with a

7      U.S.-based entity for storing digital assets on behalf of

8      Terraform.

9              Fifth, there are employees in United States, including

10     the general counsel, which I think is telling.

11             Sixth, the mAssets mimic U.S. stocks and are plainly

12     being offered to U.S. customers.

13             And, finally, there is this sponsorship.  I note that

14     there is an NBC Sports online article from February 9, which

15     says, "The Nationals announced Wednesday a partnership with the

16     cryptocurrency community Terra, a decentralized autonomous

17     organization run by stakeholders rather than a traditional

18     corporate structure.  As part of the agreement, the

19     cryptocurrency Terra USD could be accepted at Nationals Park as

20     a form of payment as early as next season."

21             Finally, I note that some of the cases that Mr. Henkin

22     has, understandably and quite persuasively, relied on are

23     different because this is a different kind of entity, and that

24     is exactly what is being explored by the SEC.  And the fact

25     that this is something that was sort of kicked off and then

M2H8USSC

1    managed on an ongoing basis by the community makes it different

2    from a lot of prior case law, and that is exactly what the SEC

3    I think is exploring.

4          Taken all together, I think that there are clearly

5    sufficient contacts and sufficient personal availment

6    authorizing specific jurisdiction over both Kwon and Terraform,

7    and I find that service is proper, and therefore the

8    application to enforce the subpoena is granted.

9          MR. HENKIN:  Your Honor, at this point, Mr. Kwon and

10   TFL would like to seek a stay of your order pending appeal

11   under FRAP 8.  Would you like us to address that now while we

12   are on the call or in some other manner?

13         THE COURT:  How long would you like a stay?  I can't

14   remember if the rule provides a specific period.

15         MR. HENKIN:  The rule does not provide a specific

16   period.  We will obviously be filing a notice of appeal, and we

17   will ask for expedited treatment, expedited handling of the

18   appeal.  So we can get the notice of appeal filed as soon as

19   there is an order from which we can appeal, and we will get

20   that done expeditiously.  If your Honor filed it today, I would

21   promise you that we will get the notice of appeal filed no

22   later than Monday, or Tuesday, actually, because Monday is a

23   holiday, so to have the stay pending.  We would also file a

24   request for an expedited hearing by the Second Circuit.  So we

25   would ask for the stay to last for at least three months or

M2H8USSC

1   until the Second Circuit addresses it otherwise.

2              THE COURT:  All right.

3              Do you want to respond, Mr. Connor?

4              MR. CONNOR:  Your Honor, I have to confess I was not

5   prepared to address the law and the standards for a stay

6   pending appeal.  What I can say is that this is a very

7   important investigation to the SEC, and through respondents'

8   failure to comply with the subpoenas, our investigation

9   continues to be delayed.  So we would reserve all our rights in

10  opposing a motion for stay of your Honor's order.  So I think

11  our position is that the subpoena should be enforced in

12  accordance with the proposed order that we filed along with our

13  application.  But we are happy to address, if plaintiffs want

14  to file something, we are happy to research the issue and

15  respond in kind.

16             THE COURT:  OK.  For now I will issue the order

17  granting the application, and I will stay my decision for a

18  period of 14 days pending the request by respondents to submit

19  anything requesting more time.  But for now I will

20  automatically stay it for 14 days, and you can file either a

21  letter motion or formal motion, letter motion is fine,

22  requesting a longer stay and then the SEC can respond as soon

23  as possible to that.  What I would like is, whenever you file

24  it, if the SEC could respond within four business days, then I

25  can determine whether and how long to grant a longer stay.

M2H8USSC

1           Does that work?

2           MR. HENKIN:  That's perfect, your Honor.  Thank you.

3           THE COURT:  Anything else from Mr. Henkin today?

4           MR. HENKIN:  No, your Honor.

5           THE COURT:  From Mr. Connor?

6           MR. CONNOR:  Nothing from us.  Thank you, your Honor.

7           THE COURT:  Thanks, everyone.

8           We are adjourned.  Have a good day.

9           (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT I

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                              Applicant,

v.

TERRAFORM LABS PTE, LTD. and DO
KWON,

                              Respondents.

Civil Action No. 1:21-mc-00810 (JPO)


__NOTICE OF APPEAL__


     **PLEASE TAKE NOTICE** that Respondents Terraform Labs PTE Ltd. and Do Kwon

appeal to the United States Court of Appeals for the Second Circuit from the Order dated and

entered February 17, 2022 (Dkt. No. 28) granting the U.S. Securities and Exchange

Commission's ("SEC") application for an order requiring compliance with investigative

subpoenas for documents and testimony in connection with the SEC's investigation entitled *In*

*the Matter of Mirror Protocol* (File No. HO-14164).

Dated: February 23, 2022

Respectfully submitted,

*/s/ Douglas W. Henkin*
Douglas W. Henkin
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6832
Facsimile: (212) 768-6800

Nicholas W. Petts (*pro hac vice* forthcoming)
1900 K Street NW
Washington, D.C. 20006
Telephone: (202) 496-7356
Facsimile: (202) 496-7756

*Counsel for Respondents Do Kwon*
*and Terraform Labs PTE, Ltd.*

## CERTIFICATE OF SERVICE

I, Douglas Henkin, an attorney, hereby certify that on February 23, 2022, I electronically filed the foregoing **NOTICE OF APPEAL** by using the CM/ECF system, which will send notification of such filing to all counsel of record.

_s/ Douglas W. Henkin_
Douglas W. Henkin

# EXHIBIT J

**DENTONS** 大成

Douglas W. Henkin

douglas.henkin@dentons.com
D   +1 212-768-6832

Dentons US LLP
1221 Avenue of the Americas
New York, New York 10020-1089
United States

dentons.com

February 23, 2022

**VIA ECF**

Hon. J. Paul Oetken
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

Re:    *SEC v. Terraform Labs Pte Ltd. et ano.*, Case No.: 1:21-mc-00810 (JPO)

Dear Judge Oetken:

On behalf of Respondents Terraform Labs PTE, Ltd. ("TFL") and Do Kwon (collectively, "Respondents"), I write seeking a stay pending appeal, pursuant to Fed. R. App. P. 8, of this Court's Order (ECF No. 28) granting the application by the Securities and Exchange Commission ("SEC") to require compliance with investigative subpoenas.

The relevant factors for granting a stay pending appeal are whether (1) the applicant will be irreparably injured; (2) issuance will substantially injure the other parties interested in the proceeding; (3) the applicant has made a strong showing that he is likely to succeed on the merits; and whether (4) the stay is in the public interest. *Noel Pane v. Town of Greenburgh*, 2012 WL 12886971, at *3 (S.D.N.Y. 2012); *In re World Trade Center Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir.2007). Although the first and third factors are the most important, "[t]he degree to which a factor must be present varies with the strength of the others; more of one [factor] excuses less of the other." *U.S. S.E.C. v. Daspin*, 557 F. App'x 46, 48 (2d Cir. 2014); *see also Nken v. Holder*, 556 U.S. 418, 129 S.Ct. 1749, 1761, 173 L.Ed.2d 550 (2009) (noting success on the merits and irreparable injury are the "most critical"). Here, each factor tilts in Respondents' favor.

*First*, ordering immediate compliance with the subpoenas will irreparably injure Mr. Kwon and TFL because they risk losing their ability to effectively contest the subpoenas. As this District has held, "[l]oss of appellate rights is a quintessential form of prejudice. Thus, where the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied." *In re Adelphia Commc'ns Corp*., 361 B.R. 337, 347–48 (S.D.N.Y. 2007). And as the Supreme Court has explained, that a court might later order the return of documents and other materials represents only a "partial remedy." *Church of Scientology of California v. United States*, 506 U.S. 9, 13 (1992). Thus, without a stay it would as a practical matter be too late to vindicate Respondents' rights and legal positions. *See id.* Requiring

Sirote ► Adepetun Caxton-Martins Agbor & Segun ► Davis Brown ► East African Law Chambers ► Eric Silwamba, Jalasi and Linyama ► Durham Jones & Pinegar ► LEAD Advogados ► Rattagan Macchiavello Arocena ► Jiménez de Aréchaga, Viana & Brause ► Lee International ► Kensington Swan ► Bingham Greenebaum ◇ Cohen & Grigsby ► Sayarh & Menjra ► For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms

![DENTONS 大成]                                                                                       dentons.com

Respondents to comply with the subpoenas (including providing testimony) while their appeal is pending would risk making the appeal academic. *See E.E.O.C. v. Quad/Graphics, Inc.*, 875 F. Supp. 558, 560 (E.D. Wis. 1995). This injury is particularly acute where a respondent might also be a target of the agency's investigation. *See Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, No. CV142090MWFPLAX, 2014 WL 12685941, at *19 (C.D. Cal. May 27, 2014) ("Respondents' disclosure of sensitive proprietary documents to the Bureau is a bell that cannot be unrung."). Indeed, the harm to Respondents' interests would be irreparable because there is nothing a court can do to withdraw knowledge or information the SEC would acquire once that information has already been divulged. *See Maxcrest Ltd. v. United States*, No. 15-MC-80270-JST, 2016 WL 6599463, at *4 (N.D. Cal. Nov. 7, 2016). Further, for Mr. Kwon, a resident of Singapore, providing live testimony to the SEC would impose a burden that is both substantial and, by its nature, irreversible. Respondents would thus suffer irreparable injury absent a stay.

*Second*, a stay will not substantially injure the SEC. The SEC did not seek expedited handling of its application in this Court, and even sought an extension of its time to file reply papers. If Respondents are unsuccessful in the Second Circuit, "the only harm incurred will be a delay in the [SEC's] receipt of the information that it has requested. A delay will not result in substantial harm to other parties interested in this litigation." *Quad/Graphics*, 875 F. Supp. at 560. And although the SEC argued that subpoena enforcement actions should be "summary" in nature (ECF No. 10 at 2), that "interest must be balanced against [Respondents'] right to contest enforcement in federal court." *Maxcrest*, 2016 WL 6599463, at *5. That is especially so when the appeal involves a threshold issue such as the interpretation and operation of SEC rules relating to the propriety of service of compulsory process.

*Third*, Mr. Kwon and TFL satisfy the likelihood of success factor. "A movant seeking a stay '"need not always show a "probability of success" on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting the stay.'" *Leroy v. Hume*, No. 20CV5325ARRCLP, 2021 WL 4350502, at *3 (E.D.N.Y. Sept. 24, 2021) (quoting *LaRouche v. Kezer*, 20 F.3d 68, 72 (2d Cir. 1994)). Respondents have a "substantial case" for appeal. Respondents' appeal will present an issue of first impression in the appellate courts, Respondents have credibly asserted that the SEC violated its own regulations in attempting to serve the subpoenas personally on Mr. Kwon, and if Respondents are correct then the subpoenas are unenforceable under established law. *See Jock v. Sterling Jewelers, Inc.*, 738 F. Supp. 2d 445, 447 (S.D.N.Y. 2010) (granting stay pending appeal because "[the] appeal presents an issue of first impression," even though "the Court remain[ed] confident in the soundness of [its] reasons"). For example, Respondents respectfully submit that the interpretation of Rule 150(b) urged by the SEC and accepted by the Court—that filing a "notice of appearance" sufficient to trigger Rule 150(b) necessarily means agreeing to accept service of compulsory process—presents significant constitutional concerns. *See O'Connor v. Pierson*, 426 F.3d 187, 201 (2d Cir. 2005) ("It is settled law that the government may not, as a general rule, grant even a gratuitous benefit on condition that the beneficiary relinquish a constitutional right."); *see also Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 328 (2d Cir. 2016) (personal jurisdiction represents the constitutional "right

to be subject only to lawful power"). These issues should be addressed by the Second Circuit before the subpoenas can be enforced.

Similarly, "[p]ersonal jurisdiction is a matter of individual liberty," *Waldman*, 835 F.3d at 328, and the personal jurisdiction issues presented here are nuanced and complex; indeed, this Court found Respondents' arguments "understandabl[e] and quite persuasive[]." (Hr'g Tr. 41:22.) Aside from "tag-jurisdiction" over Mr. Kwon—an issue bound up with whether service was proper—Respondents have compelling arguments that the nature of their contacts, and in particular the attenuated relationship between those contacts and the subpoenas, renders the exercise of personal jurisdiction improper. *Compare Blockchange Ventures I GP, LLC. v. Blockchange, Inc.*, 2021 WL 308277, *1 (S.D.N.Y. 2021) (although plaintiff pointed to partnership between defendant and New York, "[p]laintiff has not shown that its causes of action *arise out of* the partnership"), *with Shanken Communications, Inc. v. Cigar500.com*, 2008 WL 2696168, at *6 (S.D.N.Y. 2008). ("[A]ll five of the claims arise from the operation of the Cigar500.com website and have *a substantial relationship* to the actual commercial transactions that Cigar500 conducts with its United States customers."). And as this Court has held, contracting with a company to host a website and potentially list a digital asset cannot establish personal jurisdiction. *Alibaba v. AlibabaCoin*, 2018 WL 2022626, at *5–6 (S.D.N.Y. 2018). This is critical here given the decentralized nature of the Mirror Protocol: "Personal jurisdiction 'must arise out of contacts that the defendant *himself* creates'" as opposed to "'contacts between … third parties and the forum … .'" *Damian v. Click Intelligence Ltd.*, No. 20CV11066 (DLC), 2022 WL 428194, at *3 (S.D.N.Y. Feb. 11, 2022) (quoting *Walden v. Fiore*, 571 U.S. 277, 290 (2014)). Although this Court was not ultimately persuaded by them, Respondents' arguments are substantial, which means that this factor militates in favor of a stay.

*Fourth*, a stay is in the public interest. At stake are fundamental questions about how voluntary interactions with an executive agency relate to the operation of that agency's regulations; parties faced with requests to voluntarily cooperate with the SEC in the future will look to the outcome of this case in deciding how to respond to such requests. A delay to address the questions presented here regarding proper service of compulsory process, the operation of the SEC rules at issue, and personal jurisdiction would not "have an adverse impact on the public interest." *Quad/Graphics*, 875 F. Supp. at 560.

Respondents' appeal to the Second Circuit has been filed. In addition, Respondents reached out to the SEC in an effort to jointly propose an expedited briefing schedule to the Second Circuit, but the SEC indicated this morning that it does not "presently intend" to join in that request. *See* Attachment A.

dentons.com

For all the foregoing reasons, the relevant factors for a stay pending appeal weigh in favor of Respondents, and the Court should grant a stay pending completion of Respondents' appeal.

Respectfully submitted,

Dentons US LLP

*/s/ Douglas W. Henkin*

Douglas W. Henkin

cc:    All counsel of record by ECF

# EXHIBIT A

| | |
|---|---|
| **From:** | Connor, James <connorja@SEC.GOV> |
| **Sent:** | Wednesday, February 23, 2022 8:34 AM |
| **To:** | Henkin, Douglas W. |
| **Cc:** | Senderowitz, Stephen J.; Petts, Nicholas W. |
| **Subject:** | RE: Case 1:21-mc-00810-JPO U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. et al |

**[WARNING: EXTERNAL SENDER]**

Dear Mr. Henkin:

The SEC intends to oppose a request for a stay of the Court's February 17, 2022 order granting our subpoena enforcement application.  We also do not presently intend to join in the scheduling request detailed in your February 21, 2022 email.

