**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

Petitioner-Appellee,

v.

TERRAFORM LABS PTE, LTD. and DO KWON,

Respondents-Appellants.

Case No. 22-368

**PETITIONER-APPELLEE'S RESPONSE TO RESPONDENTS-
APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL
AND EXPEDITED CONSIDERATION**

Petitioner-Appellee United States Securities and Exchange Commission

("Commission" or "SEC") respectfully responds to the Emergency Motion for Stay

Pending Appeal and Expedited Consideration ("Motion") filed yesterday by

Respondents-Appellants Terraform Labs PTE, Ltd. ("TFL") and Do Kwon

(collectively, "Appellants").

It is critical to the investing public that the Commission's enforcement

investigation of potential violations of the federal securities laws by, or relating to,

TFL and Kwon proceed without further delay.  Accordingly, the Commission

agrees this appeal should be heard on an expedited basis, agrees to the briefing

1

schedule proposed by Appellants, and joins their request for the Court to schedule argument (if the Court believes argument is even warranted on this appeal) at the Court's earliest opportunity after merits briefing is complete.

However, for the same reason, the Commission opposes Appellants' request for a stay. Even with an expedited schedule, a stay would cause a substantial further delay in the Commission's investigation and the potential for corresponding harm to the public interest. On the other hand, in the unlikely event that Appellants were to prevail on the merits, any harm resulting from the subpoena compliance could be remedied.

Appellants are unlikely to succeed on the merits because their interpretation of Commission Rule of Practice 150, 17 C.F.R. § 201.150, would allow an individual to avoid service of a subpoena by simultaneously saying: (1) the Commission must serve counsel, but (2) counsel will not accept service. That is not only an unreasonable interpretation, but it also disregards the plain text of the rule that states that service of an investigative subpoena may be made by handing a copy to the person required to be served, 17 C.F.R. § 201.150(d), which the Commission did to Kwon while he was in New York. At the same time, TFL was hand-served by delivery to Kwon, TFL's CEO. Appellants' jurisdictional arguments are equally unavailing because TFL and Kwon have extensive contacts

2

with the United States, U.S. investors, and U.S. companies that are directly related to the subjects of the Commission's investigation.

## BACKGROUND

The Commission instituted an investigation to determine whether any person or entity violated various provisions of the federal securities laws in connection with the Mirror Protocol or the creation, promotion, and offer to sell mAssets and MIR tokens to U.S. investors. Ex. 1, Declaration of Roger J. Landsman ("Landsman Decl.") ¶¶ 3, 7. The Mirror Protocol is a series of computer code written on a blockchain created by TFL through which users create digital assets, called Mirrored Assets or "mAssets," that mimic or "mirror" the price of securities (such as the equity securities of Apple, Inc. or Tesla, Inc.) traded in the United States. The Mirror Protocol also allows users to obtain Mirror Tokens or "MIR tokens," another type of digital asset that TFL described as the Mirror Protocol's governance token.

Both mAssets and MIR tokens are offered and available for purchase by U.S. investors through TFL's web application and various digital asset trading platforms, and U.S. investors have purchased mAssets and MIR tokens. *Id.* ¶¶ 9, 22. TFL and Kwon promote the Mirror Protocol, mAssets, and the MIR token through, among other means, TFL's website, web application, social media accounts, podcast interviews, and U.S. media. *See, e.g., Our mission is to bring*

3

*decentralized monies to as many blockchains as possible: Terraform Labs CEO*
(July 12, 2021) Yahoo! News (https://news.yahoo.com/mission-bring-
decentralized-monies-many-171201969.html) (quoting Kwon as TFL's CEO: "So
we have things like Mirror protocol, which creates synthetic assets that track the
price of real-world assets . . . so this would be, for example, mirrored Tesla, or
mirrored Apple," referring to the equity securities of U.S.-based companies Apple,
Inc. and Tesla, Inc.); *Fake Tesla, Apple Stocks Have Started Trading on
Blockchains* (July 6, 2021) Bloomberg News
(https://www.bloomberg.com/news/articles/2021-07-06/fake-tesla-apple-stocks-
have-started-trading-on-blockchains); Ex. 1, Landsman Decl. ¶ 9.  TFL also
entered into contracts with a U.S.-based digital asset trading platform concerning
the listing of MIR tokens, the sale of MIR tokens to the digital asset trading
platform, and an agreement for the platform to provide custody of digital assets for
TFL.  Ex. 1, Landsman Decl. ¶ 9.

During the course of its investigation, Commission staff determined it was
necessary to seek documents from TFL and Kwon regarding, among other topics:
investors who purchased MIR tokens from TFL; TFL's marketing and promotion
of the Mirror Protocol, MIR tokens, and mAssets, including TFL's and Kwon's
communications with investors; TFL's ability to control, effect or change the

4

Mirror Protocol; TFL's agreements with third parties regarding the sale or transfer of mAssets and MIR tokens, and TFL's organizational chart. *Id.* ¶ 30.

After months of negotiations, TFL and Kwon refused to produce any documents on a voluntary basis. *Id.* ¶ 40. On September 20, 2021, Kwon was personally hand-served with subpoenas to TFL and Kwon in New York, NY while he was attending a digital asset conference. *Id.* ¶ 32. The SEC staff also sent the subpoenas to counsel for Appellants by email on the same day. *Id.*

After Appellants indicated they would not comply with the subpoenas, the Commission moved to enforce them. Following briefing and a hearing on the merits, the district court ordered Appellants to comply with the subpoenas. Order dated Feb. 17, 2022 (attached as Ex. A to the Declaration of Douglas W. Henkin ("Henkin Decl.")). The district court stayed its order until March 3, 2022 to allow the parties to brief whether the order should be stayed pending this appeal. *Id.* After such briefing, the district court denied Appellants request for a stay pending appeal because Appellants were not likely to prevail on the merits of the appeal, they would not face irreparable injury absent a stay, and the public interest in the Commission exercising its enforcement responsibility weighed against a stay. Ex. 2 (Order dated March 1, 2022).

## ARGUMENT

The Court should deny Appellants' motion to stay pending appeal because they have failed to satisfy any of the four relevant factors: (1) likelihood of success on the merits, (2) irreparable injury absent a stay, (3) substantial prejudice to the other parties interested in the proceeding, and (4) the public interest. *In re World Trade Center Disaster Site Litig.,* 503 F.3d 167, 170 (2d Cir. 2007). Importantly, the "burden of establishing a favorable balance of these factors is a heavy one and more commonly stay requests will be denied." *See SEC v. Daspin*, 557 F. App'x 46, 47-48 (2d Cir. Feb. 5, 2014) (Summary Order) (applying the same factors and denying appellant's motion to stay pending appeal a district court order enforcing an investigative testimony subpoena); *see also Barcia v. Sitkin,* 79 Civ. 5831, 2004 WL 691390, at *1 (S.D.N.Y. Mar. 31, 2004); *SEC v. Finazzo*, 18-mc-304, 2008 WL 1721517, at *2, 6 (S.D.N.Y. Apr. 11, 2008) (denying respondent's motion to stay pending appeal an order enforcing an investigative subpoena). A stay is "not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation omitted). It is instead an "exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Id.*

