# No. 22-368-cv

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION,

*Petitioner-Appellee,*

v.

TERRAFORM LABS PTE, Ltd. and DO KWON,

*Respondents-Appellants.*

*On Appeal from an Order of the
United States District Court for the Southern District of New York
No.: 1:21-mc-00810-JPO*

**BRIEF OF APPELLEE SECURITIES AND EXCHANGE COMMISSION**

TRACEY L. SASSER
Associate General Counsel

SAMUEL M. FORSTEIN
Assistant General Counsel

ERIC A. REICHER
Special Trial Counsel

Office of the General Counsel
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-9612
(202) 551-7921 (Reicher)
reichere@sec.gov

# **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................1

COUNTERSTATEMENT OF JURISDICTION ....................................3

COUNTERSTATEMENT OF THE ISSUES PRESENTED..................3

COUNTERSTATEMENT OF THE CASE...........................................4

   A. Terraform's Creation and Maintenance of the Mirror Protocol.....................4

   B. Terraform's and Kwon's Contacts with the United States.............................6

   C. The Enforcement Investigation ..................................................10

ARGUMENT SUMMARY ..................................................................14

STANDARD OF REVIEW ..................................................................17

ARGUMENT ........................................................................................17

I.   Court Review of Administrative Subpoenas Is Limited. ...................17

II.   Enforcement Effectively Served Terraform and Kwon. ...................17

   A. Service was proper under the Commission's Rules. .....................17

   B. Appellants misinterpret the Commission's Rules. ........................21

   C. Appellants' interpretation is illogical and would turn common practice on its head..................................................................................23

   D. Alternatively, service was proper under Rule 150(b) and (c). .......................26

   E. Appellants' various other arguments regarding service are without merit....27

     1.   Appellants are not being punished for their (limited) voluntary cooperation. .......................................................................................27

     2.   The Commission does not require counsel to accept service to represent a client in an investigation.......................................................................28

     3.   This case presents no Constitutional concerns, nor has the Commission exceeded its authority. ........................................................................29

     4.   The Commission is not trying to amend its rules, nor does its interpretation contradict earlier interpretations.....................................................30

III. There is jurisdiction over Terraform and Kwon.................................31

i

A.   This Court has jurisdiction over Kwon because he was served in New York. ...
. ..................................................................................................31

B.   The Court has specific jurisdiction over Kwon and Terraform. ....................32

C.   Appellants' jurisdictional arguments disregard their extensive contacts with
the United States, and misrepresent the Commission's arguments and the district
court's ruling. ..................................................................................39

D.   The district court did not err in considering the Nationals sponsorship. .......42

CONCLUSION ..........................................................................................44

CERTIFICATE OF COMPLIANCE .........................................................45

CERTIFICATE OF SERVICE .............................................................46

# TABLE OF AUTHORITIES

**CASES**

*23-34 94th St. Grocery Corp. v. New York City Bd. of Health*,
 685 F.3d 174 (2d Cir. 2012).................................................................13
*Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972 (9th Cir. 2021) ...............................36
*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) ......................35
*Blundell v. Cty. of Los Angeles*, 2009 WL 2486522 (C.D. Ca. Aug. 12, 2009)......24
*Chew v. Dietrich*, 143 F.3d 24 (2d Cir. 1998) .........................................................32
*Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010) ..............44
*Colby v. Town of Henniker*, 2001 WL 274780 (D.N.H. Feb. 15, 2001) ................24
*Digital Realty Trust Inc. v. Somers*, 138 S. Ct. 767 (2018)....................................22
*Doe v. SEC*, __ F.4th __, 2022 WL 880243 (D.C. Cir. Mar. 25, 2022) .................25
*Eades v. Kennedy, PC Law Offices*, 799 F.3d 161 (2d Cir. 2015) ..........................34
*EMI Christian Music Group, Inc. v. MP3tunes, LLC*,
 844 F.3d 79 (2d Cir. 2016)..............................................................................34
*Fed. Home Loan Mortgage Corp. v. Steinfeld*,
 1992 WL 428852 (E.D.N.Y. Dec. 30, 1992).................................................24
*First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16 (2d Cir. 1998) ................28
*Force v. Facebook*, 934 F.3d 53, 59 n. 5 (2d Cir. 2019) .......................................13
*FTC v. Compagnie De Saint-Gobain-Pont-a-Mousson*,
 636 F.2d 1300 (D.C. Cir. 1980) ....................................................................30
*Goldfarb v. Channel One Russia*, 442 F. Supp. 3d 649 (S.D.N.Y. 2020)...............37
*Harrington Glob. Opportunity Fund. Ltd. v. CIBC World Mkts. Corp.*,
 __ F. Supp.3d __, 2022 WL 409089 (S.D.N.Y. Feb. 9, 2022) ...........................39
*In re China-Biotics, Inc.*, Exchange Act Release No. 70800,
 2013 WL 5883342 (Nov. 4, 2013).................................................................22
*In re Edelman*, 295 F.3d 171 (2d Cir. 2002)..........................................................31
*In re Ferrer & Ortiz*, Exchange Act Release No. 706,
 2012 WL 8704497 (June 13, 2012) ...............................................................21
*In re Grand Jury Subpoenas Issued to Thirteen Corps.*,
 775 F.2d 43 (2d Cir. 1985)..............................................................................19
*Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556 (2d Cir. 1991)......32
*Kisor v. Wilkie*, 139 S. Ct. 2400, 204 L.Ed.2d 841 (2019)....................................25
*L-Tec Elecs. Corp. Elec. Org.*, Inc., 198 F.3d 85 (2d Cir. 1999) ..........................42
*M. Shanken Commc'ns, Inc. v. Cigar500.com*,
 2008 WL 2696168 (S.D.N.Y. July 7, 2008)..................................................38
*Mantello v. Hall*, 947 F. Supp. 92 (S.D.N.Y 1996) ......................................... 41, 42
*Marc Rich & Co., A.G. v. U.S.*, 707 F.2d 663 (2d Cir. 1983)................................31

*McLane Co. v. EEOC*, 137 S. Ct. 1159 (2017).........................................17

*Mirlis v. Greer*, 952 F.3d 51 (2d Cir. 2020) ........................................13

*Myers v. Casino Queen, Inc.*, 689 F.3d 904 (8th Cir. 2012) ........................37

*Owen v. Elastos Foundation*, 2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) ...........35

*PETA v. USDA*, 861 F.3d 502 (4th Cir. 2017)........................................30

*Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361 (3d Cir. 2002)........................ 36, 39

*Ratledge v. Norfolk Southern Ry. Co.*, 958 F. Supp. 2d 827 (E.D. Tenn. 2013).....37

*Reddy v. Buttar*, 2020 WL 2134191 (W.D.N.C. May 5, 2020)..............................24

*RNR Enterprises Inc. v. SEC*, 122 F.3d 93 (2d Cir. 1997) ........................17

*Robbins v. Ring*, 166 N.Y.S.2d 483 (Sup. Ct. 1957) ................................40

*SEC v. Alpine Sec. Corp.*, 982 F.3d 68 (2d Cir. 2020) ........................25

*SEC v. Carrillo*, 115 F.3d 1540 (11th Cir. 1997)....................................36

*SEC v. Lines Overseas Mgmt., Ltd.*, 2005 WL 3579139 (D.D.C. Jan. 4, 2006) .....31

*SEC v. O'Brien*, 842 Fed. Appx. 652 (2d Cir. 2021)................................11

*SEC v. PlexCorps*, 2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018)................... 36, 39

*Staples v. Guardian Auto Glass, LLC*,
   2012 WL 2192235 (E.D. Va. June 14, 2012) ..........................24

*Thornapple Assoc., Inc. v. Sahagen*,
   2007 WL 747861 (S.D.N.Y. March 12, 2007) ........................24

*U.S. Bank Nat'l Assoc. v. Bank of Am., N.A.*, 916 F.3d 143 (2d Cir. 2019)...........32

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.*,
   241 F.3d 135 (2d Cir. 2001)...............................38

*U.S. v. Construction Prod. Research, Inc.*, 73 F.3d 464 (2d Cir. 1996)..................3

*U.S. v. Venturella*, 391 F.3d 120 (2d Cir. 2004)....................................23

*uBid, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421 (7th Cir. 2010)......................37

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000)........................41

## STATUTES AND RULES

15 U.S.C. § 77e ........................................................10

15 U.S.C. § 78(f)(l)....................................................10

15 U.S.C. § 78aa.......................................................32

15 U.S.C. § 78o(a)....................................................10

15 U.S.C. § 80a-7.....................................................10

15 U.S.C. §77v(b)......................................................3

15 U.S.C. §78u(c)......................................................3

17 C.F.R. § 201.102(d) ..................................... passim

17 C.F.R. § 201.150(b) ..................................... passim

17 C.F.R. § 201.150(c) ............................ 4, 15, 20, 26

17 C.F.R. § 201.150(d) ..................................... passim

17 C.F.R. § 201.230(g) ...................................... 21, 22

iv

17 C.F.R. § 201.232(c)................................................................ 17, 21
17 C.F.R. § 203.8 ...................................................................... 17, 18
28 U.S.C. §1291 .............................................................................3
Fed. R. Civ. Pro. 5(b) ..................................................................25