Best regards,

James P. Connor
Trial Counsel
U.S. Securities and Exchange Commission
Enforcement Division
100 F Street, NE
Washington, DC 20549-5950
(202) 551-8394 (direct)
connorja@sec.gov

**From:** Henkin, Douglas W. <douglas.henkin@dentons.com>
**Sent:** Monday, February 21, 2022 5:58 PM
**To:** Connor, James <connorja@SEC.GOV>
**Cc:** Senderowitz, Stephen J. <stephen.senderowitz@dentons.com>; Petts, Nicholas W. <nicholas.petts@dentons.com>
**Subject:** Case 1:21-mc-00810-JPO U.S. Securities and Exchange Commission v. Terraform Labs Pte Ltd. et al

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Mr. Connor,

I write in connection with the above-captioned case.  In connection with their appeal of Judge Oetken's decision, TFL and Mr. Kwon plan to seek expedited treatment of that appeal.  We intend to propose the following briefing schedule to the Second Circuit, and would like to know whether the SEC would join in that request:

Appellants' Opening Brief Due:  March 15, 2022
Appellee's Opposition Brief Due:  March 29, 2022
Appellants' Reply Brief Due:  April 5, 2022

Please let us know by 12pm on February 23, 2022 whether the SEC would join that scheduling request.  In addition, please let us know whether, in light of that proposed schedule, the SEC still intends to oppose TFL's and Mr. Kwon's request for a stay pending appeal.

Best regards,

Doug Henkin

**Douglas W. Henkin**

What's Next? The answer is Talent. With more than 20,000 people, 12,000 lawyers and 200 locations, Dentons has the talent for what you need, where you need it.

D +1 212 768 6832  |  US Internal 16832
douglas.henkin@dentons.com
Bio  |  Website

Dentons US LLP

Fernanda Lopes & Associados > Guevara & Gutierrez > Paz Horowitz Abogados > Sirote > Adepetun Caxton-Martins Agbor & Segun > Davis Brown > East African Law Chambers > Eric Silwamba, Jalasi and Linyama > Durham Jones & Pinegar > LEAD Advogados > Rattagan Macchiavello Arocena > Jiménez de Aréchaga, Viana & Brause > Lee International > Kensington Swan > Bingham Greenebaum > Cohen & Grigsby > For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

# **EXHIBIT K**



# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
100 F STREET N.E.
WASHINGTON, DC 20549-5985

DIVISION OF ENFORCEMENT

James P. Connor
Trial Counsel
Direct Dial: 202-551-8394
connorja@sec.gov

February 24, 2022

**VIA ECF**
The Honorable J. Paul Oetken
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:   **Corrected Response to Respondents' Letter-Motion for a Stay Pending Appeal**
      *SEC v. Terraform Labs PTE Ltd., et al.*, **2:21-mc-00810-JPO**

Dear Judge Oetken:

The U.S. Securities and Exchange Commission ("SEC") respectfully responds to the "Letter-Motion to Stay Pending Appeal," filed by Respondents Terraform Lab PTE, Ltd. and Do Kwon (collectively "Respondents") on February 23, 2022. ECF No 31.

The Court should deny Respondents' stay motion because they have failed to satisfy any of the four relevant factors:  (1) likelihood of success on the merits, (2) irreparable injury absent a stay, (3) substantial prejudice to the other parties interested in the proceeding, and (4) the public interest. *In re World Trade Center Disaster Site Litig.,* 503 F.3d 167, 170 (2d Cir. 2007). Importantly, the "burden of establishing a favorable balance of these factors is a heavy one and more commonly stay requests will be denied." *Barcia v. Sitkin,* 79 Civ. 5831, 2004 WL 691390, at *1 (S.D.N.Y. Mar. 31, 2004); *see also SEC v. Finazzo,* 18-mc-304, 2008 WL 1721517, at *2-6 (S.D.N.Y. Apr. 11, 2008) (denying respondent's motion to stay pending appeal an order enforcing an investigative subpoena); *SEC v. Daspin,* 557 F. App'x 46, 47-49 (2d Cir. Feb. 5, 2014) (Summary Order) (applying the same factors and denying appellant's motion to stay pending appeal a district court order enforcing an investigative testimony subpoena).  A stay is "not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation omitted).  It is instead an "exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Id.* (citation omitted).

## I.      Respondents Are Not Likely To Succeed on Appeal

The first factor is "whether the stay applicant has made a strong showing that he [or she] is likely to succeed on the merits." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d at 170. Respondents cannot meet this standard, because their efforts to evade the SEC's subpoenas will likely fail on appeal just as they did in this Court.  There can be no serious dispute that the SEC

The Honorable J. Paul Oetken
February 24, 2022
Page 2

properly served Respondents under SEC Rule of Practice 150(d) [17 C.F.R. § 201.150(d)], given that the SEC personally delivered the subpoenas to Respondent Kwon, the CEO of Respondent Terraform, while Mr. Kwon was in New York (thereby satisfying Rule 150(d)). And, even if the SEC was required to serve through counsel under Rule 150(b) (and it was not), the SEC electronically delivered the subpoenas to Respondents' counsel on the very same day it served Mr. Kwon, thereby satisfying Rule 150(b) and (c).[1] As the Court rightly concluded, Respondents' position "reflects a misreading of the SEC's rules." Tr. 40:10-11 (Feb. 17, 2022).

Respondents argue (at 3) that they meet the likelihood-of-success factor because the "appeal will present an issue of first impression in the appellate court." But Respondents cannot show a likelihood of success by *creating* an issue of first impression through asking a court to interpret rules in a manner that contradicts their plain, unambiguous terms. *Cf. Finazzo,* 2008 WL 1721517, at *2 ("[a]lthough the precise issue raised by [r]espondent is one of first impression in the Second Circuit, the Court concludes that [r]espondent is unlikely to satisfy his burden of showing" a likelihood of success). Furthermore, Respondents' reliance (at 3) on *Jock v. Sterling Jewelers, Inc.,* 738 F. Supp. 2d 445 (S.D.N.Y. 2010), is misplaced. In *Jock,* the court reasoned that the movant had shown a likelihood of success because the "appeal presents an issue of first impression that relates to the application of a newly minted rule by a sharply divided Supreme Court." 738 F. Supp. 2d at 447. No such novel issue or rule exists here: in issuing the Order, the Court relied on the unambiguous language of SEC Rule of Practice 150.

Respondents also suggest (at 2) that they are likely to succeed because the "interpretation of Rule 150(b) urged by the SEC and accepted by the Court—that filing a 'notice of appearance' sufficient to trigger Rule 150(b) necessarily means agreeing to accept service of compulsory process—presents significant constitutional concerns." In addition to never stating what those "constitutional concerns" are, Respondents get the issue backwards. Respondents *failed to file* a notice of appearance (or any equivalent), meaning that the SEC's service of the subpoenas on Mr. Kwon personally under Rule 150(d) while he was in New York was proper and presents no constitutional concerns. *See In re Edelman*, 295 F.3d 171, 179 (2d Cir. 2002) ("[W]hen a potential witness comes to the United States it is neither unfair nor inappropriate under the statute to undertake his discovery here."); *Kadic v. Karadzic,* 70 F.3d 232, 247 (2d Cir. 1995) ("personal service comports with the requirements of due process for the assertion of personal jurisdiction.").

---

[1] The transcript of the February 17, 2022 hearing refers to Rule 150(a), (b), and (c), instead of Rule 150(b), (c), and (d). *See, e.g.*, Tr. 39:15-40:11. For example, the transcript references Rule 150(a), but quotes Rule 150(b) (Tr. 39:17-19 and Tr. 39:23-40:2) and references Rule 150(c), but quotes Rule 150(d) (Tr. 39:20-22). Under Rule 8 of the SEC's Rules Pertaining to Investigations [17 C.F.R. § 203.8], service of subpoenas issued in formal investigative proceedings, such as the Mirror Protocol investigation, are required to be effected in the manner prescribed by SEC Rule of Practice 232(c) [17 C.F.R. § 232(c)], which in turn states that service shall be made pursuant to the provisions of Rule of Practice 150(b), (c), and (d) [17 C.F.R. §§ 201.150(b)-(d)].

The Honorable J. Paul Oetken
February 24, 2022
Page 3

Respondents fare no better with their rehashed arguments (at 2-3) on personal jurisdiction. The Court plainly has jurisdiction over Mr. Kwon because he was served with the subpoenas while in the United States. *See Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991) ("[Exchange Act] Section 27 [15 U.S.C. § 78aa] confers personal jurisdiction over a defendant who is served anywhere within the United States."); *Kadic,* 70 F.3d at 246–47 (2d Cir. 1995) (upholding exercise of personal jurisdiction over foreign national served with summons while physically present in New York) (citing *Burnham v. Superior Court of California,* 495 U.S. 604 (1990)).

And Respondents never even discuss the litany of substantial contacts with the United States that the Court found was "clearly sufficient" to exercise specific jurisdiction over both Mr. Kwon and Terraform. Tr. 40:12-42:8 (discussing multiple contracts with U.S.-based entities, multiple Terraform employees located in the United States, among other contacts). Instead, Respondents recite the same cases they relied upon in their briefing that the SEC and the Court have already distinguished,[2] Tr. 41:21-42:3, and ignore the weight of authority showing that their contacts are more than sufficient to establish specific personal jurisdiction. *See Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 350 (S.D.N.Y. 2019) (exercising specific personal jurisdiction over co-founders of digital asset company when they "targeted the U.S. market in an effort to promote the sale of ATB coins, the very unregistered security at issue in this litigation"); *Goldfarb v. Channel One Russia*, 442 F. Supp. 3d 649, 664 (S.D.N.Y. 2020) (exercising personal jurisdiction over a Russian entity that "purposefully availed itself of the privilege of conducting business within the forum state by maintaining a studio and at least one full-time employee in New York and by distributing its programming to paying subscribers throughout New York"). In sum, Respondents have failed to make any showing—much less the required strong showing—that they are likely to succeed on appeal.

## II. Respondents Will Not Be Irreparably Harmed Absent A Stay

Respondents argue (at 1) that they will be irreparably harmed because "they risk losing their ability to effectively contest the subpoenas." But that is not correct, as courts have repeatedly held that the provision of information pursuant to an administrative subpoena or a summons does not constitute irreparable harm for purposes of a stay pending appeal. *See, e.g., United States v. Sweet,* No. 80-5046, 1980 WL 4702, at *1 (5th Cir. Jan. 31, 1980) ("The alleged injury is not irreparable for nothing contained herein, of course, constitutes a ruling concerning

---

[2] Respondents bear little resemblance to the defendants in *Alibaba Grp. Holding Ltd. v. Alibabacoin Found*, in which the Court did not exercise jurisdiction in part because plaintiff did not establish that the supposed link to the forum (a website) had "actually [been] used to effect commercial transactions with customer in New York." 18-cv-2897, 2018 WL 2022626, at *4 (S.D.N.Y. Apr. 30, 2018) (citation omitted). The same is true of *Royalty Network Inc. v. Dishant.com, LLC*, in which the Court found no jurisdiction when the only alleged contact with New York was a website and the plaintiff had "no evidence that any New York resident actually engaged in any [ ] transactions" on the website. 638 F. Supp. 2d 410, 420 (S.D.N.Y. 2009).

The Honorable J. Paul Oetken
February 24, 2022
Page 4

the admissibility or inadmissibility in evidence of any documents that may be produced pursuant to the summons or of any evidence that might be discovered as a result of their production."); *Finazzo*, 2008 WL 1721517, at *4 ("[T]he compelled production of non-privileged documents in response to an administrative subpoena does not constitute irreparable injury warranting a stay pending appeal.") (citing *Sweet* and other cases); *cf. SEC v. Finazzo*, 360 F. App'x 169, 171 (2d Cir. 2009) (Summary Order) (affirming March 27, 2008 order enforcing SEC investigative subpoena and noting that respondent "will have an opportunity…to litigate issues relating to the admissibility of relevant evidence" if the Commission filed a lawsuit against him); *Daspin*, 557 F. App'x at 49 (denying appellant's motion to stay pending appeal a district court order enforcing an investigative testimony subpoena); *United States v. Bright,* No. 07-00311, 2008 WL 351215, at *3 (D. Haw. Feb. 7, 2008) ("The mere requirement to produce documents while an appeal is pending does not constitute sufficient harm to warrant a stay."); *McCammon v. United States*, 584 F. Supp. 2d 193, 198 (D.D.C. 2008) (finding no irreparable harm because "the IRS could be enjoined from using the subpoenaed documents in any administrative or court action if Petitioner's appeal is successful"); *JSC MCC EuroChem v. Chauhan*, No. 18-5890, 2018 WL 9650037, at *2 (6th Cir. 2018) ("Should we ultimately reverse the district court, we may ameliorate any harm by imposing protective conditions on the use of the evidence and testimony or requiring the destruction and/or return of the documents.").

Respondents also argue (at 2) that they will experience irreparable harm absent a stay "because there is nothing a court can do to withdraw knowledge or information the SEC would acquire once that information has already been divulged." But this Court has rejected that very argument. *In re Noguer*, 18-MC-498, 2019 WL 1034190, at *4 (S.D.N.Y. Mar. 5, 2019) ("The mere fact that information, once disclosed, cannot be 'undisclosed' is therefore not enough by itself to warrant a finding of irreparable harm.") (citation omitted); *Partners Value Arbitrage Fund LP*, 18-CV-5176, 2018 WL 3207119, at *6 (S.D.N.Y. June 29, 2018) ("[A] requirement to produce documents, at least absent a claim of privilege or sensitivity, is not generally the type of injury that is irreparable."); *In re Gushlak*, 11-MC-0218, 2012 WL 2564466, at *7 (E.D.N.Y. Jan. 30, 2012) (noting that "the compelled production of non-privileged discovery material, standing alone, does not constitute irreparable injury warranting a stay pending appeal" and collecting cases), *report and recommendation adopted,* 11-MC-218, 2012 WL 1514824 (E.D.N.Y. Apr. 30, 2012); *see also, e.g., Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (holding that, even where the disclosure of trade secrets is at issue, irreparable harm is not to be presumed absent a showing that "a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets"). Respondents would thus not suffer irreparable harm absent a stay here.

## III. A Stay Will Substantially Prejudice the SEC

A stay will substantially prejudice the SEC because it will continue to impede the Mirror Protocol investigation. *Finazzo*, 2008 WL 1721517, at *4 ("To the extent that the requested information is essential to the continued progress of the [ ] Investigation, a stay of enforcement of the March 26 Order may constitute substantial prejudice to the SEC."); *United States v.*

The Honorable J. Paul Oetken
February 24, 2022
Page 5

*Judicial Watch, Inc.,* 241 F. Supp. 2d 15, 18 (D.D.C. 2003) (noting that a stay of enforcement pending appeal may halt the progress of an administrative investigation, and therefore prejudice the government agency). This is especially true here, when the very company and individual responsible for creating the Mirror Protocol and whose conduct the SEC is investigating – Terraform and Mr. Kwon – have continued to evade the validly issued and served subpoenas since September 2021. The Court should not permit Terraform and Mr. Kwon to continue to evade compliance with the subpoenas by granting a stay, especially because subpoena enforcement actions are designed to be "summary in nature." *Sprecher v. Graber*, 716 F.2d 968, 972 (2d Cir. 1983) (citation omitted); *see also SEC v. First Sec. Bank*, 447 F.2d 166, 168 (10th Cir. 1971) ("Questions concerning agency subpoenas should be promptly determined so that the subpoenas, if valid, may be speedily enforced.").

## IV.     The Public Interest Weighs Heavily Against A Stay

There is no question that the public interest weighs strongly against a stay here. *Finazzo*, 2008 WL 1721517, at *5 ("[T]here is a significant public interest in allowing government agencies, like the [Commission], to enforce federal securities laws."). The SEC is investigating whether Mr. Kwon's and Terraform's involvement with the Mirror Protocol, MIR tokens, and mAssets violated registration and other related provisions of the federal securities laws. The public has a strong interest in allowing the SEC to continue this investigation through receipt of the subpoenaed information, given that (1) Terraform and Mr. Kwon "promoted the Mirror Protocol and MIR tokens through Terraform's website, web application, social media accounts, interviews, and U.S. media," Tr. 40:20-22; (2) the MIR tokens are listed for sale on a U.S.-based trading platform, Tr. 40:23-41:2, and (3) the mAssets (which mimic U.S. securities like Apple, Inc.) developed through the Mirror Protocol are "plainly being offered to U.S. customers," Tr. 41:11-12.

For all of these reasons, the Court should deny Respondents' request for a stay pending appeal.