## I.     Appellants Are Not Likely To Succeed on Appeal

The first factor is "whether the stay applicant has made a strong showing that he [or she] is likely to succeed on the merits." *In re World Trade Ctr.*, 503 F.3d at 170.  Appellants do not meet this standard.  There can be no serious dispute that the Commission properly served TFL and Kwon under Commission Rule of Practice 150 [17 C.F.R. § 201.150], given that the Commission personally delivered the subpoenas to Kwon, the CEO of TFL, while Kwon was in New York (thereby satisfying Rule 150(d)).  And, even if the SEC was required to effect service through counsel under Rule 150(b) (and it was not), the SEC electronically delivered the subpoenas to Appellants' counsel on the same day it served Kwon, thereby satisfying Rule 150(b) and (c) (which states that "service shall be made electronically.")[1]  As the district court rightly observed, Appellants' position "reflects a misreading of the SEC's rules."  Tr. at 40:10-11 (attached as Ex. H to Henkin Decl.)  Appellants' reading of Rule 150 is completely unreasonable because it would allow parties to avoid service of investigative subpoenas by

---

[1]  Contrary to TFL's and Kwon's suggestion (Mot. 5), there are no "magic words" necessary to effect electronic service:  "electronic service is complete upon transmission."  Rule 150(e).

7

saying they are represented by counsel, but then direct counsel to refuse to accept service.[2]

Appellants' purported "constitutional concerns" rely on a truncated quote from the district court hearing and a misstatement of the Commission's position. Mot. at 10. The Commission has argued that filing a notice of appearance means that counsel is agreeing to accept service of documents. That is the point with which the district court agreed. It did not rely on any notice of appearance to exercise jurisdiction over TFL or Kwon. *See* Tr. at 8:23 (attached as Ex. H to Henkin Decl.) ("But when you file a notice of appearance, you are agreeing to the jurisdiction. *You can't reject service then*.") (italics added); *id.* at 40:20-41:20 (laying out seven examples of contacts that permitted exercise of jurisdiction over TFL and Kwon). In the end, the dispute about Rule 150(b) is academic, because even if TFL and Kwon are correct that their counsel filed a notice of appearance

---

[2] Appellants' assertion that this issue is a matter of first impression, Mot. at 3, is of no moment because they cannot show a likelihood of success on the merits. Put simply, appellants cannot create an issue of first impression by asking a court to interpret a rule in a manner that contradicts its plain, unambiguous terms. *See Finazzo,* 2008 WL 1721517, at *2 ("[a]lthough the precise issue raised by [r]espondent is one of first impression in the Second Circuit, the Court concludes that [r]espondent is unlikely to satisfy his burden").

(they are not), the SEC sent the subpoenas to counsel on the same day it served Kwon, which, again, constitutes proper service pursuant to Rules 150(b) and (c).[3]

Appellants' arguments on personal jurisdiction fare no better. The Commission's service of subpoenas on Kwon while he was in New York was proper and presents no constitutional concern. *See In re Edelman*, 295 F.3d 171, 179 (2d Cir. 2002) ("when a potential witness comes to the United States it is neither unfair nor inappropriate under the statute to undertake his discovery here"); *Kadic v. Karadzic*, 70 F.3d 232, 247 (2d Cir. 1995) ("personal service comports with the requirements of due process for the assertion of personal jurisdiction" and upholding exercise of personal jurisdiction over foreign national served with summons while physically present in New York).

Even if Kwon had not been personally served in New York,[4] a litany of substantial contacts with the United States related to the subpoena warrant exercise of specific jurisdiction over Kwon and TFL, including:

---

[3] Appellants' contention that counsel is not required to accept service, Mot. at 11-12, supports the Commission's position. Because counsel did not (and still has not) agreed to accept service, the Commission properly served Kwon directly.

[4] Appellants' arguments regarding tag jurisdiction over TFL, Mot. at 12, are a red herring because the district court did not find jurisdiction over TFL based on tag jurisdiction. It (rightly) held that TFL had sufficient contacts with the United States to exercise jurisdiction. And it cannot seriously be disputed that a company can be served by handing the subpoena to its CEO. *See, e.g., In re Grand Jury Subpoenas Issued to Thirteen Corps.*, 775 F.2d 43, 45 (2d Cir. 1985) ("A

9

- Kwon promotes the Mirror Protocol, mAssets, and the MIR token through TFL's publicly-accessible website, web application, social media accounts, podcast interviews, and through the U.S. Media. Ex. 1, Landsman Decl. ¶ 9.

- Approximately 15% of users of the Mirror Protocol come from the U.S. *Id.* ¶ 5.

- Kwon corresponded with a U.S. digital asset trading platform and discussed listing of MIR tokens, which led to a contract between TFL and the U.S.-based trading platform for the listing of MIR tokens with the platform. *Id.*

- Kwon signed an agreement with a U.S.-digital asset trading platform on behalf of a wholly owned TFL subsidiary, under which the U.S. digital asset trading platform paid the TFL subsidiary at least $200,000 for MIR tokens. Ex. 3, Second Declaration of Roger J. Landsman ("Second Landsman Decl.") ¶ 3.

- Kwon, in his capacity as the co-founder and CEO of Terraform, attended the digital asset conference in New York where he was served. *Id.* ¶ 5.

- TFL employs at least four employees in the United States, including its General Counsel. *Id.* ¶ 4.

- TFL has at least two contracts with U.S. based-entities associated with its digital-asset trading platform, a 2021 Listing Services Agreement and a 2019 Custodial Services Agreement with a New York-based trust by which TFL agreed to pay the U.S.-based entity to store digital assets on TFL's behalf. *Id.*

- mAssets mimic U.S. securities that are listed on U.S. national securities exchanges, e.g., Apple and Tesla stocks. *Id.* ¶ 6.

---

corporation may be served through an officer or agent explicitly or implicitly authorized to accept service of process.").

- The Washington Nationals baseball team announced a five-year, nearly $40 million agreement by which TFL will become one of the main sponsors of the Nationals with advertisements around the stadium, including right behind home plate. *See* *https://curlyw.mlblogs.com/nationals-terra-create-first-ever-sports-partnership-with-decentralized-autonomous-organization-20843cc704d3* (quoting Kwon discussing the partnership deal); *see also* Tr. at 41:13-20 (attached as Ex. H to Henkin Decl.).

The district court correctly concluded that "there are clearly sufficient contacts and sufficient personal availment authorizing specific jurisdiction over both Kwon and Terraform." Tr. at 42:4-6 (attached as Ex. H to Henkin Decl.).