**OTHER AUTHORITIES**

Amendment to the Commission's Rules of Practice,
 85 Fed. Reg. 86464 (Dec. 30, 2020) ............................................ 20, 25
Do Kwon Explains Synthetic Equities Trading on Blockchain (July 16, 2021)
 Bloomberg News (https://www.bloomberg.com/news/articles/2021-07-16/do-
 kwon-explains-synthetic-equities-trading-on-blockchain)....................................7
*Fake Tesla, Apple Stocks Have Started Trading on Blockchains* (July 6, 2021)
 Bloomberg News (https://www.bloomberg.com/news/articles/2021-07-06/fake-
 tesla-apple-stocks-have-started-trading-on-blockchains).......................................6
https://agora.terra.money/t/community-funding-proposal-for-redacted-sports-
 partnership/3962 ............................................................... 9, 43
https://curlyw.mlblogs.com/nationals-terra-create-first-ever-sports-partnership-
 with-decentralized-autonomous-organization-20843cc704d3 .............................34
https://mirrorprotocol.app/#/trade .........................................................34
https://terra.breezy.hr/ .......................................................................7
https://www.linkedin.com/in/caydenbernstein ...........................................7
https://www.linkedin.com/in/chrisamani...................................................7
https://www.linkedin.com/in/florio ........................................................7
https://www.linkedin.com/in/noahaxler....................................................7
https://www.linkedin.com/search/results/people/?facetCurrentCompany=%5B1437
 6215%5D&sid=jS8...........................................................................7
https://www.sec.gov/efapdocs/instructions.pdf ..........................................25
https://www.youtube.com/watch?v=_HzhZ6PLkAs ...................................12
https://www.youtube.com/watch?v=bmjT3gKmtAs ...................................12
https://www.youtube.com/watch?v=vKpKsoHGVow ...............................12
*Our mission is to bring decentralized monies to as many blockchains as possible:*
 *Terraform Labs CEO* (July 12, 2021) Yahoo! News
 (https://news.yahoo.com/mission-bring-decentralized-monies-many-
 171201969.html)...........................................................................6
Proposed Rules of Securities and Exchange Commission,
 58 Fed. Reg. 61732-01 (Nov. 22, 1993).............................................25
*Rest. (Third) Law Governing Lawyers* § 99 comment g .........................24
Rules of Practice, 60 Fed. Reg. 32,738 (June 23, 1995)................... 24, 25

v

Terraform Labs (LUNA) – Telegram AMA – March 15; *Medium* (April 19, 2021)
https://medium.com/gains-associates/terraform-labs-luna-telegram-ama-march-
15-7fbbcbd4f1f2 ................................................................................................8

# INTRODUCTION

Through a process server, the Division of Enforcement ("Enforcement") of the Securities and Exchange Commission ("Commission" or "SEC") served Do Kwon, CEO of Terraform Labs Pte, Ltd. ("Terraform"), with two subpoenas (one to him, one to the company) shortly before he spoke at a digital asset conference in New York. That same day, Enforcement also emailed the subpoenas to counsel for Kwon and Terraform (collectively, "Appellants"). The subpoenas were served as part of an Enforcement investigation into whether the Mirror Protocol, and Terraform's involvement with the Mirror Protocol, violate registration and other requirements of the federal securities laws. The Mirror Protocol was created by Terraform, runs on the Terraform blockchain, and allows U.S. investors to trade in "Mirrored Assets." Terraform's "Mirrored Assets" mimic the price of assets listed on United States securities exchanges, such as equity securities (like Apple, Inc.) and exchange traded funds ("ETF"). The Mirror Protocol also issues Mirrored Tokens ("MIR tokens"), a digital asset that serves as its "governance token" and trades on secondary markets in the U.S.

Kwon and Terraform seek review of a district court order directing them to comply with the subpoenas, which require production of documents and Kwon's testimony. Remarkably, they contend not only that Commission Rule of Practice 150(b) [17 C.F.R. § 201.150(b)] did not allow hand-service on Kwon because

1

Enforcement was only permitted to serve their counsel, but also that service on their counsel was invalid because their counsel declined to accept it. A plain reading of the text of the Commission's Rules of Practice (and reasonable and normal litigation practice) mandates that a party cannot have counsel appear in a capacity that precludes direct service on the party, while counsel simultaneously declines to accept service.

Rule 150(b)'s requirement to serve counsel attaches not to all persons represented by counsel, but only "upon a person represented by counsel who has filed a notice of appearance pursuant to § 201.102," which in turn requires counsel to accept service. 17 C.F.R. § 201.102(d) ("Designation of address for service"). Appellants' counsel neither filed a notice of appearance nor agreed to accept service. Therefore, Rule 150(b) did not apply, and service on Kwon was valid under Rule 150(d)(1) (permitting hand-service).

Appellants further contend they are not subject to personal jurisdiction. Kwon is subject to jurisdiction because he was served in New York. And Terraform and Kwon each had extensive contacts with the United States— including among other things (1) substantial efforts to market and promote the Mirror Protocol to U.S. consumers via Terraform's website, social media, and through U.S. media; (2) having a significant number of U.S. users; (3) multiple contracts with U.S. entities for the sale and listing of the MIR tokens created by the

Mirror Protocol and storage of digital assets; and (4) multiple employees in the U.S. working on the Mirror Protocol—that establish jurisdiction.

The district court properly enforced the subpoenas issued to Terraform and Kwon, and this Court should affirm.

## COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction to hear the Commission's subpoena enforcement application pursuant to 15 U.S.C. §77v(b) and 15 U.S.C. §78u(c). This Court has jurisdiction over Appellants' appeal pursuant to 28 U.S.C. §1291. *See also U.S. v. Construction Prod. Research, Inc.*, 73 F.3d 464, 469 (2d Cir. 1996) ("A district court order enforcing a subpoena issued by a government agency in connection with an administrative investigation may be appealed immediately without first performing the ritual of obtaining a contempt order.").

## COUNTERSTATEMENT OF THE ISSUES PRESENTED

1. Did the district court correctly conclude that the Commission's Rules of Practice permit subpoenas to be hand-served to a subpoenaed party when that party's counsel is unwilling to accept service, particularly given that Rule 150(d) permits hand-service and counsel had not "filed a notice of appearance" as required by Rule 150(b) or agreed to accept service pursuant to Rule 102(d)? Alternatively, if Enforcement were required to serve counsel, was emailing the

subpoenas to counsel effective service given that Rule 150(c) provides for electronic service?

2.     Did the district court correctly exercise personal jurisdiction over Kwon and Terraform, given that Kwon was served in New York and Terraform's and Kwon's extensive contacts with the United States related to the Mirror Protocol?

## COUNTERSTATEMENT OF THE CASE

### A. Terraform's Creation and Maintenance of the Mirror Protocol

Terraform is a Singapore-incorporated computer programming digital asset company that launched the Mirror Protocol in December 2020 and maintains and updates it.  A59, ¶6 and A61, ¶10.[1]  The Mirror Protocol is a series of computer code written on a blockchain[2] created by Terraform through which users create digital assets,[3] called Mirrored Assets or "mAssets," that are intended to mimic or

---

[1] A## refers to Appellants' Appendix.

[2] A blockchain is a type of distributed ledger or peer-to-peer database that is spread across a computer network and records all transactions in network in theoretically unchangeable, digitally recorded data packages called "blocks."  Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks form a chain.  The system relies on cryptographic techniques for securely recording transactions, and can be shared and accessed by anyone with appropriate permission.  A59, ¶6 n.2.

[3] The term "digital assets" or "digital token" generally refers to an asset issued and/or transferred using a distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," digital "coins," and digital "tokens."  A59, ¶6 n.3.

4

"mirror" the price of securities (such as equity securities, like Apple, Inc., or an ETF, such as SPDR S&P 500) traded on U.S. exchanges.  A59, ¶6.  The mAssets are created or "minted" when sufficient collateral is deposited in a so-called "smart contract," a computer program designed to execute the terms of a contract when certain triggering conditions are met.  A60, ¶7.  After mAssets have been minted, they may be traded by investors, including investors in the United States, through Terraform's website and web application.  *Id.*  The total value of mAssets outstanding under the Mirror Protocol as of November 8, 2021 was more than $437 million.  *Id.*

The Mirror Protocol allows users to obtain Mirror Tokens or "MIR tokens," another type of digital asset that Terraform describes as the Mirror Protocol's "governance token."  A60, ¶8.  MIR tokens receive value based upon, among other things, fees generated under the Mirror Protocol.  *Id.*  Investors may acquire MIR tokens through several means, including by contract with Terraform and by purchasing tokens in the secondary trading market via various digital asset trading platforms, including a prominent U.S.-based trading platform with which Terraform entered into a contract to have MIR tokens listed.  *Id.*  As of November 8, 2021, there were approximately 120 million MIR tokens in circulation, with a market capitalization of approximately $407 million.  *Id.*

5

**B. Terraform's and Kwon's Contacts with the United States**

Both mAssets and MIR tokens are offered and available for purchase by U.S. investors through Terraform's web application and various digital asset trading platforms. A60-61, ¶9. U.S. investors have purchased mAssets and MIR tokens, and approximately 15 percent of the users of the Mirror Protocol are from the United States. SA2, ¶5.[4] Terraform and Kwon promote the Mirror Protocol, mAssets, and the MIR tokens through, among other means, Terraform's website, web application, social media accounts, podcast interviews, and U.S. media. A61, ¶9 (citing *Our mission is to bring decentralized monies to as many blockchains as possible: Terraform Labs CEO* (July 12, 2021) Yahoo! News (https://news.yahoo.com/mission-bring-decentralized-monies-many-171201969.html) (quoting Kwon: "So we have things like Mirror protocol, which creates synthetic assets that track the price of real-world assets . . . So this would be, for example, mirrored Tesla, or mirrored Apple," referring to the equity securities of U.S.-based companies Tesla, Inc. and Apple, Inc.); and *Fake Tesla, Apple Stocks Have Started Trading on Blockchains* (July 6, 2021) Bloomberg News (https://www.bloomberg.com/news/articles/2021-07-06/fake-tesla-apple-stocks-have-started-trading-on-blockchains) (Kwon explaining that, although

---

[4] SA## refers to the Commission's Supplemental Appendix.