Respectfully submitted,

/s/ James P. Connor
JAMES P. CONNOR
Trial Counsel
U.S. Securities and Exchange Commission
100 F Street, NE, Washington, DC 20549
Tel:  (202) 551-8394
Email: connorja@sec.gov

cc:     All counsel of record by ECF

# **<u>EXHIBIT L</u>**

**大成 DENTONS**

**Douglas W. Henkin**

douglas.henkin@dentons.com
D    +1 212-768-6832

Dentons US LLP
1221 Avenue of the Americas
New York, New York 10020-1089
United States

dentons.com

February 24, 2022

**VIA ECF**

Hon. J. Paul Oetken
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

Re:    ***SEC v. Terraform Labs Pte Ltd. et ano.***, Case No.: 1:21-mc-00810 (JPO)

Dear Judge Oetken:

On behalf of Respondents Terraform Labs PTE, Ltd. ("TFL") and Do Kwon (collectively, "Respondents"), I write to address three issues relating to the *Corrected Response to Respondents' Letter-Motion for a Stay Pending Appeal* (ECF No. 33) ("SEC Letter"). *First*, the irreparable harm cases cited by the SEC (SEC Letter at 3–4) are not binding on this Court.[1] *Second*, the cases cited by TFL and Mr. Kwon finding irreparable harm are more consistent with the Supreme Court's discussion from *Church of Scientology of California v. United States*, 506 U.S. 9, 13 (1992), a case the SEC failed to address.  *Third*, the SEC's response regarding the appeal presenting an issue of first impression (SEC Letter at 2) ignores the undisputed facts that (i) no court has ever construed Rule 150(b) and (ii) the only court submission by the SEC addressing Rule 150(b) is inconsistent with the SEC's current interpretation.  *Cf. Lever Bros. Co. v. United States*, 981 F.2d 1330, 1337 (D.C. Cir. 1993) ("inconsistent litigating positions" by an agency are "undeniably relevant" to the proper construction of an agency's governing statute).

Respectfully submitted,

Dentons US LLP

*/s/ Douglas W. Henkin*

Douglas W. Henkin

cc:    All counsel of record by ECF

---

[1]    Although issued by the Second Circuit, *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009), has nothing to do with Respondents' request for a stay pending appeal.  In that case, the Second Circuit found that a showing of irreparable harm in the context of a preliminary injunction was defeated by the availability of money damages (559 F.3d at 118)—a remedy the SEC does not suggest is available here.

Sirote ► Adepetun Caxton-Martins Agbor & Segun ► Davis Brown ► East African Law Chambers ► Eric Silwamba, Jalasi and Linyama ► Durham Jones & Pinegar ► LEAD Advogados ► Rattagan Macchiavello Arocena ► Jiménez de Aréchaga, Viana & Brause ► Lee International ► Kensington Swan ► Bingham Greenebaum ► Cohen & Grigsby ► Sayarh & Menjra ► For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms

# **<u>EXHIBIT M</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                              Applicant,

                    -v-

TERRAFORM LABS PTE Ltd. and
DO KWON,

                              Respondents.

21-MC-810 (JPO)

ORDER

J. PAUL OETKEN, District Judge:

On February 17, 2022, this Court granted the SEC's application for an order requiring

compliance with investigative subpoenas served on Respondents Terraform and its chief

executive officer, Do Kwon.  The Court stayed its order for 14 days, to March 3, 2022.

Respondents have requested a stay pending appeal, which the SEC opposes.  (*See* Dkt. Nos. 31-

34.)

In determining whether to grant a stay pending appeal, courts consider (1) likelihood of

success on the merits, (2) irreparable injury absent a stay, (3) substantial prejudice to the other

parties interested in the proceeding, and (4) the public interest.  *In re World Trade Center

Disaster Site Litig*., 503 F.3d 167, 170 (2d Cir. 2007).  Upon consideration of these factors, the

Court concludes that Respondents have not met their burden of showing that a further stay is

warranted.  First, for the reasons explained in its oral ruling (Dkt. No. 35), the Court does not

believe that Respondents are likely to prevail on the merits of an appeal.  Second, the Court is

not persuaded that Respondents will be irreparably injured absent a stay, for substantially the

reasons set forth in the SEC's letter brief.  (Dkt. No. 33.)  Finally, an extended delay of

enforcement of the subpoenas risks impeding the SEC's Mirror Protocol investigation and the associated public interest in the Commission's enforcement functions.

Accordingly, Respondents' request for a further stay pending appeal (Dkt. No. 31) is denied.

SO ORDERED.

Dated: March 1, 2022
New York, New York

_____
J. PAUL OETKEN
United States District Judge

# **EXHIBIT N**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**U.S. Securities and Exchange Commission,**　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Petitioner,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　-v.-　　　　　　　　　　　　　　)　　　　11 Misc. 512 GK/DAR
　　　　　　　　　　　　　　　　　　　　　　　)
**Deloitte Touche Tohmatsu CPA Ltd.,**　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Respondent.　　　　　　　　　　　)
_____)

## SECURITIES AND EXCHANGE COMMISSION'S REPLY MEMORANDUM IN SUPPORT OF ITS RENEWED APPLICATION FOR ORDER REQUIRING <u>COMPLIANCE WITH SUBPOENA</u>

　　　　　　　　　　　　　　　DAVID MENDEL (D.C. Bar #470796)
　　　　　　　　　　　　　　　Assistant Chief Litigation Counsel
　　　　　　　　　　　　　　　JAN FOLENA (PA Bar #74108)
　　　　　　　　　　　　　　　Supervisory Assistant Chief Litigation Counsel
　　　　　　　　　　　　　　　U.S. Securities and Exchange
　　　　　　　　　　　　　　　Commission – Enforcement Division
　　　　　　　　　　　　　　　100 F Street, NE
　　　　　　　　　　　　　　　Washington, DC 20549
　　　　　　　　　　　　　　　(202) 551-4418 (Mendel phone)
　　　　　　　　　　　　　　　(202) 772-9282 (fax)
　　　　　　　　　　　　　　　mendeld@sec.gov
　　　　　　　　　　　　　　　folenaj@sec.gov

<u>Of Counsel:</u>
ANTONIA CHION
New York Bar Attorney Registration No. 1873405
LISA WEINSTEIN DEITCH
California Bar No. 137492
HELAINE SCHWARTZ
New York Bar Attorney Registration No. 1917046

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 3

I.    THIS COURT CAN AND SHOULD ENFORCE THE SUBPOENA EVEN
THOUGH IT SEEKS DOCUMENTS LOCATED ABROAD ........................................... 3

    A.    *Kiobel* and *Morrison* Do Not Address The SEC's Subpoena Authority ................. 4

    B.    The Presumption Against Extraterritoriality Does Not Extend To SEC
Subpoenas Served In The U.S. .................................................................................. 5

        1.    The Acts Authorize The SEC To Access Documents Abroad ................... 6

        2.    Congress Has Acted Only To Expand, Not Restrict, The SEC's
Authority Abroad ....................................................................................... 8

    C.    The SEC Does Not Seek To Enforce Extraterritorial Application Of Its
Subpoena Power ........................................................................................................ 9

II.    THE SUBPOENA WAS VALIDLY SERVED ON DTTC ........................................... 13

    A.    The SEC Is Authorized To Serve An Administrative Subpoena Through
Counsel Who Agrees To Accept Service On Behalf Of His Client ....................... 13

    B.    DTTC's Outside Counsel Was An Agent Authorized To Accept Service Of The
Subpoena ................................................................................................................. 16

III.    THE RISK OF VIOLATING CHINESE LAW DOES NOT EXCUSE DTTC'S NON
COMPLIANCE WITH THE SUBPOENA ..................................................................... 19

    A.    DTTC At Most Shows Only A Nebulous Conflict of Law ................................... 20

    B.    The Subpoena Must Be Enforced Under The Comity Factors ............................. 23

        1.    The Balance of Sovereign Interests Favors Enforcing the Subpoena ....... 23

        2.    The SEC Has No Alternative Means of Obtaining The Documents ......... 27

        3.    DTTC Cannot Demonstrate Good Faith ..................................................... 32

        4.    DTTC's Claimed Hardship Does Not Excuse Noncompliance ................. 34

CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

## CASES

*Alaska Dept. of Envtl. Conservation v.* EPA, 540 U.S. 461 (2004) ................................. 15

*Alfadda v. Fenn*, 149 F.R.D. 28 (S.D.NY 1993) ............................................................... 26

*Blackmer v. United States*, 284 U.S. 421 (1932) ............................................................... 5

*CFTC v. Nahas*, 738 F.2d 487 (D.C. Cir. 1984) ........................................................ 5, 12

*Circuit City Stores, Inc. v. Adams,* 532 U.S. 105 (2001) .................................................... 9

*\*Civil Aero. Bd. v. Deutsche Lufthansa Aktiengesellschaft*,
    591 F.2d 951 (D.C. Cir. 1979) ........................................................................ 4, 11, 12

*Consol. Rendering Co. v. Vermont*, 207 U.S. 541 (1908) ................................................ 11

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) ....................................................... 10

*FTC v. Compagnie de Saint-Gobain-Pont-a-Mouson*, No. 78-2160, 1979 U.S.
    App. LEXIS 10223 (D.C. Cir. Nov. 26, 1979) ........................................................ 15

*FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300 (D.C. Cir.
    1980) ........................................................................................................................ 12

*\*Fed. Mar. Comm'n v. DeSmedt*, 366 F.2d 464 (2d Cir. 1966) ......................................... 4

*Gabelli v. SEC*, 133 S. Ct. 1216 (2013) ........................................................................... 26

*Gucci Am., Inc. v. Curveal Fashion*, No. 09cv8458 (RJS), 2010 WL 808639
    (S.D.N.Y. Mar. 8, 2010) ......................................................................................... 32

*Gucci Am. v. Weixing Li*, No. 10cv4974 (RJS), 2011 WL 6156936 (S.D.N.Y.
    Aug. 23, 2011) ...................................................................................... 25, 28, 30, 34

*Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ............................ 4, 5, 9, 12

*Ludlow Corp. v. A.T. DeSmedt*, 249 F. Supp. 496 (S.D.N.Y. 1966) ........................... 11, 15

*Minpeco v. Conticommodity Servs., Inc.*, 116 F.R.D. 517 (S.D.N.Y. 1987) .................... 25

*Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010) ................ 4, 5, 6, 7, 8, 9, 10, 12

*\*Richmark Corp. v. Timber Falling Consultants*,
    959 F.2d 1468 (9th Cir. 1992) ...................................................................... 19, 24, 35

*SEC v. Dresser Indus.*, 628 F.2d 1368 (D.C. Cir. 1980) ..................................................... 31

*SEC v. Lavin*, 111 F.3d 921 (D.C. Cir. 1997).................................................................. 30

*\*SEC v. Minas de Artemisa*, 150 F.2d 215 (9th Cir. 1945)............................................4, 11

*SEC v. Obioha*, No. 12cv80109, 2012 WL 4889286 (N.D. Cal. Oct. 12, 2012).............. 16

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ......................................................... 6

*\*Societe Internationale Pour Participations Industrielles et Commerciales,
S.A. v. Rogers*, 357 U.S. 197 (1958)...................................................................... 20

*\*Societe Nationale Industrielle Arospatiale v. U.S. District Court for the
Southern District of Iowa*, 482 U.S. 522 (1987) ......................................19, 23, 25, 26

*Underhill v. Hernandez*, 168 U.S. 250 (1987) ................................................................. 23

*United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534 (1940) ...................................... 8

*United States v. Benjamin*, 328 F.2d 854 (2d Cir. 1964)................................................... 27

*United States v. Braxtonbrown-Smith*, 278 F.3d 1348 (D.C. Cir. 2002)............................ 8

*Wultz v. Bank of China*, No. 11 Civ. 1266(SAS), 2012 WL 5378961
(S.D.N.Y. Oct. 29, 2012).....................................................................................29, 31

*Wultz v. Bank of China*, No. 11cv1266, 2013 WL 1832186 (S.D.N.Y. May 1,
2013)...........................................................................................................21, 25, 27, 34

## STATUTES

Securities Act of 1933

Section 19(c) [15 U.S.C. § 77s(c)] ...........................................................................6, 10

Section 22(c)(1) [15 U.S.C. § 77s(c)(1)] ...................................................................... 8

Section 929P [15 U.S.C. § 77v(c)(2)] ........................................................................... 6

Securities Exchange Act of 1934

Section 21(a)(1) [15 U.S.C. § 78u(a)(1)] ...................................................................... 6

Section 21(b) [15 U.S.C. § 78u(b)] ..........................................................................6, 10

Section 21(c) [15 U.S.C. § 78u(c)]..............................................................10

Section 27(b)(1) [15 U.S.C. § 78u(b)(1)]......................................................8

Section 30(a) [15 U.S.C. § 78dd(a)]..............................................................8

Section 929P [15 U.S.C. § 78aa(b)(2)]..........................................................6

Sarbanes-Oxley Act

Section 106 [15 U.S.C. § 7216]..........................................................10, 17

16 C.F.R. § 4.4..................................................................................................16

17 C.F.R. § 201.100..........................................................................................14

17 C.F.R. §201.150(b).........................................................................13, 14, 15, 16

17 C.F.R. § 201.230(g)......................................................................................14

17 C.F.R. § 201.232(c)..............................................................................14, 15, 16

17 C.F.R. § 203.1..............................................................................................14

17 C.F.R. § 203.8..............................................................................................14

The U.S. Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this reply memorandum of law in further support of its refiled Application for an Order Requiring Compliance with a Subpoena (the "Application") and in response to the Memorandum of Points and Authorities Opposing the SEC's Renewed Application For Order Requiring Compliance With A Subpoena ("DTTC Second Opp.") filed by Deloitte Touche Tohmatsu CPA Ltd. (now known as Deloitte Touche Tohmatsu CPA LLP) ("DTTC" or the "Respondent") on May 15, 2013 (Dkt. No. 63).

## INTRODUCTION

DTTC has known since 2004, when it registered in the United States to perform audits for clients raising money in U.S. markets, that it would be required to respond to information requests from U.S. regulators regardless of possible constraints imposed by Chinese law. Now, two years after being validly served with an administrative subpoena (the "Subpoena") that concerns a possible massive fraud at a company that DTTC audited, DTTC has still failed to produce the most important documents requested by the Subpoena. There is no valid reason not to require DTTC to comply with the Subpoena.

The SEC filed this action on September 8, 2011, seeking to enforce the Subpoena which it served in the U.S. on DTTC on May 27, 2011. The Subpoena was issued in an investigation (SEC File No. HO-11698) into possible violations of the federal securities laws in connection with Longtop Financial Technologies Limited ("Longtop"), a foreign private issuer the securities of which were registered with the Commission and traded on U.S. markets. The SEC's investigation began after DTTC, Longtop's auditor for several years, disclosed that it had uncovered numerous indicia of financial fraud at Longtop and further indicated that DTTC's prior audit reports for Longtop, which it had filed with the SEC, could no longer be

relied upon by investors. At the time, Longtop had a market capitalization of over $1 billion. The Subpoena called for DTTC to produce, among other things, audit workpapers it had prepared while auditing the financial statements of Longtop. It has not done so.

DTTC chose to expose itself to U.S. law by registering with the Public Company Accounting Oversight Board ("PCAOB") and conducting audits of an issuer of securities registered with the SEC and traded on U.S. securities exchanges. DTTC financially benefited when it helped that issuer raise hundreds of millions of dollars from U.S. investors. Thus, DTTC knowingly assumed the risk that, if the SEC ever asked DTTC to produce documents, compliance with that request might subject the firm to sanction under Chinese law. The party that should bear the consequences of that decision is the audit firm, not the SEC and not U.S. investors who may have fallen victim to a fraud conducted by a U.S.-listed company that DTTC audited.