Appellants try to brush aside these extensive contacts by arguing that they "do not relate to the marketing or sale of mAssets or MIR tokens by TFL or Kwon to U.S. persons." Mot. at 12. First, many of the contacts, such as the website, appearances with U.S. media, listing on a U.S. based digital asset trading platform, and the sponsorship relate to TFL's and Kwon's marketing of mAssets and MIR tokens to U.S. customers. Appellants also ignore that the mAssets that the Commission is investigating, which were created through the Mirror Protocol that TFL created, "mirror" securities traded on U.S. national securities exchanges, leaving no question that TFL is targeting U.S. investors. *See* Ex. 1, Landsman Decl. ¶¶ 6, 9. Second, and more importantly, the Commission's investigation is

11

not limited to potentially improper *marketing* of these digital-assets.[5]  The contacts

that TFL and Kwon have with the United States have enabled individuals and

entities in the U.S. to purchase these digital assets, have these assets listed on a

U.S. digital asset trading platform, and have enabled U.S. securities to be

derivatively traded in digital form – above and beyond the various marketing that

directly targeted U.S. persons.  That these activities were "not limited to the U.S.,"

Mot. at 13, does not mean that TFL and Kwon did not target the United States.  *See*

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 350 (S.D.N.Y. 2019) (exercising

specific personal jurisdiction over co-founders of digital asset company when they

"targeted the U.S. market in an effort to promote the sale of ATB coins, the very

unregistered security at issue in this litigation").  This is especially true here, when

TFL employs at least four people located in the United States, including its

---

[5] The Mirror Protocol Investigation includes inquiry into whether any person or entity has violated certain provisions of the federal securities laws, including Section 5 of the Securities Act [15 U.S.C. § 77e], prohibiting the unregistered offer or sale of securities; Section 6(l) of the Exchange Act ("Exchange Act") [15 U.S.C. § 78f(l)], prohibiting any person from effecting transactions in a security-based swap with or for a person that is not an eligible contract participant unless such transaction is effected on a national securities exchange; Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], prohibiting acting as an unregistered broker or dealer; and Section 7(a) of the Investment Company Act of 1940 [15 U.S.C. § 80a–7], prohibiting securities transactions by unregistered investment companies, in connection with TFL's involvement with the Mirror Protocol and its participation in the creation, promotion, and offer to sell mAssets and MIR tokens to U.S. investors.  Ex. 1, Landsman Decl. ¶3.

General Counsel. *Goldfarb v. Channel One Russia*, 442 F. Supp. 3d 649, 664 (S.D.N.Y. 2020) (exercising personal jurisdiction over a Russian entity that "purposefully availed itself of the privilege of conducting business within the forum state by maintaining a studio and at least one full-time employee in New York and by distributing its programming to paying subscribers throughout New York").

## II.     Appellants Would Not Be Irreparably Harmed Absent A Stay

Appellants argue that they would be irreparably harmed without a stay because they "would be forced to begin producing documents and sit for an interview" before the appeal was decided. Mot. at 13-14. But courts have repeatedly held that the provision of information pursuant to an administrative subpoena or a summons does not constitute irreparable harm for purposes of a stay pending appeal. *See, e.g., United States v. Sweet*, No. 80-5046, 1980 WL 4702, at *1 (5th Cir. Jan. 31, 1980) ("The alleged injury is not irreparable for nothing contained herein, of course, constitutes a ruling concerning the admissibility or inadmissibility in evidence of any documents that may be produced pursuant to the summons or of any evidence that might be discovered as a result of their production."); *Finazzo*, 2008 WL 1721517, at *4 ("[T]he compelled production of non-privileged documents in response to an administrative subpoena does not constitute irreparable injury warranting a stay pending appeal.") (citing *Sweet* and

13

other cases); *cf. SEC v. Finazzo*, 360 F. App'x 169, 171 (2d Cir. 2009) (Summary Order) (affirming March 27, 2008 order enforcing SEC investigative subpoena and noting that respondent "will have an opportunity…to litigate issues relating to the admissibility of relevant evidence" if the Commission files a lawsuit against him); *United States v. Bright,* No. 07-00311, 2008 WL 351215, at *3 (D. Haw. Feb. 7, 2008) ("The mere requirement to produce documents while an appeal is pending does not constitute sufficient harm to warrant a stay."); *McCammon v. United States*, 584 F. Supp. 2d 193, 198 (D.D.C. 2008) (finding no irreparable harm because "the IRS could be enjoined from using the subpoenaed documents in any administrative or court action if Petitioner's appeal is successful"); *JSC MCC EuroChem v. Chauhan*, No. 18-5890, 2018 WL 9650037, at *2 (6th Cir. 2018) ("Should we ultimately reverse the district court, we may ameliorate any harm by imposing protective conditions on the use of the evidence and testimony or requiring the destruction and/or return of the documents.").

Courts have similarly rejected Appellants' contention that denying a stay would make the appeal "academic," Mot. at 14, because the Commission cannot unsee any documents produced. *See In re Noguer*, 18-MC-498, 2019 WL 1034190, at *4 (S.D.N.Y. Mar. 5, 2019) ("The mere fact that information, once disclosed, cannot be 'undisclosed' is therefore not enough by itself to warrant a finding of irreparable harm."); *Partners Value Arbitrage Fund LP*, 18-CV-5176,

14

2018 WL 3207119, at *6 (S.D.N.Y. June 29, 2018) ("[A] requirement to produce

documents, at least absent a claim of privilege or sensitivity, is not generally the

type of injury that is irreparable."); *In re Gushlak*, 11-MC-0218, 2012 WL

2564466, at *7 (E.D.N.Y. Jan. 30, 2012) (noting that "the compelled production of

non-privileged discovery material, standing alone, does not constitute irreparable

injury warranting a stay pending appeal" and collecting cases), *report and

recommendation adopted,* 11-MC-218, 2012 WL 1514824 (E.D.N.Y. Apr. 30,

2012); *see also, e.g., Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110,

118 (2d Cir. 2009) (holding that, even where the disclosure of trade secrets is at

issue, irreparable harm is not to be presumed absent a showing that "a

misappropriator of trade secrets will disseminate those secrets to a wider audience

or otherwise irreparably impair the value of those secrets").  Appellants would not

suffer irreparable harm absent a stay here.

## III.   A Stay Would Substantially Prejudice the Commission

A stay would substantially prejudice the Commission, because it would

continue to impede the Mirror Protocol Investigation.  *Finazzo*, 2008 WL 1721517,

at *4 ("To the extent that the requested information is essential to the continued

progress of the [ ] Investigation, a stay of enforcement of the March 26 Order may

constitute substantial prejudice to the SEC.");[6] *United States v. Judicial Watch, Inc.,* 241 F. Supp. 2d 15, 18 (D.D.C. 2003) (noting that a stay of enforcement pending appeal may halt the progress of an administrative investigation, and therefore prejudice the government agency). This is especially true here, where the very company and individual responsible for creating the Mirror Protocol and whose conduct the SEC is investigating – TFL and Kwon – have continued to evade efforts since July 2021 to obtain these documents, including the validly issued and served subpoenas in September 2021. The Court should not permit TFL and Kwon to continue to evade compliance with the subpoenas by granting a stay, especially because subpoena enforcement actions are designed to be "summary in nature." *Sprecher v. Graber*, 716 F.2d 968, 972 (2d Cir. 1983); *see also SEC v. First Sec. Bank*, 447 F.2d 166, 168 (10th Cir. 1971) ("Questions concerning agency subpoenas should be promptly determined so that the subpoenas, if valid, may be speedily enforced.").[7]

---

[6] Appellants' reliance on *Finazzo*, Mot. at 16, is misplaced. First, the quote cited by Appellants arose in the context where the Commission did not argue the requested information was essential to its investigation because the investigation focused on the company, and Finazzo was a former employee of the company. That is not the case here where the company and its CEO are the subpoenaed parties and they are plainly central to the investigation. Second, the court ultimately rejected the request for a stay. *Finazzo*, 2008 WL 1721517, at *5.