6

Terraform does not directly earn fees from the Mirror Protocol, it profits because use of the Mirror Protocol increases the value of Terraform's cryptocurrency).[5]

Terraform has several employees based in the United States, including its General Counsel, its Business Development Lead, its Head of Research, and its Director of Special Products. A58-59, ¶4.[6]  These employees directly work on the Mirror Protocol, MIR tokens, and mAssets, the focus of the Commission's investigation.  For example, Terraform's New York-based Director of Special Products gave an extensive presentation to a "Defi[7] Summit" in June 2021

---

[5] *See also e.g.,* Do Kwon Explains Synthetic Equities Trading on Blockchain (July 16, 2021) Bloomberg News  (https://www.bloomberg.com/news/articles/2021-07-16/do-kwon-explains-synthetic-equities-trading-on-blockchain) (Kwon appearing for about 35 minutes on a podcast hosted by a New York-based Bloomberg editor and discussing Mirrored Assets and the Mirror Protocol at length and, at 30:55-21:33, discussing his frequent interviews and podcast appearances as a way to promote the Mirror Protocol).

[6] In fact, Terraform's U.S. presence is growing extensively; it has hired numerous additional U.S. employees, and is actively hiring in the United States.  *See* https://www.linkedin.com/search/results/people/?facetCurrentCompany=%5B14376215%5D&sid=jS8 (accessible when logged in to LinkedIn, and showing more than twenty U.S.-based employees); *see also, e.g.,* https://www.linkedin.com/in/caydenbernstein (VP, People); https://www.linkedin.com/in/noahaxler (Chief Litigation and Regulatory Counsel); https://www.linkedin.com/in/florio (Chief Corporate Counsel); https://www.linkedin.com/in/chrisamani (Head of Operations); https://terra.breezy.hr/ (listing three Terraform U.S. job openings and a number of worldwide openings that could be filled by U.S. residents.  (All links to websites in this brief were last viewed March 27, 2022.)

[7] Defi refers to decentralized finance.

7

regarding the Mirror Protocol, including the "mApple" synthetic asset designed to mimic the price of equity securities in U.S-based, Apple, Inc., and how Terraform uses the Mirror Protocol to "target everyday users with a Robinhood-like interface" that allows "entry into major asset classes of U.S. markets[.]"  SA2-3, ¶6. Terraform's Texas-based Business Development Lead and its Head of Communications similarly participated in a joint interview on Medium (a U.S.-based online publishing platform) that publicized and explained the Mirror Protocol, which these Terraform employees referred to as one of "Terra's flagship applications," and boasted about the "creat[ion] [of] a FAANG[8] index of mAssets granting a basket of exposure to major US tech equities."  SA3, ¶7 (citing Terraform Labs (LUNA) – Telegram AMA – March 15; *Medium* (April 19, 2021) https://medium.com/gains-associates/terraform-labs-luna-telegram-ama-march-15-7fbbcbd4f1f2).

Kwon and Terraform also have extensive contractual relationships with U.S. entities and individuals.  For example, after direct involvement by Kwon in the discussions, Terraform and a U.S.-based digital trading platform entered into a contract through which the platform lists MIR tokens for trading, including to U.S. investors.  A58-59, ¶4, A61, ¶9.  Kwon, in his capacity as CEO of a Terraform

---

[8] FAANG refers to Facebook, Amazon, Apple, Netflix, and Google – all major U.S. based companies listed on U.S. based exchanges.

wholly owned subsidiary, entered into an agreement with a U.S.-based digital asset

trading platform under which the U.S.-based platform paid the Terraform

subsidiary at least $200,000 for MIR tokens. SA2, ¶3. Terraform also entered into

a 2019 Custodial Services Agreement with a U.S. entity whereby Terraform agreed

to pay the U.S. entity to store digital assets on Terraform's behalf. SA2, ¶4.

Kwon also announced a five-year, nearly $40 million contract by which

Terraform will become one of the main sponsors of the Washington Nationals

baseball team with advertisements around the stadium, including right behind

home plate. A210 at 32:3-6. Kwon stated that the agreement would "introduce the

Terra brand and provide exposure of our ethos to a diverse and expansive group of

people" (almost all of them in the United States) and highlighted the "potential

future collaborations with the franchise" and that Terraform would "continue to

work to expand this partnership into new areas beneficial to the Terra community

under an exclusive negotiating window with the franchise."[9]

Neither Terraform nor the mAssets nor MIR tokens are registered with the

Commission in any way. A61, ¶11. For example, Terraform has not registered

any offering of securities pursuant to the Securities Act of 1933 ("Securities Act"),

---

[9] *See* https://agora.terra.money/t/community-funding-proposal-for-redacted-sports-partnership/3962 (Kwon extolling the benefits of the agreement and seeking support for entry into the agreement from the Terraform community); *see also* Br. 32 (citing to a different article quoting Kwon about the agreement).

nor has it registered the mAssets or MIR tokens as a class of securities under the Securities Exchange Act of 1934 ("Exchange Act"). *Id.*

### C. The Enforcement Investigation

On May 7, 2021, the Commission issued a formal order of investigation authorizing Enforcement to investigate whether any person or entity (including Kwon and/or Terraform) violated various provisions of the federal securities laws in connection with the Mirror Protocol or the creation, promotion, and offer to sell mAssets and MIR tokens to U.S. investors, including Section 5 of the Securities Act [15 U.S.C. § 77e], prohibiting the unregistered offer or sale of securities; Section 6(l) of the Exchange Act [15 U.S.C. § 78(f)(l)], prohibiting any person from effecting transactions in a security-based swap with or for a person who is not an eligible contract participant unless such transaction is effected on a national securities exchange; Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], prohibiting acting as an unregistered broker or dealer; and Section 7(a) of the Investment Company Act of 1940 [15 U.S.C. § 80a-7], prohibiting securities transactions by unregistered investment companies, in connection with Terraform's creation of the Mirror Protocol and its participation in the creation, promotion, and offer to sell mAssets and MIR tokens to U.S. investors. A58, ¶3 and A62, ¶12.

During the course of its investigation, Enforcement decided to seek information and documents from Terraform and Kwon regarding, among other

10

things: investors who purchased MIR tokens from Terraform; Terraform's

marketing and promotion of the Mirror Protocol, MIR tokens, and mAssets

(including Terraform's and Kwon's communications with investors); Terraform's

ability to control, effect or change the Mirror Protocol; and Terraform's

agreements with third-parties regarding the sale or transfer of mAssets and MIR

tokens.  A69, ¶31.  Contrary to Appellants' assertion, Br. 4, the vast majority of

documents sought are not publicly available.  *See, e.g.,* SA12-14 and SA25-27

(document subpoenas requesting, among other things, agreements between

Terraform and third-parties, communications and presentations with investors, and

internal communications concerning the Mirror Protocol).

On July 22, 2021, Enforcement sought a voluntary production of documents

from Kwon and Terraform.  A64, ¶16.[10]  On July 27, 2021, their counsel at

Dentons LLP ("Dentons") indicated Appellants would produce certain documents,

but had concerns about some of the requests.  A64, ¶17.  From late July through

the first half of September, Enforcement and Dentons had numerous written and

---

[10]  On July 8, 2021, Kwon appeared for an interview with Enforcement, but he was unable or unwilling to provide specific information on numerous topics central to the Mirror Protocol Investigation.  A63, ¶15.  Kwon attempts to ascribe significance to that interview, Br. 9, about which the parties may disagree, but in any event that interview did not limit Enforcement's ability to subpoena Kwon's sworn testimony or seek documents.  *See SEC v. O'Brien*, 842 Fed. Appx. 652 (2d Cir. 2021) (summary order) (proffer interview does not preclude subsequent subpoena).  Many of the documents requested by the subpoenas relate to topics Kwon refused to address during the interview.  A64, ¶16.

11

oral communications regarding the potential voluntary production of documents. A64-67, ¶¶17-24. Despite all the back and forth, Appellants never produced *any* documents. A72, ¶40.