DTTC now seeks to divert attention from its own non-compliance by emphasizing a statement from China Securities Regulatory Commission ("CSRC") this year that it would provide the Longtop documents to the SEC within "weeks." But over the past three years, the SEC has repeatedly encouraged the CSRC to facilitate the production of the audit workpapers and other documents of this Respondent, DTTC, concerning potential securities fraud on the American public. To date, the SEC has not received from the CSRC a single audit workpaper for any of its investigations. The SEC should not be made to wait longer for the CSRC.

In refusing to comply with the Subpoena, DTTC has lodged a number of now-

abandoned arguments while belatedly asserting new defenses.[1]  DTTC now argues that it should not be required to comply with the Subpoena, which it concedes was issued in furtherance of a legitimate SEC investigation, for three independent reasons:  (1) Despite the fact that DTTC's then U.S. counsel accepted service of the Subpoena on DTTC's behalf, DTTC claims that the Subpoena seeks documents beyond the SEC's jurisdictional reach (DTTC Second Opp. 11-19); (2) Although until March 2013 – 22 months after service of the Subpoena – DTTC did not contend that its U.S. counsel lacked authority to accept service of the Subpoena, DTTC now argues that he did, and that the SEC lacks authority to serve virtually *any* investigative subpoena through a recipient's counsel (DTTC Second Opp. 19-26); and (3) DTTC contends that compliance with the Subpoena would violate Chinese law, resulting in potential sanctions on DTTC, and that these potential burdens and the sovereign interests of China outweigh the interests of the U.S. in this matter (DTTC Second Opp. 26-44).  None of these arguments has merit.

## ARGUMENT

### I.    THIS COURT CAN AND SHOULD ENFORCE THE SUBPOENA EVEN THOUGH IT SEEKS DOCUMENTS LOCATED ABROAD

DTTC contends that, even if the SEC properly served the Subpoena through DTTC's U.S. counsel, the SEC lacked statutory authority to obtain documents overseas through the

---

[1] DTTC has abandoned its arguments that (1) DTTC need not produce documents that were created before the effective date of the Dodd-Frank Wall Street Reform and Consumer Protection Act, P.L. 111-2003 (July 21, 2010) (the "Dodd-Frank Act"), *see* Deitch Decl. ¶¶22-24, Ex. D; (2) DTTC can elect to comply with the Subpoena by providing some of the requested documents to the CSRC, not the SEC, *id.*; and (3) despite the Court's prior order authorizing the SEC to serve the Order to Show Cause instituting these proceeding on DTTC's U.S. counsel, such service was improper because, DTTC argued, the SEC was required to serve it through the Hague Convention instead (DTTC's April 11, 2012 Opposition to SEC Application 39-44 (Dkt. No. 23) ("First DTTC Opp.")).

Subpoena.  This argument fails.  Under DTTC's view of the securities laws, the SEC is

powerless to advance *any* of its investigations by seeking documents outside the U.S. through

the use of administrative subpoenas.  This would mean that *any* person conducting or affecting

securities transactions in the U.S. could evade obligations to participate in an SEC

investigation – and, ultimately, the U.S. government's efforts to hold it accountable for any

wrongdoing – simply by maintaining its documents abroad.  The federal courts long ago

correctly rejected such an obviously unworkable "loophole."  *SEC v. Minas de Artemisa*, 150

F.2d 215, 218 (9th Cir. 1945).

     For some 70 years the U.S. courts of appeals, including the D.C. Circuit, uniformly

have upheld the SEC's authority under the Securities Act and the Exchange Act – and the

authority of other agencies operating under similarly worded statutes – to seek documents

abroad through administrative subpoenas that are served in the U.S.  *See, e.g.*, *Civil Aero. Bd.*

*v. Deutsche Lufthansa Aktiengesellschaft*, 591 F.2d 951, 953 (D.C. Cir. 1979); *Fed. Mar.*

*Comm'n v. DeSmedt*, 366 F.2d 464 (2d Cir. 1966); *Minas de Artemisa*, 150 F.2d 215.  DTTC

now seeks an outright "monumental" reversal of these clear precedents (DTTC Second Opp. 17

n. 12), contending that they were wrongly decided because they allegedly failed to account for

the long-standing "presumption against extraterritoriality."  DTTC seeks to rely on *Kiobel v.*

*Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) and *Morrison v. Nat'l Austl. Bank Ltd.*,

130 S. Ct. 2869 (2010), but neither case supports DTTC's extreme position.

     A.     *Kiobel* **and** *Morrison* **Do Not Address The SEC's Subpoena Authority**

     Neither *Kiobel* nor *Morrison* even reference, let alone repudiate, any of the numerous

federal court precedents that recognize the SEC's authority to subpoena documents located

abroad under the Securities Act and Exchange Act.  In *Kiobel*, the Supreme Court applied the

presumption against extraterritoriality to conclude that Nigerian nationals could not sue corporations operating in Nigeria for allegedly aiding and abetting atrocities committed by the Nigerian government, under the Alien Tort Statute and the law of nations.  133 S. Ct. at 1662-63.  In *Morrison*, the Court applied the presumption to conclude that Australian plaintiffs did not have a cause of action under the Exchange Act's anti-fraud provision, Section 10(b), against certain defendants for misconduct in connection with securities trades on foreign exchanges.  130 S. Ct. at 2875, 2881-83.  These decisions do not address any U.S. government agency's authority to subpoena documents overseas to assist a regulatory investigation regarding a potential fraud committed in the U.S. against U.S. investors.

Furthermore, the presumption against extraterritoriality analyzed in *Morrison* and *Kiobel* existed before the above-cited decisions of the courts of appeals upholding the SEC's exercise of subpoena power overseas.  *See, e.g.*, *Blackmer v. United States*, 284 U.S. 421, 437 (1932) (recognizing presumption against extraterritoriality and concluding that it did not undermine finding of contempt against witness in France for disobedience of U.S. government subpoena).  The Supreme Court's recent rulings provide no reason to disturb the long-standing precedents of *DeSmedt* and *Minas de Artemisa* (among others) where those courts already had occasion to apply to the presumption against extraterritoriality and found no statutory barrier to the enforcement of the subpoenas in those cases.  *See also CFTC v. Nahas*, 738 F.2d 487, 493 (D.C. Cir. 1984) (applying presumption in evaluating CFTC's statutory subpoena authority).

**B.    The Presumption Against Extraterritoriality Does Not Extend To SEC Subpoenas Served In The U.S.**

Contrary to DTTC's contentions, the presumption against extraterritoriality does not apply to the SEC's authority to seek documents overseas through subpoenas served in the U.S. In determining whether Congress intends for a statute to have extraterritorial effect,

"[a]ssuredly context can be consulted." *Morrison*, 130 S. Ct. at 2877. The Securities Act and Exchange Act clearly authorize the SEC to charge foreign entities and individuals for violations committed (at a minimum) on U.S. exchanges against U.S. investors. Given this clear context and the language of the Acts, Congress also must have intended those laws to apply where evidence related to such actions is located overseas.

      1.    The Acts Authorize The SEC To Access Documents Abroad

The Securities Act and Exchange Act clearly authorize the SEC to conduct investigations of securities law violations in which access to overseas documents is required. This "affirmative indication" is demonstrated by the various provisions of the Acts. *See Morrison*, 130 S. Ct. at 2883 (considering "the Exchange Act" in determining whether Section 10(b) applies extraterritorially). Specifically, the Exchange Act provides that the SEC may conduct "necessary" investigations to identify and prosecute securities law violations. *See* Exchange Act § 21(a)(1) [15 U.S.C. § 78u(a)(1)]. Both the Securities Act and the Exchange Act authorize the SEC to issue subpoenas in connection with such investigations. *See* Securities Act § 19(c); Exchange Act § 21(b) [15 U.S.C. §§ 77s(c), 78u(b)]. Both Acts also identify securities law violations that can involve overseas conduct by actors capable of being haled into U.S. courts. *See SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (upholding personal jurisdiction over foreign investors alleged to have conducted insider trading in securities of a U.S. corporation traded on a U.S. exchange); *Morrison*, 130 S. Ct. at 2882 n. 7 ("[A]n issuer based abroad, whose executives approve the publication in the United States of misleading information affecting the price of the issuer's securities traded on the New York Stock Exchange, probably will make use of some instrumentality of 'communication . . . between [a] foreign country and [a] State.'"); 15 U.S.C. §§ 77v(c)(2), 78aa(b)(2) (added by Section 929P of the Dodd-Frank Act) (recognizing SEC antifraud claims involving "conduct

6

occurring outside the U.S. that has a foreseeable substantial effect within the United States"). By authorizing the SEC to conduct investigations "necessary" to identifying such violations, Congress clearly indicated the SEC's authority to obtain relevant documents (and witnesses) abroad through subpoenas served in the U.S.

*Morrison* and the facts of this case confirm the SEC's clear authority in this regard. *Morrison* emphasized that the Exchange Act's central anti-fraud provision, Section 10(b), "reaches the use of a manipulative or deceptive device or contrivance . . . in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 130 S. Ct. at 2888. Here, Longtop's American depository shares ("ADSs") were listed on the New York Stock Exchange. Deitch Decl. ¶5. DTTC, though located in China, consented that its audit reports for Longtop could be filed annually with the SEC knowing that they would be relied upon by U.S. investors. *See id.* ¶¶7-9. As *Morrison* makes clear, if the SEC were to conclude that either Longtop or DTTC violated Section 10(b) (among other securities law provisions), the SEC would have a cause of action against either entity in U.S. court.[2] Having such authority, the SEC also must be able to use the ancillary statutory tools that Congress deemed "necessary" to implement this authority: the use of compulsory investigative subpoenas served in the U.S.[3]

---

[2] If there were any doubt on this point, Congress clearly removed it in the 2010 Dodd-Frank Act, which reversed the holding in *Morrison* at least as to conduct that post-dates that Act, as there clearly is in this case. *See* 15 U.S.C. §§ 77v(c), 78aa(b). DTTC did not resign as Longtop's auditor until May 2011.

[3] If it were otherwise, the SEC's only remaining option for obtaining critical information would be to bypass the investigation and seek civil discovery after filing a lawsuit. But that course of action is contrary to the securities law enforcement regime created by Congress, particularly where, as here, there is no need for emergency relief and highly relevant documents are clearly available. Among other problems, it risks omitting civil defendants who otherwise would be identified through pre-litigation investigations, and it would severely curtail the use of Commission administrative proceedings in which discovery is restricted.

Furthermore, the use of subpoenas is obviously necessary to the SEC's identification of securities law violations that occur outside the U.S. For example, Securities Act § 22(c)(1) and Exchange Act § 27(b)(1) explicitly recognize SEC antifraud claims where "the securities transaction occurs outside the United States and involves only foreign investors." 15 U.S.C. §§ 77v(c)(1), 78aa(b)(1). Through these provisions, Congress expressly recognized the extraterritorial reach of the Exchange Act. Additionally, the Exchange Act prohibits broker-dealers from effecting transactions on foreign exchanges that are designed to evade U.S. rules and regulations. *See* Exchange Act § 30(a) [15 U.S.C. § 78dd(a)]. As *Morrison* found, this is an "explicit provision for a specific extraterritorial application." 130 S. Ct. at 2883; *see also* 15 U.S.C. § 78dd-1(g)(1) (conferring alternative jurisdiction for foreign bribery violations). In these as in domestic violation cases, it is nonsensical to suggest that Congress authorized the SEC to investigate such violations while denying the SEC the basic tools it needs to fulfill these responsibilities. *See United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) ("'Even when the plain meaning did not produce absurd results but merely an unreasonable one plainly at variance with the policy of the legislation as a whole this Court has followed that purpose, rather than the literal words.'" (quoting *United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940)).

> ### 2. Congress Has Acted Only To Expand, Not Restrict, The SEC's Authority Abroad

DTTC's reliance on Section 106 of the Sarbanes-Oxley Act [15 U.S.C. § 7216] is unavailing. DTTC argues that, because Congress passed Section 106 to provide an additional mechanism by which the SEC can compel production of audit workpapers from foreign audit firms, it must be that the SEC lacked the ability to obtain such documents before its passage via subpoena. (DTTC Second Opp. 13-14). That result does not follow. Section 106 was passed

because, prior to its passage, the SEC often had difficulty obtaining access to workpapers of foreign auditors and was *generally* reliant on cooperation from foreign regulators in seeking such documents. But that is because of the practical reality that, as DTTC itself observes, it is often difficult for the SEC to serve subpoenas within the U.S. on foreign audit firms; the SEC typically must resort to such mechanisms as border watches to effectively serve foreign firms. (DTTC Second Opp. 18 n.13). Here, again, the practical difficulty that often exists was removed when DTTC's U.S. counsel accepted service of the Subpoena on DTTC's behalf.[4]

### C. The SEC Does Not Seek To Enforce Extraterritorial Application Of Its Subpoena Power

DTTC's *Morrison*-based argument also fails because, by seeking to enforce a subpoena that was validly served in the U.S. and calls for production in the U.S., the SEC does not seek extra-territorial application of its subpoena power. This is true regardless of whether a "presumption against extraterritoriality" applies to provisions of the Securities Act or Exchange Act.

*Morrison* held that Section 10(b) did not apply extraterritorially, but that was only half of the Court's inquiry. It remained for the Supreme Court to determine what Section 10(b) proscribed based on the "'focus' of congressional concern'" underlying that provision, and whether the alleged facts in the case stated a claim. *Morrison*, 130 S. Ct. at 2884; *see also Kiobel,* 133 S. Ct. at 1669 ("[W]here the claims touch and concern the territory of the United States . . . with sufficient force," they may "displace the presumption against extraterritorial

---

[4] DTTC's citation to the testimony of a representative of the accounting industry to the Senate banking committee, before passage of the Exchange Act (DTTC Second Opp. 13), is similarly unpersuasive. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 120 (2001) ("We ought not attribute to Congress an official purpose based on the motives of a particular group that lobbied for or against a certain proposal.").

application."). *Morrison* reached the conclusion (since reversed by Congress) "that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Id.*; *see also EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 255 (1991) (concluding that Congressional "focus" in Title VII of Civil Rights Act was neither the place of hiring nor the employee's citizenship but the fact of domestic employment). Because the plaintiffs in *Morrison* did not allege domestic securities transactions, the Court affirmed dismissal of their complaint.

Applied here, *Morrison* requires enforcement of the Subpoena. That is because all of the conduct that is the "'focus' of congressional concern" under Securities Act § 19(c) and Exchange Act § 21(b) occurred, or would occur, in the U.S.: the subpoena was served in the U.S. and the designated place of production is in the U.S. This Congressional focus is amply demonstrated by the provisions' language that documents or witnesses be "required from any place in the United States . . . at any designated place of hearing." Under this language, it is the *requirement of production* that must be made from a place in the U.S. [5]

When Congress enacted this language, it did so against the backdrop of court decisions that "frequently required persons within their jurisdiction to produce books and papers which were beyond the territorial limits of the court, even in cases where the documents were located

---

[5] It is further demonstrated by the Exchange Act's provision for judicial enforcement of subpoenas. Section 21(c) of the Exchange Act authorizes the SEC to "invoke the aid of the court of the United States *within the jurisdiction of which such investigation or proceeding is carried on*, or where such person resides or carries on business." 15 U.S.C. § 78u(c) (emphasis added). "Any such court may issue an order requiring such person *to appear before the Commission or member or officer designated by the Commission, there to produce records, if so ordered*." *Id.* (emphasis added). Thus Congress reflected its concern about where the subpoena's production obligation would be satisfied.

in a foreign country." *Minas de Artemis*, 150 F.2d at 217 (citing cases).[6] Moreover, as both *Minas de Artemisa* and *DeSmedt* explained, the purpose of this language was to *expand*, not to limit, the SEC's (and other agencies') authority to reach investigative materials. *Minas de Artemisa*, 150 F2d at 218; *DeSmedt*, 366 F.2d at 470-71; *see also Deutsche Lufthansa*, 591 F.2d at 953. As *Minas de Artemisa* correctly found, Section 19(c) "was intended broadly to empower the Commission to require the attendance of witnesses or the production of documentary evidence a*t any designated place of hearing, provided only that service of the subpoena is made within the territorial limits of the United States*." *Id.* at 218 (emphasis added).