[7] Appellants argue that the Commission has not acted expeditiously because it sought a short extension of the time for its reply brief in the district court. Mot. at

## IV.   The Public Interest Weighs Heavily Against A Stay

There is no disputing that the public interest weighs strongly against a stay here. *Finazzo*, 2008 WL 1721517, at *5 ("[T]here is a significant public interest in allowing government agencies, like the [Commission], to enforce federal securities laws."). The SEC is investigating whether Kwon's and TFL's involvement with the Mirror Protocol, MIR tokens, and mAssets violated registration and other related provisions of the federal securities laws. The public has a strong interest in allowing the SEC to continue this investigation through receipt of the subpoenaed information, particularly given that U.S. customers make up a significant number of the users of the Mirror Protocol, *see* Ex. 3, Second Landsman Decl. ¶5, and may be harmed by a violation of the federal securities laws by Kwon and TFL.

Appellants' contention that this case presents "fundamental questions" about whether or how parties voluntarily interact with government agencies is erroneous. *See* Mot. at 16. The Commission has never argued that TFL or Kwon's voluntary interactions afforded it jurisdiction. The Commission has merely stated what should be indisputable -- that a party cannot have counsel appear in a capacity that

---

15.  Requesting a one-week extension during a holiday season – from December 24 to December 31 – due to unexpected demands in other cases is hardly dilatory. *See* Henkin Decl. Ex. P.  And the Commission actually filed its brief on December 27, the date it was due given that December 24 was a legal holiday with Christmas falling on a Saturday.

precludes direct service on the party, while that counsel simultaneously refuses to accept service. Appellants' contention that the Commission's "diametrically opposed litigation position from 2013" creates ambiguity in Rule 150 is incorrect because the Commission's position is entirely consistent.[8] Finally, although blockchain is a relatively new technology courts have addressed the question of jurisdiction in this context. *See, e.g., Balestra*, 380 F. Supp. 3d at 350 (exercising specific personal jurisdiction over co-founders of digital asset company).

---

[8] Although the SEC's brief in that case stated that a "formal 'notice of appearance'" is not always required for Rule 150(b) to apply in investigations, *See* SEC Brief filed in unrelated 2013 case at 15 n.9 (attached as Ex. N to Henkin Decl.), the SEC stated there (just as here) that counsel was required to *accept service of the subpoena* for Rule 150(b) to be given effect. *Id*. at 13 ("The SEC Is Authorized to Serve an Administrative Subpoena Through Counsel Who Agrees to Accept Service on Behalf of His Client"); *id*. at 14-15 (arguing that Rule 150(b) applied because "the counsel upon whom service of the Subpoena was made [ ] explicitly agreed to accept such service."). In that case, counsel to a party agreed to accept service of a subpoena, then the party sought to renege on that agreement years after service was effected. *Id*. at 13-15. The case has no application here, where Respondents' counsel has refused to accept service.

## CONCLUSION

For the reasons stated above, this Court should deny Appellants' request for

a stay pending appeal.


Dated March 3, 2022                    Respectfully submitted,

<u>/s/ Eric Reicher</u>
United States Securities and
Exchange Commission
100 F. St, NE
Washington, DC 20549
202-551-7921

Counsel for Petitioner-Appellee

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding parts of the document exempt under Rule 27(a)(2)(B), it contains 4,237 words.  I also certify that this filing complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it uses a proportionally spaced, 14-point New Times Roman typeface.

/s/  Eric Reicher

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2022, I electronically filed the forgoing document with the Clerk of Court using the CM/ECF System, which will send notice of such filing to parties and counsel of record registered to receive notice of electronic filings.

<u>/s/ Eric Reicher</u>

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br>                Applicant, <br><br>     v. <br><br> TERRAFORM LABS PTE, Ltd. and DO KWON, <br><br>                Respondents. | No. 21-mc-   (   ) |

### DECLARATION OF ROGER J. LANDSMAN  IN SUPPORT OF U.S. SECURITIES AND EXCHANGE COMMISSION'S APPLICATION FOR AN ORDER TO SHOW CAUSE AND FOR AN ORDER REQUIRING COMPLIANCE WITH SUBPOENAS

I, Roger J. Landsman, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1. I am employed by the United States Securities and Exchange Commission ("SEC" or "Commission") as an attorney in the Division of Enforcement at the SEC's headquarters in Washington, DC.  I am admitted to the Bars of New York and the District of Columbia.

2. I submit this Declaration in support of the Commission's Application for an Order to Show Cause and for an Order Requiring Compliance with Subpoenas directing Respondents Do Kwon and Terraform Labs PTE Ltd. ("Terraform") to comply with investigative subpoenas served upon Mr. Kwon and Terraform in connection with the Commission's non-public investigation entitled *In the Matter of Mirror Protocol* (Internal File No. HO-14164) (the "Mirror Protocol Investigation").  This Declaration is based upon my direct participation in the Mirror Protocol Investigation and sets forth both (1) the nature of the investigation; and (2) the Commission's unsuccessful efforts to secure Mr. Kwon's and

1

Terraform's compliance with investigative subpoenas seeking documents from Mr. Kwon and

Terraform and testimony from Mr. Kwon.

## I.      **Nature of the SEC's Mirror Protocol Investigation**

3.     The Commission's Mirror Protocol Investigation concerns, among other things,

whether persons or entities have engaged in acts constituting violations of various provisions of

the federal securities laws, including, but not limited to, Section 5 of the Securities Act of 1933

("Securities Act") [15 U.S.C. § 77e], prohibiting the unregistered offer or sale of securities;

Section 6(l) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78f(l)],

prohibiting any person from effecting transactions in a  security-based swap with or for a person

that is not an eligible contract participant unless such transaction is effected on a national

security exchange; Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], prohibiting acting as

an unregistered broker or dealer; and Section 7(a) of the Investment Company Act of 1940

("Investment Company Act") [15 U.S.C. § 80a–7], prohibiting securities transactions by

unregistered investment companies, in connection with Terraform's involvement with the Mirror

Protocol, including Terraform's participation in the creation, promotion, and offer to sell

mAssets and MIR tokens to U.S. investors.

4.     Terraform is a Singapore-incorporated computer programming and digital asset[1]

company that regularly transacts business in the United States, including by contracting with

---

[1]     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of
the Securities Exchange Act of 1934: The DAO*, which advised on the "applicability" of the
federal securities laws to "virtual organizations or capital raising entities that use distributed
ledger or blockchain technology to facilitate capital raising and/or investment" and finding that
the offering of digital assets at issue in that report were securities.  The term "digital asset" or
"digital token" generally refers to an asset issued and/or transferred using distributed ledger or
blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual
currencies," digital "coins," and digital "tokens."

U.S.-based companies, such as a prominent digital asset-trading platform incorporated in Delaware. Several employees of Terraform appear to reside in the United States, including Terraform's General Counsel (located in Pennsylvania), its Business Development lead (located in Texas), its Head of Research (located in California), and its Director of Special Products (located in New York).