Because Terraform and Kwon failed to produce the relevant documents voluntarily, Enforcement issued subpoenas to Kwon (for documents and testimony) and to Terraform (for documents) (collectively, "Subpoenas"). A67, ¶28. On September 20, 2021, Kwon was personally hand-served with the Subpoenas in New York City by a process server. A69, ¶32. Enforcement also emailed the Subpoenas to Appellants' counsel that same day. *Id.*

Kwon had traveled to New York to conduct Terraform business (including promoting the Mirror Protocol) by speaking at a digital asset and blockchain conference. A67, ¶¶26-27. Kwon had a total of four speaking engagements, two at the conference[11] and two at an event the evening of the conference. *See* https://www.youtube.com/watch?v=_HzhZ6PLkAs (at 56:34-54 stating that the Mirror Protocol enables Terraform's stablecoins to be the "easiest conduit to invest

---

[11] Kwon spoke on a panel at the conference. *See* https://www.youtube.com/watch?v=bmjT3gKmtAs (at 9:50-10:02, Kwon discussing how Terraform created a "synthetics platform called Mirror whereby you can use stablecoins to invest in any asset class in the world be it from equities to commodities to ETFs."). Kwon also gave a 20-minute solo presentation. https://www.youtube.com/watch?v=vKpKsoHGVow (at 9:20-51, explaining how Mirror supports use of Terraform's stablecoin by "offer[ing] an easy gateway by which people can either spend their money or to use it to invest").

in any asset class in the world and we've enabled hundreds of thousands of people

to achieve their dream of investing in an asset class that will do well.").[12]

After discussions with Dentons, it became clear that neither Terraform nor

Kwon intended to comply with the Subpoenas. A69-71, ¶¶33-39. On November

12, 2021, the Commission applied for a district court order requiring compliance.

A52-56. After briefing and a hearing, the district court ordered Appellants to

comply with the Subpoenas because (a) "the plain language of Rule 150 permits

---

[12] Although it need not do so to rule in the Commission's favor as other evidence is
more than sufficient, this Court can properly consider details about Kwon's
speeches shown in the YouTube video links and information about Terraform
employees on LinkedIn. *See Mirlis v. Greer*, 952 F.3d 51, 63 n.11 (2d Cir. 2020)
("although these [particular] blog posts were not brought to the attention of the
District Court, the fact that Dressler maintained a blog on which he posted
extensively about Greer was raised by Greer's counsel and by Dressler himself.
The court was entitled to take judicial notice of Dressler's blog posts, as are we.")
(internal citation omitted). Here, that Kwon spoke at the New York City
conference where he was served, Terraform employees generally (and Kwon
specifically) regularly spoke to U.S. media, and Terraform had several U.S.
employees were all discussed extensively before the district court. *See, e.g.,* A58-
59, ¶¶4-5 and A67, ¶¶27-28; SA2-3, ¶¶6-7. Accordingly, this Court may take
judicial notice of the specific publicly available website posts cited herein. *See
Mirlis*, 952 F.3d at 63 n.11; *see also 23-34 94th St. Grocery Corp. v. New York City
Bd. of Health*, 685 F.3d 174, 183 n.7 (2d Cir. 2012) (taking judicial notice of
information posted on a publicly available website). Judicial notice is particularly
appropriate here where the Commission is not pointing to these websites for the
truth about the claims made by Kwon and other Terraform employees in these
websites; rather it is merely to show what they are claiming (and to whom) in their
public posts. *See Force v. Facebook*, 934 F.3d 53, 59 n.5 (2d Cir. 2019) (taking
judicial notice of information found on websites to show defendant's stated
representations, not for the truth of whether those representations are accurate).
And Appellants cited to multiple websites not directly before the district court. *See,
e.g.,* Br. 1 n.2 and 32.

the service that was made here" and Appellants' position "reflects a misreading of SEC rules;" and (b) "there is specific personal jurisdiction with respect to both Kwon and Terraform because they purposely availed themselves of the privilege of doing business in the United States in several respects that are directly causally connected to the basis for the subpoena[s] at issue here." A218 at 40:5-6, 10-11, and 14-18.

Appellants sought a stay of the district court order pending appeal. A169-72. After briefing, the district court denied Appellants' motion because they were not "likely to prevail on the merits of an appeal" and the balance of harm did not weigh in favor of a stay. SA28. Appellants filed an emergency motion with this Court seeking a stay, which was denied. A225. Their broader stay request pending appeal was likewise denied. ECF 47 (March 11, 2022).

## ARGUMENT SUMMARY

At a digital asset conference in New York, a process server hand-delivered to Kwon Enforcement subpoenas directed to Kwon and Terraform. Commission Rule of Practice 150(d) [17 C.F.R. § 201.150(d)] permits investigative subpoenas to be served by hand. Appellants' interpretation that service on counsel was required, despite counsel's unwillingness to accept service, contradicts the plain text of the Commission's rules. The Rules do not permit a party to have counsel

14

appear in a capacity that precludes direct service on the party, while that counsel declines to accept service.

Rule 150(b), upon which Appellants rely, states:

> Whenever service is required to be made upon a person represented by counsel who has filed a notice of appearance pursuant to § 201.102, service shall be made pursuant to paragraph (c) of this section upon counsel, unless service upon the person represented is ordered by the Commission or the hearing officer.

17 C.F.R. § 201.150(b).

Rule 150(b) applies only to "a person represented by counsel *who has filed a notice of appearance.*" (italics added). Counsel for Appellants, Dentons, never "filed a notice of appearance," never designated an address *for service*,[13] and has declined to accept service. Therefore, Rule 150(b) did not require service on counsel and service on Kwon was all that was required to effect service under Rules 150(c) and (d).

Alternatively, Enforcement validly effected service by emailing the Subpoenas to counsel at Dentons. Rule 150(b) states, "*Whenever* service is required to be made [on counsel] . . . service shall be made pursuant to paragraph (c) of this section upon counsel, *unless* service upon the person represented is ordered by the Commission or a hearing officer." (italics added). Rule 150(c)

---

[13] *See* 17 C.F.R. § 201.102(d) ("Designation of address for service; notice of appearance; power of attorney; withdrawal").

states service "shall be made electronically," which Enforcement did by email, and neither the Commission nor a hearing officer ordered service upon Appellants.

Appellants' jurisdictional arguments are equally without merit. Enforcement personally served Kwon while he was in New York. Moreover, Kwon and Terraform have extensive contacts with the United States that relate to the Mirror Protocol Investigation and provide specific jurisdiction, including extensive efforts to promote the Mirror Protocol to U.S. consumers, a significant number of U.S. users, multiple U.S. employees who work on the Mirror Protocol, and multiple contracts relating to the Mirror Protocol with U.S. entities.

Appellants brief *simply disregards* these critical contacts and rests on a straw man argument that the Commission predicates jurisdiction only on (a) activities relating to Terraform and/or the mAssets and MIR tokens being listed on U.S. registered national securities exchanges; and (b) a sponsorship deal with the Washington Nationals baseball team. Neither Terraform nor the mAssets nor MIR tokens are listed on U.S. registered national securities exchanges, and the failure to register these digital assets as securities is one significant issue Enforcement is investigating. Jurisdiction over Appellants is based on personal service on Kwon in New York and Appellants' extensive relevant U.S. contacts.

## STANDARD OF REVIEW

A district court's decision to enforce an administrative subpoena is reviewed for abuse of discretion. *McLane Co. v. EEOC*, 137 S. Ct. 1159, 1169 (2017) (abuse of discretion standard applies even where "the district court's primary role is to test the legal sufficiency of the subpoena").

## ARGUMENT

### I.    Court Review of Administrative Subpoenas Is Limited.

"The courts' role in a proceeding to enforce an administrative subpoena is extremely limited." *RNR Enterprises Inc. v. SEC*, 122 F.3d 93, 96 (2d Cir. 1997) (citation omitted). An administrative subpoena must be enforced so long as (1) the investigation is conducted pursuant to a legitimate purpose; (2) the inquiry is relevant to that purpose; (3) the information sought is not already in the Commission's possession; and (4) required administrative procedures have been followed. *Id.* Only element 4 is at issue here as Appellants challenge service of the Subpoenas and jurisdiction.

### II.    Enforcement Effectively Served Terraform and Kwon.

#### A. Service was proper under the Commission's Rules.

Pursuant to 17 C.F.R. § 203.8, service of subpoenas in formal Enforcement investigations, such as the Mirror Protocol Investigation, must be effected in the manner prescribed by Rule 232(c) [17 C.F.R. § 201.232(c)] of the SEC's Rules of Practice ("Rules"). Rule 232(c), in turn, states that service shall be made pursuant

17

to the provisions of Rule 150(b) through (d) [17 C.F.R. §§ 201.150(b)-(d)]. Rule

150(b)-(d) states in relevant part:

> (b) *Upon a person represented by counsel.* Whenever
> service is required to be made upon a person represented
> by counsel who has filed a notice of appearance pursuant
> to § 201.102, service shall be made pursuant to paragraph
> (c) of this section upon counsel, unless service upon the
> person represented is ordered by the Commission or the
> hearing officer.

> (c) *How made.* Service shall be made electronically in
> the form and manner to be specified by the Office of the
> Secretary in the materials posted on the Commission's
> website. Persons serving each other shall have provided
> the Commission and the parties with notice of an email
> address . . .

> (d) *Additional methods of service.* If a person
> reasonably cannot serve electronically, or if service is of
> an investigative subpoena pursuant to 17 C.F.R. 203.8,
> service may be made by delivering a copy of the filing.
> *Delivery* means:

>> (1) Personal service – handing a copy to the person
>> required to be served . . .