Congress could not have intended, through Securities Act § 19(c) and Exchange Act § 21(b), to foreclose access to documents located abroad; to conclude otherwise would give parties the obviously perverse incentive to move documents overseas from U.S. locations. This would wholly undermine the SEC's ability to conduct investigations. *See Minas de Artemisa*, 150 F.2d at 218 ("Congress having clothed the Commission with broad investigatory powers, we should be slow to impute to it the purpose of creating a loophole for companies incorporated abroad but which . . . are actively doing business and peddling their securities in the United States."); *DeSmedt*, 366 F.2d at 469.

The point is further buttressed by case law recognizing limits on agencies' authority to

---

[6] For example, in *Consolidated Rendering Co. v. Vermont*, 207 U.S. 541 (1908), cited in *Minas de Artemisa*, the Supreme Court affirmed the Vermont court's decision to hold in contempt an out-of-state company doing business in Vermont that failed to produce documents kept in Massachusetts, in response to a grand jury subpoena issued to the company in Vermont. The state statute authorizing the subpoena provided: "Such corporation, when notice . . . is served upon it, is, by the statute, directed to produce the books and papers as required. The notice is to be issued from the court or tribunal before whom the papers are required to be produced." *Id.* at 542.

*serve* subpoenas overseas. In *FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1323 (D.C. Cir. 1980), the D.C. Circuit declined to enforce a subpoena that the FTC served overseas in apparent violation of international law, because Congress had not expressly provided such authority. *Id.* at 1304, 1321. The court explained: "When an American regulatory agency directly serves its compulsory process upon a citizen of a foreign country, the *act of service itself* constitutes an exercise of American sovereign power within the area of the foreign country's territorial sovereignty." *Id.* at 1304 (emphasis added). At the same time, the court recognized "that the investigative . . . reach of domestic agencies may, and often must, extend across national boundaries," and therefore agencies may "compel production of documents located abroad" through subpoenas served in the U.S. *Id.* at 1304 (citing *Deutsche Lufthansa*, 591 F.2d 951); *see also Nahas*, 738 F.2d at 492-94.

In sum, the Subpoena must be enforced because the relevant conduct that is the focus of Congressional concern – service and failure to produce – occurred or failed to occur in the U.S.[7]

---

[7] While these facts are dispositive, additional factors also weigh in favor of the conclusion that the SEC's Application to enforce the Subpoena is sufficiently domestic in nature to displace any preemption against extraterritoriality. The SEC's "claim" for the Longtop documents also "touch[es] and concern[s]" the U.S. because: (1) the documents concern a company that raised hundreds of millions of dollars by issuing securities registered with the SEC and traded on U.S. markets; and (2) the documents are in the possession of an auditor that voluntarily registered with the PCAOB, accepted audit engagements of U.S. issuers, and consented to the use of its audit reports in Longtop's SEC filings. *Kiobel*, 133 S. Ct. at 1669; *see also id.* at 1669 (Alito, J., concurring) (noting the Court's "formulation obviously leaves much unanswered). *Morrison*, 130 S. Ct. at 2884 (stating the "presumption here (as often) is not self-evidently dispositive, but its application requires further analysis").

DTTC contends that the fact the Subpoena was served through "an outside lawyer in Washington, D.C." militates in favor of the presumption. (DTTC Second Opp. 17) This contention fails because the lawyer indisputably represented DTTC and told SEC Staff that he would accept service of the Subpoena. DTTC's position is simply a rehash of its failed arguments regarding service. Mr. Cox's authority as an agent of DTTC, an artificial person, was every bit as binding as the authority of a DTTC partner had the SEC delivered the

## II.     THE SUBPOENA WAS VALIDLY SERVED ON DTTC

In March 2013, 22 months after the Subpoena's issuance, DTTC alleged for the first time that the Subpoena was not properly served.  Although DTTC now continues to press this newly manufactured defense, nowhere in its Second Opposition does DTTC contest the following key facts:  (1) on May 23, 2011, DTTC's then U.S. counsel told SEC Staff that he represented DTTC in the Longtop matter and would accept service of the Subpoena; (2) on May 27, 2011, SEC Staff sent the Subpoena to the same U.S. counsel by commercial courier and electronic mail transmission; (3) DTTC's then U.S. counsel and subsequently-hired U.S. counsel both confirmed receipt of the Subpoena, which was clearly marked **"SUBPOENA,"** negotiated with SEC Staff for extensions of time in which to respond, and ultimately produced documents under the Subpoena; and (4) DTTC's general counsel at least twice received a copy of the Subpoena, knew that his outside counsel were negotiating with SEC Staff over the Subpoena, and at least twice reported having been served with the Subpoena to the CSRC.  Given these uncontested facts, DTTC's challenge to service is without merit.

### A.     The SEC Is Authorized To Serve An Administrative Subpoena Through Counsel Who Agrees To Accept Service On Behalf Of His Client

DTTC argues that the SEC was not authorized under its own rules to serve the Subpoena through outside counsel who explicitly confirmed that he would accept service of the Subpoena.  DTTC focuses solely on Rule 150(b) of the Commission's Rules of Practice ("Rules"), which provides, in relevant part:  "*Upon a Person Represented by Counsel.* Whenever service is required to be made upon a person represented by counsel who has filed a notice of appearance pursuant to Rule 102, service shall be made pursuant to [one of four

---

Subpoena to such a person (under applicable SEC rules) while he or she was in the U.S.  DTTC cites no authority refuting this point or any of the other agency principles extensively briefed by the SEC.

described methods] upon counsel . . . ." 17 C.F.R. 201.150(b). DTTC argues that because there was no ongoing "proceeding" in which a notice of appearance could have been filed, Rule 150(b) is inapplicable by its own terms. DTTC Second Opp. 19-20.

DTTC's analysis is flawed because it ignores the other relevant rules relating to service of administrative subpoenas in formal SEC *investigations*, which was the situation here. (Initial Br. 5-6; Deitch Decl. ¶3, Ex. A).[8] The primary authority for such service lies in Rule 8 of the SEC's Rules Relating To Investigations, which provides: "Service of subpoenas issued in formal investigative proceedings shall be effected in the manner prescribed by Rule 232(c) of the Commission's Rules of Practice." 17 C.F.R. 203.8. Rule 232(c) of the Rules of Practice in turn states:

> *Service.* Service shall be made pursuant to the provisions of **Rule 150(b) through (d). The provisions of this paragraph (c) shall apply to the issuance of subpoenas for purposes of investigations**, as required by 17 CFR 203.8, as well as hearings.

17 C.F.R. § 201.232(c) (emphasis added). Thus, by operation of Rule 232(c), the provision for service upon counsel in Rule 150(b) *does* apply to service of administrative subpoenas in formal investigations. Whether the counsel has filed a notice of appearance in a "proceeding" is irrelevant. This is particularly true where, as here, the counsel upon whom service of the

---

[8] As a general matter, an SEC *investigation* is commenced to determine whether violations of the securities laws have occurred, are occurring, or are about to occur, and is subject to the SEC's Rules Relating To Investigations, 17 C.F.R. § 203.1 *et seq.* Separately, and generally following an investigation, the Commission may institute an administrative proceeding which is governed by the SEC's Rules of Practice, 17 C.F.R. § 201.100 *et seq.* Administrative proceedings are distinct from investigations, even though the Rules Relating To Investigations may incorporate provisions of the Rules of Practice. Indeed, once an administrative proceeding is commenced, the use of investigatory subpoenas pursuant to the same formal order of investigation is restricted. *See* Rule 230(g) of the Rules of Practice, 17 C.F.R. § 201.230(g) (providing for ALJ oversight of administrative subpoenas after institution of proceedings).

Subpoena was made (Douglas Cox of the Gibson Dunn firm) told SEC staff that he represented the party being served and explicitly agreed to accept such service.[9]

Even assuming (without conceding) that Rule 150(b) does not apply to SEC investigative subpoenas in the absence of an ongoing proceeding, Mr. Cox's explicit agreement to accept service made service effective under the SEC's rules. Through such an agreement (which Mr. Cox never recanted, and which DTTC did not recant over the ensuing 22 months) Mr. Cox became an authorized agent of DTTC. Accordingly, the SEC was free to serve the Subpoena on DTTC by delivering it to Mr. Cox through any of the methods provided under Rule 150(c), which the SEC promptly did. *Cf. Ludlow Corp. v. A.T. DeSmedt*, 249 F. Supp. 496, 498 (S.D.N.Y. 1966) (upholding service of agency subpoena seeking documents located overseas where agency's rules did "not direct that the person served must be the person named in the subpoena" and "respondents do not question the authority of the employees served").

Given the above, DTTC's reliance on *FTC v. Compagnie de Saint-Gobain-Pont-a-Mouson*, No. 78-2160, 1979 U.S. App. LEXIS 10223 (D.C. Cir. Nov. 26, 1979), is misplaced. There apparently, as here, the recipient of an administrative subpoena challenged service through its U.S. counsel under the agency's rules where no "proceeding" had been commenced. In a footnote, the D.C. Circuit without explanation appeared to agree that such

---

[9] Rule 150(b) is reasonably construed to permit legal counsel to accept service after they appear in an investigative matter, which Mr. Cox clearly did by informing SEC Staff that he represented DTTC regarding Longtop. It would elevate form over substance to require, in the context of an SEC *investigation*, that a formal "notice of appearance" be entered in order for Rule 150(b) to be given effect. As noted, an investigation often precedes and is distinct from an administrative proceeding. Thus, in almost all cases requiring entry of a "notice of appearance" would frustrate and render ineffective Rule 232(c)'s express reference to Rule 150(b), a result that any reasonable construction of the SEC's rules should avoid. *See Alaska Dept. of Envtl. Conservation v. EPA*, 540 U.S. 461, 489 n.13 (2004). Here, Mr. Cox removed any possible unfairness in the application of Rule 150(b) to the SEC's service of the Subpoena on DTTC, because Mr. Cox *expressly agreed* to accept such service.

service was ineffective. *See id.* at *2 n. 2. But whatever the court's rationale may have been, the case is easily distinguishable from the facts here for at least two reasons. First, the record in *Saint-Gobain* is devoid of any suggestion that the U.S. counsel had agreed to accept service of the subpoena in that case. Second, the FTC's rules at issue in that case, unlike the SEC Rule of Practice 232(c) here, did not explicitly invoke a rule providing for service upon counsel (*i.e.*, Rule 150(b)) for purposes of an administrative subpoena. *See* 1973 version of FTC Rules of Practice, 16 C.F.R. § 4.4., DTTC Ex. 1 at page 4 (Docket Entry 63-13).[10]

### B.   DTTC's Outside Counsel Was An Agent Authorized To Accept Service Of The Subpoena

DTTC's belated arguments that Mr. Cox was not authorized to accept service of the Subpoena, as opposed to a Section 106 request, are similarly unavailing. Indeed, they contradict Mr. Cox's express statements to SEC Staff in May 2011, as well as numerous communications between DTTC's counsel and SEC Staff over the ensuing months. As the SEC has explained, by virtue of these and other communications and actions of DTTC, DTTC's counsel were its agents for purposes of accepting and responding to the Subpoena under the doctrines of (1) actual authority; (2) apparent authority; (3) estoppel; or (4) ratification. (SEC Initial Br. 14-20).

---

[10] DTTC's position is suspect for the additional reason that, if accepted, it would cast doubt on a commonly accepted practice within the securities bar. Consistent with agency principles, legal counsel regularly accept service of SEC administrative subpoenas (among other process) on behalf their clients. But if DTTC were correct that an SEC administrative subpoena could not be served upon a recipient's counsel absent an already-instituted "proceeding," in each such case SEC Staff would be forced to serve the Subpoena directly on the named recipient under one of the methods set forth in Rule of Practice 150(c), lest the recipient later claim that service of the Subpoena was unauthorized. Such a scenario urged by DTTC defies common sense and, fortunately, is plainly not required under agency principles. *See SEC v. Obioha*, No. 12cv80109, 2012 WL 4889286, at *2 (N.D. Cal. Oct. 12, 2012) (service on British Virgin Islands entity was sufficient where attorney had emailed SEC Staff that he was "authorized to accept legal service" on behalf of entity).

The main predicate of DTTC's position is the suggestion – first revealed in a declaration from DTTC's general counsel James Edward Jamison, filed March 20, 2013 ("Jamison Decl.") (Docket Entry 54, re-filed as 63-2) – that Mr. Jamison only authorized Mr. Cox to accept a request for documents pursuant to Section 106 of the Sarbanes-Oxley Act ("Section 106 request"), and not a subpoena. But the record plainly undermines this claim. Within 90 minutes of receiving the Subpoena on May 27, 2011, Mr. Cox forwarded the Subpoena to Mr. Jamison by electronic mail. *See* SEC Attached Exhibit 2 (Docket Entry 62-5). Mr. Jamison admits that, approximately two months earlier, in March 2011, he had received a Section 106 request from the SEC related to a different investigation. Jamison Decl. ¶8 & Ex B. The Subpoena that Mr. Jamison received from his U.S. counsel on May 27, 2011, which was clearly marked **"SUBPOENA,"** makes no reference to Section 106 and bears no resemblance to the Section 106 request that Mr. Jamison had received in March 2011. This fact alone refutes any assertion that, as of the day of the Subpoena's issuance, Mr. Jamison (or his experienced securities counsel) were confused as to whether, with respect to the Longtop investigation, they had in fact received an administrative subpoena.[11]

_____

[11] In addition to the different check-the-box caption and format of the Subpoena, its content compared to the earlier Section 106 request obviously demonstrated to Mr. Cox and his U.S. counsel that the Subpoena was in fact an administrative subpoena. The Section 106 request was a two-page letter that expressly invoked Section 106 and, consistent with the statutory provision, simply demanded "All audit work papers and all other documents related to any audit work or interim reviews performed . . . for the fiscal year ending December 2009." Jamison Decl. Ex. B; *compare* 15 U.S.C. § 7216(b)(1)(A) (authorizing request to firm that performs audit work for "the audit work papers of the foreign public accounting firm and all other documents of the firm related to any such audit work"). By contrast, the Subpoena included a five-page attachment setting forth tailored definitions and instructions and nine enumerated requests for documents. Certain of the Subpoena's requested items, while relevant and important to the Longtop investigation, were not required under Section 106. *See* SEC Attached Ex. 2 at pages 3-5 (seeking, among other information, documents about employees who provided services to Longtop irrespective of engagement (Item 3), partners, officers, shareholders, or beneficial owners of DTTC (Item 4), and DTTC's document retention policies

In any event, the subsequent communications of Mr. Jamison, Mr. Cox, and DTTC's subsequently-hired U.S. counsel, Michael Warden, with the SEC Staff, the CSRC, and each other, all evidenced their understanding that DTTC had received – and Mr. Cox had been authorized to accept – an administrative subpoena.  (SEC Initial Br. 14-18)  Glaringly absent from DTTC's voluminous briefs and declarations filed in this case is any statement from Mr. Cox stating that he was authorized only to accept service of a Section 106 request.

DTTC now also argues that it timely raised Mr. Cox's alleged lack of authority to accept service of the Subpoena with the SEC.  This is simply untrue.  On April 11, 2012 – almost a year after the Subpoena was issued – DTTC conceded in its first opposition brief in this case "*the fact that experienced SEC defense counsel that previously represented DTTC accepted service of the Subpoena rather than requiring the Staff to serve it on DTTC in China or through Section 106*."  DTTC First Opp. 18 (emphasis added).  A cursory review of that brief's Table of Contents corroborates this concession; DTTC made no argument, as it does here now, that service of the Subpoena was unauthorized.