5.      Do Kwon is the co-founder and Chief Executive Officer ("CEO") of Terraform and a resident of the Republic of Korea. Mr. Kwon graduated with a Bachelor of Science degree in computer science from Stanford University in California and travels to the United States to conduct business on behalf of Terraform, including to a digital asset and blockchain conference held in New York City in September 2021.

6.      To the best of my understanding, Terraform launched the Mirror Protocol in December 2020. The Mirror Protocol is a series of computer codes written on a blockchain[2] through which users create digital assets,[3] called Mirrored Assets, or "mAssets." The mAssets "mirror" equity or other types of securities traded in the United States, including those traded on U.S. national securities exchanges, such as shares of Apple, Inc. or Tesla, Inc., in that they are designed so that their value rises and falls with the value of those securities. The mAssets corresponding to those equities have been named as "mAAPL" or "mTSLA." *See* Terraform website, https://terra.mirror.finance and https://docs.mirror.finance (last visited November 10,

---

[2]      A blockchain is a type of distributed ledger or peer-to-peer database that is spread across a computer network and records all transactions in the network in theoretically unchangeable, digitally recorded data packages called "blocks." Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain. The system relies on cryptographic techniques for securely recording transactions. A blockchain can be shared and accessed by anyone with appropriate permissions.

[3]      The term "digital asset" or "digital token" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," digital "coins," and digital "tokens."

2021) ("mAssets mimic the price behavior of real-world assets and give traders anywhere in the world open access to price exposure without the burdens of owning or transacting real assets."). Users access the Mirror Protocol through a variety of means, including through Terra's website and web application.  *See* Terraform website, https://docs.mirror.finance/user-guide/getting-started (last visited November 5, 2021).

7.     mAssets are created or "minted" when sufficient collateral is deposited in a so-called "smart contract," a computer program designed to execute the terms of a contract when certain triggering conditions are met.  After mAssets have been minted, they may be traded by investors, including investors located in the United States, through Terraform's web application. According to Terraform's web application, the total value of mAssets outstanding under the Mirror Protocol is more than $437 million, as of November 8, 2021.  *See* Terraform website, https://terra.mirror.finance.

8.     The Mirror Protocol also provides users with the ability to obtain Mirror Tokens or "MIR tokens," a digital asset that Terraform describes as the "governance token" for the Mirror Protocol.  *See* Terraform website, https://docs.mirror.finance/protocol/governance.  As of November 8, 2021, there are approximately 120 million MIR tokens in circulation, with a market capitalization of approximately $407 million.  https://terra.mirror.finance.  MIR tokens receive value based upon, among other things, fees generated under the Mirror Protocol.  MIR tokens have been or may be purchased through several means, including through entry into a contract with Terraform and through purchasing tokens in the secondary trading market via various digital asset trading platforms.

9.     Both mAssets and MIR tokens are offered and available for purchase by U.S. investors through Terraform's web application.  MIR tokens can also be purchased on digital

asset trading platforms.  Upon information and belief, U.S. investors have purchased both mAssets and MIR tokens.  Terraform and Mr. Kwon promote the Mirror Protocol, mAssets, and the MIR token through, among other means, Terraform's website, web application, social media accounts, podcast interviews, and through U.S. media.  *See, e.g. Our mission is to bring decentralized monies to as many blockchains as possible: Terraform Labs CEO* (July 12, 2021) Yahoo! News (https://news.yahoo.com/mission-bring-decentralized-monies-many-171201969.html); and *Fake Tesla, Apple Stocks Have Started Trading on Blockchains* (July 6, 2021) Bloomberg News (https://www.bloomberg.com/news/articles/2021-07-06/fake-tesla-apple-stocks-have-started-trading-on-blockchains).  In addition, Terraform appears to be actively conducting business in the U.S. by, among other things, (1) entering into a contract with a U.S. digital asset trading platform concerning the listing of MIR tokens; (2) Mr. Kwon corresponding with a U.S. digital asset trading platform and discussing listing of MIR tokens; and (3) Terraform completing an extensive questionnaire to the U.S. digital asset trading platform in furtherance of the digital asset trading platform's decision to custody MIR tokens, and the questionnaire was potentially used for the platform making a listing determination as well.

10. It appears that Terraform also continues to play an active role in maintaining and updating the technological architecture for the Mirror Protocol.

11. Terraform, the mAssets and the MIR tokens are not registered with the SEC in any capacity.  For example, Terraform has not registered any offering of securities pursuant to the Securities Act, nor has it registered the mAssets or MIR tokens as a class of securities under the Exchange Act.  Terraform has also not registered with the SEC as a broker or dealer under Section 15(a) of the Exchange Act, or as an investment company under Section 7(a) of the Investment Company Act.

12.     On May 7, 2021, pursuant to Section 20(a) of the Securities Act [15 U.S.C. § 77t(a)], Section 21(a) of the Exchange Act [15 U.S.C. § 78u(a)], and Section 42(a) of the Investment Company Act [15 U.S.C. § 80a-41], the Commission issued an Order Directing Private Investigation and Designating Officers to Take Testimony in the Mirror Protocol Investigation (the "Formal Order").[4]  Among other things, the Formal Order:

    a.  directed, pursuant to Section 20(a) of the Securities Act, Section 21(a) of the Exchange Act, and Section 42(a) of the Investment Company Act that the Commission staff conduct a private investigation to determine whether any persons or entities have engaged in acts or practices in violation of various provisions of the federal securities laws; and

    b.  designated, pursuant to Section 19(c) of the Securities Act, Section 21(b) of the Exchange Act, and Section 42(b) of the Investment Company Act, certain individuals, including myself, as officers of the Commission empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records deemed relevant or material to the investigation.

## II.    The Commission's Unsuccessful Efforts to Secure Documents from Terraform and Mr. Kwon and Testimony from Mr. Kwon

13.     On May 20, 2021, I sent an email to Mr. Kwon and Terraform's Chief Financial Officer to request a voluntary meeting with a representative of Terraform regarding the Mirror Protocol.  A copy of my May 20, 2021 email is attached as **Exhibit 1**.  After receiving a notification that the email had not been opened, I resent the email to Mr. Kwon and Terraform's CFO on May 23, 2021.  A copy of my May 23, 2021 email is **Exhibit 2**.

14.     Several days later, on May 27, 2021, my co-counsel, Kathleen Hitchins, and I, spoke on a call with Douglas W. Henkin and Stephen J. Senderowitz of the law firm Dentons US

---

[4]     Commission formal orders are not public. The Commission has not included a copy of the Formal Order with this Application and respectfully requests that the Court conduct an *in camera* review if the Court wishes to examine it.  Counsel for Respondents Terraform and Mr. Kwon requested a copy of the formal order, which was provided to counsel on October 5, 2021.