(emphasis original).

Rule 150(d) explicitly allows investigative subpoenas to be delivered by

hand-service. That is precisely what Enforcement did when a process server hand-

delivered the Subpoenas to Kwon in New York. Because Enforcement personally

served Kwon, and as CEO he is an authorized agent of Terraform, the Subpoenas

18

were properly served under the Commission's administrative rules and are thus enforceable.[14]

Appellants argue that service upon Kwon was improper because counsel, not Kwon, was the "person required to be served" under Rule 150(d)(1). They contend the obligation to serve counsel derives from Rule 150(b) because counsel represented Appellants in communications with Enforcement before issuance of the Subpoenas. This argument ignores the text of the Rules in two respects.

First, Rule 150(b) does not state service on counsel is required for every represented party; it applies only to "a person represented by counsel *who has filed a notice of appearance pursuant to § 201.102*." (italics added). Dentons never filed a notice of appearance, so the rule does not apply. Appellants argue that counsel "informed [Enforcement] that Dentons represented Mr. Kwon and TFL, and provided his contact information" and that is equivalent to filing a notice of appearance. Br. 20. But that is not "filing" a notice of appearance as required by Rule 150(b). And, if it were, Dentons's purported notice of appearance consented to service electronically, and email service of the Subpoenas to counsel at Dentons

---

[14] *See, e.g., In re Grand Jury Subpoenas Issued to Thirteen Corps.*, 775 F.2d 43, 46 (2d Cir. 1985) ("A corporation may be served through an officer or agent explicitly or implicitly authorized to accept service of process.").

the same day Kwon received the Subpoenas constituted effective service under Rule 150(c).

Second, Rule 150(b) requires filing a notice of appearance *pursuant to Rule 102*. Rule 102(d), in turn, requires counsel to designate an address for service. Although Dentons provided an *address* to the Commission, it did not provide an address *for service* and declined to accept service on behalf of Appellants,[15] and thus did not file an appearance *pursuant to Rule 102*. Accordingly, Rule 150(b)'s obligation to serve counsel did not attach and direct service to Kwon was proper under Rule 150(d).[16] And, if providing an address could be construed as tantamount to designating an address *for service* as required by Rule 102(d), then email service to counsel at Dentons constituted effective service under Rule 150(c).

---

[15] Appellants assert that they quoted from Rule 102 "in relevant part," Br. 17, but they disregard the pertinent language in Rule 102(d) that requires "Designation of address for service."

[16] Counsel who files a notice of appearance through the Commission's electronic filing system automatically consents to receive service electronically (unless also filing a certificate explaining why counsel "reasonably could not comply with the electronic service requirement," whereby counsel agrees to accept service by other means), which is why Rule 102(d) indicates one must provide email and other contact information *for service*. *See* Amendment to the Commission's Rules of Practice, 85 Fed. Reg. 86464, 86473 (Dec. 30, 2020). Appellants are simply incorrect that the Commission's Rules allow counsel to file a notice of appearance pursuant to Rule 102 without agreeing to accept service.

## B. Appellants misinterpret the Commission's Rules.

Appellants argue that during an investigation there is no formal docket where counsel can "file" a notice of appearance, and Rule 150(b) has meaning in investigations (in accordance with Rule 232(c)) only if their representation of Appellants and provision of contact information to Enforcement without agreeing to accept service somehow constituted "filing" a notice of appearance. Br. 18. That argument fails for two reasons. First, in some circumstances investigative subpoenas *are* served after an administrative proceeding has commenced and there *is* a docket to file a notice of appearance. *See* 17 C.F.R. § 201.230(g). Second, there is a far more contextual and common sense interpretation of the Rules as they apply to investigative subpoenas that would not vitiate parts of Rule 150, as would Appellants' strained reading.

First, pursuant to 17 C.F.R. § 201.230(g) ("Issuance of investigatory subpoenas after institution of proceedings"), Enforcement may issue investigative subpoenas after the commencement of an administrative proceeding. Thus in some circumstances an attorney who has filed a notice of appearance in an administrative proceeding may receive service of an investigative subpoena on behalf of a client. *See, e.g., In re Ferrer & Ortiz*, Exchange Act Release No. 706, 2012 WL 8704497, at \*\*2-3 (June 13, 2012) (permitting issuance of investigative

21

subpoena to respondent in a pending administrative proceeding).[17] When

Enforcement issues an investigative subpoena in a matter for which an

administrative proceeding has commenced (such as *Ferrer*), then pursuant to Rule

150(b) Enforcement is required to serve the investigative subpoena on counsel

(who had filed a notice of appearance) unless the Commission or a hearing officer

ordered otherwise. This straightforward interpretation comports with the text and

gives meaning to Rule 150(b) in the context of investigative subpoenas.[18]

Second, Dentons never indicated in any way that it would accept service on

behalf of Appellants. To the contrary, appellants contend that service on counsel

was ineffective because counsel did not agree to accept it. Accordingly, the

absence of a formal docket for filing a notice of appearance in the investigative

context is not pertinent here, as at least theoretically might be the case if a party

had provided some form of notice of willingness to accept service and the

adequacy of that notice were the issue.

---

[17] *See also In re China-Biotics, Inc.*, Exchange Act Release No. 70800, 2013 WL 5883342, at *18 n. 131 (Nov. 4, 2013) (Rule 230(g) permitted investigative subpoena after institution of administrative proceedings).

[18] *See, e.g., Digital Realty Trust Inc. v. Somers*, 138 S. Ct. 767, 780 (2018) (a provision has meaning even if the number of people affected by it is "relatively limited").

Moreover, Appellants' interpretation would nullify portions of the Commission's Rules. It would read out the provision that Rule 150(b) applies only to "a person represented by counsel *who has filed* a notice of appearance pursuant to § 201.102." (italics added). It would also disregard Rule 102(d)'s requirement that a person appearing before the Commission in a representative capacity designate an "address for service."[19] 17 C.F.R. § 201.102(d).

### C. Appellants' interpretation is illogical and would turn common practice on its head.

Appellants' contention that service on Kwon was ineffective because counsel had to be served, even though counsel never filed a notice of appearance and declined to accept service, presents a classic "heads-I-win, tails-you-lose" situation, an absurd result that is plainly inconsistent with the intent and text of Rule 150. *See, e.g., U.S. v. Venturella*, 391 F.3d 120, 126 (2d Cir. 2004) ("A statute should be interpreted in a way that avoids absurd results.") (internal citation omitted).

The intent of Rule 150 and the Rules more broadly is clear on their face. If a person or entity is represented by counsel who will accept service, service should be made on counsel. Otherwise, service can be made directly.

---

[19] It would also disregard the statement in Rule 150(b) that "[w]henever" service is required to be made on counsel, it "shall be made pursuant to paragraph (c) of this section," which requires electronic service. *See infra* at 26-27.

23

The Commission's Rules of Practice, including Rule 150, were designed in significant ways to mirror the Federal Rules of Civil Procedure. *See, e.g.,* Rules of Practice, 60 Fed. Reg. 32,738, 32,750 (June 23, 1995). It is routine in federal practice to serve a complaint or subpoena directly if an attorney declines to accept service, without obtaining a court order.[20] *See, e.g., Thornapple Assoc., Inc. v. Sahagen*, 2007 WL 747861, at *7 (S.D.N.Y. March 12, 2007) (serving directly where counsel refused to accept service); *Colby v. Town of Henniker*, 2001 WL 274780, at **1-2 (D.N.H. Feb. 15, 2001 (same).[21]

Statements in the Commission's rule releases further demonstrate that filing a notice of appearance pursuant to Rule 102(d) requires agreeing to accept service.

---

[20] The routine act of using a process server to effectuate direct service when counsel will not accept service is not an ethical violation, as Appellants suggest, *see* Br. 27. *See, e.g., Staples v. Guardian Auto Glass, LLC*, 2012 WL 2192235, at *3 (E.D. Va. June 14, 2012) (rejecting suggestion that personal service was improper where counsel refused to accept service); *Reddy v. Buttar*, 2020 WL 2134191, at *2 (W.D.N.C. May 5, 2020) (personal service when counsel refused was "beyond reproach"); *see also Rest. (Third) Law Governing Lawyers* § 99 comment g ("law commonly provides for service of process on a defendant, even in instances where the lawyer for the plaintiff knows that the defendant is represented by a lawyer in the matter").

[21] A party must obtain a court order allowing alternative service only *if* unable personally to serve a party. *See, e.g., Blundell v. Cty. of Los Angeles*, 2009 WL 2486522, at *5 (C.D. Ca. Aug. 12, 2009) (it was improper to rely on alternative service when plaintiffs had "not shown that service could not be made personally" on defendants); *Fed. Home Loan Mortgage Corp. v. Steinfeld*, 1992 WL 428852, at *3 (E.D.N.Y. Dec. 30, 1992) (ordering alternative service after efforts at personal service failed and attorney refused to accept service).

*See* Amendments to the Commission's Rules of Practice, 85 Fed. Reg. 86464 at

86474 ("Consistent with the introduction of electronic filing and service, we

proposed to amend Rule 102(d) to require that both a mailing address and an email

address must be provided under paragraphs (d)(1), (d)(2), and (d)(4)"); Rules of

Practice, 60 Fed. Reg. at 32751 ("Where a party is represented by counsel who has

filed a notice of appearance, service ordinarily shall be made on counsel.");[22] *see*

*also* https://www.sec.gov/efapdocs/instructions.pdf, at p. 3 ("Rule 102(d) requires

you to provide an email address for service.").