Nor can DTTC can find solace in Mr. Warden's July 8, 2011 letter to SEC Staff, which does not contest the validity of *service* of the Subpoena.  Deitch Decl. Ex. D.  Nowhere did that letter contend that Mr. Cox or his firm lacked authority in any respect in its representation of DTTC.  Rather, that letter stated DTTC's position that it would purport to "compl[y] with the Subpoena" by providing responsive documents to the CSRC, as allegedly permitted under Section 106 of Sarbanes-Oxley.  Deitch Decl. Ex. D, at 2.  It also set forth DTTC's misguided legal arguments – since refuted by the SEC and now abandoned by DTTC – regarding *how* it

---

(Item 5)).  These obvious differences put DTTC on additional notice that it had received an administrative subpoena, not a Section 106 request.

could comply with the Subpoena.  (SEC Initial Br., Argument Section IV.A; *supra* note 1).  But the letter does *not* allege that the authority of DTTC's outside U.S. counsel to accept service of the Subpoena was in any way unauthorized.

To the extent the July 8 letter reveals anything about DTTC's "state of mind" as to service, the letter confirms that DTTC *did not* at the time think it had been served with a SOX Section 106 request, but instead *knew* it had been served with an SEC subpoena – and that it was not objecting to service.  Indeed, the Warden letter repeatedly references the "Subpoena" as being separate and distinct from a Section 106 request:  "DTTC stands ready to comply fully with the *Subpoena* through the mechanism contemplated by Section 106." (emphasis added).  Thus, DTTC's belated assertion that it was confused about the nature of the Commission's demand – or that the SEC was required to clarify the statutory basis for the Subpoena (DTTC Second Opp. 21-24) – is defeated by DTTC's own correspondence with the SEC.

## III. THE RISK OF VIOLATING CHINESE LAW DOES NOT EXCUSE DTTC'S NON-COMPLIANCE WITH THE SUBPOENA

DTTC's third argument is also unavailing.  DTTC contends that this Court should deny the SEC's Application and refuse to order compliance with the Subpoena because doing so may result in Chinese sanctions on DTTC.  But whatever the potential risk DTTC may bear in complying with the Subpoena, it must be balanced against U.S. interests in enforcing its laws and the burden on the SEC and U.S. investors created by DTTC's refusal to comply.  *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1474 (9th Cir. 1992) ("The PRC's admitted interest in secrecy must be balanced against the interests of the United States and the plaintiffs in obtaining the information."); *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for the S. D. of Iowa*, 482 U.S. 522, 544 n.29 (1987) (discussing need to balance interests of sovereigns where enforcing U.S. law on discovery would lead to a conflict with

19

foreign law); *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 204-206 (1958).

Permitting DTTC to flout its U.S. legal obligations by refusing to produce critical documents to the SEC hurts not only the SEC, but also the investors it seeks to protect. DTTC does not dispute that the SEC has a legitimate investigative interest in the Longtop documents. Instead, DTTC contends that this Court should not enforce the Subpoena because the SEC instead should *continue* to pursue these documents through regulator-to-regulator channels. But the simple fact is that meaningful information-sharing between the SEC and the CSRC on cross-border investigations does not currently exist. Accordingly, requiring the SEC to seek China-based documents exclusively from the CSRC, instead of directly from Chinese entities that engage in the U.S. financial markets, would thwart the SEC's ability to obtain documents highly relevant to financial frauds in China.

It is unclear that the Restatement's comity factors even should be considered in this case, given the wholly indeterminate nature of the risk facing DTTC if it were to comply with the Subpoena. Assuming the factors do apply, they weigh decisively in favor of enforcing the Subpoena. There is no realistic probability that time – or further negotiations – will result in the production of documents. The SEC's interests here are serious and DTTC, having elected to engage in the U.S. financial markets, is obligated to comply with relevant U.S. rules. Accordingly, the Court should require DTTC to comply with the Subpoena.

### A.   DTTC At Most Shows Only A Nebulous Conflict Of Law

DTTC's "proof" that its production of the requested documents will violate Chinese law is far from "comprehensive and detailed." (DTTC Second Opp. 27). Indeed, it remains a mystery whether production of the bulk of the requested documents would run afoul of the

Chinese laws that allegedly pose the greatest threat of sanction for DTTC – in particular, China's laws involving state secrets. *See Wultz v. Bank of China*, No. 11cv1266 (SAS), 2013 WL 1832186, at *4 (S.D.N.Y. May 1, 2013) ("*Wultz II*") ("[T]he party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law.").

DTTC's latest brief confirms that many if not the vast majority of the requested documents have *not* been determined by the Chinese government to contain "state secrets." Rather, DTTC's expert provides an update that, after an unspecified amount of "review," he has determined that "the Longtop Audit Workpapers contain information that has been affixed with the state secret mark." (Second DTTC Opp. 31; Second Tang Decl. ¶ 10) But Mr. Tang's new statement raises more questions than it answers. He does not explain how many pages from the cache of responsive documents contain such a stamp, who affixed the stamp and why (if he knows), or even whether the pages with the stamps were documents that DTTC itself created or merely gathered for inclusion in the workpapers. He makes no claim that any requested documents other than the workpapers have been affixed with the state secret mark. And as for the workpapers and other documents that have not been affixed, DTTC has no greater secrecy claim than it started with, which is the facially overbroad generalization that – based on the identities of certain of *Longtop's* clients – the documents of *DTTC* "very likely" include state secrets. *See* First Tang Decl. ¶43. As before, DTTC's claim that the Subpoena presents a conflict with Chinese state secrets law as to all of the requested documents is speculative.[12]

---

[12] Although DTTC argues that the SEC and Professor Clarke have not attempted to rebut DTTC's contention that the workpapers themselves "very likely" contain state secrets, it is DTTC's burden in the first instance to demonstrate an actual conflict of law. *See* SEC Initial

DTTC argues that, under Regulation 29 and various other laws, rules, or edicts, DTTC is prohibited from producing *any* of the voluminous remaining requested documents unless "approval" is first obtained from "a number of regulatory authorities" in China, including the CSRC and the Chinese Ministry of Finance ("MOF"), State Secrets Bureau ("SSB"), and State Archives Administration ("SAA"). (DTTC Second Opp. 28; Tang Decl. ¶¶38-39). But the actual language of the Chinese legal materials cited by DTTC and provided to this Court (including the CSRC's October 2011 letter which materialized after the SEC commenced this proceeding) show only that the approvals of the SSB and the SAA – and not those of the CSRC or MOF – may be needed for certain of the requested documents.[13] And assuming, *arguendo*, the CSRC or MOF's approval is now clearly required, that was not the case when DTTC first received the Subpoena; Regulation 29 did *not* impose a clear obligation on Chinese accounting firms to obtain pre-clearance from the CSRC and the MOF prior to producing workpapers abroad. *See* Declaration of Donald Clarke ¶¶ 8, 12-23 ("First Clarke Decl."); Second Declaration of Donald Clarke ¶¶ 3-11. Indeed, it was DTTC's choice, and not its

---

Br. 28 (citing cases). In any event, neither the SEC nor Professor Clarke have had access to the workpapers that would allow for such a document-by-document rebuttal.

[13] As Professor Clarke explains, where requested documents implicate state secrets or archives matters, Chinese law requires that the respective authorities – namely the SSB and the SAA – be notified and their approval sought. Declaration of Donald Clarke ¶ 24 ("First Clarke Decl."); *see also* Reg. 29, Art. 8, Para. 3 (Tang Decl. Ex. 2, Item 20). However, this does not mean that DTTC necessarily had to consult with the SSB and SAA about all responsive documents. *See* First Clarke Decl. ¶ 16. Meanwhile, the CRSC's October 2011 letter nowhere explicitly states that CSRC itself must approve the production of the requested documents to the SEC. Warden Decl. Ex. 20. The only other purported record evidence that CSRC approval is required is DTTC's National Audit Leader's declaration stating that, at some point after DTTC "informed" the CSRC about the Subpoena and "requested direction . . . on how to respond," "[t]he CSRC responded orally and did not consent to the production of the Longtop workpapers directly to the SEC." Declaration of Charles Lip Sai-Wo ¶25; DTTC Second Opp. 27. This begs the questions of whether DTTC asked for the CSRC's consent; whether the CSRC was authorized to consent; and when the CSRC provided this oral response.

obligation, to seek pre-clearance from the CSRC prior to responding to the SEC's Subpoena. *Id.* In any event, regardless of which authorities' approvals are now required, no such approval has been granted in the two years since the Subpoena was issued; DTTC has stopped trying to get approval from some or all of these authorities (to the extent it ever tried) (First Tang Decl. ¶¶36-39);[14] and we have no idea when, if ever, or under what reasoning, any of these authorities would decide whether to grant approval in the future.

**B.     The Subpoena Must Be Enforced Under The Comity Factors**

Assuming (without conceding) that DTTC has carried its burden of showing that compliance with the Subpoena presents an actual conflict of law, the Subpoena nevertheless should be enforced under the comity factors.

   1.     The Balance of Sovereign Interests Favors Enforcing the Subpoena

DTTC argues that because the Chinese government has repeatedly pronounced the importance it places on state secrecy and state sovereignty, the interests of China must outweigh those of the U.S. in this matter. In essence, DTTC is arguing that because the Chinese government aggressively protects "commercially sensitive information" within its borders (DTTC Second Opp. at 38), while the U.S. government generally seeks to cooperate with foreign governments, the SEC must now bow to the CSRC. Nothing could be further from the truth. If this Court looks behind the interests at stake, as it must,[15] it will see that the

---

[14] DTTC has not provided any correspondence from it to any Chinese authority asking for permission to produce documents in response to the Subpoena. DTTC has provided only a copy of a short notice to the CSRC in which it "reported" the Subpoena to the CSRC and asked for instructions on how to proceed. (Warden Decl. Ex. 14).

[15] DTTC selectively quotes from *In re Sealed Case* to suggest that this Court "should not 'sit in judgment on the acts of the government of another done within its own territory.'" Second Opp. Br. at 38 (borrowing part of quotation from *Underhill v. Hernandez*, 168 U.S. 250, 252 (1987), involving act of state doctrine). But this is not correct, precisely because the nature of the sovereign interests must be balanced against each other. *See Société Nationale Industrielle*

SEC's interests in enforcing the Subpoena are far more significant than those of the Chinese government in precluding production.

The risk that the Chinese government may sanction DTTC for complying with the Subpoena says little about the legitimacy of the Chinese interests in this case.  DTTC still has not explained how production of its audit workpapers for Longtop, a Cayman Islands company, would actually harm China's economic interests that its secrecy laws are purportedly designed to protect.  DTTC's lack of showing in this regard is unsurprising because here, as in *Richmark*, there is "no indication that [DTTC or the customers of Longtop], much less the economy of the PRC as a whole, will be adversely affected at all by disclosure of this information."  959 F.2d at 1477. [16]  More fatal still, DTTC contends there is a conflict of law primarily on grounds that the relevant Chinese authorities must approve any production of documents to the SEC.  Yet two years have passed since service of the Subpoena and still – according to DTTC – the Chinese authorities have not provided any reason for not providing such approval; they have opined only that the SEC should work cooperatively with Chinese regulators to obtain requested materials such as workpapers.  (Warden Decl. Ex. 20.)  *See*

---

*Aérospatiale*, 482 U.S. at 544 n.29.  This Court can and should consider the reasons behind a foreign sovereign's choices when deciding whether to defer to them or enforce federal law.

[16] In *Richmark*, the district court imposed discovery sanctions and held Beijing Ever Bright Industrial Co. ("Beijing"), a corporation organized under PRC laws and an arm of the PRC government, in contempt for refusing to comply with a discovery order, notwithstanding the fact that complying with the discovery order would constitute a violation of Chinese state secrecy laws.  The Ninth Circuit affirmed, and noted that "the State Secrecy Bureau did not express interest in the confidentiality of this information prior to the litigation in question. Indeed, Beijing routinely disclosed information regarding its assets, inventory, bank accounts, and corporate structure to the general public, for example, through a trade brochure, and to companies with whom it did business.  The State Secrecy Bureau did not object to the *voluntary* disclosure of any of this information.  It is only now, when disclosure will have adverse consequences for Beijing, that the PRC has asserted its interest in confidentiality."  *Id.* at 1476.

*Wultz II*, 2013 WL 1832186, at *9 (U.S. interests in "seeing justice done" would outweigh Chinese government's interest in asserting state secrets to protect Chinese entity from liability).[17]

At bottom, it appears that China's interests in precluding production by DTTC are, most fundamentally – and despite DTTC's protests to the contrary – sovereignty for sovereignty's sake. That is not, according to the Supreme Court, a legitimate interest. *See Société Nationale*, 482 U.S. at 544 n.29 (holding that a nation's statutes requiring confidentiality are "relevant to the court's particularized comity analysis only to the extent that its terms and its enforcement identify the nature of the sovereign interests in nondisclosure of specific kinds of material."). Yet that is the crux of DTTC's argument, as DTTC claims China's interests in precluding direct production by DTTC should be respected simply because the CSRC has purportedly expressed the desire to "channel all foreign securities regulators' requests for documents in the PRC through the CSRC." DTTC Second Opp. 39.

The SEC agrees that a foreign country may have valid sovereign interests in making sure that all production of documents passes through its regulators prior to production to the U.S. For example, DTTC notes that the United Kingdom takes an analogous position to that of the CSRC with regard to direct production of certain documents abroad. (Second DTTC Opp. 39 n. 25). And we agree that, in that case, United Kingdom's sovereign interests (and those of at least certain other EU national regulators) are valid and, generally speaking, should be

---

[17] The absence of any submission by the Chinese government in this case, explaining the basis for its alleged prohibitions or instructions not to produce the documents, further undermines DTTC's claim of Chinese sovereign interests. *See Gucci America*, 2011 WL 6156936, at *10 ("[T]he Chinese government has not voiced any objections to disclosure in this case, which 'militates against a finding that strong national interests of the foreign country are at stake.'" (quoting *Minpeco*, 116 F.R.D. at 525) (additional internal quotation omitted)).

respected.[18]  But the crucial difference is that British regulators have historically been willing to work with the SEC to create a viable and expeditious framework within which the SEC's investigative needs can be met while still respecting foreign law.  The CSRC's stated interest in controlling the dissemination of documents here rings hollow given, in the past four years, it has not provided the SEC with any meaningful assistance on cross-border investigations, notwithstanding its obligations under the International Organization of Securities Commissions ("IOSCO") Memorandum of Understanding ("MMOU").  *See* Tafara Decl. ¶¶ 7-22; First Arevalo Decl. ¶¶4-26, 33-42, 45, 54-64; Second Arevalo Decl. ¶¶5-8.  Given the CSRC's failure to cooperate meaningfully with the SEC, China's claimed interest in precluding direct production of documents in favor of regulator-to-regulator production is particularly suspect.

The SEC's interest in obtaining the subpoenaed documents, on the other hand, is based on the legitimate national need to enforce the securities laws.  *See, e.g.*, *Gabelli v. SEC*, 133 S. Ct. 1216, 1222 (2013); *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.NY 1993) ("[t]he United States has a strong national interest in the enforcement of its securities fraud laws").  The SEC is conducting an active investigation into an apparently massive fraud at Longtop, and DTTC's audit workpapers would be critical evidence to understanding the scope of the fraud, how it was committed, who was involved, and how it could have gone undetected for so long.  "These are undoubtedly important questions to the SEC and to the American investors who may have been defrauded."  April 22, 2013 Order at 8.

For two years, DTTC openly confirmed that it did not dispute either the SEC's need for the Longtop documents or the Subpoena's specificity.  *See* DTTC First Opp. 27 n.15 ("DTTC

---

[18] Even in such cases, though, there are of course limits to when the foreign jurisdiction's law should take precedence over U.S. law.  *See, e.g.*, *Société Nationale Industrielle Aérospatiale*, 482 U.S. at 544 n. 29.

does not contend that the Subpoena is vague or unspecific"); *id.* 35 ("not disput[ing] that the

SEC has an interest in obtaining the subpoenaed documents in connection with its

investigation."). DTTC's attempts now to challenge the SEC's enforcement interest fall flat.