LLP ("Dentons") after they contacted me. Mr. Henkin indicated that he and Mr. Senderowitz represented Terraform regarding the SEC's Mirror Protocol Investigation and asked what interest the Commission had in Terraform and Mr. Kwon, who Mr. Senderowitz described as a foreign company and foreign witnesses. I told Mr. Henkin and Mr. Senderowitz that the SEC was interested in an interview with Mr. Kwon or another representative of Terraform to better understand the Mirror Protocol. In response, during subsequent conversations, Dentons offered that Mr. Kwon would agree to an interview if the SEC would enter into a proffer agreement with Mr. Kwon, under which statements made by Mr. Kwon could not be used against him or Terraform in subsequent proceedings, except that the Commission may use statements made during the proffer session as a source of leads to discover additional evidence and for impeachment or rebuttal purposes if Mr. Kwon or Terraform testifies or argues inconsistently in a subsequent proceeding. *See SEC Enforcement Manual* §§ 3.3.3, 3.3.7 (Nov. 28, 2017) (available at https://www.sec.gov/divisions/enforce/enforcementmanual.pdf).

15. Following further negotiations, the SEC entered into a proffer agreement with Mr. Kwon and Terraform. The SEC staff, including myself, then interviewed Mr. Kwon by videoconference for approximately four and a half hours on July 8, 2021. Mr. Senderowitz and Mr. Henkin represented Mr. Kwon and Terraform during the interview. Among other things, Mr. Kwon was unable to provide specific information or failed to answer several questions on a variety of topic areas, including Terraform's relationship with a U.S.-based digital asset trading platform, its contacts with third parties regarding the sale of MIR tokens, the corporate structure of Terraform, whether Terraform owned any MIR tokens, and Terraform raising capital in connection with the Mirror Protocol.

16.     Two weeks later, on July 22, 2021, I, along with Ms. Hitchins, initiated a call with Mr. Henkin and Mr. Senderowitz, to discuss follow-up requests to Mr. Kwon's proffer interview. Among other things, I explained that the SEC proposed sending voluntary document requests to Terraform, and I inquired whether Terraform would agree to produce documents related to the Mirror Protocol. In response, Mr. Senderowitz stated that Terraform could not commit whether it would voluntarily produce documents until the SEC provided the document requests. Later that same day, I emailed the SEC's document requests to Mr. Henkin and Mr. Senderowitz. A copy of my July 22, 2021 email transmitting the document requests, along with the document requests, is attached as **Exhibit 3**. The document request included requests for documents regarding topics that Mr. Kwon did not provide specific information during the proffer session, such as the corporate structure of Terraform and its contacts with third parties regarding the sale of MIR tokens. The document request also asked for information concerning topics that Mr. Kwon did discuss during the proffer interview.

17.     On July 27, 2021, Ms. Hitchins and I had a telephone call with Mr. Henkin and Mr. Senderowitz regarding the SEC's document requests, including offering to modify the document requests based upon counsel's concerns. Mr. Senderowitz indicated that Terraform could produce certain documents, but had concerns regarding the proprietary nature of several of the document requests by the SEC.

18.     On July 28, 2021, Ms. Hitchins and I had a follow-up call with Mr. Henkin and Mr. Senderowitz to discuss the SEC's document requests. Mr. Henkin and Mr. Senderowitz stated that Terraform took issue with certain of the requests for various reasons, including how the requests were phrased and that several of the documents were allegedly available in the public domain. Ms. Hitchins and I responded to many of Mr. Henkin and Mr. Senderowitz's

comments, explaining what the document requests were seeking.  In addition, we requested that

Mr. Henkin and Mr. Senderowitz provide links to the documents Mr. Henkin and Mr.

Senderowitz said were in the public domain, but they never did so.  In an effort to allow the

parties to work cooperatively to resolve any disputes, on the same day, I emailed Mr. Henkin and

Mr. Senderowitz to request that they state their objections to the document requests in writing.  A

copy of my July 28, 2021 email to Mr. Henkin and Mr. Senderowitz is attached as **Exhibit 4**.

Mr. Senderowitz responded the following day that Terraform hoped to provide its written

objections within the following one or two days.  A copy of Mr. Senderowitz's July 29, 2021

email is attached as **Exhibit 5**.

19.     The following week, the SEC staff and Dentons continued to have

communications regarding the timing of Terraform providing a written description of

Terraform's objections to the document requests, but did not receive those objections.  On

Monday August 16, 2021, I emailed Mr. Henkin and Mr. Senderowitz to inquire about the status

of the responses to the voluntary document requests, because we had not received the objections.

A copy of my August 16, 2021 email is attached as **Exhibit 6**.

20.     The following day, on August 17, 2021, Mr. Senderowitz provided Terraform's

responses to our voluntary document requests, which included objections that certain document

requests were allegedly "unclear, overbroad, sought information not relevant to the

Commission's inquiry, sought production of publicly available data, or sought information

Terraform does not possess."  A copy Mr. Senderowitz's letter containing Terraform's response

to the SEC's voluntary document requests is attached as **Exhibit 7**.  Nonetheless, Mr.

Senderowitz concluded by stating that "Terraform desires to cooperate with the Commission on

a voluntary basis, to provide information reasonably related to the Commission's inquiry that

Terraform has in its possession and identify public sources to which it can direct the Commission's attention."

21.    In Mr. Senderowitz's August 17, 2021 letter, he also wrote "we indicated [on the July 28, 2021 call] that it is important for the Commission to advise us of (1) its intentions related to Terraform's status in the investigation, (2) its intentions relating to the Mirror Protocol, and whether (3) the Commission is seeking a specific goal with respect to the operation of the Mirror Protocol (so that Terraform can evaluate whether it might be able to assist the Commission in a cost-efficient and satisfactory resolution of the matter)."

22.    In response to Mr. Senderowitz's letter, a week later, on August 25, 2021, Ms. Hitchins and I initiated a telephone call with Mr. Henkin and Mr. Senderowitz to discuss Terraform's response to the SEC's document requests, including its request for information on the Commission's intentions.  Among other things, I explained that the SEC staff was investigating whether MIR tokens and mAssets were securities and had concerns these potential securities were being offered and sold in the United States in violation of the federal securities laws, and further pointed out Terraform's contacts with the United States.  For example, I explained that Terraform employees continued to promote the Mirror Protocol and its associated assets (the MIR tokens and mAssets) to investors located in the United States.  We offered Terraform the opportunity to respond to and address our concerns.

23.    On September 3, 2021, Ms. Hitchins and I had another telephone call with Mr. Henkin and Mr. Senderowitz.  During the call, Mr. Henkin explained that Terraform wished to cooperate with the SEC's investigation and that it could take limited steps to restrict the future sale of mAssets and MIR tokens in the United States if the SEC would agree not to bring an enforcement action against Terraform.  At the conclusion of the September 3, 2021 call, I again

inquired about the status of Terraform's production of documents, noting again that Terraform had still not produced any documents in response to the SEC's document request.

24. On September 15, 2021, Ms. Hitchins, my supervisor and I, had a follow-up telephone call with Mr. Henkin and Mr. Senderowitz. We informed counsel that our investigation was still ongoing, as we had done on prior occasions. We further discussed Terraform's response to the SEC's document requests.

25. On September 17, 2021, Mr. Henkin and Mr. Senderowitz called me and stated that Terraform wished to discuss how it could resolve the Mirror Protocol Investigation.

### III. The SEC's Service of Subpoenas upon Terraform and Mr. Kwon

26. On September 13, 2021, I learned that Mr. Kwon was scheduled to speak at the Mainnet conference, a digital asset conference held in New York, NY. I learned this information through Mr. Kwon's publicly available Twitter account. Do Kwon (@stablekwon), Twitter (September 9, 2021, 12:34 p.m.) ("I almost never go to crypto conferences, but when I do I speak @messaricrypto Mainnet. Come say hi.").