Finally, to the extent there is any ambiguity in the Rules, "the SEC's

interpretation is reasonable and not plainly erroneous or inconsistent with the

regulation," and thus is entitled to deference. *SEC v. Alpine Sec. Corp.*, 982 F.3d

68, 77 n.34 (2d Cir. 2020) (citation omitted); *see also Doe v. SEC*, __ F.4th __,

2022 WL 880243, at *4-6 (D.C. Cir. Mar. 25, 2022) (deferring to the

Commission's reasonable interpretation of its whistleblower rule "in accordance

with the United States Supreme Court's holding in *Kisor v. Wilkie*, 139 S. Ct.

2400, 204 L.Ed.2d 841 (2019)").

---

[22] The statement in the rule release cited by Appellants does not change this conclusion. *See* Br. 18. The proposed rule would have allowed direct service "provided that counsel is *also served*." Proposed Rules of Securities and Exchange Commission, 58 Fed. Reg. 61732-01, 61738 (Nov. 22, 1993) (italics added). The final rule instead permitted only service on counsel, unless ordered otherwise, which is consistent with Fed. R. Civ. Pro. 5(b). The statement is irrelevant to a situation where counsel declines to accept service.

25

**D. Alternatively, service was proper under Rule 150(b) and (c).**

If *arguendo* Appellants are correct that Rule 150(b) obligated service upon counsel, then Enforcement met that burden by emailing the Subpoenas to counsel. Rule 150(b) states:

> *Whenever* service is required to be made upon a person represented by counsel who has filed a notice of appearance pursuant to § 201.102, service *shall be made* pursuant to paragraph (c) of this section upon counsel, *unless* service upon the person represented is ordered by the Commission or the hearing officer.

(italics added).

Rule 150(c) provides that "[s]ervice shall be made electronically." Enforcement emailed counsel the Subpoenas the same day Kwon was hand-served. Neither the Commission nor a hearing officer ordered service be made on Appellants directly. Therefore, *if* service were required to be made upon counsel under Rule 150(b), then emailing the Subpoenas to counsel effected service pursuant to Rules 150(b) and (c).

Appellants contend that counsel was not authorized to accept service and therefore Enforcement *had* to get an order from the Commission to effect service. Br. 5. But Rule 150(b) does not say Enforcement *must* get an order to serve a party directly if counsel declines to accept service. It says *unless* the Commission orders otherwise, service shall be made on counsel via email. Appellants further contend that service on counsel was ineffective under Rule 150(c) because Enforcement's

26

cover email stated the Subpoenas were served personally on Kwon and "did not purport to have effected service by being sent to Dentons." Br. 11. There are no magic words required with transmittal of subpoenas; Rule 150(e) states that "[e]lectronic service is complete upon transmission." Once the Subpoenas were transmitted via email (with or without any cover message) service was effective.

### E. Appellants' various other arguments regarding service are without merit.

#### 1. Appellants are not being punished for their (limited) voluntary cooperation.

Appellants argue that the Commission's "interpretation of Rule of Practice 150(b) would deny its protections to all individuals under investigation who choose to cooperate voluntarily with the assistance of counsel." Br. 22. Their argument is backwards. It is only because Dentons represented Appellants during their limited voluntary cooperation that they have even a fig-leaf of an argument that Enforcement had to serve counsel under Rule 150(b). Without such cooperation, there could be no question Appellants could have been served directly.

Appellants' similar suggestion that Terraform's cooperation as a foreign entity enabled the Commission to avoid seeking documents through the International Organization of Securities Commissions ("IOSCO") is also incorrect. First, the Commission had no obligation to work through international treaties and properly served Kwon in New York. *See First Am. Corp. v. Price Waterhouse*

*LLP*, 154 F.3d 16, 21 (2d Cir. 1998) (holding service on a foreign-based partner while on a business trip was proper because the "Hague Convention is not the exclusive means for obtaining discovery from a foreign entity. Nor is the Convention necessarily the means of first resort.") (internal citation omitted). Kwon's decision to come to New York on a business trip facilitated service of the Subpoenas without reliance on IOSCO, not his limited cooperation.[23] Second, Appellants' nationality is irrelevant for the interpretation of Rule 150. Appellants' argument would mean that, if an American individual or company took the same position as Appellants (being represented to block direct service, but counsel declining to accept service), Enforcement would have no means (at least without direct Commission intervention) to serve a subpoena because IOSCO (or similar international conventions) would be unavailable.

### 2. The Commission does not require counsel to accept service to represent a client in an investigation.

Appellants mistakenly contend the Commission's interpretation would require counsel in an investigation to accept service on behalf of a client. *See* Br. 24. Dentons has represented (and continues to represent) Appellants in

---

[23] Appellants' contention that "the SEC cannot serve administrative subpoenas outside the United States, although it can obtain information through cooperative agreements with foreign regulators or through voluntary arrangements with foreign nationals" is irrelevant because the Subpoenas were served in New York, not outside the United States. *See* Br. 2-3.

Enforcement's investigation without ever agreeing to accept service of the Subpoenas. Nor does the Commission contend "that Appellants had authorized Dentons to accept service of process on their behalf." *Id.* Rather, because Dentons did *not* agree to accept service, Enforcement served Appellants directly under Rule 150(d). Counsel has continued to represent Appellants without accepting service, but cannot use that representation to block direct service on Kwon and Terraform.

### 3. This case presents no Constitutional concerns, nor has the Commission exceeded its authority.

Appellants claim that this matter "presents significant constitutional concerns" because the district court purportedly held that filing a notice of appearance constitutes acceptance of jurisdiction. Br. 25. This mistaken argument relies on a truncated quote from the district court. *See* A186 at 8:23-24 (the district court stating, "But when you file a notice of appearance, you are agreeing to the jurisdiction. *You can't reject service then*.") (italics added). The Commission has argued that filing a notice of appearance *pursuant to Rule 102* means that counsel is agreeing to accept *service* of documents. That is the point with which the district court agreed. As will be discussed below, the district court did not rely on any notice of appearance by counsel to exercise *jurisdiction* over Terraform and

Kwon. *See* A218-19 at 40:20-41:20 (laying out seven examples of contacts that permitted exercise of jurisdiction over Terraform and Kwon).[24]

### 4. The Commission is not trying to amend its rules, nor does its interpretation contradict earlier interpretations.

Appellants state that "the SEC cannot use a litigation interpretation to amend" Rule 150. Br. 24. But that is irrelevant because the Commission is not seeking to amend the rule. It is merely interpreting the existing rule in accordance with its text and plain intent, and common sense.[25]

Finally, Appellants contend with no factual support that the district court merely deferred to the Commission's interpretation of Rule 150. *See* Br. 22. But the district court reached its conclusion based on the plain language of the Rule.

---

[24] Finally, discussing *FTC v. Compagnie De Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300 (D.C. Cir. 1980), Appellants appear to argue that the Commission exceeded Congressional authority in how it issued the Subpoenas. Br. 23. *Compagnie* is irrelevant, however, as the "sole issue to be resolved . . . [was] the propriety of the technique employed by the FTC to serve its subpoena abroad namely, registered mailing to a foreign citizen on foreign soil." 636 F.2d at 1306.

[25] The Commission's interpretation is not contradicted by a reply brief filed in 2013. *See* Br. 21-22. The SEC stated there (just as here) that counsel was required to *accept service of the subpoena* for Rule 150(b) to be given effect. *Id*. at 13. In that case, counsel to a party agreed to accept service of a subpoena, then the party sought to renege on that agreement years after service was effected. *Id*. at 13-15. The Commission argued that counsel *could* make an appearance and agree to accept service under Rule 150(b). That is precisely what the Commission argues here. The 2013 brief has no application here, where Dentons has declined to accept service. *See generally PETA v. USDA*, 861 F.3d 502, 511 n.5 (4th Cir. 2017) (determining statement made in reply brief in earlier litigation was not inconsistent after looking at the "context" in which it was made).

*See* A218 at 40:5-6 ("I think the plain language of Rule 150 permits the service that was made here."). And if the district court had chosen to defer to the Commission's interpretation of the Rule, that would have been proper for the reasons discussed *supra* at 25.

## III. There is jurisdiction over Terraform and Kwon.

Because this is a subpoena enforcement action, the Commission need not prove it has jurisdiction over Appellants (although it has); it only must show a "reasonable probability" that it can establish jurisdiction. *Marc Rich & Co., A.G. v. U.S.*, 707 F.2d 663, 670 (2d Cir. 1983) (enforcing subpoena); *see also SEC v. Lines Overseas Mgmt., Ltd.*, 2005 WL 3579139, at *2 (D.D.C. Jan. 4, 2006) ("The burden the SEC must carry to show personal jurisdiction [in a subpoena enforcement matter] is not a heavy one. All that is required is a showing of a reasonable probability that personal jurisdiction can ultimately be established.").