Far from becoming "diminish[ed]" over time, the SEC's interests in obtaining the documents

through the Subpoena have only grown more acute, particularly in light of the CSRC's

continued resistance to helping the SEC. (DTTC Second Opp. 40)[19]

Contrary to DTTC's assertion that the Longtop investigation is "entirely retrospective"

(*id.* 40), it potentially may result in the identification of responsible individuals whose removal

from the markets would protect *future* investors. And in any event, the SEC's interest in

seeking retrospective remedies on behalf of U.S. investors still easily outweighs China's

overbroad and non-specific interest in blocking access to "commercially sensitive

information." *See Wultz II*, 2013 WL 1832186, at *9; *cf. United States v. Benjamin*, 328 F.2d

854, 863 (2d Cir. 1964) (Friendly, J.) ("In our complex society the accountant's certificate and

the lawyer's opinion can be instruments for inflicting pecuniary loss more potent than the

chisel or the crowbar.").

   2.   The SEC Has No Alternative Means of Obtaining The Documents

The SEC's clear lack of alternative means for obtaining the requested documents

overwhelmingly weighs in favor of enforcement of the Subpoena. The SEC has waited for

three years for the CSRC to cooperate with its requests for assistance by facilitating the

---

[19] DTTC's late complaint about the breadth of the Subpoena (DTTC Second Opp. 41-42)
directly contradicts its earlier brief and, in any event, says nothing to undermine the SEC's
need for the requested documents. The Subpoena is not overbroad. To the contrary, the
requested documents are within the scope of the SEC's formal order (Deitch Decl. Ex. A) and
virtually all relate to Longtop or to DTTC's services rendered to Longtop. DTTC
mischaracterizes the requests by omitting the detailed categories of documents sought by them.
*See* Deitch Decl. Ex. C page 3 (request item #6).

production of DTTC's audit workpapers. During extended intervals the SEC proactively tried to negotiate with the CSRC. No documents have been produced. Given this dismal track record, there is a substantial *un*likelihood that any such documents now will be produced within any reasonable timeframe. SEC enforcement investigations cannot last in perpetuity, as DTTC undoubtedly knows. Because the CSRC has not produced the Longtop documents – and, in any event, currently is not a viable gateway for audit workpapers from China (Second Arevalo Decl. ¶16) – the Court should enforce the Subpoena. *See Gucci Am., Inc. v. Weixing Li*, No. 10cv4974 (RJS), 2011 WL 6156936, at *8 (S.D.N.Y. 2011) (ordering Bank of China to produce documents from China; "[T]he mere fact that the Hague Convention provides an alternative method for obtaining the documents is not proof that it is necessarily an effective, or efficient, method for doing so in this case.").

The SEC has established in prior briefing and declarations that: (1) it has not received from the CSRC any of the Longtop documents, despite having asked the CSRC to assist in providing these document nine months ago – in August 2012 (First Arevalo Decl. ¶54); (2) although the SEC requested assistance from the CSRC *nearly three years ago* – in June 2010 – with respect to the audit workpapers of another China-based DTTC issuer-client, the SEC has not received any of those documents either (*id.* ¶¶13, 33, 56); (3) the SEC has not received meaningful assistance with respect to any of the 21 other requests for assistance that it has sent to the CSRC in the last several years (*id.* ¶¶4, 59; Second Arevalo Decl. ¶5)[20]; and (4) these conditions have persisted despite numerous communications between the regulators in which the SEC sought to obtain the CSRC's cooperation (First Arevalo Decl. ¶¶29-59).

---

[20] One of these other 21 requests for assistance also involved audit workpapers. The CSRC has not acknowledged that request. (First Arevalo Decl. ¶ 26.)

Notwithstanding this stark reality, DTTC now contends that the SEC should pin new hope on the CSRC's (now-months-old) representations that it has developed "new procedures" and will be able to send documents to the SEC "in a matter of weeks." Second Arevalo Decl. ¶13. Based on these purported developments – which the SEC voluntarily disclosed in a supplemental declaration – DTTC contends that the SEC's argument that it lacks alternative means "should no longer be credited, and this Court should require the SEC to continue pursuing the documents from the CSRC." DTTC Second Opp. 34. DTTC is wrong in all respects.

*First*, the CSRC's failure to produce any of the Longtop documents to date is itself dispositive proof that the SEC lacks alternative means. *See Wultz v. Bank of China, Ltd.*, No. 11cv1266 (SAS), 2012 WL 5378961, at *6 (S.D.N.Y. Oct. 29, 2012) ("*Wultz I*") (alternative means exist only when information can be "easily obtained"); *Second*, DTTC's argument ignores what has been only intransigence accompanied by a series of false starts from the CSRC, including:

- The CSRC has not provided the workpapers of another DTTC China-based client in response to the SEC's requests, even though the CSRC has had the documents *in its possession* since the summer of 2010 (First Arevalo Decl. ¶¶34-35, 56; Second Arevalo Decl. ¶5).

- As recently as 2012 the CSRC has insisted that any workpapers that it might produce not be used in enforcement litigation (the very purpose for obtaining the documents) without the CSRC's advance written authorization (First Arevalo Decl. ¶¶ 37, 39-42, 60-62)

- For 18 months (May 2011 to October 2012), the CSRC had insisted – contrary to the SEC's position – that existing protocols (including the IOSCO MMOU) were insufficient to address the SEC's requests for assistance, and that a separate information-sharing framework was necessary. (*Id*. ¶¶36, 60). When – after then-SEC Chairman Shapiro traveled to China and met with the CSRC – the SEC proposed a new framework to the CSRC and obtained a stay of this proceeding to allow time for its consideration, the CSRC objected to the framework and no agreement was reached. (*Id.* ¶¶ 50-53).

29

Thus, the SEC has gone well beyond showing that the Longtop documents cannot be "easily obtained" from the CSRC. The SEC has made a showing that is not even required under the case law: that pursuing the documents through the CSRC is pointless because "the CSRC currently is not a viable gateway for the production of audit work papers." (Second Arevalo Decl. ¶16); *see Weixing Li*, 2011 WL 6156936, at *7 (alternative means need not be "'futile' for this factor to weigh in favor of the requesting party"). Meanwhile, the CSRC's claim of "new procedures" lacks credibility and does not weigh against enforcement of the Subpoena.[21]

_____

[21] Although the SEC has no realistic expectation that the CSRC will produce the requested audit workpapers in the foreseeable future, this is not to say the SEC will not communicate with the CSRC on the topic, or that the SEC will not continue to encourage the CSRC to abide by its international commitments. It *is* to say that three years of trying to work with the CSRC (or, more recently, simply waiting for the CSRC) have been futile. DTTC suggests that the SEC has falsely described the present state-of-play between the regulators, but it has not. (DTTC Opp. 1, 33-34) DTTC mischaracterizes SEC counsel's in-court statements by selectively quoting them. As counsel's full statements reveal, the SEC has accurately framed its position based on available information. *See* Mar. 13, 2013 Motion Hr'g Tr. at 13:14 – 13:16 ("So we have, *as of today,* exhausted our efforts to attain these documents through these other international sharing mechanisms . . . ." (emphasis added)); April 11, 2013 Tr. at 25:25-26:4 ("*At least to date* the SEC's only option for obtaining the documents that it needs . . . is in this court seeking an order requiring Deloitte to produce the documents . . . . We can't go anywhere else for that. *We can't do an administrative proceeding to get the documents.*" (emphasis added)); *see also* Apr. 11, 2013 Motion Hr'g Tr. at 26:15-17 ("*And as of now, even if circumstances could change*, we have to proceed on the assumption that our only option is through this Court."). The SEC's statements that its negotiations with the CSRC had concluded unsuccessfully were also correct. (First Arevalo Decl. ¶64). The SEC is unwilling to revisit the proposed new bilateral framework that it pursued last year with the CSRC (*id.* ¶51); and since moving to lift the stay in December 2012 the SEC has consistently maintained that it will continue to pursue the Longtop documents through the Subpoena absent actual cooperation by the CSRC, and will not agree to any preconditions to the CSRC's own production of these documents (*id.* ¶¶37, 58, 64; Second Arevalo Decl. ¶13).

Relatedly, DTTC continues to try to drag out this proceeding by claiming that it needs "targeted" discovery relating to the SEC's communications with the CSRC. DTTC Second Opp. 34 n.21. Both the Magistrate Judge and this Court properly refused these requests. *See* April 22, 2013 Order (overruling DTTC's objections to the Magistrate Judge's decision to hold a merits hearing without allowing discovery). The SEC-CSRC correspondence presents no "special circumstance" justifying discovery and is unnecessary for the Court "to discharge [its] duty" in this summary proceeding. *SEC v. Lavin*, 111 F.3d 921, 926 (D.C. Cir. 1997). No discovery can change the fact that the CSRC has not produced the Longtop documents to the

The 2011 *Wultz I* decision, ordering the Bank of China to produce documents allegedly protected by China's bank secrecy laws, is a case in point. There the court considered (1) a letter from Chinese government regulators specifically urging U.S. federal judges to require use of the Hague Convention procedures, and (2) the fact that the court had sent a Letter of Request under these procedures to avoid a conflict of law for the discovery at issue. *See Wultz I*, 2012 WL 5378961, at *5-6. Based on experience with these Hague procedures in other cases and the passage of time since its own letter, the Court found that the procedures "were not a viable alternative method" of obtaining the requested information. *See id.* So too here. Three years since the SEC's first request for assistance regarding DTTC's audit workpapers and nine months since the Longtop request are enough. Waiting longer "would definitively not represent a reasonable alternative means for [the SEC] to obtain discovery" that it needs for the Longtop investigation. *Id.*, at *6.

Finally, the CSRC's demonstrated history of non-cooperation is not cured by its recent signing of an MOU with the PCAOB. DTTC Notice of Supplemental Authority (Dkt. No. 65). There has long been in place the IOSCO MMOU to which the SEC and the CSRC are both signatories, but that agreement has not resulted in the production of any audit workpapers to the SEC. *Supra* Argument Section III.B.1. There is no good reason to think the SEC will have an easier time obtaining documents from the CSRC indirectly through a U.S. government-created entity (the PCAOB), than the SEC has had through its own direct requests to the CSRC. As before the PCAOB MOU, the SEC lacks an "alternate means" for obtaining the

---

CSRC. Whether DTTC would have conducted negotiations with the CSRC differently than the SEC did is irrelevant to this proceeding. *See SEC v. Dresser Indus.*, 628 F.2d 1368, 1388 (D.C. Cir. 1980) (cautioning against "transform[ing] subpoena enforcement proceedings into exhaustive inquisitions into the practices of regulatory agencies").

Longtop documents, and this factor weighs heavily in favor of enforcing the Subpoena. *See Gucci Am., Inc. v. Curveal Fashion*, No. 09cv8458 (RJS), 2010 WL 808639, at *4 (S.D.N.Y. Mar. 8, 2010).

### 3.  DTTC Cannot Demonstrate Good Faith

Contrary to DTTC's arguments, the Court can and should consider DTTC's inability to demonstrate good faith as part of any comity analysis. DTTC's conduct before and during this matter belies its claim of good faith. It voluntarily accepted numerous client engagements in U.S. markets knowing full well that it might face difficulties in complying with U.S. rules relating to information requests from regulators, to the detriment of investors.

DTTC argues that its conduct is justified because, when it registered with the PCAOB in 2004, the PCAOB's rules "permitted" DTTC to submit its registration form without signing Exhibit 8.1, which called for consent to "cooperate in and comply with any request for . . . production of documents." DTTC Second Opp. at 7, 43; Warden Decl. Ex. 3. DTTC is wrong. In approving DTTC's registration, the PCAOB expressly wrote to DTTC that, although DTTC had failed "to supply a 'Consent to Cooperate with the Board,'" the Board's approval despite this omission did "not relieve Deloitte of the obligation to cooperate in and comply with Board demands (including for documents or testimony)." Williams Decl. Ex. A.[22] Furthermore, the

---

[22] Moreover, in public guidance the PCAOB wrote:

> A registered firm's failure to cooperate with Board requests [for production of documents] in these contexts may subject the firm to disciplinary sanctions, including substantial civil money penalties and revocation of the firm's registration. In the staff's view, if a firm fails to cooperate with the Board, the fact that the firm has not obtained a client consent that might be necessary (under non-U.S. law) to allow the firm to cooperate is not a defense to a disciplinary action for failure to cooperate.

> As a practical matter, therefore, a firm must choose whether (1) to satisfy itself in advance that the non-U.S. client will provide any necessary consent if and when the Board demands documents or information concerning the client, (2) to proceed without

PCAOB rules cited by DTTC did *not* permit DTTC to avoid cooperation obligations under any circumstances, including where the firm had omitted an advance cooperation commitment from its registration form. Rather, PCAOB Rule 2105 only permitted the firm, under certain circumstances, to withhold certain information from the *registration form itself*, and not in response to any future information request from a regulator.[23] In any event, the PCAOB's express warnings – both in its letter to DTTC and in public guidance – put DTTC on notice that it would be held to account for failures to cooperate with information requests. SEC Initial Br. 3-4; Williams Decl. Exs. 3, 4.

Finally, nowhere does DTTC point to any attempt to obtain a waiver from Chinese authorities that would permit it to comply with the Subpoena. To the contrary, DTTC admits that it is not even trying to obtain permission or approval from either the SSB or the SSA, the two agencies with responsibility for the types of allegedly sensitive information (states secrets and archives) that might be contained in the subpoenaed documents. DTTC Second Opp. 44; First Tang Decl. ¶36 (although DTTC "must submit" potentially secret information to "relevant secrecy authorities for classification . . . . DTTC did not take such action."); *id.* ¶37.

---

such assurance and take a risk that it may later have to choose between providing information without the client's consent or facing a Board sanction for failing to provide the information, or (3) to decline the audit engagement. The Board has not attempted to dictate which of these choices a firm should make.

Williams Decl., Ex. B. DTTC chose to accept the audit engagement for Longtop and engage in the U.S. financial markets. It accepted precisely the risk the PCAOB warned of, and now must comply with U.S. law.

[23] PCAOB Rule 2105(a), *available at* http://pcaobus.org/Rules/PCAOBRules/Pages/Section_2.aspx. DTTC also cites PCAOB Rule "2207.6" (DTTC Second Opp. at 6), but this appears to be a typographical error. In any event, Rule 2207 only permits foreign public accounting firms, in certain circumstances, to omit information or affirmations from certain periodic filings with the PCAOB; it does not authorize the firms to withhold information sought by Accounting Board Demands.

4.     <u>DTTC's Claimed Hardship Does Not Excuse Noncompliance</u>

In arguing that it would face hardship in complying with the Subpoena, DTTC tries to compare itself to a "neutral source of information." DTTC Second Opp. 36. But the SEC's investigation encompasses all of the relevant players, including DTTC. To the extent the SEC determines that a fraud occurred at Longtop, it would look not only at whether its auditors were complicit in such fraud but also at whether its auditors complied with professional standards. *See* SEC Initial Br. 36-37 & n.12. The fact that DTTC "brought the potential fraud at Longtop to the SEC's attention" (DTTC Second Opp. 36) does not exempt DTTC from this process.

Furthermore, given the wholly ambiguous and malleable nature of the Chinese-law constraints that DTTC alleges it is under, it is extremely difficult to say what sanction, if any, might be imposed on DTTC if it produces documents to the SEC. DTTC "has produced no evidence of an [accounting firm] or its employees being meaningfully punished for disclosing confidential information to a U.S. court in contravention of Chinese law." *Wultz II*, 2013 WL 1832186, at *9. For documents that do not contain state secrets, separate criminal liability under the Archives law is unlikely in this case, because the documents at issue appear not to involve state-owned archives. *See* First Clarke Decl. ¶25. The instances cited by DTTC where individuals have been incarcerated in China for violations of state secret laws are all far afield from this case, where DTTC would be responding to a valid court order and would not be providing documents in any way related to national security (a fact DTTC has not contested). While compliance with the Subpoena may bring some risk of sanction, it remains extremely speculative to predict what those sanctions might be – not only for criminal penalties, but for civil and administrative sanctions as well. *See Weixing Li*, 2011 WL 6156936, at *11 (Chinese bank's claim of potential liability was "unduly speculative" where it "cited no specific instance

in which a Chinese financial institution was punished for complying with a foreign court order directing the production of documents").