27. The conference was marketed on Mainnet's public website as a "gather[ing] [of] crypto leaders, operators, builders, and investors[.]" https://mainnet.events/ (last visited November 1, 2021). The conference's public website announced Mr. Kwon as a speaker in his capacity as the co-founder and CEO of Terraform and noted when and where he would speak.

28. My co-counsel, supervisor and I concluded that it was necessary and appropriate to serve subpoenas upon Terraform and Mr. Kwon while he was located in the United States conducting business on behalf of Terraform. To the best of my knowledge, after inquiry, Mr. Henkin and Mr. Senderowitz had not filed a notice of appearance pursuant to Rule 102.

29.     On September 17, 2021, pursuant to the Formal Order, I prepared subpoenas requesting documents from Terraform and testimony and documents from Mr. Kwon related to the Mirror Protocol, MIR tokens, and mAssets. The September 17, 2021 investigative subpoena to Terraform seeking documents is attached as **Exhibit 8** and required that Terraform produce documents by October 4, 2021. The September 17, 2021 investigative subpoena to Mr. Kwon seeking documents and testimony is attached as **Exhibit 9**. The subpoena addressed to Mr. Kwon required him to produce documents by October 4, 2021 and to testify on October 27, 2021. I also requested that the SEC's contracted process server, Cavalier Courier & Process Service, serve Mr. Kwon with both subpoenas.

30.     The subpoenas seek documents necessary for the Commission's investigation relating to the Mirror Protocol, including, among other things, documents concerning investors who purchased MIR tokens from Terraform; Terraform's presentations to investors in MIR tokens; Terraform's marketing and promotion of the Mirror Protocol, MIR tokens, and mAssets, including Terraform's and Kwon's communications with investors; Terraform's ability to control, effect or change the Mirror Protocol; Terraform's agreements with third parties regarding the sale or transfer of mAssets and MIR tokens, the corporate structure of Terraform, whether Terraform owns any MIR tokens, and whether Terraform has raised capital in connection with the Mirror Protocol. The documents sought through the subpoenas included documents that the SEC Staff had deemed necessary and initially sought through the July 22 voluntary document request for which Terraform produced no documents. In addition, the subpoenas sought documents on new areas of inquiry developed since our initial document requests to Terraform, and the subpoenas modified and clarified certain language that counsel for Mr. Kwon and Terraform took issue with previously. No other source could cover all the

documents requested in the subpoenas. Without the requested documents, the Commission lacks important information about the Mirror Protocol, mAssets, and the MIR tokens, the subject matters of the SEC's investigation, including whether mAssets and MIR tokens qualify as securities or security-based swaps under the federal securities law.

31.     The subpoena calling for Kwon's testimony was issued because the Commission staff determined that it was necessary to seek the sworn testimony of Respondent Kwon regarding, among other topics, Terraform's marketing and promotion of the Mirror Protocol, MIR tokens, and mAssets, including Terraform's and Kwon's communications with investors; Terraform's presentations to investors in MIR tokens; Terraform's relationship with a U.S.-based digital asset trading platform, its contacts with third parties regarding the sale of MIR tokens, the corporate structure of Terraform, whether Terraform owns any MIR tokens, and whether Terraform has raised capital in connection with the Mirror Protocol. In deciding to issue a subpoena for Kwon to testify, Commission staff determined that it was necessary to obtain his testimony of these subjects as Kwon was the CEO of Terraform.

32.     On September 20, 2021, Mr. Kwon was personally served with the September 17, 2021 subpoenas. A copy of the proofs of service is attached as **Exhibit 10 and 11**. I then emailed a copy of the September 17, 2021 subpoenas to Mr. Henkin and Mr. Senderowitz, explaining that both subpoenas were served earlier that day upon Mr. Kwon. A copy of my September 20, 2021 email to Mr. Henkin and Mr. Senderowitz is attached as **Exhibit 12.**

IV.     **Mr. Kwon's and Terraform's Refusal to Comply with the Subpoenas**

33.     On September 24, 2021, I followed up with Mr. Henkin and Mr. Senderowitz regarding the status of the subpoenas served upon Mr. Kwon. In response, Mr. Senderowitz requested a "copy of the order entered pursuant to Rule 150(b) of the Rules of Practice by the

13

Commission authorizing personal service of the subpoenas upon Mr. Kwon." A copy of the email exchange is attached as **Exhibit 13**.

34.     I emailed Mr. Senderowitz on September 28, 2021, and later that day over the phone, explained to Mr. Senderowitz that the subpoenas were properly served pursuant to Rule 150(d). During the September 28 conversation, Mr. Senderowitz stated that he believed there was an issue with service of the subpoenas and stated that they would provide more information within a week regarding whether Terraform and Mr. Kwon would comply with the subpoenas. A copy of the email exchange is also attached as **Exhibit 13**.

35.     On October 1, 2021, Mr. Henkin sent an email to Ms. Hitchins and me regarding the September 17, 2021 subpoenas. Mr. Henkin stated he had "not made a determination regarding our views of whether service [of the subpoenas] was valid." Nonetheless, Mr. Henkin requested that the return dates for the subpoenas be "temporarily suspend[ed]" so the parties could focus on a resolution of the SEC's investigation. A copy of Mr. Henkin's October 1, 2021 email is attached as **Exhibit 14**.

36.     On October 7, 2021, Ms. Hitchins and I spoke again by telephone to Mr. Henkin and Mr. Senderowitz. During the call, as part of discussions regarding a potential settlement that would be submitted to the Commission for approval, I offered to extend the return dates of the September 17, 2021 subpoenas, which required that Terraform and Mr. Kwon produce responsive documents by October 4, 2021 and that Mr. Kwon testify on October 27, 2021. Specifically, I offered to extend the date for the start of the production of documents responsive to the subpoenas from October 4, 2021 to October 29, 2021 and the end of document production to be completed by November 30, 2021. I also offered to delay Mr. Kwon's testimony from October 27, 2021 to December 15, 2021. Mr. Senderowitz did not accept our offer to extend the

dates and instead stated that he did not believe that service of the subpoenas was proper.  I reiterated that service was proper upon Mr. Kwon and that, even if they contended it was not, the SEC also sent the subpoenas to Mr. Henkin and Mr. Senderowitz.  Mr. Senderowitz responded that even if I served counsel properly, that could not effect jurisdiction over Mr. Kwon and Terraform.  I responded that we were amenable to allowing Terraform to focus on the settlement discussions, requesting that Terraform and Mr. Kwon state whether they were willing to continue to negotiate settlement by October 22, 2021.  Mr. Henkin indicated that they could respond by or before October 22.  I then emailed Mr. Henkin and Mr. Senderowitz to confirm the SEC was willing to extend the return dates of the subpoenas as discussed by telephone earlier in the day.  A copy of my October 7, 2021 email is attached as **Exhibit 15.**

37.     On October 19, 2021, I followed up with Mr. Henkin and Mr. Senderowitz by email in regards to the settlement negotiations, but received no reply.  A copy of my October 19, 2021 email is attached as **Exhibit 16.**