### A. This Court has jurisdiction over Kwon because he was served in New York.

Kwon was served in New York while availing himself of the benefits of conducting business in the jurisdiction. Therefore, it is black-letter law that the Court has personal jurisdiction over him because he was personally served with process and "found" in that jurisdiction. *See In re Edelman*, 295 F.3d 171, 179 (2d Cir. 2002) ("when a potential witness comes to the United States it is neither unfair nor inappropriate under the statute to undertake his discovery here"); *Kidder,*

31

*Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991)

("[Exchange Act] Section 27 [15 U.S.C. § 78aa] confers personal jurisdiction over

a defendant who is served anywhere within the United States.").

### B. The Court has specific jurisdiction over Kwon and Terraform.

There are three conditions that must be met for specific jurisdiction over a

nonresident: "First, the defendant must have purposefully availed itself of the

privilege of conducting activities in the forum State or have purposefully directed

its conduct into the forum State. Second, the plaintiff's claim must arise from or

relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must

be reasonable under the circumstances." *U.S. Bank Nat'l Assoc. v. Bank of Am.,*

*N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal citations omitted); *see also Chew*

*v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998) ("relatedness test is but a part of a

general inquiry which is designed to determine whether the exercise of personal

jurisdiction in a particular case does or does not offend traditional notions of fair

play and substantial justice") (internal citation omitted).

Kwon and Terraform have availed themselves of the privilege of conducting

business in the United States and directed their conduct towards the United States

relating to the Mirror Protocol in a myriad of ways, making exercise of jurisdiction

over them entirely reasonable. Their substantial contacts with the United States

related to the Mirror Protocol include:

32

- Kwon and Terraform promote the Mirror Protocol, mAssets, and the MIR token through Terraform's publicly-accessible website, web application, social media accounts, podcast interviews, and through the U.S. Media. *See, e.g.,* A60-61, ¶9; SA2-3, ¶¶5-7.

- Approximately 15% of users of the Mirror Protocol come from the U.S. SA2, ¶5.

- Terraform employs numerous employees in the United States, including its General Counsel. A59, ¶ 4.[26] These U.S.-based employees are directly involved in the promotion of the Mirror Protocol and mAssets to U.S. investors via U.S. media sources. SA2-3, ¶¶5-7.

- Kwon corresponded with a U.S. digital asset trading platform and discussed listing of MIR tokens, leading to a contract between Terraform and the U.S.-based trading platform for the listing of MIR tokens with the platform. A60-61, ¶9.

- Kwon signed an agreement with a U.S.-digital asset trading platform on behalf of a wholly owned Terraform subsidiary under which the U.S. digital asset trading platform paid the Terraform subsidiary at least $200,000 for MIR tokens. SA2, ¶ 3.

- Kwon, in his capacity as the co-founder and CEO of Terraform, attended the digital asset conference in New York where he was served. A59, ¶5 and A67, ¶¶27-28.[27]

- Terraform entered into a 2019 Custodial Services Agreement with a New York-based trust by which Terraform agreed to pay the U.S.-based entity to store digital assets on Terraform's behalf. SA2, ¶4.

---

[26] In fact, Terraform has significantly expanded its number of U.S.-based employees and is continuing to hire in the U.S. *See supra* at 7 n.6.

[27] Kwon's multiple speeches at the conference and at an event later that night promoted Terraform generally and the Mirror Protocol specifically. *See supra* at 12-13 and n.11.

33

- mAssets are intended to mimic U.S. securities and ETFs listed on U.S. national securities exchanges, e.g., Apple and Tesla stocks.  A59-60, ¶ 6.[28]

- The Washington Nationals baseball team announced a five-year, nearly $40 million agreement by which Terraform will become one of its main sponsors with advertisements around the stadium, including right behind home plate.  *See* https://curlyw.mlblogs.com/nationals-terra-create-first-ever-sports-partnership-with-decentralized-autonomous-organization-20843cc704d3 (quoting Kwon discussing the sponsorship deal); *see also* A210 at 32:3-6; Br. 32 (citing to a different article about the sponsorship).

This Court and others have regularly found far less substantial contacts sufficient to exercise jurisdiction.  *See, e.g., Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 169 (2d Cir. 2015) (defendant's "three purposeful contacts with New York meet the 'minimum contacts' test"); *EMI Christian Music Group, Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016) (individual defendant knew his company "had at least 400 users in New York and that his company provided services to New York customers" and "attempts to serve a nationwide market constitute evidence of [the defendant's] attempt to serve the New York market, albeit indirectly") (internal citation omitted).[29]

---

[28] *See also* https://mirrorprotocol.app/#/trade (showing mAssets for many other major U.S. companies and indices available for trading).

[29] The court further held that it was appropriate to impute the company's contacts to the founder and CEO of the company.  *Id.*

34

In the present case, not only did Kwon and Terraform attempt to serve a worldwide market indirectly targeting the United States, but they also made concerted efforts to target U.S. consumers directly through U.S. media (conventional and otherwise) and those efforts have resulted in a significant number of U.S. users of the Mirror Protocol. For example, Kwon regularly spoke to U.S. media about mAssets and the Mirror Protocol and he came to New York to promote the business. A59-61, ¶¶5, 9. Similarly, the company's U.S.-based Director of Special Projects and other U.S. employees promoted these products in interviews and other means of media outreach. SA2-3, ¶¶6-7. And Terraform has become a main sponsor of the Washington Nationals, an effort that will reach almost exclusively a U.S. audience. *See* A210 at 32:3-6; Br. 32. Many courts addressing digital asset and securities companies have exercised jurisdiction because of such targeting of U.S. consumers. *See Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 350 (S.D.N.Y. 2019) (exercising specific personal jurisdiction over co-founders of digital asset company when they "targeted the U.S. market in an effort to promote the sale of ATB coins, the very unregistered security at issue in this litigation"); *Owen v. Elastos Foundation*, 2021 WL 5868171, at *8 (S.D.N.Y. Dec. 9, 2021) (finding specific jurisdiction where the "Amended Complaint contains numerous allegations related to [defendant's] promotion of Elastos and ELA Tokens in the United States"); *SEC v. PlexCorps*, 2018 WL

35

4299983, at *10, 19 (E.D.N.Y. Aug. 9, 2018) (Commission made a *prima facie*

showing of jurisdiction over a digital asset company when the company "created

contacts with the United States by, among other things, doing business while

traveling in the United States, utilizing United States–based payment services, and

marketing their products to United States consumers via the Internet"); *see also*

*SEC v. Carrillo*, 115 F.3d 1540, 1544 (11th Cir. 1997) ("the advertisements were

'related to' the causes of action because the advertisements were a means by which

[defendant] offered and sought to sell its unregistered securities to potential

American investors"); *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 365 (3d Cir.

2002) ("by sponsoring ADRs that are actively traded by American investors,

Roche purposely availed itself of the American securities market and thereby

evidenced the required minimum contacts with the United States").[30]

Cases addressing the analog world similarly have held that efforts to target

specifically consumers in the jurisdiction are a basis for exercising personal

jurisdiction. *See, e.g., Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 980-81 (9th

Cir. 2021) (through social media posts defendant "targeted its promotional

materials specifically towards the United States" resulting in 10% of users coming

---

[30] *Pinker* concerned American Depositary Receipts ("ADRs") that allow American investors to indirectly invest in foreign stocks without owning the underlying security. Similarly, mAssets allow American investors to invest in stocks of American companies indirectly without owning the underlying security.

from the U.S. and finding jurisdiction even where the company had no U.S. employees); My*ers v. Casino Queen, Inc.*, 689 F.3d 904, 913 (8th Cir. 2012) (prominent advertisement at professional baseball stadium constituted targeted effort to attract customers from the jurisdiction); *uBid, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 429 (7th Cir. 2010) (it "would be reasonable for such a company to expect to be sued there [given national and Illinois-specific marketing] [even though] GoDaddy's way of doing business allows it to avoid the type of physical presence that makes these questions easier when dealing with non-Internet companies").

Although *uBid* recognized that jurisdiction may exist over some technology companies even when they do not have a physical presence in the jurisdiction, Terraform has a physical presence here with multiple employees in the U.S. who directly work on and promote mAssets and the Mirror Protocol. *See, e.g., Goldfarb v. Channel One Russia*, 442 F. Supp. 3d 649, 664 (S.D.N.Y. 2020) (exercising personal jurisdiction over a Russian entity that "purposefully availed itself of the privilege of conducting business within the forum state by maintaining a studio and at least one full-time employee in New York and by distributing its programming to paying subscribers throughout New York").[31]

---

[31] *See also Ratledge v. Norfolk Southern Ry. Co.*, 958 F. Supp. 2d 827, 833 (E.D. Tenn. 2013) (exercising jurisdiction over company that had "at least three Tennessee employees, including a sales agent").

Terraform also has multiple contracts with U.S. entities relating to the Mirror Protocol. For example, after extensive direct involvement by Kwon, Terraform and a U.S.-based digital trading platform entered into a contract through which the platform lists MIR tokens for trading, including to U.S. investors. A60-61, ¶9; *see also* SA2, ¶¶3-4 (discussing additional contracts with U.S. entities for the sale and storage of digital assets). These contractual contacts also support exercise of jurisdiction. *See, e.g., U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.*, 241 F.3d 135, 152-53 (2d Cir. 2001) (defendants "'purposely availed itself' of the United States forum by negotiating and forming a contract with an American corporation located in New York" and using a broker in Connecticut to negotiate with plaintiffs' U.S. employees); *M. Shanken Commc'ns, Inc. v. Cigar500.com*, 2008 WL 2696168, at **8-9 (S.D.N.Y. July 7, 2008) (finding jurisdiction comported with due process when defendant entered into a contract with a party in the forum, among other contacts, and had 10 percent of sales in the forum, even though defendant did not have any employees in the forum, advertising did not specifically target the forum, and "the contract was not the direct cause of the present action").