In any event, DTTC has no cogent answer to the fact that it entered U.S. markets notwithstanding clear PCAOB warnings. "[I]f the hardship is self-imposed, or if [the defendant] could have avoided it, the fact that it finds itself in an undesirable position will not work against disclosure of the requested information." *Richmark*, 959 F.2d at 1477.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in the SEC's Initial Brief, the Commission requests that the Court act expeditiously to grant this Application and issue (i) an order requiring DTTC to comply with the Subpoena by immediately producing all responsive documents; and (ii) such other and further relief as may be necessary and appropriate to achieve compliance with the Subpoena directed to the Respondent.

Dated:   Washington, D.C.
         May 30, 2013

Respectfully submitted,

*/s/ David Mendel*
DAVID MENDEL (D.C. Bar #470796)
Assistant Chief Litigation Counsel
JAN FOLENA (PA Bar #74108)
Supervisory Assistant Chief Litigation Counsel
U.S. Securities and Exchange
Commission – Enforcement Division
100 F Street, NE
Washington, DC 20549
(202) 551-4418 (Mendel phone)
(202) 772-9282 (fax)
mendeld@sec.gov
folenaj@sec.gov

Of Counsel:
ANTONIA CHION
New York Bar Attorney Registration No. 1873405
LISA WEINSTEIN DEITCH
California Bar No. 137492
HELAINE SCHWARTZ
New York Bar Attorney Registration No. 1917046

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2013, I served, via email, a copy of the foregoing

Securities and Exchange Commission's Reply Memorandum in Support of its Renewed

Application for Order Requiring Compliance with Subpoena, together with Declaration of

Donald Clarke and Second Declaration of Donald Clarke, on counsel for the Respondent:

> Michael D. Warden
> Sidley Austin LLP
> 1501 K Street, NW
> Washington, DC 20005
> (202) 736-8000
> mwarden@Sidley.com
>
> Gary F. Bendinger, *pro hac vice*
> Sidley Austin LLP
> 787 Seventh Avenue
> New York, NY 10019
> (212) 839-5300
> gbendinger@sidley.com
>
> Miles N. Ruthberg
> Jamie L. Wine
> 885 Third Avenue
> New York, NY 10022-4834
> (212) 906-1200
> miles.ruthberg@lw.com
> jamie.wine@lw.com

Dated:  May 30, 2013

<i>/s/ David Mendel</i>         <br>David Mendel

# **<u>EXHIBIT O</u>**



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
100 F STREET N.E.
WASHINGTON, DC 20549-5985

DIVISION OF ENFORCEMENT

James P. Connor
Trial Counsel
Direct Dial: 202-551-8394
connorja@sec.gov

November 17, 2021

<u>VIA ECF</u>

The Honorable J. Paul Oetken
U.S. District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:     **Response to Letter-Motion to Consolidate**
        ***SEC v. Terraform Labs PTE Ltd., et al.*, No. 2:21-mc-00810-JPO**

Dear Judge Oetken:

The Securities and Exchange Commission ("SEC") respectfully writes to respond to the letter-motion filed by Respondents Terraform Labs PTE, Ltd. and Do Kwon on November 15, 2021, before this case was reassigned from Judge Woods to Your Honor on November 16, 2021. *See* Ltr.-Mot. to Consolidate Cases, ECF No. 8 (Nov. 15, 2021). Respondents appear to request that this action – a miscellaneous application for an order to show cause and an order requiring compliance with SEC investigative subpoenas (the "Subpoena Enforcement Action") – be "consolidate[d]" with a related civil action, *Terraform Labs PTE, Ltd., et al. v. SEC*, 21-cv-8701 (the "Civil Action"), and be assigned to the same District Judge. *See* ECF No. 8 (docket text).

To the extent Respondents only sought related-case treatment, the SEC agrees that the Subpoena Enforcement Action and the Civil Action are related and that it was appropriate to assign both cases to the same District Judge.[1] On the other hand, Respondents styled their filing as a "Letter-Motion to Consolidate Cases" on the Court's Electronic Case Filing system ("ECF"). *See* ECF No. 8 (docket text). To the extent Respondents also sought consolidation of the actions under Rule 42 of the Federal Rules of Civil Procedure, the Court should deny that request because the Subpoena Enforcement Action and the Civil Action are governed by different rules setting forth different procedures and timelines, and are therefore inappropriate for consolidation. *See SEC v. Comm. on Ways & Means of the U.S. House of Representatives*, 161

---

[1] Consistent with our obligation under Local Rule 1.6, the SEC filed a Statement of Relatedness on November 12, 2021; the Court accepted the cases as being related on November 16, 2021; and the Subpoena Enforcement Action was reassigned from Judge Woods to Your Honor on the same day. *See* Statement of Relatedness, ECF No. 6 (Nov. 12, 2021); Docket Entry ("Case Accepted as Related") (no docket number) (Nov. 16, 2021); Docket Entry ("Notice of Reassignment to Judge J. Paul Oetken") (no docket number).

The Honorable J. Paul Oetken
November 17, 2021
Page 2

F. Supp. 3d 199, 224 (S.D.N.Y. 2015) ("The Court also notes that this is a subpoena enforcement application and not a plenary civil lawsuit, and that 'enforcement proceedings may be summary in nature' and 'do not typically involve discovery, testimony from parties or witnesses, or the presentation of evidence.'") (internal citations and quotations omitted); *CSX Transp., Inc. v. Alban Waste, LLC*, No. CIV. JKB-13-1770, 2014 WL 1340041, at *2 (D. Md. Apr. 2, 2014) (denying motion to consolidate when cases were on different schedules); *Valente v. Int'l Follies, Inc.*, No. 1:15-CV-2477-ELR, 2017 WL 9882665, at *3 (N.D. Ga. Sept. 22, 2017) (denying motion to consolidate when it would "dramatically slow down and frustrate the resolution of" one of the cases.); c*f. Fin. Fusion, Inc. v. Ablaise Ltd.*, No. C-06-2451 PVT, 2006 WL 3734292, at *4 (N.D. Cal. Dec. 18, 2006) ("Relation is not consolidation . . . [t]wo related cases may still proceed on different schedules."); 9 C. Wright & A. Miller, *Federal Practice & Procedure: Civil 2d* § 2383 Consolidation – Discretion of Trial Court (3d ed.) ("there are many reasons why a district judge may deny a request for the consolidation of separate cases[,] [f]or example, a motion under Rule 42(a) may be denied if . . . consolidation will cause delay in the processing of one or more of the individual cases.").

Indeed, it is well settled that, unlike civil actions, "subpoena enforcement proceedings are summary in nature." *Sprecher v. Graber*, 716 F.2d 968, 972 (2d Cir. 1983) (citing *SEC v. Knopfler*, 658 F.2d 25, 26 (2d Cir. 1981)); *EEOC v. Aerotek, Inc.*, 815 F.3d 328, 333 (7th Cir. 2016) ("[s]ubpoena enforcement proceedings are designed to be summary in nature.") (citation omitted). The summary nature of the proceedings is partly because the "[t]he courts' role in a proceeding to enforce an administrative subpoena is extremely limited." *RNR Enterprises, Inc. v. SEC*, 122 F.3d 93, 96 (2d Cir. 1997) (citation omitted); *see also* SEC's Mem. in Supp. of App. for an Order to Show Cause and for an Order Requiring Compliance with Subpoenas, at 9-10, ECF No. 2 (Nov. 12, 2021). The summary nature of the subpoena enforcement actions also means they are "designed to [be] decide[d] expeditiously." *See EEOC v. Roadway Express, Inc.*, 750 F.2d 40, 42 (6th Cir. 1984); *SEC v. First Sec. Bank*, 447 F.2d 166, 168 (10th Cir. 1971) ("Questions concerning agency subpoenas should be promptly determined so that the subpoenas, if valid, may be speedily enforced").

By way of example, courts in this District typically resolve the SEC's applications for orders to show cause and to require compliance with subpoenas within 30 days, with courts often issuing an order to show cause within one or two business days of the SEC's filing of its application, which in this case was filed on November 12, 2021. *See* Application for an Order to Show Cause and for an Order Requiring Compliance with Subpoenas, ECF No. 1 (Nov. 12, 2021); *see also SEC v. Fauth*, Nos. 1:21-mc-00783-LJL (S.D.N.Y.), 1:21-mc-00783787-ALC (S.D.N.Y.) (SEC subpoena enforcement filed on October 20, 2021; court issued an order to show cause on October 21, 2021; court resolved subpoena enforcement action on November 12, 2021); *SEC v. Carter*, No. 1:18-mc-00182-PGG (S.D.N.Y) (SEC subpoena enforcement action filed on May 2, 2018; court issued order on to show cause on May 3, 2018; court resolved subpoena enforcement action on May 18, 2018).

The Honorable J. Paul Oetken
November 17, 2021
Page 3

There is also no basis to allow Respondent's Civil Action challenging the SEC's subpoenas to delay resolution of the Subpoena Enforcement Action. This is especially so here, when a subpoena enforcement action "is the ***exclusive method*** by which the validity of SEC investigations and subpoenas may be tested in the federal courts." *Sprecher*, 716 F.2d at 974. (emphasis added); *Sprecher v. Von Stein*, 772 F.2d 16, 18 (2d Cir. 1985) ("the exclusive method for testing the validity of the SEC's investigatory motives or methods is a contested subpoena enforcement proceeding[.]"). Respondents' disregard of this precedent by filing the Civil Action further shows why the Court should expeditiously resolve the Subpoena Enforcement Action notwithstanding the Civil Action. *See United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5 (1st Cir. 1996) ("Subpoena enforcement proceedings are designed to be summary in nature, and an 'agency's investigation should not be bogged down by premature challenges to its regulatory jurisdiction.'") (citation omitted). To do otherwise would be to permit Respondents' Civil Action to improperly delay resolution of the Subpoena Enforcement Action and allow Respondents to continue to hamper the SEC's investigation. *See id.* Indeed, if Respondents have defenses to the Subpoena Enforcement Action, they should be raised in response to an order to show cause, not through a separate civil action.

Accordingly, the SEC respectfully requests that the Court resolve the SEC's application for an order to show cause and an order requiring compliance with SEC investigative subpoenas and deny Respondents' motion to consolidate.

Respectfully submitted,

/s/ James P. Connor
JAMES P. CONNOR
Trial Counsel
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

cc:     Douglas W. Henkin (counsel for Respondents Terraform Labs PTE, Ltd. and Do Kwon)

# **<u>EXHIBIT P</u>**



# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
100 F STREET N.E.
WASHINGTON, DC 20549-5985

DIVISION OF ENFORCEMENT

James P. Connor
Trial Counsel
Direct Dial: 202-551-8394
connorja@sec.gov

December 21, 2021

**VIA ECF**

The Honorable J. Paul Oetken
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:   **Letter-Motion to Extend The Deadline to File Reply Brief**
      ***SEC v. Terraform Labs PTE Ltd., et al.*, No. 2:21-mc-00810-JPO**

Dear Judge Oetken:

Pursuant to ¶ 3(C) of Your Honor's Individual Rules and Practices in Civil Cases, the
U.S. Securities and Exchange Commission ("SEC") respectfully submits this letter-motion to
extend the deadline for the SEC's reply in support of our Application for an Order Requiring
Compliance with Subpoenas ("Subpoena Enforcement Action") by 7 days, from December 24,
2021 to December 31, 2021.  *See* Docket Entry ("repl[y] due by December 24, 2021") (no docket
number) (December 3, 2021).[1]  The SEC has not previously requested an extension of this date,
and counsel for Respondents Terraform Labs PTE, Ltd. and Do Kwon ("Respondents") consents
to our request.

There is good cause for SEC's extension request.  The SEC filed the Subpoena
Enforcement Action on November 12, 2021, the Court convened a status conference on
December 3, 2021, and Respondents filed their Opposition on December 17, 2021.  Since that
time, SEC counsel has not had meaningful time to prepare the SEC's reply due to, among other
things, (1) a December 20, 2021 motion-to-dismiss argument in *SEC v. Morningstar Credit
Ratings, LLC*, 20-cv-01359-RA (S.D.N.Y.) that was scheduled after the status conference in this
case, along with associated preparation for the motion-to-dismiss argument; and (2) preparation
of a complaint filed on December 20, 2021 in *SEC v. Kliushin, et al.*, Civil Action No. 21-CV-
12088) (D. Mass).  SEC counsel also will not have sufficient time to prepare the reply brief this
week due in part to childcare responsibilities because of an unexpected closure of his son's
school on December 22, 2021, due to a COVID-19 outbreak.

---

[1]  A previous docket entry set the due date for our reply as December 23, 2021.  ECF No.
15 (December 3, 2021).  To the extent that the current deadline is December 23, 2021, the SEC
requests an 8-day extension of time, so that out reply would be due on December 31, 2021.

The Honorable J. Paul Oetken
December 21, 2021
Page 2

Accordingly, the SEC respectfully requests that the Court extend the time for the SEC to file our reply in support of the Subpoena Enforcement Action by 7 days, from December 24, 2021 to December 31, 2021.

Respectfully submitted,

/s/ James P. Connor
JAMES P. CONNOR
Trial Counsel
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Telephone:  (202) 551-8394
Email:  Connorja@sec.gov

cc:    All counsel of record by ECF

# EXHIBIT Q

**From:**          Reicher, Eric <reichere@SEC.GOV>
**Sent:**           Wednesday, March 02, 2022 7:56 AM
**To:**             Henkin, Douglas W.
**Cc:**             Senderowitz, Stephen J.; Petts, Nicholas W.
**Subject:**      Re: United States Securities v. Terraform Labs Pte Ltd., No. 22-368 (2d Cir.)

**[WARNING: EXTERNAL SENDER]**

Mr. Henkin,

I will provide you a response today.

Eric

Sent from my iPhone

On Mar 1, 2022, at 5:44 PM, Henkin, Douglas W. <douglas.henkin@dentons.com> wrote:

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Mr. Reicher,

We represent Terraform Labs Pte Ltd. ("TFL") and Do Kwon in connection with the above-captioned appeal. TFL and Mr. Kwon intend to file a motion tomorrow morning with the Second Circuit seeking to stay the District Court's decision pending appeal, expedite briefing and argument of the appeal, and provide an interim stay of the District Court's decision while the motion is pending. Pursuant to FRAP 27 and LR 27.1, please let me know by 9:00a.m. NY time on March 2, 2022 whether the SEC will consent to the interim stay, whether it intends to oppose the stay motion itself, and whether it will take a position on the request for expedited briefing and argument of the appeal, so that I can apprise the Court of the SEC's positions.

Best regards,

Douglas Henkin

 **Douglas W. Henkin**

What's Next? The answer is Talent. With more than 20,000 people, 12,000 lawyers and 200 locations, Dentons has the talent for what you need, where you need it.

D +1 212 768 6832  |  US Internal 16832
douglas.henkin@dentons.com
Bio  |  Website

Dentons US LLP

1

Fernanda Lopes & Associados > Guevara & Gutierrez > Paz Horowitz Abogados > Sirote > Adepetun Caxton-Martins Agbor & Segun > Davis Brown > East African Law Chambers > Eric Silwamba, Jalasi and Linyama > Durham Jones & Pinegar > LEAD Advogados > Rattagan Macchiavello Arocena > Jiménez de Aréchaga, Viana & Brause > Lee International > Kensington Swan > Bingham Greenebaum > Cohen & Grigsby > For more information on the firms that have come together to form Dentons, go to http://dentons.com/legacyfirms

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see http://dentons.com for Legal Notices.