38.     On the evening of October 22, 2021, I received an email from Mr. Senderowitz attaching a complaint against the SEC in relation to the subpoenas served on Mr. Kwon and Terraform.  A copy of Mr. Senderowitz's email is attached as **Exhibit 17.**

39.     On November 1, 2021, I emailed Mr. Henkin and Mr. Senderowitz to inquire whether Terraform and Mr. Kwon intended to comply with the September 17, 2021 subpoenas.  I pointed out that Terraform and Mr. Kwon had failed to produce any documents to the SEC by October 29, 2021, the extended return date offered by the SEC for documents responsive to the subpoenas.  I requested that Mr. Henkin and Mr. Senderowitz indicate whether Terraform and Mr. Kwon intended to comply with the documents subpoenas and whether Mr. Kwon accepted our offer to reschedule his testimony for December 15, 2021.  I further stated that the

15

Commission may seek appropriate remedies if Terraform and Mr. Kwon continued to not comply with the subpoenas.  Mr. Henkin responded to my inquiry on November 4, 2021, stating by email that the subpoenas were not "validly issued."  A copy of the email exchange is attached as **Exhibit 18**.

40.     Neither Terraform nor Mr. Kwon have produced a single document responsive to the September 17, 2021 subpoenas nor the July 22, 2021 document request and Mr. Kwon has not provided testimony pursuant to the subpoena.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.


 November 12, 2021

Roger J. Landsman

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                              Applicant,

                    -v-

TERRAFORM LABS PTE Ltd. and
DO KWON,

                              Respondents.

21-MC-810 (JPO)

ORDER

J. PAUL OETKEN, District Judge:

On February 17, 2022, this Court granted the SEC's application for an order requiring

compliance with investigative subpoenas served on Respondents Terraform and its chief

executive officer, Do Kwon. The Court stayed its order for 14 days, to March 3, 2022.

Respondents have requested a stay pending appeal, which the SEC opposes. (*See* Dkt. Nos. 31-

34.)

In determining whether to grant a stay pending appeal, courts consider (1) likelihood of

success on the merits, (2) irreparable injury absent a stay, (3) substantial prejudice to the other

parties interested in the proceeding, and (4) the public interest. *In re World Trade Center

Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007). Upon consideration of these factors, the

Court concludes that Respondents have not met their burden of showing that a further stay is

warranted. First, for the reasons explained in its oral ruling (Dkt. No. 35), the Court does not

believe that Respondents are likely to prevail on the merits of an appeal. Second, the Court is

not persuaded that Respondents will be irreparably injured absent a stay, for substantially the

reasons set forth in the SEC's letter brief. (Dkt. No. 33.) Finally, an extended delay of

enforcement of the subpoenas risks impeding the SEC's Mirror Protocol investigation and the associated public interest in the Commission's enforcement functions.

Accordingly, Respondents' request for a further stay pending appeal (Dkt. No. 31) is denied.

SO ORDERED.

Dated: March 1, 2022
      New York, New York

                                      J. PAUL OETKEN
                             United States District Judge

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Applicant, | No. 21-mc-00810 (JPO) |
| v. | |
| TERRAFORM LABS PTE, Ltd. and DO KWON, | |
| Respondents. | |

**SECOND DECLARATION OF ROGER J. LANDSMAN IN SUPPORT OF U.S. SECURITIES AND EXCHANGE COMMISSION'S APPLICATION FOR AN ORDER REQUIRING COMPLIANCE WITH SUBPOENAS**

I, Roger J. Landsman, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1.      I am employed by the United States Securities and Exchange Commission ("SEC" or "Commission") as an attorney in the Division of Enforcement at the SEC's headquarters in Washington, DC.  I am admitted to the Bars of New York and the District of Columbia.

2.      I submit this Declaration in support of the Commission's Reply in Support of Application for an Order Requiring Compliance with Subpoenas directing Respondents Do Kwon and Terraform Labs PTE Ltd. ("Terraform") to comply with investigative subpoenas served upon Mr. Kwon and Terraform in connection with the Commission's non-public investigation entitled *In the Matter of Mirror Protocol* (Internal File No. HO-14164) (the "Mirror Protocol Investigation").  This Declaration is based upon my direct participation in the Mirror Protocol Investigation.

1

3.      The staff has obtained evidence of an agreement entitled "SAFT (Simple

Agreement for Farmed Tokens)" signed and executed by Do Kwon in his capacity as CEO of a

Terraform wholly owned subsidiary, and a U.S. based digital asset trading platform.  In exchange

for the digital asset trading platform paying $200,000, it would receive MIR tokens based on a

pre-defined formula set out in Schedule 1 of the SAFT.  The agreement refers to this as the

"Token Sale."  This evidence can be found on a document with the Bates range ending 0001 to

0010.

4.      The staff has obtained evidence of an agreement entitled "Trust Company

Custodial Services Agreement" signed and executed by Chang Joon Han, Terraform's Head of

Finance and a U.S. based subsidiary of the U.S. based digital asset trading platform ("Trust

Company").  The agreement is for the Trust Company to store certain digital assets on

Terraform's behalf in exchange for a fee.  This evidence can be found on a document with the

Bates range ending 0031 to 0054.

5.      The staff obtained evidence of an email from a Terraform employee to the U.S.

based digital asset trading platform and U.S. based outside representatives of the trading

platform, indicating that about 15% of users of the Mirror Protocol come from the U.S.  This

email copies Terraform's U.S. based head of Business Development as well as at least one U.S.

based employee for the digital asset trading platform.  This evidence can be found on a document

with the Bates range ending 0732 to 0733.

6.      Terraform's U.S.-based Director of Special Projects provided a presentation to the

"Defi Summit" (https://www.defisummit.com/) in June 2021 that included an extensive

discussion of Terraform's Mirror Protocol.  Among other things, Terraform's Director of Special

Projects discussed that the Mirror Protocol is Terraform's "answer for investments; it's powered

by synthetic assets." *See* DCentral Con, *Introducing the Terra Luna DeFi Ecosystem w/ SJ Park - DeFi Conference Day 2*, YouTube (June 29, 2021), https://www.youtube.com/watch?v=cU0Rv5jCjy0 (at 4:20). He specifically addressed the "mApple" synthetic asset, an asset designed by the Mirror Protocol to mimic the price of the equity securities of U.S.-based company, Apple, Inc. *Id*. at 5:25. Terraform's Director of Special Projects also discussed how Terraform uses the Mirror Protocol to "target everyday users with a Robinhood-like interface" and allows "entry into major asset classes of U.S. markets[.]" *Id*. at 6:05.

7. Terraform's Business Development lead and its Head of Communications participated in an interview that publicized and explained the Mirror Protocol, noting that Terraform has "a team of [approximately] 40 people working full-time across Asia / US." The article explains that "Mirror is a synthetic assets protocol" and that Terraform plans to expand Mirror "beyond SE Asia and the typical US market." Terraform Labs (LUNA) — Telegram AMA — March 15, *Medium* (April 18, 2021), https://medium.com/gains-associates/terraform-labs-luna-telegram-ama-march-15-7fbbcbd4f1f2.


I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.


December 27, 2021

*Roger J. Landsman*

Roger J. Landsman