Finally, that mAssets mimic stocks of American corporations and ETFs listed on American exchanges with mostly American investors indicates that the

38

mAssets could have a significant effect on American companies, exchanges, and investors, so that there is a national interest in exercising jurisdiction. *See Pinker*, 292 F.3d at 372 ("we believe that the national interest in furthering the policies of the American securities regulatory system militates in favor of exercising personal jurisdiction over Roche," even though ADRs were not listed on American exchanges); *PlexCorps*, 2018 WL 4299983, at *20 (noting the "'strong federal interests' in pursuing securities cases and protecting domestic investors" in finding jurisdiction over Canadian defendants in case concerning cryptocurrencies) (citation omitted); *Harrington Glob. Opportunity Fund. Ltd. v. CIBC World Mkts. Corp.,* __ F. Supp.3d __, 2022 WL 409089, at *4 (S.D.N.Y. Feb. 9, 2022) (conduct undertaken by Canadian defendants on Canadian exchanges could establish jurisdiction because of the effects on shares listed on a U.S. exchange).

### C. Appellants' jurisdictional arguments disregard their extensive contacts with the United States, and misrepresent the Commission's arguments and the district court's ruling.

Appellants' arguments on jurisdiction amount to little more than disregarding almost all of the bases upon which the district court found jurisdiction. Appellants are completely silent about: the extensive efforts to market the Mirror Protocol to U.S. consumers (other than the Nationals sponsorship); the U.S. employees involved in marketing and other efforts to support the Mirror Protocol; the significant percentage of users in the U.S.; the contracts with U.S.

39

entities concerning the MIR tokens and the Mirror Protocol; and that mAssets
mimic U.S. stocks.

Instead of addressing these contacts, Appellants make a series of puzzling
arguments. First, they contend that Enforcement's efforts to obtain voluntary
cooperation before issuing the Subpoenas somehow proves Enforcement knew it
did not have jurisdiction over Appellants. Br. 28. That Enforcement tried to
obtain documents voluntarily, particularly when the prospect of such cooperation
was repeatedly offered, *see, e.g.,* A64, ¶¶17 and 20, is hardly an admission of lack
of jurisdiction.

Second, Appellants cite a state trial court decision from 1957 for the
proposition that being listed on an American Stock Exchange and having a New
York transfer agent are "not sufficient to support general jurisdiction because such
allegations would subject 'almost every corporation' to general jurisdiction in New
York." Br. 29 (citing *Robbins v. Ring*, 166 N.Y.S.2d 483, 484-85 (Sup. Ct. 1957)).
That is wholly irrelevant here, where the district court held Appellants were subject
to *specific* jurisdiction for reasons unrelated to listing on a U.S. exchange. (The
failure to register the mAssets and MIR tokens is one of the things the Commission
is investigating, and Terraform shares are not listed on a U.S. exchange.)
Moreover, *Robbins* highlighted that the company "has no salesmen, nor agents, nor
representatives, nor any clerical staff whatever within this jurisdiction; it solicits no

orders, makes no sales, and engages in no shipping within the state," *id.* at 485, which easily distinguishes it from the present case where Appellants solicit and make sales in the jurisdiction and have multiple employees in the jurisdiction.[32]

Finally, relying on *Mantello v. Hall*, 947 F. Supp. 92, 97-98 (S.D.N.Y 1996), which involved the New York theater industry, Appellants contend that "the SEC cannot support personal jurisdiction by arguing that certain businesses, by their very nature, result in a person or company being 'present' in the U.S." and that under the Commission's position "virtually any company that chooses to participate in software development[33] relating to digital assets" would be subject to jurisdiction. Br. 30. But the Commission is not saying *any* company or *any* individual in the digital asset space is inherently subject to U.S. jurisdiction. It is merely saying that *a* company and *an* individual with extensive U.S. contacts – including extensive marketing and promotion to U.S. consumers, a significant number of U.S. users, multiple U.S. employees, numerous contracts with U.S. entities, and business trips to the U.S. – are subject to jurisdiction. *Mantello*,

---

[32] *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000), cited Br. 29 n.13, actually undercuts Appellants' position. *Wiwa* held that there was jurisdiction because defendant's contacts were not "merely 'incidental'" to the stock exchange listing and reflected a choice to establish a broader relationship with New York. *Id*. at 97. Kwon and Terraform made the same choice.

[33] Of course, whether Terraform is just "a software company, not a securities issuer," Br. 30, is something the Commission is investigating and Terraform has not argued that the Commission lacks the authority to investigate this issue.

41

where defendants had no "employees in New York . . . [and never] solicit[ed] business or advertise[d] in New York" is readily distinguishable from this case. 947 F. Supp. at 97.

### D. The district court did not err in considering the Nationals sponsorship.

The district court laid out seven different types of contacts with the United States that warranted jurisdiction over Appellants.  A218-20 at 40:20-42:8. Appellants complain that it was improper to consider one of these contacts, the Nationals sponsorship, "because it was not in the SEC's moving papers."  Br. 31. But the sponsorship agreement was not announced until on or about February 9, 2022, more than a month after the Commission filed its reply brief.  *See* A4.  It was proper for the district court to consider at the hearing evidence of an event that had not happened at the time of briefing. [34]  *See generally L-Tec Elecs. Corp. v. Cougar Elec. Org.*, Inc., 198 F.3d 85, 88 (2d Cir. 1999) (even after a final judgment new evidence can be considered if it "could not have been discovered earlier through plaintiff's due diligence").[35]

---

[34] Moreover, the Commission did not make incorrect "assertions" about the agreement at the hearing.  *See* Br. 31-32.  The Commission stated what it did (and did not) know about the agreement.  A215-16 at 37:18-20 and 38:6-7 ("we don't have those agreements.  We can only read what is in the press . . . We can't speak with any more specificity on that because we don't have those agreements yet.").

[35] Appellants contend that the stadium sponsorship is "wholly unrelated to TFL," *see* Br. 32, because the Terra Community Trust apparently signed the deal to

Appellants conveniently disregard that Kwon was instrumental in setting up the sponsorship deal and promoting it to the Terraform community to obtain approval. *See, e.g.,* https://agora.terra.money/t/community-funding-proposal-for-redacted-sports-partnership/3962.[36] He similarly discussed the benefits of the deal to Terraform following its announcement. *See, e.g.,* Br. 32 (citing article).

Appellants' contention that the sponsorship is unrelated to the Mirror Protocol fares no better. Terraform will be promoted prominently throughout the stadium and on Nationals branded merchandise, such as t-shirts. The Mirror Protocol is one of Terraform's "flagship applications," SA3, ¶7 (citing the Medium article where the statement was made), and incorporates use of the Terraform stablecoin. *See supra* at 12-13 and n.11. Driving brand recognition of Terraform will drive recognition of mAssets and the Mirror Protocol—just as a prominent McDonald's advertisement would help drive hamburger (and other product) sales.

---

obtain the sponsorship for Terraform. Terraform's name (or shorthand "Terra," as Terraform is often referred) will be plastered throughout the stadium as a result of the agreement. One would not say that prominent Coca-Cola advertisements are unrelated to the drink company because a related (or even unrelated) entity, and not Coca-Cola, Inc., signed the sponsorship deal. Nor would an advertisement for the 'King of Beers' be unrelated to Anheuser-Busch, Inc. because the full, formal name of the company is not used.

[36] It is similarly incorrect to say that the Terra Community Trust has no relationship to Terraform (or Kwon) because it "is directed solely by the Terra community." Br. 32. Kwon is undoubtedly the de facto leader of the Terra community and he has significant influence over how the community votes.

43

The Nationals sponsorship more than adequately relates to mAssets and the Mirror Protocol for it to be considered in the specific jurisdiction analysis, particularly given the extensive contacts that exist. *See Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 167 (2d Cir. 2010) (vacating district court judgment finding no jurisdiction because it "too narrowly construe[d] the nexus requirement, which merely requires the cause of action to 'relate to' defendant's minimum contacts with the forum").

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order granting the Commission's motion to compel Appellants to produce documents and for Kwon to appear for testimony before officers of the Commission.[37]

Dated: March 29, 2022

Respectfully submitted,

   /s/   Eric Reicher
TRACEY L. SASSER
SAMUEL M. FORSTEIN
ERIC A. REICHER

Office of the General Counsel
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-9612
(202) 551-7921
reichere@sec.gov

*Counsel for Appellee United States Securities and Exchange Commission*

---

[37] Should this Court vacate the district court's decision, it should remand to allow the district court to address the proper remedy.

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because it contains 10,550 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

I also certify that this motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it uses a proportionally spaced, 14-point New Times Roman typeface.


    /s/   Eric Reicher        

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 29, 2022, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF System, which will send

notice of such filing to parties and counsel of record registered to receive notice of

electronic filings.


    /s/   Eric Reicher